**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

GUILFORD COLLEGE, GUILFORD
COLLEGE INTERNATIONAL CLUB,
THE NEW SCHOOL, FOOTHILL-DE
ANZA COMMUNITY COLLEGE
DISTRICT, *and* HAVERFORD COLLEGE,

       *Plaintiffs*,

    v.

KIRSTJEN NIELSEN, U.S.
DEPARTMENT OF HOMELAND
SECURITY, L. FRANCIS CISSNA, *and*
U.S. CITIZENSHIP AND IMMIGRATION
SERVICES,

       *Defendants*.

Civil Action No.: 18-891

**COMPLAINT**

## COMPLAINT

Plaintiffs Guilford College, Guilford College International Club, The New School,

Foothill-De Anza Community College District, and Haverford College bring this Complaint

against Defendants Kirstjen Nielsen, in her official capacity as Secretary of Homeland

Security; the U.S. Department of Homeland Security ("DHS"); L. Francis Cissna, in his

official capacity as Director of U.S. Citizenship and Immigration Services; and U.S.

Citizenship and Immigration Services ("USCIS"). Plaintiffs allege as follows.

## INTRODUCTION

1.     The United States is a center of global education. Because many of the world's

leading colleges, universities, and research institutions are located here, more than a million

individuals travel to the United States each year to study and teach. On August 9, 2018,

- 1 -

Defendants adopted a new policy that is purposefully designed to impose three- and ten-year bars to reentry on tens of thousands of these individuals. This policy is a massive reconfiguration of the immigration laws relating to higher education.

2.    In 1996, Congress created the concept of "unlawful presence" and established a penalty for individuals who are "unlawfully present" in the United States. An individual who is unlawfully present for more than 180 days is barred from reentering the United States for a period of three years. An individual who is unlawfully present for a year or more is barred from reentering for ten years. These reentry bars are typically not subject to any judicial review. And, because these reentry bars preclude an individual from lawfully entering the United States for any purpose for a lengthy period of time, they fundamentally disrupt the personal and professional lives of those affected, as well as the missions of affected organizations and institutions.

3.    In 1997, the United States adopted a clear policy governing the implementation of this statute. Recognizing that the determination of whether an individual is "unlawfully present" in the United States is complex and will often turn on administrative discretion, the United States established objective rules that provided visa holders notice. If the authorized period of stay ended on a date certain on which the individual was required to leave the country, unlawful presence began following that date. And for all individuals, unlawful presence began the day after either a government official or immigration judge made a determination that the individual was out-of-status. This provided well-intentioned individuals an opportunity to cure their circumstances and remain in the country—or to depart the country within 180 days. Either way, individuals acting in good faith had an opportunity to avoid imposition of a three- or ten-year reentry bar.

4.     The United States reaffirmed this policy for more than two decades, including via a May 2009 Policy Memorandum. *See* Ex. C.

5.     The vast majority of international students[1] enter the country on F or M visas, while some enter on J visas. Many international researchers, scholars, and professors at higher education and research institutions enter the country on J visas for exchange visitors. In general, when F, J, or M visa holders enter the country, they are not supplied with a date certain on which they must depart. Rather, their visas are valid for the "duration of status," or "D/S."

6.     For more than two decades, the United States has held that the unlawful-presence clock for these individuals begins on the day after a government official or immigration judge adjudicates the individual as out-of-status. That is, unlawful presence begins at the point that an F, J, or M visa holder is provided unequivocal notice that the government believes that the individual is out-of-status.

7.     This policy provided essential notice to F, J, and M visa holders. Technical or inadvertent errors can render an individual unwittingly out-of-status. Moreover, whether an individual is in-status often turns on complex issues subject to varying interpretations, and those adjudications are often at the discretion of USCIS officials.

8.     On August 9, 2018, Defendants issued a new policy memorandum (August 2018 Policy Memorandum, Ex. A). The August 2018 Policy Memorandum fundamentally alters the calculation of unlawful presence for F, J, and M visa holders.

9.     Now, when a government official or immigration judge determines that an F, J,

---

[1]   By "international students," we refer to individuals who are neither U.S. citizens nor lawful permanent residents and who, prior to starting their education, typically resided outside the United States.

or M visa holder is out-of-status, the unlawful-presence clock will be backdated to the day on which Defendants conclude that the visa holder first fell out-of-status. The immigration system is beset with processing delays, and many of these status determinations are made when an individual is applying for new immigration benefits. Thus, the new policy's use of a backdated unlawful-presence clock will render tens of thousands of F, J, and M visa holders subject to three- and ten-year reentry bars without any opportunity to cure.

10. This policy is intentionally designed to impose tens of thousands of reentry bars on F, J, and M visa holders each year.

11. This policy, accordingly, will result in the three- or ten-year banishment of untold numbers of international students and exchange visitors acting in good faith.

12. The imposition of a reentry bar on an international student or exchange visitor has a drastic effect on her life. It will preclude her from completing her degree program, deprive her of employment opportunities, and exclude her from friends and family living in the United States. For those students and visitors who have chosen to teach or work in the United States, imposition of a three- or ten-year reentry bar will fundamentally and irreparably injure their lives. It also imposes a financial harm on institutions in terms of lost tuition dollars and local communities in terms of foregone discretionary expenditures by bias holders.

13. This policy thus drastically injures holders of F, J, and M visas. Moreover, by disrupting the ability of these individuals to continue studying at their schools—or continuing their research, teaching, or other scholarly pursuits—the August 2018 Policy Memorandum fundamentally upsets student-school and employee-school relationships. This results in concrete, significant harms to colleges and universities, including through the loss

- 4 -

of irreplaceable community members, loss of tuition dollars, and loss of trained employees.

14.     This new policy is unlawful for several reasons.

15.     To begin with, Defendants failed to undertake the notice and comment required in these circumstances. Defendants did not publish advance notice of this rule in the *Federal Register*, did not provide reasoned responses to public comments, did not undertake the required Regulatory Flexibility Act analysis, and did not comply with the whole host of requirements imposed by the Administrative Procedure Act ("APA").

16.     The policy is also arbitrary and capricious. Defendants assert that the advent of a computer database in August 2003 justifies the policy change. But Defendants had previously reaffirmed this policy many years after that computer database came online. And the policy is arbitrary and capricious for several other reasons. For example, the August 2018 Policy Memorandum relies on erroneous data and erects arbitrary distinctions among similar classes of individuals.

17.     The policy violates the statutory text. In 1996, Congress created a new concept of "unlawful presence." As Defendants have said in prior memoranda, "unlawful presence" must be understood as distinct from the concepts that previously existed. Because Defendants' new policy is at odds with the statutory text, it is unlawful.

18.     The policy violates protections guaranteed by the Due Process Clause. The August 2018 Policy Memorandum will result in the imposition of three- and ten-year bars on individuals without notice or the opportunity to cure. The Constitution forbids such unforeseeable and arbitrary government conduct.

19.     For these reasons and others, the Court should vacate the August 2018 Policy Memorandum, declare it unlawful, and enjoin Defendants from applying it.

## PARTIES

### Plaintiffs

20.     Plaintiffs in this case include multiple leading higher education institutions. Each school counts as students, employees, and exchange visitors a significant number of individuals who are present in the United States based on an F, J, or M visa.

21.     Plaintiff **Guilford College** is a private, liberal arts college in Greensboro, North Carolina. Guilford was originally founded in 1837.

22.     Guilford currently enrolls approximately 26 students on F-1 visas. Additionally, Guilford has approximately six alumni F visa holders on post-completion optional practical training.

23.     Guilford is required to terminate student I-20s when students fall out-of-status. In view of the August 2018 Policy Memorandum, some I-20 terminations will result in students being saddled with a three- or ten-year reentry bar.

24.     Plaintiff **Guilford College International Club** is a student association at Guilford College.

25.     Guilford College International Club is an unincorporated, voluntary association, and its members include Guilford College students present in the United States on F-1 visas. It has two or more members, and they are joined together by mutual consent for a common, nonprofit purpose.

26.     Guilford College International Club has regular meetings of its members.

27.     Guilford College International Club counts as among its mission the advocacy for the rights of its international student members within the United States.

28.     Plaintiff **The New School** is a private research university located in New York

- 6 -

City. The New School consists of the Parsons School of Design, the Eugene Lang College of Liberal Arts, The New School for Social Research, the Schools of Public Engagement, and the College of Performing Arts.

29.    More than 10,000 students are enrolled at The New School. Over 30 percent of The New School's students are international. The New School features one of the highest—if not the highest—proportions of international students among all higher education institutions in the Nation.

30.    Currently, The New School has among its community approximately 3,600 international students on F-1 visas.

31.    Many of The New School's 3,600 international students have on-campus employment—and are thus employees of The New School—consistent with the terms of the F-visa regulations.

32.    The New School also has roughly an additional 900 F-1 alumni currently completing optional practical training.

33.    The New School has approximately 100 students on J visas and roughly an additional 38 J-1 scholars.

34.    Each year, The New School is obligated to terminate dozens of I-20s because of identified status violations.

35.    In some (if not many) these cases, the August 2018 Policy Memorandum will result in the imposition of a three- or ten-year reentry bar.

36.    Recently, because of the August 2018 Policy Memorandum, a student of The New School left the United States in order to take the correct action to regain her status but subsequently took a semester-long leave of absence out of fear of accruing unlawful-

presence time under the new policy. That fundamentally disrupted the student-university relationship, and The New School lost tuition as a result. But for the August 2018 Policy Memorandum, the student would not have stopped her education with The New School.

37.     Another student at The New School, a doctoral candidate, had an I-20 with a program end date of June 30, 2018. This student has been at The New School since 2012. Because of financial constraints, the student was unable to extend the I-20, as the Designated School Officer was unable to determine that the student could support themselves. To avoid accruing unlawful presence under the August 2018 Policy Memorandum, the student was required to travel in order to restart the I-20, which came at significant cost.

38.     The August 2018 Policy Memorandum has caused The New School to change its policies and practices regarding international students. For example, the new policy has caused The New School to defer advising with respect to students' change-of-status and reinstatement applications. The institution is more likely to refer a student to an outside immigration lawyer. That increases the costs to the students and imposes delay burdens on The New School.

39.     Plaintiff **Foothill-De Anza Community College District** is a public district of community colleges located in Cupertino, California. The district operates Foothill College and De Anza College.

40.     Currently, the Foothill-De Anza Community College District has more than 2,500 international students on F-1 visas.

41.     Each year, the Foothill-De Anza Community College District is required to terminate I-20s when it identifies that students are out-of-status. Under the August 2018 Policy Memorandum, many students identified as out-of-status will be subject to a three- or

ten-year reentry bar. That is because, when Foothill-De Anza Community College District identifies a status violation, sometimes more than 180 days will have elapsed from the underlying facts giving rise to that violation.

42.     Plaintiff **Haverford College** is a private, liberal arts college located in Haverford, Pennsylvania. Haverford was founded in 1833. More than 1,300 students are enrolled at Haverford.

43.     Haverford counts among its community approximately 148 students on F-1 visas. Haverford also has one student on a J visa.

44.     In addition, Haverford has approximately 17 alumni on F visas who are still in the United States during a period of optional practical training.

45.     In response to the August 2018 Policy Memorandum, Haverford has changed its practices regarding international students. It now makes different advising decisions. For example, prior to the August 2018 Policy Memorandum, Haverford would provide its students a range of advice regarding compliance with visa status. Following that memorandum, Haverford more frequently advises its students to consult with outside immigration lawyers, which imposes added burden and delay on students and Haverford alike.

46.     In particular, as a result of the August 2018 Policy Memorandum, Haverford recently was required to ask two international students to leave the campus based on potential status violations that, prior to the new policy, would not have disrupted their studies. This upset the crucial student-university relationship with these students and has irreparably disrupted these students' educational plans, and Haverford has lost tuition as a result.

**Defendants**

47. Defendant Kirstjen Nielsen is the Secretary of Homeland Security and therefore the "head" of the Department of Homeland Security. 6 U.S.C. § 112(a)(2). Under the Immigration and Nationality Act, she is charged with administering and enforcing the federal immigration and nationality laws. 8 U.S.C. § 1103(a)(1), (3). She is sued in her official capacity.

48. Defendant Department of Homeland Security ("DHS") is the executive department charged with authority over federal immigration law (*see* 6 U.S.C. § 251) and an "agency" within the meaning of the APA (5 U.S.C. § 551(1)).

49. Defendant L. Francis Cissna is the Director of U.S. Citizenship and Immigration Services and therefore the "head" of that agency (6 U.S.C. § 271(a)(2)). He is sued in his official capacity.

50. Defendant U.S. Citizenship and Immigration Services ("USCIS") is a component of DHS (6 U.S.C. § 271) and an "agency" within the meaning of the APA (5 U.S.C. § 551(1)). USCIS is the component of DHS that issued the August 2018 Policy Memorandum.

**JURISDICTION AND VENUE**

51. This Court has federal question jurisdiction over Plaintiffs' complaint under 28 U.S.C. § 1331. It has the authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202; 5 U.S.C. §§ 705, 706(1), 706(2)(A)-(D); and its general equitable powers.

52. The APA provides a cause of action for parties adversely affected by final agency action when "there is no other adequate remedy in a court." 5 U.S.C. § 704. That

condition is met in this case because the August 2018 Policy Memorandum is a "final agency action" within the meaning of the statute and there is no other adequate remedy available in any other court.

53. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are officers or agencies of the United States and one or more Plaintiffs reside in the district within the meaning of 28 U.S.C. § 1391(d).

## FACTUAL BACKGROUND

### Immigration for Higher Education and Research Institutions Provides Innumerable Benefits to the United States

54. Many of the world's leading higher education and research institutions are located in the United States. More than a million individuals travel to the United States each year to study, research, or teach on F, J, or M visas.

55. Most international visitors require a visa to be admitted to the United States. Nearly all international students who travel to the United States from abroad are admitted via an F, J, or M visa.

56. An F visa authorizes an international individual to enter the United States on a non-immigrant basis to pursue an educational program. Students on an F visa must be enrolled at an institution that participates in the Student and Exchange Visitor Program (SEVP).

57. An M visa authorizes international individuals to study at a vocational or technical school. Like those on F visas, students on an M visa must be enrolled at an approved institution.

58. Students on F and M visas come from every continent in the world except Antarctica, with more than 229 countries and territories represented in the U.S. academic

community. *See* ICE, *SEVIS by the Numbers: Biannual Report on International Student Trends*, 7 (Apr. 2018), goo.gl/d4gy2A.

59.     In March 2018, approximately 1.2 million individuals were present in the United States on either an F or M visa. *Id.* at 3. Of these, approximately 400,000 students were enrolled in a bachelor's degree program, while nearly as many were seeking a Master's degree. *Id.* at 5.

60.     In March 2018, approximately 8,700 schools have been certified by SEVP as eligible to enroll international students. *Id.* at 13.

61.     A J visa is a non-immigrant visa issued to individuals who participate in an authorized "Exchange Visitor Program." The U.S. Department of State has authorized more than 1,500 academic institutions, for-profit and non-profit private sector organizations, or federal, state, and local government entities to operate such a program. The vast majority of these designated programs are accredited American institutions of higher education. Participants in such programs include students, research scholars, professors, teachers, physicians, au pairs, camp counselors, and several other categories of individuals.

62.     More than 300,000 J visas were issued in 2017.

63.     As of March 2018, around 210,000 individuals were present in the United States on a J visa.

64.     Many U.S. colleges have determined that a robust community of international students is essential to the educational mission for *all* students—domestic and international alike. Domestic students gain critical new insights by living and studying with international students. These diverse environments teach essential values of multiculturalism and tolerance, breaking down stereotypes of the "other." International students, similarly, learn

Case 1:18-cv-00891-LCB-JEP     Document 1     Filed 10/23/18     Page 12 of 37

from their American counterparts, gaining new experiences and perspectives that will benefit them for life.

65.     Recruiting leading international students, researchers, and academics to U.S. schools is also crucial to ensuring that the United States retains its perch as the leader of the academic world. Higher education institutions are at the forefront of developing critical new technologies—in fields as diverse as healthcare, pharmaceuticals, computing, energy, and transportation. This innovation ensures the United States' status as the premier economic global force, thanks in significant measure to contributions by international students.

66.     In the 2016 to 2017 school year, international students contributed nearly $37 billion to the U.S. economy and created or supported more than 450,000 jobs. *See* NAFSA, *NAFSA International Student Economic Value Tool*, goo.gl/kN6gSb. International students also contribute substantially to the economic health of the thousands of colleges and universities at which they enroll and thus pay tuition. For many of these communities, the higher education institution is the main engine or even sole guarantor of economic wellbeing.

### **"Unlawful Presence"**

67.     In the 1996 Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Congress introduced sanctions for non-U.S. persons who are "unlawfully present" in the United States. The concept of "unlawful presence" had never previously existed in U.S. immigration law.

68.     According to the statute, "an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." 8 U.S.C. § 1182(a)(9)(B)(ii).

69.     If an individual accrues more than 180 consecutive days (but less than a year) of unlawful presence, the individual is barred from reentering the United States for a period of three years. 8 U.S.C. § 1182(a)(9)(B)(i)(I). If the individual has been unlawfully present in the United States for a year or more, the individual is barred from reentering the United States for a period of ten years. *Id*. § 1182(a)(9)(B)(i)(II).

70.     When many categories of non-immigrants are admitted to the United States— such as most individuals coming to the United States as tourists or to temporarily engage in business—they are provided with a date certain on which their authorized period of stay expires, according to the I-94 Record of Admission. In these circumstances, calculating "unlawful presence" is relatively straightforward. If the individual stays after the specific date authorized, the individual begins to accrue "unlawful presence" time.

71.     But most individuals admitted to the United States on F, J, and M visas are not provided a date certain on which their authorized period of stay expires. Rather, they are admitted for the "duration of status," or "D/S."

**The Legacy Policy**

72.     Since 1997, Defendants—and their predecessors, including the Immigration and Naturalization Service—had adopted a consistent policy in practice for calculating "unlawful presence," including as it related to individuals admitted for a "duration of status."

73.     In the August 2018 Policy Memorandum, Defendants explain the prior policy: "foreign students and exchange visitors (F and J non-immigrants, respectively) who were admitted for, or present in the United States in, duration of status (D/S) started accruing unlawful presence on the day after USCIS formally found a nonimmigrant status violation while adjudicating a request for another immigration benefit or on the day after an

- 14 -

immigration judge ordered the applicant excluded, deported, or removed (whether or not the decision is appealed), whichever came first." Ex. A at 1.

74. INS issued a memorandum on September 19, 1997, entitled "Section 212(a)(9)(B) Relating to Unlawful Presence." Ex. D. Written by Paul Virtue, then-Acting Executive Associate Commissioner, this document is often referred to as the "Virtue Memo."

75. The Virtue Memo provides: "Unlawful presence does not begin to run from the date of a status violation (including unauthorized employment). Unlawful presence for a nonimmigrant may begin to accrue before the expiration date noted on the I-94, however, in two circumstances: (1) when an immigration judge makes a determination of a status violation in exclusion, deportation or removal proceedings, or (2) when the Service makes such a determination during the course of adjudicating a benefit application." Ex. D at 2.

76. On May 6, 2009, USCIS issued an "Interoffice Memorandum" that it titled "Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(c)(i)(I)." *See* Ex. C. That memorandum canvassed then-existing policies regarding unlawful presence and recodified them into the Adjudicator's Field Manual.

77. That memorandum provided: "Nonimmigrants Admitted for Duration of Status (D/S). If USCIS finds a nonimmigrant status violation while adjudicating a request for an immigration benefit, unlawful presence will begin to accrue on the day after the request is denied. If an immigration judge makes a determination of nonimmigrant status violation in exclusion, deportation, or removal proceedings, unlawful presence begins to accrue the day after the immigration judge's order. *It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which*

- 15 -

***removal proceedings are initiated.***" Ex. C at 25 (emphasis added).

## The August 2018 Policy Memorandum

78.     On May 11, 2018, Defendants posted a memorandum (dated May 10, 2018) indicating an intent to revise longstanding policy and legal interpretation regarding the definition and calculation of "unlawful presence." *See* Ex. B.

79.     On August 9, 2018, Defendants issued a Policy Memorandum titled "Accrual of Unlawful Presence and F, J, and M Nonimmigrants." The memorandum is designated as PM-602-1060.1. It is attached as Exhibit A.

80.     Pursuant to this new policy, USCIS will start the unlawful-presence clock *not* on the date that an individual on an F, J, or M visa is adjudicated as being out-of-status. Instead, USCIS will *backdate* "unlawful presence" to the date on which the underlying facts that gave rise to the status violation occurred.

81.     Thus, under the new policy, "[a]n F, J, or M nonimmigrant begins accruing unlawful presence, due to a failure to maintain his or her status on or after August 9, 2018, on . . . [t]he day after the F, J, or M nonimmigrant no longer pursues the course of study or the authorized activity, or the day after he or she engages in an unauthorized activity." Ex. A at 4.

82.     This new policy imposes a non-discretionary duty on USCIS officers. It binds and preordains their actions in all cases within the scope of the policy.

83.     The August 2018 Policy Memorandum asserts certain overstay rates as a basis for reversing 21 years of policy. In particular, it asserts that the overstay rate is 6.19 percent for F-visa non-immigrants, 3.8 percent for J-visa non-immigrants, and 11.6 percent for M-visa non-immigrants. Ex. A at 2.

- 16 -

84.    The overstay rates asserted in the August 2018 Policy Memorandum are misleading and inaccurate. In fact, USCIS does not have any accurate means of assessing overstay rates. SEVIS does not include a means to track departures from the United States by F, J, and M visa holders.

85.    USCIS cites "out-of-country" overstay rates, describing individuals whose departure was recorded after their lawful period of admission expired. This likely encompasses individuals who stayed just a few days longer than the conclusion of their program to tie up their personal affairs and is not a true representation of the "overstay" population with which Defendants are concerned. Indeed, regulations specifically authorize individuals to stay in the United States during 30- and 60-day grace periods.

86.    The "in-country" overstay rates have been calculated at much lower rates by Defendants.

87.    The source on which USCIS relies for this information recognizes that calculating overstay rates is difficult and uncertain.

88.    USCIS has admitted to being unable to know with certainty when many individuals on F, J, and M visas depart the United States. During an August 2018 stakeholder call, a DHS official conceded this point.

89.    The August 2018 Policy Memorandum draws a distinction among non-immigrant classes without justification. Per the terms of the policy, individuals on F, J, or M visas begin accruing "unlawful presence" on the date that the facts give rise to that finding, while different "date certain" accrual rules apply to all other visa classes.

90.    The August 2018 Policy Memorandum fails to offer any good reason to support the policy change.

91.     The August 2018 Policy Memorandum asserts that "the Student and Exchange Visitor Information System (SEVIS)" "has provided USCIS officers additional information about an alien's immigration history, including information that indicates that an alien in F, J, or M nonimmigrant status may have completed or ceased to pursue his or her course of study or activity." Ex. A at 2.

92.     The August 2018 Policy Memorandum fails to recognize the fact that SEVIS was created in 2002, and it was in effect no later than 2003. Defendants have offered no explanation as to why, 16 years later, the creation of SEVIS justifies a major policy change regarding unlawful presence.

93.     When Defendants reaffirmed their earlier policy in the May 2009 Policy Memorandum, SEVIS had been operational for nearly six years.

94.     The August 2018 Policy Memorandum identifies no change in facts or circumstances since the May 2009 Policy Memorandum.

95.     The August 2018 Policy Memorandum does not identify any evidence that SEVIS has in fact aided accuracy.

96.     Any contention by Defendants that SEVIS creates accurate adjudications is incorrect. As Defendants are aware, SEVIS is plagued with inaccurate information. For example, port-of-entry information entered into the system is often incorrect.

**Promulgation of the Memorandum**

97.     Defendants did not undertake notice-and-comment rulemaking prior to issuing the August 2018 Policy Memorandum.

98.     On May 10, 2018, Defendants issued a Policy Memorandum (May 2018 Policy Memorandum), proposing to change policy with respect to unlawful presence calculations

for F, J, and M visa holders. *See* Ex. B. The May 2018 Policy Memorandum purported to provide for a period of public comments. *See* Ex. B at 1.

99.     Members of the public submitted comments in response to the May 10 notice, but the agency did not provide a reasoned response to those comments.

100.     Defendants prepared no initial regulatory flexibility analysis.

101.     The May 10 notice was not submitted for review by the Office of Management and Budget and was not published in the *Federal Register*.

102.     None of the statutory exceptions to the requirement of notice-and-comment rulemaking is applicable here. *See* 5 U.S.C. § 553(b).

103.     For example, the August 2018 Policy Memorandum reflects a legislative policy judgment, not interpretive guidance. The August 2018 Policy Memorandum does not engage in "interpretation" of the underlying statute. It does not quote the statutory text or explain how the policy it reflects is the better interpretation of the legal text compared with the status quo ante, which reflects more than 20 years of practice.

104.     To the extent that Defendants provide any reasons at all for the policy, the reasoning is entirely policy-based.

105.     The August 2018 Policy Memorandum was promulgated to effect Defendants' belief that it is a better policy compared with the status quo ante and thus should be the governing rule.

106.     The August 2018 Policy Memorandum causes a change in existing law or policy. The Memorandum expressly and repeatedly describes itself as establishing a "new policy," displacing the "former INS policy." *E.g.*, Ex. A at 2-3.

107.     The August 2018 Policy Memorandum states a new policy that is a matter of

considerable importance to the class of individuals it regulates, the higher education community, and the American public at large.

108. The August 2018 Policy Memorandum sets forth policy with present, binding effect.

109. The August 2018 Policy Memorandum admits of no discretion in its enforcement. Adjudicators must follow the Memorandum's requirements, with no choice.

110. The August 2018 Policy Memorandum has the force of law.

111. The August 2018 Policy Memorandum amends the USCIS Adjudicator's Field Manual. That Manual indicates that policy determinations of this sort are "binding" on USCIS employees: "All material which is designated as policy material is binding upon *all* employees of USCIS, unless or until it is specifically superseded by other policy material. There are no exceptions to this rule." USCIS, *USCIS Adjudicator's Field Manual* § 3.4(b), goo.gl/wnKdkx.

112. USCIS Adjudicator's Field Manual provides extensive guidance on distinguishing "correspondence" and "policy" materials. The Manual states:

(a) Distinction between Correspondence and Policy.

Headquarters and regional components are responsible for issuing a large volume of written material to field offices, the general public, congressional office and members of the private immigration bar. The vast majority of this material is a response to a direct, specific inquiry or a "hypothetical" situation. Other material is prepared as implementing instructions to accompany a new USCIS-wide program, policy or regulation. It is important to note that there is a distinction between "correspondence" and "policy" materials. ***Policy material is binding on all USCIS officers and must be adhered to unless and until revised, rescinded or superseded by law, regulation or subsequent policy, either specifically or by application of more recent policy material.*** On the other hand, correspondence is advisory in nature, intended only to convey the author's point of view. Such opinions should be given appropriate weight by the recipient as well as other USCIS employees who may encounter

- 20 -

similar situations. However, such correspondence does not dictate any binding course of action which must be followed by subordinates within the chain of command. Examples of policy materials are:

. . .

Field and Administrative Manuals

. . .

Memoranda and cables from Headquarters specifically designated as policy (bearing the "P" suffix in the reference file number).

USCIS, *USCIS Adjudicator's Field Manual* § 3.4(b), goo.gl/wnKdkx (emphasis added).

113. The August 2018 Policy Memorandum uses a "P" suffix in the reference file number for the August 2018 Policy Memorandum, PM-602-1060.1. Ex. A at 1.

114. The "P" suffix confirms that USCIS views the August 2018 Policy Memorandum as the sort of binding policy memorandum that permits no discretion. The Manual contrasts this with ten categories of correspondence—including "USCIS and General Counsel opinions" and "Training materials"—which are not binding.

115. When USCIS deems an individual to be unlawfully present and subject to a three- or a ten-year reentry bar, that bar applies only after an individual exits the United States and subsequently seeks to reenter the United States or reapplies for an immigration benefit. At that time, the doctrine of consular non-reviewability precludes judicial review of any USCIS determination regarding unlawful presence.

116. There is no meaningful way in which most individuals subject to a reentry bar may seek judicial review over that determination.

117. Thus, while the August 2018 Policy Memorandum imposes binding obligations on USCIS officers, and while those obligations will have severe consequences on the

individuals regulated as well as the academic communities to which they belong, those individual decisions by USCIS officers are not judicially reviewable.

118.　While unlawful presence has a discretionary waiver process, the statute (8 U.S.C. § 1182(a)(9)(B)(v)) and regulation (8 C.F.R. § 212.7(e)(10)-(11)) make clear that waiver decisions are non-reviewable.

### Harm Inflicted on International Students, Researchers, Employees, and Their Sponsoring Institutions

119.　Promulgation of the August 2018 Policy Memorandum impairs the interests of students and employees at each institution who are present on F, J, and M visas.

120.　Under the new policy, many more international students and employees will be subject to a three- or ten-year reentry bar as compared with the previous regulatory framework, even in the absence of any bad faith or even knowing conduct.

121.　There are a multitude of ways in which a well-intentioned individual on an F, J, or M visa can be adjudicated out-of-status. Some of these include:

A.　**Information update:** Failure of F, J, or M visa holder to update a Designated School Officer (DSO) regarding a change to information, including a change in address.

B.　**Course load:** Failure to obtain proper approval for dropping below the minimum course load. Alternatively, USCIS may retroactively deny a request for a student to take a course-load below that typically required.

C.　**Excess work:** A student on an F or M visa authorized to work 20 hours per week on campus works an hour extra one week to complete a deadline.

D.　**Unauthorized employment:** Any employment by the spouse or child of an F, J, or M visa holder, including services as innocuous as babysitting.

E.　**Designated School Officer (DSO) error:** There are a litany of errors a DSO may inadvertently make that may render a student out-of-status.

- 22 -

Just a few examples include:

(i)      Making a typographical error in SEVIS.

(ii)     Erroneously identifying a student as having completed a course of study.

(iii)    Inadvertently failing to register a student as returning for a particular semester.

(iv)    Mistakenly entering an incorrect, premature school transfer date.

F.     **Curricular Practical Training (CPT):** Curricular practical training, is the ability of some international students to work while attending school. For those international students on high financial aid, this can be a necessity if their home countries do not have a tax treaty with the U.S. disburdening them of the requirement of paying U.S. income tax on aid in excess of tuition; this tax can amount to thousands of dollars. CPT creates many opportunities for an individual to violate status:

(i)      **Eligibility error:** After the fact, USCIS determines that CPT is not sufficiently "integral" to student's education and thus finds the CPT an unauthorized form of employment.

(ii)     **OPT implications:** Student is not informed that a full year or more of CPT may preclude post-completion optional practical training.

G.     **Optional Practical Training (OPT):** Students may generally apply for one year of post-graduate employment, called OPT, if it is training related to the completion of one's education. For students obtaining a degree in science, technology, engineering, or math (STEM), the student may extend OPT for an additional two years (STEM OPT) to complete their education. There are many ways in which an individual may inadvertently fall out-of-"status" in connection with OPT and STEM OPT:

(i)      **Program approval:** Retroactive determination by USCIS that a student's "optional practical training" does not qualify as sufficiently related to a student's degree.

(ii)     **Absence reporting:** Failure of the employer of a student on optional practical training to provide a report as to any absence by a student.

- 23 -

(iii) **Training plan:** Failure of the employer of a student on optional practical training to provide a report as to any changes made to the student's training plan.

(iv) **Self-evaluation:** Failure of a student to provide an annual self-evaluation report or final evaluation—signed by the employer—regarding optional practical training.

(v) **Third-party placement:** Error made regarding third-party placement during an optional practical training designation.

(vi) **Worksite transfer:** USCIS determination, after the fact, that an international assignment was an impermissible worksite transfer.

(vii) **Miscalculation of unemployment periods:** DSO failure to properly calculate a student's unemployment periods between jobs, such that USCIS may determine that a student was not properly within STEM OPT status.

122. Many of these determinations rest on discretionary judgments by USCIS. Thus, it is impossible for an F, J, or M visa holder—or the institution of which they are a member—to know at the outset what conduct will render an individual out-of-status.

123. Under the prior policy, the unlawful-presence clock began after USCIS made these often-discretionary adjudications. That provided individuals 180 days to order their affairs and exit the country without accruing any reentry bar—or to otherwise regain status and avoid a reentry bar.

124. It was standard practice—endorsed by Defendants—for students who had fallen out-of-status to exit the country, and then reenter, beginning a new legal status. Students and other individuals operating in good faith could thus generally cure an out-of-status finding, and therefore continue their education or cultural exchange programs in the United States.

125. The August 2018 Policy Memorandum, however, will backdate unlawful

presence. That means that individuals will have less than 180 days, or often no time at all, to leave the country prior to being subject to a reentry bar.

126.    In fact, because of delays in USCIS processing and immigration court backlogs, most of these adjudications will occur more than 180 days after the underlying facts giving rise to a status violation. In those circumstances, an F, J, or M visa holder will automatically be subject to a three-year reentry bar with no opportunity to cure whatsoever.

127.    Because of processing delays, and also because USCIS may make a status-violation finding during a subsequent request for adjustment of status, many of these adjudications will occur 365 days or more after the underlying facts giving rise to a status violation. In those circumstances, an F, J, or M visa holder will automatically be subject to a ten-year reentry bar with no opportunity to cure whatsoever.

128.    By design, the August 2018 Policy Memorandum will result in many more holders of F, J, and M visas being subject to three- and ten-year reentry bars.

129.    When a student on an F, J, or M visa is subject to a reentry bar, that student is not able to continue enrollment at the academic institution. This disrupts the student-school relationship. It also costs the school tuition revenue.

130.    Moreover, because the August 2018 Policy Memorandum starts the unlawful-presence clock at an earlier time, it causes colleges and universities to make different decisions about international students, including by requiring international students to stop their education following a finding by the school that there has been an inadvertent status violation.

131.    When an individual participating in a J-visa cultural exchange program is subject to a reentry bar, Plaintiff loses that valuable, trained member of the community. The

institution suffers financial losses when it must hire and train new individuals to fulfill the duties of the individual barred from reentering the country. This harm accrues with respect to international research scholars and others on cultural exchange programs. It also stems from students who work for the university in connection with an approved on-campus employment.

132.    When a researcher on a J-1 visa is forced to leave the United States, the university or college irreparably loses valuable research projects. The researcher's career is forever disrupted. And the critical relationship between researcher and employer is upset.

133.    Plaintiffs provide international students and exchange visitors material advice as to what they may and may not do to maintain their visa status. Plaintiffs have developed these policies and practices in reliance on the fact that an F, J, or M visa holder will not begin to accrue "unlawful presence" unless and until a government official adjudicates the individual as out-of-status. Plaintiffs' policies thus relied on the preexisting policy. The August 2018 Policy Memorandum topples the basis on which Plaintiffs and other institutions structured their international student advising offices, policies, and practices.

134.    Now, many schools and universities have changed the advising they provide, and they provide fewer advising services to their international students and researchers. That constitutes a loss to the university or college: the institution is unable to service the critical needs of its community members, precisely because the August 2018 Policy Memorandum upset long-settled expectations.

## STANDING

135.    Plaintiffs have both independent standing and associational standing.

- 26 -

## Independent Standing of University Plaintiffs

136. Because the August 2018 Policy Memorandum was issued without being submitted through formal notice-and-comment rulemaking, Plaintiffs had no meaningful opportunity to provide pre-decisional comments and feedback to the agency. Defendants' failure to provide an adequate opportunity for public comment prior to acting has caused both Plaintiffs and their students and employees injury. All Plaintiffs therefore have been aggrieved by promulgation of the Rule. *See generally JEM Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994).

137. Plaintiffs invest substantial resources in programs designed to assist their students and employees with obtaining and maintaining lawful immigration status. In particular, Plaintiffs, as SEVP-certified institutions, have hired and are required to train Designated School Officers that provide advice to each institution's international students. The Rule has changed the regulatory framework and consequently will require Plaintiffs to expend additional resources on new training and assistance. Plaintiffs therefore have standing to challenge the Rule in their own right. *See generally Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982).

138. Because the August 2018 Policy Memorandum makes it significantly easier for well-intentioned students to become subject to a three- or ten-year bar to reentry, many students will have their educations in this country fundamentally disrupted.

139. The loss to the campus environment is substantial: the school is injured because the August 2018 Policy Memorandum removes a student that the school had specifically chosen to attend. That imposes a direct, irreparable harm on the institution and all its members.

140. Additionally, Plaintiffs will lose tuition revenue from international students who are subject to three- and ten-year reentry bars.

141. The August 2018 Policy Memorandum will also chill international students' willingness to attend institutions of higher education, including the Plaintiff institutions, in the United States. This chilling effect will further cause a loss of revenue to Plaintiffs, and it will hinder the ability of Plaintiffs to attract the international, diverse community that they believe essential.

142. Plaintiffs' injuries are caused directly by the August 2018 Policy Memorandum. And their injuries would be redressed by an order vacating, invalidating, or otherwise declaring unlawful the August 2018 Policy Memorandum.

143. Because of potential liability stemming from the consequences of advising students, many colleges and universities are reducing the scope of advising supplied to international students and other international members of their communities.

### Associational Standing of University Plaintiffs

144. Plaintiffs' students have standing to sue in their own right as parties regulated under the August 2018 Policy Memorandum.

145. Neither the claims asserted nor the relief requested in this lawsuit requires individual students' or employees' participation in this lawsuit.

146. Plaintiffs' missions as institutions of higher education include representing and advocating for the interests and rights of their students and employees before government bodies.

147. Plaintiffs' students and employees are formal members of each school. Students pay tuition, dues, and other fees and are accordingly afforded the formal benefits of

- 28 -

membership in the school community. Each Plaintiff is therefore a formal association of students and faculty who join together in pursuit of their educational mission.

148.    Plaintiffs' and their members' injuries would be redressed by an order vacating, invalidating, or otherwise declaring unlawful the August 2018 Policy Memorandum.

### Associational Standing of Guilford College International Club

149.    Guilford College International Club is a voluntary association whose members include Guilford students present in the United States on F-1 visas.

150.    Members of Guilford College International Club present in the United States on F-1 visas have standing to sue in their own right as parties regulated under the August 2018 Policy Memorandum.

151.    Neither the claims asserted nor the relief requested in this lawsuit requires individual members' participation in this lawsuit.

152.    Guilford College International Club's mission includes advocating for the rights of its international student members. In celebrating and advocating for diversity, moreover, Guilford College International Club counts as among its mission advocating for policies that ensure its members present on F-1 visas have full and fair opportunity to be present in the United States without undue fear about the imposition of a three- or ten-year reentry bar.

153.    Guilford College International Club's and their members' injuries would be redressed by an order vacating, invalidating, or otherwise declaring unlawful the August 2018 Policy Memorandum.

## FIRST CAUSE OF ACTION:
## THE AUGUST 2018 POLICY MEMORANDUM WAS ISSUED WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW

154.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

155.    Under the Administrative Procedure Act, an agency must provide "[g]eneral notice of proposed rule making … published in the Federal Register" whenever the agency seeks to promulgate a rule. 5 U.S.C. § 553(b). After the agency has published the required notice, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c).

156.    Following the submission of comments, the agency must then respond to those comments. "[I]nextricably intertwined with . . . 5 U.S.C. § 553(c) is the agency's need to respond, in a reasoned manner, to any comments received by the agency that raise significant issues with respect to a proposed rule." *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1379 n.11 (Fed. Cir. 2017). "[C]onsideration of comments as a matter of grace is not enough. It must be made with a mind that is open to persuasion." *Advocates for Highway & Auto Safety v. Fed. Highway Admin.*, 28 F.3d 1288, 1292 (D.C. Cir. 1994) (citation and alteration omitted).

157.    Several other legal obligations follow from a Section 553 rulemaking procedure. For example, 5 U.S.C. § 603 requires the preparation of an "initial regulatory flexibility analysis."

158.    Defendants did not undertake notice-and-comment rulemaking prior to issuing the August 2018 Policy Memorandum.

159.    Defendants prepared no initial regulatory flexibility analysis.

160.    Although the agency purported to accept comments in its May notice, this

procedure was not an authorized alternative to the required rulemaking.

161.  The August 2018 Policy Memorandum was therefore issued "without observance of procedure required by law" and is invalid under 5 U.S.C. § 706(2)(D).

**SECOND CAUSE OF ACTION:**
**THE AUGUST 2018 POLICY MEMORANDUM IS**
**SUBSTANTIVELY ARBITRARY AND CAPRICIOUS**

162.  Plaintiffs incorporate by reference the preceding allegations of this Complaint.

163.  The August 2018 Policy Memorandum constitutes a substantial change in policy from approximately 20 years of prior behavior.

164.  "[U]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (citation and quotation marks omitted). Defendants have failed to provide "good reasons for the new policy." *Id.*

165.  Defendants assert that the basis for the policy change is enhanced accuracy in their data that has been caused by the use of SEVIS. But Defendants fail to recognize that SEVIS has been fully operational since August 2003, and Defendants fail to identify any change in circumstances since May 2009, when they previously reaffirmed their longstanding policy.

166.  Defendants also rely on faulty data. Assuming for the sake of argument that the overstay rate is relevant, Defendants have relied on the wrong and inaccurate data in assessing the overstay rate.

167.  Defendants have failed to identify any match between the alleged problem—asserted overstays of F, J, and M visa holders—and the August 2018 Policy Memorandum. Given that the new policy fails to identify how it will address overstay rates, the policy is

- 31 -

arbitrary and capricious.

168.    The status quo ante has engendered serious reliance interests that must be taken into account. Defendants did not acknowledge these interests or take them into account.

169.    Moreover, Defendants now treat similarly situated individuals differently. USCIS does not, for example, backdate an out-of-status finding regarding an individual on an H-1B visa for purposes of unlawful presence. This is consistent with the statutory definition and over 20 years of interpretation. The August 2018 Policy Memorandum singles out F, J, and M visa holders, subjecting them to unique, harsh regulations. Defendants do not address, much less justify, why individuals on F, J, and M visas are treated more harshly than are individuals present in the United States via other kinds of visas.

170.    The August 2018 Policy Memorandum accordingly is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and is invalid under 5 U.S.C. § 706(2)(A).

### THIRD CAUSE OF ACTION:
### THE AUGUST 2018 POLICY MEMORANDUM IS
### INCONSISTENT WITH THE STATUTORY TEXT

171.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

172.    The August 2018 Policy Memorandum is "unlawful" because it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). Because the policy conflicts with the governing statute, it is invalid and may not be enforced.

173.    8 U.S.C. § 1182(a)(9)(B)(ii) provides in relevant part that "an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General."

174.    This statute created the concept of "unlawful presence." The concept did not

previously exist in immigration law.

175. Prior to 1996, however, other related concepts had existed. In particular, prior statutes addressed individuals in "unlawful status" (*see*, *e.g.*, 8 U.S.C. § 1255a) and "unlawful immigration status" (*see*, *e.g.*, *id*. § 1255). The 1996 Act did not use the well-established concept of "status," but instead created a new category of "unlawful presence."

176. USCIS observed in 2009 that there is a critical distinction between unlawful status and unlawful presence. As USCIS wrote in its May 2009 memorandum (Ex. C at 9):

### (2) Distinction Between "Unlawful Status" and "Unlawful Presence"

To understand the operation of sections 212(a)(9)(B) and 212(a)(9)(C)(i)(I) of the Act, it is important to comprehend the difference between being in an unlawful immigration status and the accrual of unlawful presence ("period of stay not authorized"). Although these concepts are related (one must be present in an unlawful status in order to accrue unlawful presence), they are not the same.

As discussed in chapters 40.9.2(b)(2) and (3), there are situations in which an alien who is present in an unlawful status nevertheless does not accrue unlawful presence.

177. The plain statutory text dictates the same result here. When a visa holder is provided a date certain on which the visa expires, including via a date certain on a Form I-94, then the "expiration" of the "period of stay authorized by the Attorney General" is concrete. The period of stay authorized expires on the date stated.

178. By contrast, when a visa holder is admitted for the "duration of status," the "period of stay authorized" reaches "expiration" when the Attorney General makes a finding that the person is out-of-"status," a decision which thus terminates the "period of stay authorized."

179. 8 U.S.C. § 1202(g) likewise applies to an individual who has "remained in the

- 33 -

United States beyond the period of stay authorized by the Attorney General." The prevailing policy embodied in this statute is at odds with the August 2018 Policy Memorandum.

180.     The August 2018 Policy Memorandum is therefore "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" and is invalid under 5 U.S.C. § 706(2)(C).

**FOURTH CAUSE OF ACTION:**
**THE AUGUST 2018 POLICY MEMORANDUM VIOLATES THE**
**FIFTH AMENDMENT'S DUE PROCESS GUARANTEE**

181.     Plaintiffs incorporate by reference the preceding allegations of this Complaint.

182.     The August 2018 Policy Memorandum violates the procedural and substantive protections of the Fifth Amendment's Due Process Clause.

183.     Whether Defendants will determine that a particular individual is within permissible "status" on an F, J, or M visa is a decision that an individual cannot know with certainty at the outset. Not only do new circumstances create novel legal questions, but—in many cases—there are discretionary judgment calls and inconsistent interpretations of language in regulations and policy memoranda that determine whether someone is within or without status.

184.     The holder of an F, J, or M visa cannot therefore know with any confidence what conduct will cause a USCIS official or immigration judge to later deem him or her to be outside approved "status."

185.     Under the prior policy, an individual was provided notice *before* he or she could be subject to the harsh penalty and restriction of freedom that is a three- or ten-year reentry bar.

186.     Now, however, the August 2018 Policy Memorandum renders it impossible for

an individual to know with certainty what conduct will trigger such a reentry bar. An individual may commit conduct that he or she has no reasonable way of knowing will later cause an USCIS officer or immigration judge to later declare him or her "out-of-status," and—because of the new policy of backdating—will be immediately subject to a reentry bar once that decision is made.

187.    In this way, the August 2018 Policy Memorandum makes the imposition of the three- and ten-year bars to reentry unpredictable, vague, and arbitrary.

188.    The Due Process Clause provides F, J, and M visa holders the right to notice and an opportunity to cure prior to imposition of a three- or ten-year reentry bar. Because the August 2018 Policy Memorandum precludes that essential right, it is unlawful.

189.    Under the August 2018 Policy Memorandum, if an F, J, or M visa's principal holder is deemed to be unlawfully present, so too will those individuals whose visas are derivative of and dependent upon the principal's visa. Because those derivative visa holders may have no knowledge of the activities of the F, J, or M visa holder that renders the principal out-of-status, they lack the notice and opportunity to cure that is required by the Due Process Clause.

190.    The August 2018 Policy Memorandum is therefore "contrary to constitutional right, power, privilege, or immunity" and invalid under 5 U.S.C. § 706(2)(B).

## <u>REQUEST FOR RELIEF</u>

For the foregoing reasons, Plaintiffs request that the Court:

a)    declare that the August 2018 Policy Memorandum is unlawful;

b)    vacate the August 2018 Policy Memorandum;

c)    enjoin Defendants from enforcing or applying any aspect of the August 2018

Policy Memorandum;

d) grant Plaintiffs their costs in this action, including reasonable attorneys' fees incurred; and

e) award other relief that the Court deems just and proper.

Respectfully submitted,

Paul W. Hughes
(Notice of Special Appearance Forthcoming)
D.C. Bar No. 997235
Michael B. Kimberly
(Notice of Special Appearance Forthcoming)
D.C. Bar No. 991549
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
(202) 263-3300 (fax)
phughes@mayerbrown.com
mkimberly@mayerbrown.com

*/s/ Cory S. Menees*
Cory S. Menees
N.C. State Bar No. 045111
Mayer Brown LLP
214 North Tryon Street, Suite 3800
Charlotte, NC 28202
(704) 444-3500
cmenees@mayerbrown.com

H. Ronald Klasko
(Notice of Special Appearance Forthcoming)
Klasko Immigration Law Partners, LLP
1601 Market Street, Suite 2600
Philadelphia, PA 19103
(215) 825-8600
rklasko@klaskolaw.com

*Attorneys for Plaintiffs*

Dated: October 23, 2018