# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| GUILFORD COLLEGE, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18-cv-0891 |
| | ) | |
| KIRSTJEN NIELSEN, in her official capacity as Secretary of Homeland Security, *et al.*, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

JOSEPH H. HUNT
Assistant Attorney General

WILLIAM C. PEACHEY
Director

GLENN M. GIRDHARRY
Assistant Director

JOSHUA S. PRESS
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Phone: (202) 305-0106
Facsimile: (202) 305-7000
e-Mail: joshua.press@usdoj.gov

*Attorneys for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION................................................................................................................1

BACKGROUND ...............................................................................................................2

I.      Legal Background .........................................................................................2

        A.     *The F-1 Nonimmigrant Student Visa Program* ........................................2

        B.     *The J-1 Nonimmigrant Exchange Visitor Visa Program* .........................3

        C.     *The M-1 Nonimmigrant Vocational Student Visa Program* ...................4

        D.     *The Federal Government's Database for Foreign Students*...................5

        E.     *The Military Accessions Vital to the National Interest Pilot Program*...................6

        F.     *The August 2018 Policy Memorandum*....................................................7

II.     Factual And Procedural Background ............................................................11

STANDARDS OF REVIEW ...........................................................................................12

I.      Federal Rule Of Civil Procedure 12(b)(1) .................................................12

II.     Federal Rule Of Civil Procedure 12(b)(6) ................................................12

ARGUMENT...................................................................................................................13

I.      The Plaintiffs Lack Standing. ....................................................................13

        A.     *Organizational Plaintiffs* ......................................................................14

        B.     *Ripeness and the Individual Plaintiffs* .................................................17

II.     Final Agency Action ..................................................................................19

CONCLUSION ...............................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Gardner,*
  387 U.S. 136 (1967) .................................................................................................. 17

*Action Alliance of Senior Citizens v. Heckler,*
  789 F.2d 931 (D.C. Cir. 1986) ................................................................................. 18

*Adams v. Bain,*
  697 F.2d 1213 (4th Cir. 1982) ................................................................................. 12

*Am. Legal Found. v. FCC,*
  808 F.2d 84 (D.C. Cir. 1987) ................................................................................... 15

*Appalachian Energy Group v. EPA,*
  33 F.3d 319 (4th Cir. 1994) ..................................................................................... 19

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................................ 12, 13

*Belle Co. v. U.S. Army Corps of Eng'rs,*
  761 F.3d 383 (5th Cir. 2014) ................................................................................... 19

*Bitar v. DOJ,*
  582 F. Supp. 417 (D. Colo. 1983) .............................................................................. 2

*Cabaccang v. USCIS,*
  627 F.3d 1313 (9th Cir. 2010) ................................................................................. 20

*Charter Fed. Sav. Bank v. Office of Thrift Supervision,*
  976 F.2d 203 (4th Cir. 1992) ....................................................................... 17, 18, 19

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) .................................................................................................... 16

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ................................................................................................. 14

*Constantine v. Rectors & Visitors of George Mason Univ.,*
  411 F.3d 474 (4th Cir. 2005) ................................................................................... 12

*Dhakal v. Sessions,*
  895 F.3d 532 (7th Cir. 2018) ................................................................................... 20

ii

*Francis v. Giacomelli,*
   588 F.3d 186 (4th Cir. 2009) ........................................................ 12

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992)...................................................................... 19

*FW/PBS, Inc. v. City of Dallas,*
   493 U.S. 215 (1990)...................................................................... 14

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982)...................................................................... 15

*Holloway v. Pagan River Dockside Seafood, Inc.,*
   669 F.3d 448 (4th Cir. 2012) ................................................... 12, 13

*In re Birmingham,*
   846 F.3d 88 (4th Cir. 2017) ........................................................ 12

*Invention Submission Corp. v. Rogan,*
   357 F.3d 452 (4th Cir. 2004) ...................................................... 19

*Jama v. DHS,*
   760 F.3d 490 (6th Cir. 2014) ...................................................... 20

*Kemler v. Poston,*
   108 F. Supp. 2d 529 (E.D. Va. 2000) ......................................... 19

*Kurfees v. INS,*
   275 F.3d 332 (4th Cir. 2001) ...................................................... 20

*Massieu v. Reno,*
   91 F.3d 416 (3d Cir. 1996)........................................................... 19

*McBurney v. Cuccinelli,*
   616 F.3d 393 (4th Cir. 2010) ................................................... 15, 16

*Md. Highways Contractors Ass'n v. Maryland,*
   933 F.2d 1246 (4th Cir. 1991) ................................................. 15, 16

*Nat'l Taxpayers Union v. United States,*
   68 F.3d 1428 (D.C. Cir. 1995)...................................................... 15

*O'Shea v. Littleton,*
   414 U.S. 488 (1974)...................................................................... 16

iii

*Painter's Mill Grille, LLC v. Brown*,
    716 F.3d 342 (4th Cir. 2013) ................................................................. 13

*Qureshi v. Holder*,
    663 F.3d 778 (5th Cir. 2011) ................................................................. 20

*Reg'l Mgmt. Corp., Inc. v. Legal Servs. Corp.*,
    186 F.3d 457 (4th Cir. 1999) ................................................................. 17

*Reiter v. Cooper*,
    507 U.S. 258 (1993) ................................................................................ 19

*S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands*, LLC,
    713 F.3d 175 (4th Cir. 2013) ........................................................ 14, 17

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ......................................................................... 15, 16

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................ 17

*Texas v. United States,*
    523 U.S. 296 (1998) ................................................................................ 18

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) ............................................................. 19

*United States v. Salman*,
    378 F.3d 1266 (11th Cir. 2004) .......................................................... 2, 3

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................................ 14

*Young Dong Kim v. Holder*,
    737 F.3d 1181 (7th Cir. 2013) ............................................................ 5, 6

## STATUTES

8 U.S.C. § 1101(a)(15)(J) ............................................................................ 3

8 U.S.C. § 1101(a)(15)(M) .......................................................................... 5

8 U.S.C. § 1182(e) ....................................................................................... 4

8 U.S.C. § 1440 ....................................................................... 7, 13, 18, 20

iv

8 U.S.C. § 1182(a)(9)(B) ................................................................................ 7, 14, 18

8 U.S.C. § 1182(e) ................................................................................................... 4

10 U.S.C. § 504 ....................................................................................................... 6

10 U.S.C. § 513 ..................................................................................................... 12

**CIVIL RULES**

Fed. R. Civ. P. 12(b)(1) ..................................................................................... 1, 12

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 12

**REGULATIONS**

8 C.F.R. § 214.2 ...................................................................................................... 8

8 C.F.R. § 214.2(f)(5) ............................................................................................. 2

8 C.F.R. § 214.2(f)(5)(i) .......................................................................................... 2

8 C.F.R. § 214.2(f)(5)(iv) ........................................................................................ 3

8 C.F.R. § 214.2(f)(10) ........................................................................................... 2

8 C.F.R. § 214.2(m)(5) ............................................................................................ 5

8 C.F.R. § 214.3(a)(2)(ii) ........................................................................................ 5

8 C.F.R. § 214.3(*l*) ................................................................................................ 6

22 C.F.R. § 41.62(a)(1) ........................................................................................... 3

v

## INTRODUCTION

Defendants respectfully move the Court to dismiss Plaintiffs' First Amended Complaint (ECF No. 14) ("Complaint" or "Pls.' Compl.") for lack of subject matter jurisdiction, or in the alternative, for failure to adequately plead a plausible claim for relief. Fed. R. Civ. P. 12(b)(1), (b)(6). Plaintiffs seek injunctive and declaratory relief against U.S. Citizenship and Immigration Services' ("USCIS") guidance regarding the calculation of unlawful presence of former foreign students, exchange visitors, or vocational students' status while in the United States. But in the rush to invalidate USCIS's August 9, 2018 Policy Memorandum, PM-602-1060.1, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants" (ECF No. 14-1) ("August PM"), Plaintiffs are asking the Court to override the agency's judgment about how its officers should interpret and enforce the Nation's immigration laws. The Court need not consider this request because none of the Plaintiffs has standing, the case is unripe, and is not otherwise justiciable under the Administrative Procedure Act ("APA") for want of final agency action. It should therefore be dismissed.

## BACKGROUND

I. **Legal Background.**

   A. *The F-1 Nonimmigrant Student Visa Program*

The U.S. Department of Homeland Security ("DHS") administers several programs through which foreign nationals may obtain permission to enter and remain in the United States, including the F-1 nonimmigrant Student Visa Program. The F-1 classification allows foreign nationals to enter the United States to pursue a full course of study at an approved school or educational program. *See* 8 U.S.C. § 1101(a)(15)(F)(i) (students may enroll in an approved college,

university, seminary, conservatory, academic high school, private elementary school, other academic institutions, or in an accredited language training program). "Nonimmigrant" classifications convey permission for a foreign national to enter the United States temporarily for a specific purpose. *See generally* 1 Charles Gordon *et al.*, *Immigration Law and Procedure* § 1.03[2][e][iii] at 1-30 (Matthew Bender rev. ed. 2015) (explaining the distinguishing features of nonimmigrant classifications and corresponding visas which allow students, business visitors, tourists, and others to temporarily remain in the United States). To qualify for an F-1 nonimmigrant visa, a foreign national is required to (1) apply and gain admission to an approved U.S. educational institution, (2) obtain a Form I-20, Certificate of Eligibility for Nonimmigrant (F-1) Student Status – For Academic and Language Students, issued by the school, and (3) submit a visa application at the U.S. Embassy or Consulate where he resides. *See, e.g.*, *Bitar v. DOJ*, 582 F. Supp. 417, 418–19 (D. Colo. 1983) (describing this process). To maintain F-1 status, a foreign student must "pursue a full course of study" or "engage in authorized practical training." 8 C.F.R. § 214.2(f)(5)(i). Practical training must be "directly related to [a student's] major area of study" in order to qualify as authorized training. 8 C.F.R. § 214.2(f)(10). Accordingly, without an underlying program of study, there is no way for a student to maintain his or her F-1 status.

F-1 nonimmigrants are generally admitted for their "duration of status" as a student, meaning the students are authorized to stay in the United States while they are pursuing a full course of study at an educational institution approved for attendance by foreign students or engaging in authorized practical training following completion of studies. *See United States v. Salman*, 378 F.3d 1266, 1267 n.1 (11th Cir. 2004) (per curiam); 8 C.F.R. § 214.2(f)(5). Once an F-1 nonimmigrant has completed his or her course of study and any authorized practical training

following completion of those studies, the nonimmigrant must either: transfer to another Student and Exchange Visitor Program ("SEVP")-certified school to continue studies in a new program; apply for and be granted a change of nonimmigrant status; otherwise legally extend their period of authorized stay in the United States; or leave the United States. *See* 8 C.F.R. § 214.2(f)(5)(iv). F-1 nonimmigrants are allowed 60 days after the completion of such studies and practical training to prepare for departure from the United States. *See id.*

B.      *The J-1 Nonimmigrant Exchange Visitor Visa Program*

In addition to the F-1 classification, the United States may also admit "an alien having a residence in a foreign country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill." 8 U.S.C. § 1101(a)(15)(J) ("J-1 classification" or "J-1 nonimmigrant"). The J-1 nonimmigrant classification grants temporary status in the United States "for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills or receiving training." *Id.*

Thus, J-1 status may be granted to foreign nationals who come to the United States under the sponsorship of an exchange-vistor program approved by the U.S. Department of State ("State Department"). *See* 8 U.S.C. § 1101(a)(15)(J); 22 C.F.R. § 41.62(a)(1). A few such programs are specifically aimed at students and scholars, including scholarship programs for college and university students (such as the Fulbright program) and secondary school exchange programs. J-1 nonimmigrants cover a wide range that includes distinguished scholars, teachers, professors, business trainees, high school students, nannies, and camp counselors participating in qualified exchange programs. Correspondingly, J-1 visitors' spouses and children receive J-2 status. J-1

- 3 -

nonimmigrants may work for the program sponsor or another designated employer, within the guidelines of the approved exchange program.

Certain J-1 nonimmigrants are required to live outside the United States for two years after completing their course of study before they are eligible to apply for permanent resident status or for H or L nonimmigrant status. 8 U.S.C. § 1182(e). This home-residence requirement applies to J-1 nonimmigrant visa holders who: (1) participated in a program that received financing from the U.S. government or from their own government; (2) are nationals or residents of countries designated by the State Department as clearly requiring the services of persons engaged in the visitor's field of specialized knowledge or skill (such specializations are published in the form of a skills list); or (3) obtained J status in order to receive graduate medical training in the United States. 8 U.S.C. § 1182(e).

Exchange visitors who have received graduate medical training are ineligible to change their status to any other nonimmigrant classification without a waiver. Other exchange visitors who are subject to the two-year foreign residency requirement may not change their status to any other nonimmigrant status except A (for foreign diplomats), G (for designated principal resident representatives of foreign governments), T (for victims of trafficking), or U (for victims of criminal activity) before complying with the requirement. 8 U.S.C. §§ 1182(e), 1258. Exchange visitors, however, are able to re-enter the U.S. in certain nonimmigrant statuses such as O-1 or B-1 before completing their two-year foreign residency requirement.

C.    *The M-1 Nonimmigrant Vocational Student Visa Program*

The M-1 nonimmigrant vocational student classification permits foreign nationals to study at an established vocational or other recognized "nonacademic" school (other than in a language

- 4 -

training program) within the United States. *See* 8 U.S.C. § 1101(a)(15)(M). These "non-academic" institutions may include community colleges or junior colleges which provide vocational or technical training and which award recognized associate degrees, vocational high schools, schools that provide vocational or nonacademic training other than language training. *See generally* 8 C.F.R. § 214.3(a)(2)(ii).

Qualifying spouses and dependent children of M-1 nonimmigrants receive M-2 status. *See* 8 U.S.C. § 1101(a)(15)(M)(ii). The M-1 nonimmigrant visa program enables vocational students to remain in the United States until the termination of their training or program of study, and they may enter and exit the country at will during that time. Once a vocational student's program of study has terminated, an M-1 immigrant may remain in the country for six months when authorized for practical training. *See* 8 C.F.R. § 214.2(m)(5) and (14).

### D.    The Federal Government's Database for Foreign Students

To keep track of the many foreign students within the United States, another DHS component-agency, ICE, separately maintains the Student and Exchange Visitor Information System ("SEVIS"). *See, e.g.*, *Young Dong Kim v. Holder*, 737 F.3d 1181, 1182 n.2 (7th Cir. 2013) (describing the database). SEVIS is a web-based system used to maintain information on SEVP-certified schools and their F-1 and M-1 students and exchange visitors. *See* U.S. Immigration and Customs Enforcement, *SEVIS Overview* http://www.ice.gov/sevis/overview (last visited January 8, 2019). SEVIS contains information on nonimmigrant students, exchange visitors, their dependents, and the schools and exchange visitor program sponsors that host these individuals in the United States. *See id.* Each foreign student has an individualized SEVIS record that is updated by designated school officials with biographical information relating to the student's lawful status,

- 5 -

including name, date and place of birth, nationality, current residential address, current academic status, date of commencement and termination of studies, degree program and field of study, and any authorizations for practical training. *See Young Dong Kim*, 737 F.3d at 1182 n.2 (describing how the school officials "must have an office at the school[,] be accessible to the … students," and "must update and maintain student records in … SEVIS" (citing 8 C.F.R. § 214.3(*l*)).

        E.       *The Military Accessions Vital to the National Interest Pilot Program*

In addition to the DHS or State Department operations described above, the U.S. Department of Defense ("DOD") previously operated another program relevant to the individual Plaintiffs in this case (Messrs. Sen Li and Jia Ye), the Military Accessions Vital to the National Interest ("MAVNI") pilot program. The MAVNI pilot program was a recruitment program operated by DOD between 2008 and 2017 to allow certain lawfully present foreign nationals who were not Lawful Permanent Residents ("LPRs"), including F, J, and M nonimmigrants, to enlist in the armed forces. In order to qualify for enlistment through the MAVNI program, individuals were required to be healthcare professionals or to possess certain language and culture capabilities in a language considered critical to DOD.

In general, individuals wishing to enlist in the armed forces must be U.S. citizens or nationals, LPRs, or citizens of one of three states with a Compact of Free Association with the United States. *See* 10 U.S.C. § 504(b).[1] However, 10 U.S.C. § 504(b)(2) provides the Secretary of

---

[1]    10 U.S.C. § 504 is the statutory standard for military enlistment. While this statutory authority authorizes enlistments vital to the national interest, others eligible for enlistment under this authority must be one of the following: a national of the United States; a foreign national who is lawfully admitted for permanent residence; or a person described in section 341 of one of the following compacts: the Compact of Free Association between the Federated States of Micronesia and the United States; the Compact of Free Association between the Republic of the Marshall Islands and the United States; or the Compact of Free Association between Palau and the United

Defense and the Secretaries of the Military Departments the authority to enlist certain individuals who do not meet citizenship and residency requirements when they determine that such enlistment is "vital to the national interest." Pursuant to 8 U.S.C. § 1440, a person who serves honorably as a member of the Selected Reserve of the Ready Reserve or in an active-duty status in the U.S. armed forces "during any other period which the President by Executive order shall designate as a period in which Armed Forces of the United States are or were engaged in military operations involving armed conflict with a hostile foreign force" may apply to be naturalized as a citizen "whether or not he has been lawfully admitted to the United States for permanent residence," provided that he or she was within the United States or another specified area at the time of enlistment or induction. Such individuals qualify for naturalization without regard to age, period of residence in the United States, or length of military service. On July 3, 2002, the President determined, for purposes of 8 U.S.C. § 1440, that the military is engaged in such armed conflict. *See* Exec. Order No. 13269, 67 Fed. Reg. 45,287 (July 3, 2002), *Expedited Naturalization of Aliens and Noncitizen Nationals Serving in an Active Duty Status During the War on Terrorism.* That Executive Order remains in effect.

### F.      *The August 2018 Policy Memorandum*

At issue in this case is USCIS's August 2018 PM, which was issued to reduce the number of overstays by F, J, and M nonimmigrants and to improve how USCIS implements the unlawful presence ground of inadmissibility under 8 U.S.C. §§ 1182(a)(9)(B) and (C)(i)(I) as it relates only to F-1, J-1, and M-1 nonimmigrants, and their dependents (F-2, J-2, and M-2). Unlawful presence

---

States.

is defined as the period of time when an individual is in the United States without being admitted or paroled or is present in the United States after expiration of a "period of stay authorized by the Secretary of Homeland Security."

The August PM clarifies how F, J, and M nonimmigrants admitted or otherwise authorized to be present in the United States in duration of status (D/S), or admitted until a specific date (date certain), start accruing unlawful presence. The August PM applies prospectively on or after August 9, 2018. Individuals who failed to maintain their status *before* that date began accruing unlawful presence on August 9, 2018, unless he or she had already begun accruing unlawful presence under the previous memorandum.[2] F, J, or M nonimmigrants who failed to maintain nonimmigrant status *on or after* August 9, 2018 on the earliest of any of the following: (1) the day after the student or exchange visitor longer pursues the course of study or the authorized activity or engages in an unauthorized activity; (2) the day after completing the course of study or program (including any authorized practical training plus any authorized grace period as outlined in 8 C.F.R. § 214.2); (3) the day after the Form I-94 expires, if the F, J, or M nonimmigrant was admitted for a date certain; or (4) the day after an immigration judge orders the foreign national removed (regardless of an appeal). The August PM also clarifies when students and exchange visitors do not accrue unlawful presence because they are considered to be in a period of authorized stay even if they are not maintaining F, J, or M status, or are not pursuing an authorized F, J, or M visa activity. For

---

[2] Such foreign nationals began accruing unlawful presence prior to August 9, 2018 on the day after DHS denied the request for an immigration benefit, if DHS made a formal finding that the he or she violated his or her nonimmigrant status while adjudicating a request for another immigration benefit; the day after the Form I-94, Arrival/Departure Record, expired, if the F, J, or M nonimmigrant was admitted for a date certain; or the day after an immigration judge ordered the foreign national removed (regardless of an appeal).

example, the August PM makes clear that an F or M nonimmigrant who has fallen out of status, but has a timely-filed reinstatement application with USCIS, will not accrue unlawful presence during the pendency of the application. Similarly, F, J, or M nonimmigrants whose status was reinstated did not accrue unlawful presence during the period of time that they were out of status.

In this case, USCIS issued the August PM revising its guidance of when "unlawful presence" starts accruing for such former foreign students or exchange visitors. Under the prior guidance, a foreign student or exchange visitor who was admitted for duration of status, but failed to maintain his or her status or violated that status, did not begin to accrue unlawful presence until the day after USCIS (in the context of a subsequent immigration benefit) or an immigration judge (in the context of removal proceedings) found that the foreign national failed to maintain his or her status or violated his or her status. *See* Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (May 6, 2009) (ECF No. 14-3). Similarly, under the prior approach, a foreign student or exchange visitor who was admitted for a specific period of time ("date certain") generally did not begin to accrue unlawful presence until the day after the authorized period of admission, as reflected on Form I-94, expired. *See id.* This was true even when such an individual engaged in activities inconsistent with their status (such as unauthorized employment) while his or her authorized period of admission had not expired unless USCIS or an immigration judge found that the foreign national failed to maintain his or her status or violated status. *Id.*

The concept of "unlawful presence" is important in the INA because it may implicate a 3- or 10-year bar to admission. Thus, for example, a foreign national who is found to have accrued unlawful presence of more than 180 days but less than one year, and who departs the United States

after accruing that period of unlawful presence, is inadmissible to the United States for a period of 3 years; if the foreign national accrued at least one year of unlawful presence and then departed the United States, the foreign national would be inadmissible for a period of 10 years. Essentially, the August PM provides guidance for USCIS personnel on when "the clock" for unlawful presence begins to tick (that is, when unlawful presence begins to accrue), which is now determined by when a nonimmigrant student or exchange visitor ceases to comply with the conditions under which he or she was admitted (as they will know when they stop attending classes, graduate, or otherwise violate or fail to maintain their status), unless they are otherwise in an authorized period of stay.

Nevertheless, it is important to note the difference between unlawful *presence* (that is, a foreign national not being in a period of authorized stay) and unlawful immigration *status* (being present without an unexpired authorized period of admission or in a lawful status), which are related but distinct concepts. A foreign national accruing unlawful presence is typically present in the United States without lawful immigration status. A foreign national in unlawful immigration status, though, is not necessarily accruing unlawful presence. There are situations in which a foreign national who is present in an unlawful immigration status might be in a period of authorized stay and is, therefore, protected from accruing unlawful presence. However, such a foreign national in unlawful immigration status may still be placed in removal proceedings, and can ultimately be removed by ICE, even though he or she is in a period of stay authorized. The fact that the foreign national does not accrue unlawful presence does not mean that the foreign national's presence in the United States is actually lawful. This is important because notwithstanding the August PM, a foreign national who failed to maintain his or her status, or otherwise violated that status, would

always have been subject to removal from the United States, and placed in removal proceedings before an immigration judge, even if he or she was not accruing unlawful presence that would lead to inadmissibility upon departure from the United States.

## II.    Factual And Procedural Background.

Plaintiffs filed the operative complaint on December 14, 2018. ECF No. 14 (Pls.' Compl."). One set of Plaintiffs includes colleges and collegiate associations from California, New York, North Carolina, and Pennsylvania. *Id.* ¶¶ 21, 24, 28, 39, 42. They have sued because they allege that they enroll, employ, and graduate numerous foreign students based on F, J, and M visas. *See generally id.* ¶¶ 20–46. Another Plaintiff-organization is the American Federation of Teachers ("AFT"), a union affiliate that allegedly serves and advocates for F and J nonimmigrants. *Id.* ¶¶ 48–50. The educational institutions allege that the foreign students with whom they associated may now or in the future become unlawfully present, but they do not allege the quantity of such nonimmigrants. The educational institutions claim this burdens them and their students, and may cost them tuition. *Id.* ¶¶ 23, 38, 41, 45–46; *see also id.* ¶ 24–27 (for Plaintiff Guilford College International Club, alleging no injury); *id.* ¶¶ 47–50 (for AFT, alleging no injury).

The final set of Plaintiffs are two former students who entered the United States on F-1 nonimmigrant visas. *Id.* ¶¶ 52, 61. They admit to no longer being enrolled in classes or practical training, as required by the terms of their nonimmigrant visas, but they have sought to enlist in the United States Army and are currently undergoing DOD background checks to determine whether they are suitable for military service. *Id.* ¶¶ 56–57, 62–63. In the meantime, the Army has placed them in the Delayed Entry Program ("DEP"), *id.* ¶¶ 56, 62, which is a program for individuals who seek enlistment in a regular component of an armed force but are temporarily enlisted as Reserves

- 11 -

prior to being permitted to serve on active duty, *see* 10 U.S.C. § 513. MAVNI enlistees may be placed in the DEP, but are not permitted to enter into service in a regular or reserve component while their security and suitability screening requirements and military-service suitability determinations are in progress. *Id.* The Plaintiffs claim that the August PM (1) violates the APA's notice-and-comment requirements; (2) is arbitrary and capricious; (3) is inconsistent with the INA; and (4) violates due process. *See* Compl. 36–42.

## STANDARDS OF REVIEW

### I.    Federal Rule Of Civil Procedure 12(b)(1).

Under Civil Rule 12(b)(1), a party may seek dismissal based on a court's "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Subject matter jurisdiction is a threshold issue that relates to the court's power to hear a case and must be decided before a determination on the merits of the case. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 479–80 (4th Cir. 2005). A motion under Rule 12(b)(1) raises the question of "whether [the plaintiff] has a right to be in the district court at all and whether the court has the power to hear and dispose of [the] claim." *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012). The burden of proving subject matter jurisdiction rests with the Plaintiff. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

### II.    Federal Rule Of Civil Procedure 12(b)(6).

A motion to dismiss under Civil Rule 12(b)(6) "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). Such a motion "should be granted unless the complaint 'states a plausible claim for relief.'"   *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017) (internal citation omitted, quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679

(2009)). To that end, although courts must accept all factual allegations as true, they are "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. Thus, a complaint may fail to state a claim upon which relief can be granted in two ways: first, by failing to state a valid legal cause of action (that is, a cognizable claim), *see Holloway*, 669 F.3d at 452; or second, by failing to allege sufficient facts to support a legal cause of action, *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).

## ARGUMENT

This case should be dismissed pursuant to Civil Rules 12(b)(1) and (b)(6) because neither the organizational nor the individual Plaintiffs have standing and because there has been no final agency action applying an unlawful-presence bar to the individual Plaintiffs, whose MAVNI applications are still pending agency action with the DOD.

## I.        The Plaintiffs Lack Standing.

The first fundamental flaw with Plaintiffs' Complaint is how they lack standing right now to challenge the August PM. The organizational Plaintiffs do not expressly identify the capacity in which they bring this suit. Regardless, they make little or no attempt to identify any injury whatsoever to their own interests as organizations, merely pointing to the fact that they have current (not former) foreign students amongst their ranks. Pls.' Compl. at 6–10. Their allegations are, therefore, patently insufficient to establish standing. The individual Plaintiffs similarly do not yet have standing under the APA because their claims are unripe. If the Army ultimately finds that they are suitable for military service and they begin serving honorably during a designated time of conflict, they may become eligible for naturalization under 8 U.S.C. § 1440 without regard to any past period of unlawful presence. And even if they are not found suitable for military service, they

- 13 -

will not become inadmissible based on the accrual of unlawful presence until they accrue at least 180 days of unlawful presence, depart the United States, and then seek readmission within the inadmissibility period. 8 U.S.C. § 1182(a)(9)(B). That chain of events is entirely speculative.

A.    *Organizational Plaintiffs*

To establish Article III standing, an organization suing on its own behalf must meet the familiar standing requirements that apply to individuals: (1) injury in fact; (2) causation; and (3) redressability. *See, e.g.*, *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands*, LLC, 713 F.3d 175, 184 (4th Cir. 2013). As the parties invoking the Court's jurisdiction, the Plaintiff-organizations bear the burden "clearly to allege facts demonstrating" each of these three elements. *Warth v. Seldin*, 422 U.S. 490, 518 (1975). The necessary facts "must affirmatively appear in the record" and "cannot be inferred argumentatively from averments in the pleadings." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). The standing inquiry is "especially rigorous" where, as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted).

Here, however the Plaintiff-organizations themselves are not subject to the August PM. Nor are their current students ("members"), including nonimmigrant students who are maintaining their nonimmigrant status. Instead, a generous reading of the Complaint reveals, at most, the Plaintiff-organizations' dissatisfaction with the alleged effects of the August PM on *former* nonimmigrant students who have, by definition, lost their connection to the universities.[3] But an

---

[3]    Plaintiff the American Federation of Teachers ("AFT") fares no better on this front because its anonymous members in this litigation, John and Janes Doe, are *current* F-1 nonimmigrants and thus have not yet been affected by the PM. *See* ECF Nos. 16-5, 16-6, 16-7.

- 14 -

"organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Article III." *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

Nor do the Plaintiff-organizations show any injury to their own activities. To satisfy Article III under this theory of standing, an organization must demonstrate a "concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources—constitut[ing] ... more than simply a setback to the organization's abstract social interests." *Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (alterations in original) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "Such a showing requires 'more than allegations of damage to an interest in "seeing" the law obeyed or a social goal furthered.'" *Id.* (quoting *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987)). Rather, "the organization must allege that discrete programmatic concerns are being directly and adversely affected" by the challenged action. *Id.* Here, the vast majority of the Plaintiff-organizations do not even try to meet this test. Only the New School and Haverford College have alleged *any* change in their practices. Pls.' Compl. at 8–9.

Otherwise, the most the Plaintiff-organizations argue is that the August PM's application to any of their current or future foreign students might cause them to change how they handle the "student-university relationship" with foreign students. Pls.' Compl. ¶ 46. Even assuming this allegation of injury is sufficient for purposes of organizational standing, it fails to allege an ongoing injury that would entitle them to the injunctive relief they seek. *McBurney v. Cuccinelli*, 616 F.3d 393, 410–11 (4th Cir. 2010) ("to maintain standing for declaratory and injunctive relief" a plaintiff

must "plead an[] ongoing injury" (emphasis omitted)). To satisfy the case or controversy requirement of Article III in an action seeking only prospective relief through an injunction or declaratory judgment, a plaintiff must show exposure to illegal conduct accompanied by "continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("Absent a sufficient likelihood that he will again be wronged in a similar way, [plaintiff] is no more entitled to an injunction than any other citizen"). Here, the sole allegation of injury to organizational standing relates to an alleged diversion of resources to assist foreign students, a purported injury that is entirely unripe (see below). In the absence of an ongoing injury to its own activities, consisting of more than harm to its "abstract concern" for immigrant rights, the Plaintiff-organizations lack standing to obtain the prospective injunctive relief they seek. *Md. Highways Contractors Ass'n*, 933 F.2d at 1251; *McBurney*, 616 F.3d at 411.

Because the Plaintiff-organizations do not sufficiently allege injury to themselves, "they can establish standing only as representatives of those of their members who have been injured in fact." *Simon*, 426 U.S. at 40 (citation omitted). But it is a stretch to say that students are "members" of the universities for the purposes of standing doctrine and, aside from the AFT, the organizations fail to identify any particular member allegedly harmed by the PM, and that alone dooms any claim of representational standing. To plead representational standing, the Plaintiff-organizations must allege that "(1) [their] own members would have standing to sue in their own right; (2) the interests the organization[s] seek[] to protect are germane to the organization[s'] purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *Md. Highways Contractors Ass'n*, 933 F.2d at 1251. To satisfy the first of these prongs, an

- 16 -

association must at the very least name a specific member with standing for each claim it asserts. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (association must "name the individuals who were harmed"); *S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 184 (association must "identify a single specific member" who was injured). Only AFT's John and Janes Doe could fit this bill, but not even they do because, as explained below, their claims are unripe. General allegations, or listing of how many nonimmigrant students are currently enrolled in the Plaintiff-organizations, do not satisfy the elements for representational standing, which requires naming a particular member or members. *See Summers*, 555 U.S. at 498.

### B. Ripeness and the Individual Plaintiffs

A related issue regarding both AFT's Doe members and the individual Plaintiffs' standing is ripeness. For a case or controversy to be ripe for judicial review, it must involve "an administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties." *Charter Fed. Sav. Bank v. Office of Thrift Supervision,* 976 F.2d 203, 208 (4th Cir. 1992). This description and others attempt to flesh out the holding of the seminal case on this point, *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99 (1977). *Abbott* requires that two questions be asked: (1) are the issues fit for judicial review and (2) will hardship fall to the parties upon withholding court consideration? *Id.* at 149. This is important because it goes to both standing as well as the "interest in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Reg'l Mgmt. Corp., Inc. v. Legal Servs. Corp.,* 186 F.3d 457, 465 (4th Cir. 1999).

The Fourth Circuit has clarified the first prong of this test as a case involving "purely legal [issues] and where the agency rule or action giving rise to the controversy is final and not

dependent upon future uncertainties or intervening agency rulings." *Charter Fed.*, 976 F.2d at 208. That is entirely lacking for the AFT's Doe members because it is entirely uncertain whether the August PM will ever apply to them, and it certainly does not apply to them now. *See* ECF Nos. 16-5, 16-6, 16-7. They simply allege that they are current F-1 students who *may* be affected based on unspecified potential violations of their nonimmigrant status. *Id.*

As for Plaintiffs Sen Li and Jia Ye, it is entirely unclear whether the PM will ever affect them while their military-service suitability determinations are pending. A favorable determination could potentially make them eligible for naturalization under 8 U.S.C. § 1440. And, of course, the unlawful presence bars they ostensibly fear will only apply to them if they accrue at least 180 days of unlawful presence, depart the United States, and thereafter seek readmission. 8 U.S.C. § 1182(a)(9)(B). Like the AFT's Doe members, that is entirely speculative. *Texas v. United States,* 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (internal quotation omitted)); *accord Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 940 (D.C. Cir. 1986) (R. B. Ginsburg, J.)). This makes judicial action inappropriate at this time.

Fourth Circuit precedent is in line with this principle. In *Charter Federal*, a financial institution sought a ruling from the FDIC as to the enforceability of a contract before the FDIC even threatened any action against the institution. The court of appeals held that the case was not ripe for review. *Id.* at 207. This is entirely applicable to the individual Plaintiffs here. The Fourth Circuit found that "several contingencies separate[d] Charter from a threat of final agency action," and, therefore, held that "the tentative nature of the FDIC's involvement renders Charter's claims not ripe[.]" *Id.* at 209. And even more like this case, the Fourth Circuit has ruled that judicial

review was not proper for a challenge to an internal EPA memorandum discussing a new permitting system. *See Appalachian Energy Group v. EPA*, 33 F.3d 319, 322 (4th Cir. 1994). In other words, "the agency rule or action giving rise to the controversy ... [is not yet] final and … dependent upon future uncertainties or intervening agency rulings," *Charter Fed.*, 976 F.2d at 208, making the effects upon the individual Plaintiffs "dependent upon numerous contingencies," *Kemler v. Poston*, 108 F. Supp. 2d 529, 541 (E.D. Va. 2000).

## II.     Final Agency Action

Another jurisdictional concern exists here because there has not yet been final agency action regarding the individual Plaintiffs. If the challenged agency action is not "final" under the APA, a court must dismiss the complaint for lack of subject matter jurisdiction. *Invention Submission Corp. v. Rogan,* 357 F.3d 452, 460 (4th Cir. 2004).[4] The "core question" is whether an action marks the completion of the "decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts,* 505 U.S. 788, 797 (1992). Thus, "[w]here relief is available from an administrative agency, the plaintiff is ordinarily required to pursue that avenue of redress before proceeding to the courts, and until that recourse is exhausted, suit is premature and must be dismissed." *Reiter v. Cooper*, 507 U.S. 258, 269 (1993); *accord Massieu v. Reno*, 91 F.3d 416, 421 (3d Cir. 1996) (Alito, J.) ("[I] it is well settled that judicial review is precluded if the alien has failed to avail himself of all administrative remedies[.]" (quotations and citations omitted)). Anything less is contrary to the APA's statutory framework

---

[4]     There is a circuit split on this question as to whether APA finality is truly jurisdictional and should be decided based on Civil Rule 12(b)(1) or (b)(6). *Compare Trudeau v. FTC*, 456 F.3d 178, 184–85 (D.C. Cir. 2006) (merits), *with Belle Co. v. U.S. Army Corps of Eng'rs*, 761 F.3d 383, 387–88 (5th Cir. 2014) (jurisdictional). Defendants move to dismiss under both rules out of an abundance of caution.

- 19 -

and would allow Plaintiffs to raise their claims in district court to effectively "bypass the administrative process" and undermine Congress' intent to streamline judicial review and conserve judicial resources. *Kurfees v. INS*, 275 F.3d 332, 336 (4th Cir. 2001).

This requirement bars the individual Plaintiffs' suit because, as noted above, several events must take place before anyone involved in this litigation will be subject to an inadmissibility determination. Moreover, the Army still has not rendered military-service suitability determinations to decide whether the individual Plaintiffs will be permitted to serve, thereby potentially becoming eligible for military naturalization under 8 U.S.C. § 1440 such that the unlawful presence bar will *never* apply to them. *See* ECF Nos. 16-1, 16-2. Where there are ongoing administrative processes that may entirely moot the underlying APA challenge, courts lack jurisdiction under the APA. *See, e.g.*, *Qureshi v. Holder*, 663 F.3d 778, 780–81 (5th Cir. 2011) (no final agency action for something it is "only an intermediate step in a multi-stage administrative process"); *Cabaccang v. USCIS*, 627 F.3d 1313, 1317 (9th Cir. 2010) (same); *see also Dhakal v. Sessions*, 895 F.3d 532, 540 & n.10 (7th Cir. 2018); *Jama v. DHS*, 760 F.3d 490, 496 (6th Cir. 2014). With such administrative processes still underway, this Court is without jurisdiction under the APA.

## CONCLUSION

Based on the foregoing, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint.

- 20 -

Dated: January 9, 2019                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

WILLIAM C. PEACHEY
Director

GLENN M. GIRDHARRY
Assistant Director

By: */s/ Joshua S. Press*
JOSHUA S. PRESS
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Phone: (202) 305-0106
Facsimile: (202) 305-7000
e-Mail: joshua.press@usdoj.gov

*Attorneys for Defendants*

- 21 -

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2019, I electronically filed the foregoing with the Clerk

of the Court by using the CM/ECF system, which will provide electronic notice and an electronic

link to this document to all attorneys of record.


DATED:   January 9, 2019

By: */s/ Joshua S. Press*_____
    JOSHUA S. PRESS
    Trial Attorney
    United States Department of Justice
    Civil Division

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d), I hereby certify that this filing contains 6,250 words, excluding all parts of the brief exempted by that same rule.

DATED:   January 9, 2019

By: */s/ Joshua S. Press*
JOSHUA S. PRESS
Trial Attorney
United States Department of Justice
Civil Division

- 23 -