

May 24, 2018

Mr. L. Francis Cissna
Director
U. S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, DC 20529

Dear Director Cissna:

NAFSA: Association of International Educators writes in response to the U.S. Citizenship and Immigration Services (USCIS) policy memorandum of May 10, 2018, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants." The memo is an abrupt, radical departure from more than 20 years of policy guidance. NAFSA requests that USCIS withdraw the memo and implement the recommendations provided below.

The proposed change is operationally complex and may lead to wrongly identifying a large number of foreign students and exchange visitors as failing to maintain lawful status, thus unfairly subjecting them to the 3-year, 10-year, or permanent bars to re-entry to the United States. Like American students, international students should be allowed to complete their studies at their chosen institution, without the stress or fear of being deported based on an oversight of which they may not be aware.

This memo eliminates the long-held distinction between violating immigration status and being unlawfully present in the United States. The concept of "unlawful presence" with various "clocks," "tolling" provisions, and "bars" has to this point been the purview of immigration law specialists and law school classes. Immigration policy is incredibly complex with dire consequences for violation. Foreign students, scholars, and exchange visitors are not immigration attorneys or policy professionals and it is unfair to treat them as such. Unlawful presence should only trigger when there is clear notice of remaining beyond an expiration date of authorized stay in the United States and not when there is a contestable allegation of violation of status.

This proposal is yet another policy which makes the United States less attractive to talented international students, scholars, and exchange visitors and undoubtedly will encourage them to look elsewhere to do their groundbreaking research and build diplomatic ties. Foreign students, scholars, and exchange visitors are here to learn, and they make America safer by becoming the nation's best ambassadors and allies. By treating them all as criminals for minor or technical violations, we will be making America less safe and a less desirable place to study. This is contrary to our nation's values as a welcoming nation of immigrants.

NAFSA: ASSOCIATION OF INTERNATIONAL EDUCATORS

1307 New York Avenue NW, Eighth Floor, Washington, DC 20005-4701 USA • Telephone: 1.202.737.3699 • Fax: 1.202.737.3657 • E-mail: inbox@nafsa.org • Web: www.nafsa.org

GC CAR000557

Further, USCIS may achieve the goal of reducing the number of nonimmigrants who violate immigration status or stay beyond the legally allowable period through the implementation of various policies within the sub-agencies of the Department of Homeland Security (DHS) and in collaboration with other federal agencies. These policy changes must be implemented before announcing a policy change that will apply a disproportionate punishment of the 3-year, 10-year, and permanent bars of admissibility to international students and exchange visitors and their spouses and children.

**Background**

The current policy has held up for more than twenty years because it provides bright-line dates established in government systems, which give adequate notice to students and exchange visitors and their schools and exchange programs.

The expiration date on a Form I-94 is one such clearly established date. If an individual stays beyond that date, he or she begins to accumulate days of unlawful presence. Many status violations do not present such a bright line, particularly because there is overlap between different types of "status." For example,

- Visa status (the validity period of the nonimmigrant visa in your passport)

- SEVIS status (the draft, initial, active, completed, deactivated, or terminated status of a nonimmigrant's electronic record in the Student and Exchange Visitor Information System database)

- Nonimmigrant status (abiding by the duration and other conditions of the nonimmigrant category in which an alien is admitted to the United States by DHS)

DHS now proposes to directly equate a violation of nonimmigrant status accorded under INA 214, with the start of counting days of unlawful presence under INA 212(a)(9)(B).

While an alien who violates his or her nonimmigrant status is certainly removable, the policy in place for the last 20 years that distinguishes between status violations and unlawful presence makes sense for purposes of applying INA 212(a)(9)(B), from both legal and public policy viewpoints. A clear government determination, whether it is the expiration date on a nonimmigrant's Form I-94, or a formal finding of a status violation made in the course of a DHS benefits determination or by an immigration judge, serves as a fair and clear warning to an alien that the clock is ticking, and he or she must take action to leave the United States or otherwise cure the status deficiency. An alien who persists after such fair notice, must face the possibility of not being able to return to the United States for either 3 or 10 years.

**Complexity**

INA 214(a)(1) provides that, "admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General [DHS Secretary] may by regulations prescribe..."

Nonimmigrant status is a legal condition, not a physical thing. It is also dynamic, not static, which means that a person's nonimmigrant status must be acquired and maintained, and can be changed, or lost, and in some circumstances, reinstated. In many respects,

NAFSA: ASSOCIATION OF INTERNATIONAL EDUCATORS
1307 New York Avenue NW, Eighth Floor, Washington, DC 20005-4701 USA • Telephone: 1.202.737.3699 • Fax: 1.202.737.3657 • E-mail: inbox@nafsa.org • Web: www.nafsa.org

GC CAR000558

nonimmigrant status is a relationship with the U.S. immigration system, with actions, events, and data in the "real" world contributing to the acquisition and maintenance, change, loss, or restoration, of the nonimmigrant relationship.

These actions, events, and data are often recorded and presented in relation to one another in the form of physical and electronic documents and records. Documents and electronic records only point to immigration status, though; they do not stand in the place of it. In this sense, the various documents associated with a nonimmigrant status, and the data contained in databases associated with that status, should be viewed as indicators of nonimmigrant status. If all documents and electronic records are consistent, their reliability as indicators of immigration status is high. However, these documents and records reflect only a snapshot in time, they reflect only some, not all, actions, events, and data, and they are subject to both machine and human error.

A failure to account for inconsistency among immigration documents, electronic records, and actions and events in the real world could lead to an adverse determination on status or benefit eligibility. Whether the data in documents and electronic records is being interpreted correctly, taking into account all applicable law and policy, is also a primary concern.

Immigration law is complicated, and both compliance and enforcement is a very technical matter that requires training and expertise. Because of this complexity, an alien might not even know he or she is "out of status" until informed by the government.

**Fairness**

Because the INA 212(a)(9)(B) penalties are so severe, we must also weigh the fairness of the policies enforcing that law. Long USCIS adjudication times, for example, may lead to someone becoming subject to the unlawful presence penalties in any case that is ultimately denied. For example, consider a student who registers for fewer classes than she should have one semester, which leads her school to terminate her SEVIS record. In good faith, the student registers for a full course of study the next semester, and applies in good faith to USCIS to reinstate her student status. It is not uncommon for a USCIS Service Center to take six months or longer to adjudicate an application for reinstatement to student status.

Under current USCIS policy, if USCIS ultimately denies her reinstatement the student would start counting unlawful presence as of the date of the denial, which gives sufficient time to either make arrangements to leave the country, or possibly to ask USCIS to reconsider its decision. In the proposed policy, virtually all students whose reinstatement applications are denied would find themselves subject to at least the 3-year bar, merely because USCIS takes so long to adjudicate applications for reinstatement.

In addition, a student or exchange visitor might not even know that he or she was in violation of status until DHS makes a formal determination of that. If the unlawful presence "clock" is seen to start at some distant time in the past in such cases, any window for departing the country will have passed.

NAFSA: ASSOCIATION OF INTERNATIONAL EDUCATORS
1307 New York Avenue NW, Eighth Floor, Washington, DC 20005-4701 USA • Telephone: 1.202.737.3699 • Fax: 1.202.737.3657 • E-mail: inbox@nafsa.org • Web: www.nafsa.org

GC CAR000559

**Interagency Coordination**

There is no indication that USCIS has adequately coordinated implementation of this extreme policy shift with other government stakeholders, including the Department of State (including the Visa Office and the Bureau of Education and Cultural Affairs' Exchange Visitor Program), and other divisions of DHS, such as Immigration and Customs Enforcement (ICE), the Student and Exchange Visitor Program (SEVP), and Customs and Border Protection.

**Recommendations**

In lieu of implementing the policy described in the memo, NAFSA recommends the following.

- Leave in place the current policy, which has served for over 20 years. Neither DHS nor legacy INS ever published regulations to implement this important area of law. If the agency wishes to implement such a drastic change to longstanding common interpretation of the law, it must be done through the notice and comment process.

- Do not implement any policy change until implementation has been fully coordinated with the Department of State and other DHS units such as CBP and SEVP.

- Exclude from the unlawful presence count any status violations that occurred under color of law, to avoid "gotcha" scenarios, where the student reasonably relied on the authorizations granted. For example, curricular practical training authorized in SEVIS that DHS later determines may have been improperly given, should not start the unlawful presence "clock" until DHS or an immigration judge makes a formal status determination.

- Apply the change of status/extension of stay tolling rules to reinstatement applications.

- Expand the sections describing examples where F, M, and J nonimmigrants "do not accrue unlawful presence in certain situations." [draft Adjudicator's Field Manual 40.9.2(b)(1)(E)(iii)].

Thank you for the opportunity to comment.

Sincerely,

Esther D. Brimmer, Executive Director and CEO

NAFSA: ASSOCIATION OF INTERNATIONAL EDUCATORS

1307 New York Avenue NW, Eighth Floor, Washington, DC 20005-4701 USA • Telephone: 1.202.737.3699 • Fax: 1.202.737.3657 • E-mail: inbox@nafsa.org • Web: www.nafsa.org

GC CAR000560

Case 1:18-cv-00891-LCB-JEP   Document 57-2   Filed 07/03/19   Page 4 of 203



June 8, 2018

The Honorable L. Francis Cissna
Director
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, D.C. 20529

Dear Director Cissna:

The Alliance for International Exchange, an association of 90 nongovernmental organizations comprising the international educational and cultural exchange community in the United States, writes to comment on the U.S. Citizenship and Immigration Services (USCIS) policy memorandum dated May 10, 2018 concerning the "Accrual of Unlawful Presence and F, J, and M Nonimmigrants." While we support the overall goals of upholding the rule of law and ensuring our national security, we have some concerns regarding the new policy guidance.

Nonimmigrant foreign students and exchange visitors are usually admitted entry to the United States for duration of status rather than for date certain visas. While foreign students and exchange visitors are advised of U.S. laws and program compliance requirements, including the requirement not to overstay visas, maintaining lawful status may be inadvertently or unknowingly violated in minor, technical infractions. For example, minor deviations from the scope of exchange visitor activities that are raised in a U.S. Department of State site visit are subsequently remedied by the host and participant. Under the new policy guidance, that scenario could start the accrual of unlawful presence due to the inadvertent violation of status, even if it is something that is remedied under existing protocols outlined in 22 CFR 62.45. We encourage the agency to factor in these protocols, along with the ability of the Student and Exchange Visitor Program (SEVP) or the U.S. Department of State to approve reinstatements of program to valid status, into this policy guidance.

Under the new policy guidance, foreign students and exchange visitors begin accruing unlawful presence due to failure to maintain status on the day after no longer pursuing "the course of study or the authorized activity, or the day after he or she engages in an unauthorized activity." Unauthorized activity could be interpreted so that minor issues, such as not securing a travel validation before international travel, could have significant long-term implications.

While we support improving technologies and systems used to monitor compliance with programs, the systems are subject to automated and clerical errors. These factors should be taken into account in determining violation of status leading to accrual of unlawful presence. We encourage USCIS to continue working with the U.S. Department of State and other federal agencies to improve the accuracy of data collected by these systems to ensure that foreign students and exchange visitors are not negatively impacted by inaccurate information.

Under existing exchange program guidelines, there is a grace period for participants to depart the country to allow for potential travel disruptions. We support maintaining a grace period, consistent with guidance from U.S. Department of State and other departments and agencies, to allow for

GC CAR000561



adequate departure plans before unlawful presence begins accruing. We thank the agency for maintaining this grace period in the draft policy guidance and request that any future versions continue to do so.

Exchange programs are an important part of our public diplomacy efforts furthering U.S. national security. We support maintaining the integrity of the programs and ensuring its continued robustness through fair enforcement of the rule of law.

Sincerely,

Ilir Zherka
Executive Director

GC CAR000562

 

Mr. L. Francis Cissna                    **Submitted via publicengagementfeedback@uscis.dhs.gov**
Director
United States Citizenship and Immigration Service                    June 7, 2018
Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, DC 20529

**Re: Accrual of Unlawful Presence and F, J, and M Nonimmigrants (PM-602-1060),
Dated May 10, 2018**

Dear Director Cissna:

  The University of St. Thomas submits this comment in response to the above
referenced policy memorandum.  The May 10, 2018 Policy Memorandum, PM-602-1060 *on
Accrual of Unlawful Presence and F, J, and M non-immigrants* (May 2018 Memorandum) is
an extreme departure from past practice which eliminates the historic distinction between
violating immigration status and being unlawfully present in the United States, but for only
the F, J, and M non-immigrants.   Moreover, USCIS's proposed retroactive adjudication of
unlawful presence for F, J, and M non-immigrants is vague, unfair, violates our
understanding of due process, and allows USCIS to arbitrarily second-guess decisions
delegated to Designated School Officials (DSOs) by regulation.

  The University of St. Thomas does not intend to minimize the seriousness of the
situation for Fs, Js, or Ms who have their record in SEVIS terminated for failure to enroll, or
who remain after the expiration of their 60 day grace period following graduation, but the
university believes there are better ways to address those violations. With the low
percentage of F, J, and Ms overstay violations reported by USCIS, the University of St.
Thomas questions whether it is worth upending the existing system that has generally
worked well for many years and replacing it with a new, vague, ill-defined and
operationally complex policy that imposes a severe penalty for both major and minor
infractions and creates an opaque enforcement system. The University of St. Thomas
believes that the new policy in the May 2018 Memorandum will be impractical for USCIS to
enforce and will likely lead to unpredictable and unreasonable outcomes for F, J, and M
non-immigrants.

  Instead, the University of St. Thomas recommends that the United States Citizenship
and Immigration Services (USCIS) reconsider or withdraw the proposed changes to accrual
of unlawful presence in the May 2018 Memorandum for the reasons stated below, and
instead continue to apply the May 6, 2009 Policy Memorandum on the *Consolidation of*

GC CAR000563

*Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I)* (May 2009 Memorandum).

## About the University of St. Thomas:

The University of St. Thomas is a private non-profit Catholic university based in St. Paul, Minnesota with additional campuses in Minneapolis, Minnesota and in Rome, Italy. Founded in 1885, the University of St. Thomas is the largest private university in Minnesota, and nationally known for academic excellence. The University of St. Thomas prepares its students for the complexities of the contemporary world. Our university is rooted in the Catholic intellectual tradition, students are taught to think critically, act wisely and work for the common good. The University of St. Thomas's approximately 10,000 students pursue degrees in a wide range of liberal arts, professional and graduate programs.

Within that student body, The University of St. Thomas has more than 500 F-1 and J-1 students and international scholars from more than 70 different countries. The diversity that these F-1s and J-1s bring adds an important dimension to the college experience. The University of St. Thomas' Office of International Students and Scholars (OISS) provides a wide variety of services for the F-1 and J-1 students that attend the University, including handling the SEVIS issues for our F and J non-immigrants. OISS also co-leads an international student retention group to help minimize barriers and enhance success.

University of St. Thomas' OISS has received praise from the Department of Homeland Security Student and Exchange Visitor Program (SEVP) as a model institution for compliance with immigration regulations. DHS SEVP Liaison brought SEVP central personnel to meet with University of St. Thomas OISS as a sample model school.

## The May 2018 Memorandum Is Too Vague:

The May 2018 Memorandum on unlawful presence as drafted is too vague, making it difficult to advise students on the best of course of action to avoid incurring unlawful presence. On page 4, the May 2018 Memorandum states that on or after August 9, 2018 the F, J, or M non immigrant (and dependents) will begin accruing unlawful presence "the day after the F, J, or M nonimmigrant no longer pursues the course of study or the authorized activity, or the day after he or she engages in an unauthorized activity." For reasons that we explain below, this entire bullet point does not inform students or advisors of what activities trigger unlawful presence or when an activity would trigger unlawful presence.

GC CAR000564

It is unclear what "no longer pursues course of study" means in light of different institutional rules about financial holds on registration, late registration, and drop/add. With regard to "the day after the F, J, or M nonimmigrant no longer pursues the course of study", USCIS has not explained how it will know "the day" that happened and the objective measure it would use to determine when a student no longer pursues a course of study. If USCIS had wanted a clear and simple rule, USCIS could have stated that unlawful presence begins when the Designated School Official terminates the F, J, or M non-immigrant's record in SEVIS for failure to register or maintain a full course or study without approval of the Designated School Official. USCIS in the May 2018 Memorandum does not adopt such a simple rule unfortunately, and it does not explicitly use the definitions in 8 CFR § 214.2(f)(6) of "full course of study."

It is not clear whether an F-1 student has failed to pursue a course of study when the student would like to enroll in classes, but the student cannot register for classes due to a financial hold. Institutions have different rules and grace periods for lifting the financial hold and enabling enrollment even after the beginning of a semester and the start of classes. The May 2018 Memorandum is unclear as to whether unlawful presence will begin in the circumstances of a financial hold, and if so, if it will begin at the end of the grace period set by the college or university, or at some other time. The May 2018 Memorandum also does not make clear, if the USCIS adjudicator will apply the institution's rules applicable at the time of the financial hold, or at the time of adjudication, or how USCIS will address a situation where the institution's rules applicable at the time of financial hold are no longer available or applicable.

In addition, there are similar concerns about the wide variety of rules at different institutions of higher education about late registration, and dropping and adding classes. USCIS in the May 2018 Memorandum does not clarify how drop/add rules or late registration rules might apply in the pursuit of a course of study. The May 2018 Memorandum is unclear as to whether unlawful presence will be triggered if a student registers late, but within an institution's grace period, or if a student drops a class, thereby falling temporarily below full-time, but later adds a new class (either within the institution's grace period or perhaps not).

Similarly, USCIS in the May 2018 Memorandum provides no clear guidance as to what USCIS means by "engaged in an unauthorized activity." It is unclear exactly what activities USCIS means to include, in addition to the requirement of pursuing a course of study specifically noted in the May 2018 Memorandum. Students are required to do a lot of different things under 8 CFR § 214.2(f) such as report change of address, seek extensions of Curricular Practical Training (CPT), report changes in OPT employers, inform the DSO of changes of major, work on OPT in a position related to their degree, work on-campus part-

GC CAR000565

time during class and full-time during breaks, obey the terms of their CPT as to part-time or full-time, report to the institution at the beginning of the semester, and not work without authorization, to name a few. It is not clear whether USCIS means in the May 2018 Memorandum to include a failure to adhere to one or more of these rules, or all of them. Also, some of these norms are not well-defined, such as what constitutes part-time, when a change of major must be reported, and other institutional rules. USCIS adds to the confusion by not clearly stating that the bullet pointed activities on page 10 and 11 are permitted in-status activities for students within the rules of 8 CFR § 214.2(f). Instead USCIS calls this a list of activities where students "generally do not accrue unlawful presence," which is not the same thing, and invites USCIS adjudicators to question whether a student who engages in a specifically authorized in-status activity has somehow violated status by doing so.

## The May 2018 Memorandum Process Proposed by USCIS for Determining Unlawful Presence Retroactively Is Unfair and Appears to Second Guess the Authority Delegated to Designated School Officials:

The May 2018 Memorandum proposes to have unlawful presence determined by USCIS officers when F, J, or M non-immigrants apply for benefits or a change of status. This means that USCIS will be looking backward months, or even years, over the course of a student's career to try to find a blemish on their status. If a violation of status is found, the USCIS adjudicator must determine the date unlawful presence began and inform the F, J, or M non-immigrant that they may be unlawfully present past the critical 180 day or 365 day periods. Because there is significant grey area around some of these rules, the student may not even be aware that USCIS would consider the blemish a violation of status.

Moreover, the F regulations and the regulations around SEVIS delegate significant authority in 8 CFR § 214.3 and 8 CFR § 214.4 to Designated School Officials (DSO) to address some of these issues and determine whether the issues are serious enough to warrant termination of a SEVIS record. USCIS with this May 2018 Memorandum appears to be intruding upon and second guessing the authority of the DSO to address these issues and resolve them.

## The May 2018 Memorandum Imposes Too Great A Penalty for Potentially Minor Violations:

International students, like U.S. students, are in college to get a degree and mature. Part of becoming a mature adult sometimes involves making minor mistakes and learning from them. International students are experiencing the world in a different country far from their parents and they sometimes make poor choices. The University of St. Thomas'

GC CAR000566

international advisers and Designated School Officials provide our international students with significant assistance to help them comply with F and J rules, but even with reminders, some students make mistakes. A mistake does not make someone a bad person and should not define their lives, or their academic careers. Most international students, once they realize a mistake is made, take action to correct the mistake and then do not make the same mistake in the future. The May 2018 Memorandum demands that young adults be mistake-free, which is unreasonable. While expecting students to continue to pursue a full-time course of study might be reasonable, it is not reasonable to throw away a whole academic career, because someone made a minor mistake. In fact, the whole process of reinstatement exists because USCIS and SEVP have recognized that mistakes do get made and that it many cases a mistake should not end an academic career.

## The May 2018 Memorandum Does Not Encourage Reporting Issues and Applying for Re-instatement:

The May 2018 Memorandum should encourage students to report issues and apply for reinstatement and this Memorandum does not. USCIS could solve this problem by simply not starting unlawful presence until after a decision was made on reinstatement. Under the May 2018 Memorandum, reinstatement will trigger unlawful presence on the day of the reported violation in the reinstatement request. According to footnote 29 of the May 2018 Memorandum, unlawful presence continues while the request pends without tolling, and only if it is approved, does the unlawful presence disappear. The current trend on reinstatement requests is that they increasingly take longer and longer to be processed, with some of them taking 6 months or more. Accordingly, students may avoid reporting and seeking reinstatement, because the student may not want to take the risk of becoming subject to an unlawful presence 3-year or 10 year bar upon departure from the U.S., while waiting for the reinstatement request to be adjudicated.

## University of St. Thomas' Policy Recommendations for USCIS:
- USCIS should withdraw the May 18, 2018 Memorandum and continue to apply the May 2009 Memorandum.
- USCIS should adopt a bright-line rule that provides advanced notice to the F, J, and M non-immigrant consistent with due process and other regulations for when unlawful presence begins. For example, by withdrawing the vague May 2018 Memorandum, USCIS could instead revise the May 6, 2009 Policy Memorandum so that unlawful presence for F, J, and M nonimmigrants accrues when the Designated School Official (DSO) or Responsible Officers (RO) or Alternate Responsible Officers (ARO) terminates the F, J, or M non-immigrant's record in SEVIS for failure to show or failure to enroll in course of study. However, unlawful presence would be tolled if a reinstatement was requested consistent with other guidance in the May 2009 Memorandum. This ground would be in addition to the

GC CAR000567

other instances noted in the May 2009 Memorandum when unlawful presence begins to accrue for F, J, and M non-immigrants.

- USCIS should adopt the Policy Recommendations in the NAFSA Letter, dated May 24, 2018 to USCIS Director Cissna.

We sincerely appreciate the opportunity to openly and candidly address our concerns.

Respectfully Submitted,

Lori Friedman, PDSO
Director, Office of International Students & Scholars
University of St. Thomas

GC CAR000568



BERKELEY INTERNATIONAL OFFICE
2299 Piedmont Avenue
Berkeley, California 94720-2321

TEL: (510) 642-2818
FAX: (510) 643-7289
EMAIL: internationaloffice@berkeley.edu

Mr. L. Francis Cissna
Director
U. S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Avenue,
NW Washington, DC 20529

Dear Director Cissna:

I write in response to the U.S. Citizenship and Immigration Services (USCIS) policy memorandum of May 10, 2018, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants." The memo is a departure from more than 20 years of policy guidance. We respectfully request that this policy not be implemented and instead further study the issue and coordinate a better strategy by coordinating with other agencies.

The proposed change is operationally complex and may lead to wrongly identifying some foreign students and exchange visitors as failing to maintain lawful status, thus unfairly subjecting them to the 3-year, 10-year, or permanent bars to re-entry to the United States. Given the huge financial investments made by international students they should be allowed to complete their studies at their chosen institution, without the stress or fear of being deported based on an oversight of which they may not be aware. This memo eliminates the long-held distinction between violating immigration status and being unlawfully present in the United States. The concept of "unlawful presence" with various "clocks," "tolling" provisions, and "bars" has to this point been the purview of immigration law specialists.

USCIS may achieve the goal of reducing the number of nonimmigrants who violate immigration status or stay beyond the legally allowable period through the implementation of various policies within the sub-agencies of the Department of Homeland Security (DHS) and in collaboration with other federal agencies. These policy changes must be implemented before announcing a policy change that will apply a disproportionate punishment of the 3-year, 10-year, and permanent bars of admissibility to international students and exchange visitors and their spouses.

A failure to account for inconsistency among immigration documents, electronic records, and actions and events in the real world could lead to an adverse determination on status or benefit eligibility. Whether the data in documents and electronic records is being interpreted correctly, taking into account all applicable law and policy, is also a primary concern. Immigration law is complicated, and both compliance and enforcement is a very technical matter that requires training and expertise. Because of this complexity, an alien might not even know he or she is "out of status" until informed by the government.

GC CAR000569

Because the INA 212(a)(9)(B) penalties are so severe, we must also weigh the fairness of the policies enforcing that law. Long USCIS adjudication times, for example, may lead to someone becoming subject to the unlawful presence penalties in any case that is ultimately denied. In the proposed policy, virtually all students who submit reinstatement applications and who are denied would find themselves subject to at least the 3-year bar, merely because USCIS takes so long to adjudicate applications for reinstatement. For example, a student who simply forgets to extend their I-20 and misses the extension deadline by more than 15 days ( PDSO extension window) and has only 1 semester left. These students can either travel and lose OPT or file for reinstatement. These reinstatements take up to 6 months or more. The risk for reinstatement would be so great that the student would have to make a terrible choice- to disrupt studies and travel at a critical completion period and lose post-completion training benefits OR apply for a reinstatement that might result in their facing 3-10 year bars if denied. In addition, a student or exchange visitor might not even know that he or she was in violation of status until DHS makes a formal determination of that. If the unlawful presence "clock" is seen to start at some distant time in the past in such cases, any window for departing the country will have passed.

In addition, there is no indication that USCIS has adequately coordinated implementation of this extreme policy shift with other government stakeholders, including the Department of State (including the Visa Office and the Bureau of Education and Cultural Affairs' Exchange Visitor Program), and other divisions of DHS, such as Immigration and Customs Enforcement (ICE), the Student and Exchange Visitor Program (SEVP), and Customs and Border Protection.

Recommendations in lieu of implementing the policy described in the memo:

• Leave in place the current policy, which has served for over 20 years. Neither DHS nor legacy INS ever published regulations to implement this important area of law. If the agency wishes to implement such a drastic change to longstanding common interpretation of the law, it must be done through the notice and comment process.

• Do not implement any policy change until implementation has been fully coordinated with the Department of State and other DHS units such as CBP and SEVP.

• Exclude from the unlawful presence count any status violations that occurred under color of law.

• Apply the change of status/extension of stay tolling rules to reinstatement applications.

• Expand the sections describing examples where F, M, and J nonimmigrants "do not accrue unlawful presence in certain situations."

Sincerely,

Ivor M. Emmanuel
Director

GC CAR000570

# UNIVERSITY OF MINNESOTA

June 5, 2018

Re: Accrual of Unlawful Presence and F, J, and M Nonimmigrants

Dear USCIS,

I am writing in regard to "Policy Memoranda: Accrual of Unlawful Presence and F, J, and M Nonimmigrants (PM-602-1060)." This proposal is a drastic change from the current interpretation and application of the regulations.

I work at the University of Minnesota, where we have a substantial number of international students, researchers, staff and faculty on our campuses who bring a wide range of experiences and perspectives to our classrooms and contribute to important discoveries and innovations in our research labs.

As a PDSO/ARO I was alarmed to read the proposed changes with regard to accrual of unlawful presence. I advise international students, scholars and their dependents on how to maintain their visa status. Maintaining legal status is something most of our population try to do, but for students, it means they need to be aware of visa regulations while also balancing the demands all students experience along with the University's requirements and sometimes this can be very confusing.

I am concerned about how I and my staff will assist F/J visa holders in understanding these new policies without unintentionally engaging in the unauthorized practice of law. The proposed changes are especially problematic because they would upend visa regulations that have been in place for over 20 years. What is so disturbing about this policy is that USCIS will in most instances not provide any advance warning or issue any specific adjudication to inform an F or J nonimmigrant that he/she has begun to accrue unlawful presence. Rather, the determination as to whether a violation has occurred that will trigger a finding of "unlawful presence" will oftentimes occur either at the time the individual seeks to adjust to permanent resident status or returns from a trip abroad.

Here are examples of some problems DSOs/AROs foresee with the implementation of this memoranda:

1. **Recent SEVP Portal Release:** SEVP recently implemented the Student Portal through which F-1 students on post-completion optional practical training (OPT) or STEM OPT are allowed to report their personal and/or employment information, but there have been issues with the system. Students are required to report these changes with ten days, but

## Driven to Discover℠

GC CAR000571

periodic problems with SEVIS and the Portal have resulted in incomplete information being available to students and instances when students have not been able to access the Portal. Additionally, some students have been confused about what information to enter and how to correctly enter it. All of this has resulted in incomplete and inaccurate data being reported to SEVIS through the Portal despite the best efforts of F-1 visa holders to report their information. Therefore, if USCIS relies on information from SEVIS (something the Policy memo mentions as a likely source of information for making decisions about violations of status), it is likely that there will be students judged to have violated their status based on bad data.

The new interpretation of the regulations could mean that these student could be judged to have violated their status and could be accruing unlawful presence without realizing it.

2. **Changes to Regulations Causing Previously Approved Actions to Become Violations:** SEVIS is set up so that school officials bear a great deal of responsibility for assisting F/J/M visa holders to maintain their status. As DSOs/AROs, we do our best to communicate with our students when there are changes to visa regulations and regulatory interpretations. This is not an easy task—especially when changes to regulations or regulatory interpretations require that we tell students something that is the reverse of what we previously correctly advised them.

In instances like the recent announcement restricting 3rd party employment for students on STEM OPT, it is very possible students will believe that they have done everything necessary to comply with the rules, only to apply to renew a visa or to change visa status in the future and be told that their actions (permissible when they started, but now not allowed due to changes in regulatory interpretations) were a violation of their status, and they have since accrued unlawful presence, barring them from changing visa status or re-entering the U.S.

These are but two recent examples of actions that could result in international students accruing unlawful presence **despite their attempts to follow the rules**. We foresee many additional problems and unintended consequences that will result from such a large and dramatic shift in regulatory interpretation.

These changes will likely result in confusion causing well-intentioned international students and exchange visitors to be found to have accrued unlawful presence due to innocent mistakes or misunderstandings of changing regulations. Due to the strict bars, these misunderstandings will have severe consequences. Consequences that do not match the severity of the status violation.

International students can choose to study anywhere in the world. Many international students who enroll at U.S. institutions are the best and brightest and receive offers to attend institutions around the world. While here, they excel in the classroom, and expose U.S. students to new perspectives and experiences which broaden their horizons.

GC CAR000572

In order to ensure international students fulfill the purpose they came for, we must ensure regulations are structured and implemented in a fair and transparent manner. We must work to limit uncertainty so that they can focus on learning instead of tracking constantly changing regulations. This new policy will have the opposite result.

I ask you to take these concerns into consideration and rather than making the proposed changes, consider the following recommendations suggested by NAFSA (Association of International Educators):

• Do not implement any policy change until implementation has been fully coordinated with the Department of State and other DHS units such as CBP and SEVP.
• Exclude from the unlawful presence status violations that occurred under color of law, to avoid "gotcha" scenarios, where the student reasonably relied on the authorizations granted. For example, curricular practical training authorized in SEVIS that DHS later determines may have been improperly given, should not start the unlawful presence "clock" until DHS or an immigration judge makes a formal status determination.
• Apply the change of status/extension of stay tolling rules to reinstatement applications.
• Expand the sections describing examples where F, M, and J nonimmigrants "do not accrue unlawful presence in certain situations." [draft Adjudicator's Field Manual 40.9.2(b)(1)(E)(iii)].

Thank you for taking my comments into consideration

Sincerely,

Theresa GanglGhassemlouei
Assistant Director for Advising/PDSO/ARO

GC CAR000573



# CLAUDIA SLOVINSKY & ASSOCIATES, PLLC

CLAUDIA SLOVINSKY (NY, NJ)
██@████

DOMINIC KONG (NY, NJ & DC)
██@█████

DAVID JACOBUS (NY)
██@██████



THE WOOLWORTH BUILDING
NEW YORK, NY ████
T: ████████
F: ████████
WWW.SLOVINSKY.COM

June 7, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

> **Re:** **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

I am an immigration attorney in practice for 35 years. I am very familiar with the issues regarding unlawful presence and the three, ten year and permanent bars to admission. I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge.

The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension.

What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

Additionally, the question as to whether an F, M or J visa holder has accrued unlawful presence so as to subject him or her to the three or ten year bar, is generally addressed when a subsequent visa is applied for at a US Consul abroad. This change would require the US consul to conduct an investigation and make a fact based determination whether a violation occurred that triggered the three or ten year bar. Such a complex issue would delay and compound the job of the US Consul and because of the nebulous nature of many of the facts in such cases, create extensive opportunity for erroneous decision making.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy.

I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,

Claudia Slovinsky
Claudia Slovinsky and Associates, PLLC

New York, N.Y.

GC CAR 000576

June 7, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

Re:     **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M**
        **Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

GC CAR000577

"D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

Another example may be accepting employment which is later deemed by USCIS as not being related to the student's degree.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,

Erica Loomba
Attorney at Law
Proskauer Rose LLP

GC CAR000578

# LAW OFFICES OF MOKHIBER & MORETTI PLLC

████████

GREAT FALLS, VIRGINIA ██████ USA
TEL: ████████████

June 8, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

> **Re:    USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,

*Albert Mokhiber*

Albert Mokhiber

GC CAR 000580

June 8, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

Re:     **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

GC CAR000581

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,


Enola French

GC CAR000582

06/08/2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

**Re:** **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This will be done only with F-1, J-1 and M non-immigrant. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

I am a Principle Designate School Official at a large public institution. I can think of hundreds students over the years that fell out of status for a variety of reasons. Sometimes it was their fault. Sometimes it was the fault of the DSO. They are students. Like domestic students they make mistakes. I have worked with these student to help them get back into status. That process is currently taking up to a year through USCIS. None of these student were malicious in their intent, or dangerous. Most of them just dropped a class they were about the fail and didn't notify their DSO. Some of them took a semester longer to finish their degree and failed to extend their F-1 program/document. Some of them were struggling financially because of changes in the circumstances of their families back home and dropped out for a semester. Some of them were wrongly terminated by their DSO and did nothing to violate their status.

If this is left to stand and moves forward it is possible these students could be barred from the US for long periods of time. This change also only applies to F-1, J-1 and M students. What is rational or fair about that! There is an alphabet soup of other non-immigrant classifications. Why single out a population that is already monitored and tracked in SEVIS at great expense and more than any other. Is this population is particularly dangerous!? Undesirable?? These are

GC CAR000583

people that have come to pursue degrees in the US, to our great economic benefit. They are just the type of non-immigrant our system should encourage to come but they alone are singled out in this policy and could be barred for years from getting a visa should they stumble along the way! This policy will accomplish none of the goals it purports to. It will only send another strong message that people that want to come to get an education in the US (ideal non-immigrants in most cases) are looked on with particular suspicion and are not welcome.

Please do not apply this unfair, unnecessary, unhelpful, and severe rule to these students that we want to encourage to come. Our number of international students in the US are already going down as Canada, the UK, Australia and New Zealand capture more and more of this education export market (US education is one of our largest exports!). We are already monitoring these students at great expense. Please act in the best interest of the US and alter or rescind this memo!

Sincerely,

Richard Porter

GC CAR000584

June 8, 2018

U.S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Ave, NW
Washington, DC 20529

Re: Accrual of Unlawful Presence and F, J, and M Nonimmigrants

Dear USCIS,

I am writing in regard to the recommendations made in "Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants (PM-602-1060)" of May 10, 2018. This memorandum represents a radical change in USCIS's interpretation and application of the regulations related to the accrual of unlawful presence by those in student (F nonimmigrant) or exchange visitor (J nonimmigrant) status and their dependents while in the United States.

I work at the University of South Florida, and we have international students from more than 145 nations and faculty from across the globe. The international students, visiting scholars, researchers, staff and faculty on our campuses bring unique experiences and perspectives to our classrooms, important ideas for discovery and innovation to our research labs, and exciting leadership to our campus community.

As the PDSO (Primary Designated School Official) and RO (Responsible Officer), I was alarmed to read these proposed changes. A great deal of the daily work of my staff and myself consists of advising international students and scholars on how to maintain their visa status (and that of their dependents). This is something that the vast majority of international students and scholars deeply and sincerely want to do. Unlike their domestic counterparts, they need to remain aware of visa regulations while also balancing the demands of student life and meeting all the requirements of their academic program.

While changes in regulations are to be expected, these proposed changes are especially problematic because they are a departure from the long-standing, common sense interpretation of visa regulations that has been in place for over 20 years. Furthermore, the changes create a system where F/J visa holders may be found to have violated their visa status years after the violation supposedly occurred. This is especially troubling since this

GC CAR000585

memorandum attaches the possibility that this violation could result in individuals being barred from entering the U.S. for three years, ten years, or permanently.

Although the announcement regarding these changes comes with sufficient notice for individuals who are currently out of status to take steps to remedy their visa status before they begin accruing unlawful presence, this new interpretation will cause a great deal of uncertainty for F/J visa holders moving forward.  Here are some specific examples of some problems DSOs/AROs foresee:

1. **Recent SEVP Portal Release:** SEVP recently implemented a Portal through which F-1 students on post-completion optional practical training (OPT) or STEM OPT are allowed to report changes to their personal and/or employment information. Students are required to report these changes with ten days, but periodic problems with SEVIS and the Portal have resulted in incomplete information being available to students and instances when students have not been able to access the Portal. Additionally, some students have been confused about what information to enter and how to correctly enter it. All of this has resulted in the reporting of incomplete and inaccurate data to SEVIS through the Portal despite the best efforts of F-1 visa holders to report their information. Therefore, if USCIS relies on information from SEVIS (something the Policy memo mentions as a likely source of information for making decisions about violations of status), it is likely that there will be students judged to have violated their status based on this bad data.

   While DSOs/AROs and others have, historically, been able to help students resolve these data issues, the new interpretation of the regulations could mean that these student could be judged to have violated their status and could be accruing unlawful presence without realizing it.

2. **Changes to Regulations Causing Previously Approved Actions to Become Violations:** The Student Exchange Visitor System (SEVIS) is set up so that school officials bear a great deal of responsibility for assisting F/J visa holders to maintain their status. As DSOs/AROs, we do our best to communicate with our students when there are changes to visa regulations and regulatory interpretations. This is not an easy task—especially when changes to regulations or regulatory interpretations require that we tell students something that is the reverse of what we previously correctly advised them.

   For example, with the recent announcement restricting third party employment for students on STEM OPT, it is very possible students will believe that they have done

GC CAR000586

everything necessary to comply with the rules, only to be told that they are out of status during a visa renewal or application to change visa status. Their actions, which were permissible when they started, are now not allowed due to changes in regulatory interpretations, and they have since accrued unlawful presence, barring them from changing visa status or re-entering the U.S.

These are only two recent examples of actions that could result in international students accruing unlawful presence despite their attempts to follow the rules. We foresee many additional problems and unintended consequences that will result from such a large and dramatic shift in regulatory interpretation.

**In conclusion**

The USCIS press release for this memorandum states, "USCIS is dedicated to our mission of ensuring the integrity of the immigration system. F, J, and M nonimmigrants are admitted to the United States for a specific purpose, and when that purpose has ended, we expect them to depart, or to obtain another, lawful immigration status." This change, however, will not contribute meaningfully to that objective. Instead, it will likely result in confusion and well-meaning international students and exchange visitors being found to have accrued unlawful presence due to innocent mistakes or misunderstandings of changing regulations. Due to the strict bars that will be applied to these individuals due to these changes, these misunderstandings could have severe consequences.

We are at a point in time where our international students can choose to study anywhere in the world. Many international students who enroll at U.S. institutions are the best of their classes at home, and they receive offers to attend institutions around the world. They choose to come to the United States because they have determined an institution is the best option for them to pursue their chosen field of study. While here, they excel in their classes, and they provide new perspectives and experiences to their classmates and the broader university community.

If we want to ensure the students fulfill the "specific purpose" they receive their visa (obtaining an education at a U.S. institution), we must ensure our laws and regulations are structured and implemented in a fair and transparent manner. We must work to limit uncertainty so that students can focus on learning instead of tracking constantly changing regulations. This new policy has the opposite result.

GC CAR000587

**Recommendations**

I urge you to take these concerns into consideration, and rather than making the proposed changes, consider the following recommendations suggested by NAFSA (Association of International Educators):

> • Leave in place the current policy, which has served for over 20 years. Neither DHS nor legacy INS ever published regulations to implement this important area of law. If the agency wishes to implement such a drastic change to longstanding common interpretation of the law, it must be done through the notice and comment process.

> • Do not implement any policy change until implementation has been fully coordinated with the Department of State and other DHS units such as CBP and SEVP.

> • Exclude from the unlawful presence count any status violations that occurred under color of law, to avoid "gotcha" scenarios, where the student reasonably relied on the authorizations granted. For example, curricular practical training authorized in SEVIS that DHS later determines may have been improperly given, should not start the unlawful presence "clock" until DHS or an immigration judge makes a formal status determination.

> • Apply the change of status/extension of stay tolling rules to reinstatement applications.

> • Expand the sections describing examples where F, M, and J nonimmigrants "do not accrue unlawful presence in certain situations." [draft Adjudicator's Field Manual 40.9.2(b)(1)(E)(iii)].

Thank you for the opportunity to comment.

Sincerely,

Marcia Taylor, M.A.
Director, International Services
SEVIS PDSO and RO

USF World|University of South Florida|4202 East Fowler Ave, CGS101|Tampa, FL 33620
P: (813) 974-5206|F: (813) 974-0491|http://global.usf.edu/isss/

GC CAR000588



odriguez Immigration Law Firm, LLC

Madison, Connecticut



*Jennifer Strait Rodriguez*
*Admitted in CT & NY*

June 7, 2018

Office of the Director
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Re:    USCIS Policy Memorandum:
       Accrual of Unlawful Presence and F, J, and M Nonimmigrants

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum,
"Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and
Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice
regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii)
of the Immigration and Nationality Act (INA) by reference to an individual who "is present in
the United States after expiration of the period of stay authorized by the Attorney General or is
present in the United States without being admitted or paroled." For nonimmigrant students and
exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service
(INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to
the individual of a status violation prior to the commencement of the unlawful presence clock.
Such notice is provided in the context of the adjudication of a request for an immigration benefit
by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance
articulating this position states, "It must be emphasized that the accrual of unlawful presence
neither begins on the date that a status violation occurs, nor on the day on which removal
proceedings are initiated."[1] This longstanding policy provides certainty in determining when
unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to
have started accruing as of the day after the date that a status violation occurs, thus removing the
critical procedural safeguard of providing notice to affected individuals that may find themselves
subject to the three- and ten-year bars to admissibility. This raises serious questions regarding

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections
212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-
consolidation-guidance-unlawful-presence.

Telephone:
Email:

*Fax Number:*
*Website: www.jsrodriguezlaw.com*
GC CAR 000589

Case 1:18-cv-00891-LCB-JEP   Document 57-2   Filed 07/03/19   Page 33 of 203

fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by a dependent spouse and/or child of an F-1, M-1, or J-1 nonimmigrant.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,

Jennifer S. Rodriguez
Attorney at Law

GC CAR 000590

June 8, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

Re:     **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M
          Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum,
"Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and
Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice
regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii)
of the Immigration and Nationality Act (INA) by reference to an individual who "is present in
the United States after expiration of the period of stay authorized by the Attorney General or is
present in the United States without being admitted or paroled." For nonimmigrant students and
exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service
(INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to
the individual of a status violation prior to the commencement of the unlawful presence clock.
Such notice is provided in the context of the adjudication of a request for an immigration benefit
by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance
articulating this position states, "It must be emphasized that the accrual of unlawful presence
neither begins on the date that a status violation occurs, nor on the day on which removal
proceedings are initiated."[1] This longstanding policy provides certainty in determining when
unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to
have started accruing as of the day after the date that a status violation occurs, thus removing the
critical procedural safeguard of providing notice to affected individuals that may find themselves
subject to the three- and ten-year bars to admissibility. This raises serious questions regarding
fundamental fairness and due process and will have a significant negative impact on the student,
vocational, and exchange visitor communities.

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections
212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-
consolidation-guidance-unlawful-presence.

GC CAR000591

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

Other examples include:

- Due to feeling pressured to keep their GPA high not to lose their scholarship, students sometimes drop a class at the end of their semester to avoid a low grade and fall below full time enrollment. Student's SEVIS record will have to be terminated. However, the student is eligible to file for re-instatement. However, since those re-instatement applications take more than 6 month (often up to a year) to get adjudicated, implementing the new rule would cause this student to accrue unlawful presence if the application would get denied.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,


Karin Senft

GC CAR000592

June 7, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

> **Re:** **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition to the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

The new memorandum will subject F, J and M aliens to greater scrutiny than other non-immigrant visa holders. Other non-immigrant visa holders that violate the terms of their stay are not subject to unlawful presence penalties.

A consequence of such a policy for F, J and M aliens will be that many such visa holders who have violated their status will not leave the U.S, since they will not be able to return as a result of their violations. Those that remain in the U.S. will wait for a change in the law, a new policy memo from a new administration or may get married to a U.S. citizen.

Sincerely,

Andrew Ceraulo, Esq.
████████████
New York, N.Y. ████████

1

GC CAR 000593



**LEVIN SANTALONE LLP**

ATTORNEYS AT LAW
LARCHMONT, NY
TEL: ▪▪▪▪ • FAX: ▪▪▪▪

June 8, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

*Submitted via email: publicengagementfeedback@uscis.dhs.gov*

**Re:   USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M
Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated." This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

GC CAR 000594
Case 1:18-cv-00891-LCB-JEP   Document 57-2   Filed 07/03/19   Page 38 of 203

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

Other examples from my own practice include:

- A 19 year old college student who developed a fast growing tumor in her breast. She went from a doctor's visit to immediate serious surgery, and did not finish her semester courses.

- An 18 year old college student who babysat for her professor, and accepted cash payment at the professor's insistence.

- A high school student who was moved from one private school to another, where the second school was not an F-1 SEVIS school.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,

Sara B. Levin

GC CAR 000595

# LAW OFFICE OF PAUL S. ZOLTAN

### DALLAS, TEXAS ▉

**PHONE:** ▉                                                                      **FAX** ▉

June 8, 2018

Kirstjen M. Nielsen, Secretary
U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Re:     USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M
        Nonimmigrants

Dear Secretary Nielsen:

I write to express my opposition to the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

Deeming unlawful presence to have started accruing as of the day after the date that a status violation occurs removes critical procedural safeguards and violates due process. It will grievously harm a great many people admitted to the U.S. as F, M, and J nonimmigrants for an indeterminate period of time. Such "duration of their status" or "D/S" admissions require each student to maintain a full course of study or remain in the exchange program, forbid them from engaging in unauthorized employment or other unauthorized activities, and compel them to promptly complete the academic or exchange program or obtain an extension.

What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity.
USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,

Paul S. Zoltan

# UNIVERSITY OF MINNESOTA

*Twin Cities Campus*

*International Student and Scholar Services*
*Global Programs and Strategy Alliance*

**June 7, 2018**

*Minneapolis, MN*
*Office:*
*Email:* @

Re: Accrual of Unlawful Presence and F, J, and M Nonimmigrants

Dear USCIS,

I am writing in regard to the recommendations made in "Policy Memoranda: Accrual of Unlawful Presence and F, J, and M Nonimmigrants (PM-602-1060)." These proposals represent a radical change in USCIS's interpretation and application of the regulations related to the accrual of unlawful presence by those in student (F nonimmigrant), exchange visitor (J nonimmigrant), or vocational student (M nonimmigrant) status and their dependents while in the United States.

I work at the University of Minnesota, and we have international students from more than 135 nations and faculty from across the globe. The international students, researchers, staff and faculty on our campuses bring unique experiences and perspectives to our classrooms, important ideas for discovery and innovation to our research labs, and exciting leadership to our campus community.

I was alarmed to read these proposed changes. A great deal of my daily work consists of advising international students and scholars on how to maintain their visa status (and that of their dependents). This is something that the vast majority of international students and scholars deeply and sincerely want to do, and this means they need to remain aware of visa regulations while also balancing the demands all students experience along with their institution's requirements.

There have been significant discussions amongst international educators since this memorandum was released regarding how we will assist F/J/M visa holders in understanding these new policies without inadvertently engaging in the unauthorized practice of law. Absent an unlawful presence finding by DHS or an Immigration Judge that the F or J individual has violated status, Universities who sponsor F and J nonimmigrants will - *de facto* - become charged with this legal task. This creates immense risk and liability to institutions of higher education as fact finder and arbitrator of how a potential violation of status may turn duration of status (D/S) into unlawful presence with a bar to re-entry. The current practice provides certainty and clarity around the important determination of accrued unlawful presence time and whether a 3 or 10 year bar will attach. The proposed policy places numerous liabilities on F and J program sponsors in "helping" the nonimmigrant make these determinations in order to take corrective action or otherwise cure the status deficiency.

While changes in regulations are to be expected, these proposed changes are especially problematic because they are a departure from the long-standing, common sense interpretation of visa regulations that has been in place for over 20 years, and it creates a system where F/J/M visa holders may be found to have violated their visa status years after the violation supposedly occurred—something that is especially troubling since this memorandum attaches the possibility that this violation could result in individuals being barred from entering the U.S. for three years, ten years, or permanently.

Although the announcement regarding these changes comes with sufficient notice for individuals who are currently out of status to take steps to remedy their visa status before they begin accruing unlawful presence, this new interpretation will cause a great deal of uncertainty for F/J/M visa holders moving

**Driven to Discover**

GC CAR 000597
Case 1:18-cv-00891-LCB-JEP   Document 57-2   Filed 07/03/19   Page 41 of 203

forward. Here are some specific examples of some problems DSOs/AROs foresee with the implementation of this memoranda:

1. **Recent SEVP Portal Release:** SEVP recently implemented a Portal through which F-1 students on post-completion optional practical training (OPT) or STEM OPT are allowed to report changes to their personal and/or employment information, but there have been issues with the system. Students are required to report these changes with ten days, but periodic problems with SEVIS and the Portal have resulted in incomplete information being available to students and instances when students have not been able to access the Portal. Additionally, some students have been confused about what information to enter and how to correctly enter it. All of this has resulted in incomplete and inaccurate data being reported to SEVIS through the Portal despite the best efforts of F-1 visa holders to report their information. Therefore, if USCIS relies on information from SEVIS (something the Policy memo mentions as a likely source of information for making decisions about violations of status), it is likely that there will be students judged to have violated their status based on this bad data.

   While DSOs/AROs and others have been, historically, been able to help students resolve these data issues, the new interpretation of the regulations could mean that these student could be judged to have violated their status and could be be accruing unlawful presence without realizing it.

2. **Changes to Regulations Causing Previously Approved Actions to Become Violations:** The student and scholar visa system (SEVIS) is set up so that school officials bear a great deal of responsibility for assisting F/J/M visa holders to maintain their status. As DSOs/AROs, we do our best to communicate with our students when there are changes to visa regulations and regulatory interpretations. This is not an easy task—especially when changes to regulations or regulatory interpretations require that we tell students something that is the reverse of what we previously correctly advised them.

   In instances like the recent announcement restricting 3rd party employment for students on STEM OPT, it is very possible students will believe that they have done everything necessary to comply with the rules, only to apply to renew a visa or to change visa status in the future and be told that their actions (permissible when they started, but now not allowed due to changes in regulatory interpretations) were a violation of their status, and they have since accrued unlawful presence, barring them from changing visa status or re-entering the U.S.

These are only two recent examples of actions that could result in international students accruing unlawful presence despite their attempts to follow the rules. We foresee many additional problems and unintended consequences that will result from such a large and dramatic shift in regulatory interpretation.

**In conclusion**

The USCIS press release for this memorandum quotes USCIS Director L. Francis Cissna as saying, "USCIS is dedicated to our mission of ensuring the integrity of the immigration system. F, J, and M nonimmigrants are admitted to the United States for a specific purpose, and when that purpose has ended, we expect them to depart, or to obtain another, lawful immigration status." This change,

however, will not contribute meaningfully to that objective. Instead, it will likely result in confusion that will mean well-meaning international students and exchange visitors could be found to have accrued unlawful presence due to innocent mistakes or misunderstandings of changing regulations. Due to the strict bars that will be applied to these individuals due to these changes, these misunderstandings could have severe consequences.

We are at a point in time where our international students can choose to study anywhere in the world. Many international students who enroll at U.S. institutions are the best of their classes at home, and they receive offers to attend institutions around the world. They choose to come to the United States because they have determined an institution is the best option for them to pursue their chosen field of study. While here, they excel in their classes, and they provide new perspectives and experiences to their classmates and the broader university community.

If we want to ensure the students fulfill the "specific purpose" they receive their visa (obtaining an education at a U.S. institution), we must ensure our laws and regulations are structured and implemented in a fair and transparent manner. We must work to limit uncertainty so that students can focus on learning instead of tracking constantly changing regulations. This new policy has the opposite result.

### Recommendations

I urge you to take these concerns into consideration and rather than making the proposed changes, consider the following recommendations suggested by NAFSA (Association of International Educators):

- Leave in place the current policy, which has served for over 20 years. Neither DHS nor legacy INS ever published regulations to implement this important area of law. If the agency wishes to implement such a drastic change to longstanding common interpretation of the law, it must be done through the notice and comment process.
- Do not implement any policy change until implementation has been fully coordinated with the Department of State and other DHS units such as CBP and SEVP.
- Exclude from the unlawful presence count any status violations that occurred under color of law, to avoid "gotcha" scenarios, where the student reasonably relied on the authorizations granted. For example, curricular practical training authorized in SEVIS that DHS later determines may have been improperly given, should not start the unlawful presence "clock" until DHS or an immigration judge makes a formal status determination.
- Apply the change of status/extension of stay tolling rules to reinstatement applications.
- Expand the sections describing examples where F, M, and J nonimmigrants "do not accrue unlawful presence in certain situations." [draft Adjudicator's Field Manual 40.9.2(b)(1)(E)(iii)].

Sincerely,

Molly Hoffman
H-1B Program Director
University of Minnesota

June 8, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

> **Re:** **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

GC CAR000600

"D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

Other examples include:

- A student who unknowingly takes more than the allowable amount of online-only coursework, due to miscommunication with the academic advisor or due to poor advising from the academic advisor.
- A student who may accidentally fall out of status due to extenuating circumstances, such as a medical issues (injury, mental health) and forgets to consult with their Designated School Office for assistance on receiving an authorized medical reduced course load, or struggles financially due to unexpected loss of funding.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,


Christy Czerwien

GC CAR000601



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

**Re: USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

This new memorandum would reverse over 20 years of USCIS practice regarding the accrual of "unlawful presence." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not. The law must provide certainty to those who are living under it and trying to abide by it.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

CHENHALLS NISSEN, S.C., ███ █. ████, ███, Milwaukee, WI ███
Phone ███ ████ | Fax ███ ████ | www.cnvisalaw.com
GC CAR 000602
Case 1:18-cv-00891-LCB-JEP   Document 57-2   Filed 07/03/19   Page 46 of 203

nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

In my practice I have seen specific examples of DSOs who are new to the position, filling in for someone on leave, or just not well-trained in the SEVIS system who have made minor errors in the system regarding employment authorization or course loads. These minor errors not even committed by student him/herself could not have catastrophic, long-term effects on the unwitting students who trust these officials to manage their status.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,

Kelley A. Chenhalls
Attorney at Law

June 8, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529
Submitted via email: publicengagementfeedback@uscis.dhs.gov

**Re: USCIS Policy Memorandum Accrual of Unlawful Presence and F, J, and J Nonimmigrants,
PM-602-1060.**

Dear Sir or Madam,

This is public comment on the USCIS policy memorandum Accrual of Unlawful Presence and F, J, and M
Nonimmigrants, posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

The University of Massachusetts (UMass) is a public institution established by the Commonwealth of
Massachusetts with more than 17,000 university faculty and staff and nearly 75,000 students enrolled at
our five campuses located in Amherst, Boston, Dartmouth, Lowell, and Worcester. Each campus is
individually certified by the Department of Homeland Security (DHS), Student and Exchange Visitor
Program (SEVP) to administer and issue documents in support of F International Student nonimmigrant
status as well as individually designated by SEVP to administer and issue documents in support of certain
J Exchange Visitors nonimmigrant classifications. Additionally, UMass employs individuals work
authorized under F and J nonimmigrant status in various positions throughout the UMass system,
depending on underlying requirements of the nonimmigrant classification.

As both employer and SEVP program sponsor of F and J nonimmigrants, UMass is alarmed by the swift
and radical departure from long standing statutory law, federal regulation and agency policy on unlawful
presence as it pertains to these nonimmigrants. Further, UMass is deeply concerned by the significant
institutional liability and risk that this policy change will likely have on F and J program administrators —
largely institutes of higher education.

The legal concerns are as follows:

**1. The new policy violates the clear language of the Immigration & Nationality Act**
Congress established Unlawful Presence as a new ground of exclusion in 1996, effective April 1, 1997, in
which it defined unlawful presence at Section 212(a)(9)(B)(ii) of the Act:

> "(ii) Construction of unlawful presence. - For purposes of this paragraph, an alien is deemed to
> be unlawfully present in the United States if the alien is present in the United States *after the
> **expiration** of the period of stay* authorized by the Attorney General (now DHS) or is present in
> the United States without being admitted or paroled." (Emphasis added)

Shrewsbury, MA ▮▮▮▮  P: ▮▮▮▮▮

GC CAR 000604

The Service had historically applied Congress' definition of unlawful presence to nonimmigrants, such as H-1Bs and O-1s who were admitted to a date certain and who had remained *after the expiration* of that date certain.

Due to the changeable nature of their stay, almost all F, J and M nonimmigrants, unlike most other nonimmigrants, are admitted to a date *uncertain* (D/S, duration of status). Despite that difference between date certain and date uncertain - previously recognized by USCIS as a vitally significant trigger date for determining the onset of unlawful presence- the Service, for the first time, seeks to apply Congress' definition of unlawful presence to nonimmigrants who have not been admitted to a date certain and/or who may not have remained after the expiration of their programs.

Congress uses clear language in the Act to calibrate the onset of unlawful presence from *after the* ***expiration*** *of the period* of stay authorized by (DHS). Now, the Service seeks to conflate a failure to maintain status *per se* with the accrual of unlawful presence rather than with overstaying the authorized period of stay. So, for instance, an F-1 student who timely departs the United States after the completion of his/her program, who was never "present in the United States *after the* ***expiration*** *of the period of stay* authorized by (DHS)" can be found to have accrued unlawful presence because of an earlier status violation such as having failed in one semester to carry a full course load.

This new policy violates the clear language of the Act at 212(a)(9)(B)(ii) and Congressional intent. The Service seeks to amend the clear language of the Act without Congressional action.

The Service acts here *ultra vires*.

## 2. The new policy violates the requirements of due process, clarity and fairness
The penalties for remaining in the United States *after the* ***expiration*** *of the period of stay* authorized by the (DHS) are severe. Overstaying the date certain for departure by 180 days can result in a bar to re-entry to the United States of 3 years. Overstaying by 1 year can result in a bar to re-entry of 10 years.

Persons who would suffer these severe penalties deserve the clarity and fairness of a rule of law, which permits them to comport their behavior with that which the law demands. The Service has historically understood this. As summarized by the Service in this May 10, 2018 Policy Memorandum, the Service's previous policy was dramatically different:

> "...foreign students and exchange visitors (F and J nonimmigrants, respectively) who were admitted for, or present in the United States in, duration of status (D/S) started accruing unlawful presence on the day after USCIS formally found a nonimmigrant status violation while adjudicating a request for another immigration benefit or on the day after an immigration judge ordered the applicant excluded, deported, or removed (whether or not the decision is appealed), whichever came first. F and J nonimmigrants, and foreign vocational students (M nonimmigrants), who were admitted until a specific date (date certain) accrued unlawful presence on the day after their Form I-94 expired, on the day after USCIS formerly found a nonimmigrant status violation while adjudicating a request for another immigration benefit, or on the day after an immigration judge ordered the applicant excluded, deported, or removed (whether or not the decision was appealed), whichever came first." At Page 1.

Therefore, except for F, J or M nonimmigrants admitted to a date certain - which is very rare - unlawful presence for an F, J or M nonimmigrant with a D/S entry was not triggered by an 'overstay'. The unlawful presence clock was triggered by the finding of an officer or judge that the individual had

2

violated status; subsequently, nonimmigrant received a dated notice of the violation in writing, the foreign national was ordered to depart by a date certain and was warned that failure to depart by that date would trigger the accrual of unlawful presence time. In compliance with Section 212(a)(9)(B)(ii) of the Act, this procedure set a date certain for departure; notice was in writing and was subject to review via motion or appeal.

The new policy offers none of these due process protections.

An individual may be found years after an event to have violated status, thus to be found barred from re-entry. The clock may have begun to run without the individual's knowledge – as well as the sponsoring F and J institution - and the alleged violation of status may also have been unknowing. The date of the alleged violation may be difficult if not impossible to determine. The date certain after which the unlawful presence bar will attach may be anything but certain. Evidence and witnesses in rebuttal may have become unavailable with the passage of time.

The new policy is fundamentally unfair.

### 3. The new policy will discourage valid applications to 'seek reinstatement'

A student who violates status, particularly if done so innocently or through no fault of his/her own, may, in some cases, seek reinstatement from the Service. See: 8 C.F.R. § 214.2(f)(16) The Service often takes 10 to 14 months to adjudicate these applications. Even when filing a timely, non-frivolous application for reinstatement, the student - not knowing if the application will be granted or denied - will now have to balance the possibility of reinstatement with the risk of denial and the ensuing, new, added danger of the imposition of the 3/10 year bar to admissibility, retroactive to the date of the status violation.

This seems like an unlawful burden on the student's right to seek reinstatement. At a minimum, in such cases, the Service policy should withhold the start of the unlawful presence clock until a decision by DHS or an Immigration Judge on the merits.

### 4. The new policy must be put into effect via 'notice and comment' rulemaking pursuant to the Administrative Procedures Act

Section 214(a)(1) of the Immigration and Nationality Act states the "(a)dmission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as (DHS) may by regulations prescribe...". In compliance with this Congressional mandate, it is impermissible for the Service, other than by regulation, to create substantially new and significant 'conditions' under which an F, J, or M nonimmigrant may be admitted to or remain in the U.S. The Service must comply with the Immigration and Nationality Act and the Administrative Procedures Act.

These legal concerns have real impact for University F and J program sponsors, who are charged by SEVP as compliance administrator and adviser to these nonimmigrants. The following substantive institutional liability and risk management concerns flow from the legal ramifications of the policy change:

### 1. Absent an unlawful presence finding by DHS or an Immigration Judge that the F or J individual has violated status, Universities who sponsor F and J nonimmigrants will - *de facto* - become charged with this legal task.

This creates immense risk and liability to institutions of higher education as fact finder and arbitrator of how a potential violation of status may turn duration of status (D/S) into unlawful presence with a bar to

3

re-entry. The University's five certified Primary Designated Student Officials (PDSO) and designated Responsible Officers (RO) and staff are not equipped to make such critical, legal determinations, which have always been the purview of the Department of Homeland Security or Department of Justice.

F and J program sponsors have received no guidance or training from DOS or DHS (USCIS, SEVP, etc.) on how to make these complex and legal findings. Even with training and guidance, University program sponsors do not, and will not, have access to the F and J nonimmigrant's complete immigration history, which is essential to a legal determination of unlawful presence. SEVIS access to historical data in F and J status is limited to the sponsoring institution, meaning no access to SEVIS data transferred from another school. The simple fact is that University F and J program sponsors are not the personal immigration attorney of the nonimmigrant; rather their compliance obligation is to SEVP. There is an inherent conflict of interest in placing F and J program sponsors in the position to be collector of facts and arbitrator of a finding of unlawful presence to the F or J beneficiary. This is a complex legal finding with dire and long-term consequence to the F and J nonimmigrant. Without a clear ruling by DHS or an Immigration Judge, F and J nonimmigrants will rely on the University to provide legal advice on this matter, thereby opening to University to legal exposure.

## 2. Absent a dated notice issued by DHS or an Immigration Judge specifying when unlawful presence clock is triggered, F and J program sponsors will – *de facto* – become charged with this legal task.

Under the current practice, the nonimmigrant receives a dated notice of the violation of status in writing and the clock is triggered on the day after the date of the notice. The current practice provides certainty and clarity around the important determination of accrued unlawful presence time and whether a 3 or 10 year bar will attach, or because of the retroactive nature of the new policy, has already attached. The new policy places numerous liabilities on F and J program sponsors in "helping" the nonimmigrant make these determinations in order to take corrective action or otherwise cure the status deficiency. As with #1 above, PSDOs, ROs and their respective DSOs and AROs are not equipped to execute this legal function and any errors in judgement, process, or communication will place our University at risk of failure to properly administer the program as well as potential claims by the nonimmigrant against the University.

## 3. The retroactive nature of the policy creates institutional liability that can occur at any time and continue without end.

Absent a finding of unlawful presence by DHS or an Immigration Judge legally creating a "date certain" for triggering unlawful presence, any F and J nonimmigrant may come to the University in initial status or as a transfer and, wittingly or unwittingly, bring with them possible unlawful presence. Further, any action by the nonimmigrant that may, wittingly or unwittingly, have caused them to temporarily fall out of status during their time at the University will forever bind the University to unlawful presence, whether at the time known to the University or not. The combination of uncertainty in whether unlawful presence has attached, lack of clarity around when the clock starts, and retroactive nature of the new policy will mean that the University will be subject to liability and risk no matter what. Any attempt to "help" the nonimmigrant identify an unlawful presence event and count accrued time could make the University liable. In the alternative, if the University does not weight in on these legal matters, it could also be held liable for failure to properly advise the nonimmigrant and adequately comply with SEVP program requirements.

## 4. The unlawful presence policy will fundamentally change the nature of higher education compliance as SEVP program sponsors and advising to F and J nonimmigrants.

The dedicated (P)DSOs and (A)ROs at all 5 UMass campuses take immigration compliance and their related advising duties seriously. Their inherent relationship with SEVP Field Representatives and with F

4

International Students and J Exchange Visitors must operate within an environment of candor and trust. The new unlawful presence policy erodes such trust and creates the setting that all F and J nonimmigrants could be potential liabilities to the University if previous status violations, for whatever reason, were not disclosed or even known. Basic advisory functions around maintenance of status, international travel and reinstatement will become mired in institutional risk and liability if 3 and 10 bars to re-entry under unlawful presence become part of (P)DSOs and (A)ROs compliance and advising responsibilities. Such complex consequences will likely impact the University's ability to administer the program within current SEVP regulatory and compliance requirements.

In light of these significant concerns, the University favors the recommendations submitted by NAFSA: Association of International Educators on May 24, 2018. Namely that in lieu of implementing the policy described in the memo, the following happen:

- Leave in place the current policy, which has served for over 20 years. Neither DHS nor legacy INS ever published regulations to implement this important area of law. If the agency wishes to implement such drastic changes to longstanding common interpretation of the law, it must be done according to the Administrative Procedures Act (APP) and through notice and comment.

- Implementation of any unlawful presence policy change must be fully coordinated with relevant government stakeholders, such as the Department of State, including the Visa Office and the Bureau of Education and Cultural Affairs' Exchange Visitor Program, and other divisions of DHS, including Immigration and Customs Enforcement (ICE) and the Student and Exchange Visitors Program (SEVP), and Customs and Border Protection (CBP).

- Exclude from unlawful presence count any status violations that occurred under color of law, where the student or exchange visitor reasonably relied on authorizations granted. For example, curricular or optional practical training authorized by SEVIS, or admission by CBP, or any number of agency actions that DHS later determines may have been improperly given should not start the unlawful presence clock until DHS or an Immigration Judge makes a formal status determination.

- Apply the change of status/extension of stay tolling rule to reinstatement applications.

- Expand the sections describing where F, J, and M nonimmigrants "do not accrue unlawful presence in certain situations." [draft Adjudicator's Field Manual 40.9.2(b)(1)(E)(iii)].

As you review the comments submitted, I trust you will incorporate stakeholder concerns into consideration to ensure that American universities, major F and J constituents, are not negatively impacted by the new policy memorandum.

Thank you for your attention and consideration to these issues.

Sandra E. Torres
Associate Counsel, Immigration and International Services
Office of the General Counsel
University of Massachusetts

5

June 8, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

Re: **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

GC CAR000609

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

We are constantly reviewing the regulations to insure that the "grey areas" in the law, which are not covered by the regulations, are met in every way. Designated School Officials pour over the regulations, contact the government agencies, and oftentimes get conflicting responses. We believe that a student could accrue unlawful presence inadvertently at no fault of the student. The price they would pay for the inconsistency would be much too high for the realities that happen in real life, and with serious students, scholars and colleges/universities.

The students and scholars are tracked daily via the SEVIS system, and the seriousness of their study or research program is detailed, tracked and reported constantly for all of the students and scholars.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,

Adria L. Baker, Ed.D.
7918 Pagewood Ln.
Houston, Texas

GC CAR000610



Teaching Assistants' Association | 520 University Avenue, Suite 220, Madison, WI 53703
taa@taa-madison.org | www.taa-madison.org

The Teaching Assistants Association at the University of Wisconsin-Madison expresses its deepest concern for the recent changes proposed by U.S. Citizenship and Immigration Services on the conditions in which international students in the U.S can accrue "unlawful presence". The proposed changes would create unnecessary burden on international students, their peers, and the academic community as a whole.

Under the current policy, international students can accrue "unlawful presence" in the U.S. after they are found to have violated the terms of their visa. After 180 days of "unlawful presence", they can be barred from returning to the U.S. for up to 10 years. The proposed changes would declare an international student as "unlawfully present" in the country from the moment they are said to have violated the terms of their visa, even if they do it unknowingly and are not notified. This change generates deep concern in terms of students' rights to be informed, understand, and contest any allegations. This situation creates great uncertainty that can harm not only international students at UW-Madison, but also the larger university community.

International students are key members of our community. Research, learning and teaching projects require a diversity of perspectives, experiences, and the labor of international students. All undergraduate students benefit when they learn with and are taught by their international peers. As equal members of the UW-Madison community, we believe that international students deserve stability and certainty regarding their visa status. The uncertainty introduced by the proposed policy change would harm the advancement of university projects, stifle innovation, and impede instruction goals at UW-Madison.

By limiting the possibility to contest alleged violations of visa status, the proposed policy change would add considerable legal burden and emotional vulnerability for international students. Furthermore, the changes would disproportionately affect lower income students who lack access to legal counsel. This policy further disadvantages these students who already face severe limitations to obtaining an education.

We believe that all students, regardless of their country of origin and economic means, should have the right to complete their studies and participate in innovation and instruction at UW-Madison. The TAA stands in solidarity with international students to advance education, research, and teaching in a dignified and free environment.

The Executive Board

GC CAR000611

June 8, 2018

Mr. L. Francis Cissna, Director
U.S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, DC 20529

RE: Accrual of Unlawful Presence and F, J, and M Nonimmigrants Policy Memo

Dear Director Cissna,

I am writing to express my concern with the proposed changes outlined in the Unlawful Presence memorandum as they apply to F-1 and J-1 students. Based on more than 30 years advising international students as a Principal Designated Official, I strongly believe these changes are an abrupt change to more than 20 years of policy guidance.

International students are a viable and valuable part of the U.S. economy. In the latest Open Doors report, approximately 1,078,822 international students are currently in the U.S. and their economic value is $36.9 billion. Many U.S. universities and college rely on the tuition fees international students bring to their campuses. These changes make the U.S. a less attractive place for international students to choose to study. Already, U.S. universities are losing the international students who will return home to become advocates of the U.S. to other countries such as China, Australia, Canada and the UK.

International students do not deserve the added anxiety this will cause them regarding their immigration status. Already international students have great anxiety regarding their immigration status. They send thousands of dollars to scam callers who claim to be immigration officers, they worry that forgetting to extend their I-20 will lead to deportation. They should be allowed to complete their studies as do American students without this additional worry.

The proposed change is complex and will be difficult to put into operation. Numerous scenarios will come into play that will lead to wrongly identifying international students as failing to maintain their lawful status. It will add pressure for USCIS to more quickly to adjudicate F-1 student applications for change of status or OPT which will add to the mistakes already made on these applications on a daily basis. A mistyped OPT date, an incorrect name or birthdate, common mistakes now, could lead to unfairly subjecting international students to the 3 year or 10 year bar to re-entry to the U.S. Other applications, such as reinstatement to F-1 status, now has an adjudication delay of 4-5 months, and if the application is denied the 3 year bar will already have begun and is even more unfair to the student than the adjudication delay.

GC CAR000612

Further operational roadblocks will appear. Currently F-1 students leaving the U.S. do not meet with an immigration officer. At the airports, they check out but how long does it take the airlines to process their departure. At the land borders, international students walk into Mexico or Canada without seeing anyone, and if Customs and Border Protection officers are taken from meeting the persons coming into the U.S the waits at the borders will increase tenfold. And many students only cross the border into Mexico or Canada to shop, eat or enjoy an evening in these countries. I wonder whether the officers will have time to differentiate between those exiting the U.S. for the evening or forever.

Additionally, I-20 forms which are the basis of international students' D/S status in the U.S., are first issued for an estimated period of time for students to complete their program of study. Students may finish their studies before the end date on their I-20 and believe they are eligible to remain in the U.S. If unlawful presence kicks in, they are in danger of being barred from the country where they lived as students for 4-5 years.

I remember the fear that the unlawful presence regulation caused international educators when it was first enacted in the 1990's. But then knowing that a definite decision had to be made before it went into effect, lessened our fears. Leave the current policy as it has been for over the last 20 years. Do not use international students as a scapegoat to assist the current administration into believing it is making America safer.

Thank you for the opportunity to comment.

Sincerely,

Jane C. Kalionzes
Principal Designated School Official
Associate Director - International Student Center
San Diego State University
jkalionz@sdsu.edu

GC CAR000613


JOURNAL ON MIGRATION
and Human Security

# DHS Overestimates Visa Overstays for 2016; Overstay Population Growth Near Zero During the Year

Robert Warren
*Center for Migration Studies*

## Executive Summary

For years, noncitizens who fail to abide by the terms of their nonimmigrant (temporary) visas were not widely recognized as major contributors to the US undocumented population. Yet since 2005, the ratio of overstays to illegal entries across the border has increased rapidly as the number of border crossings dropped to 1970s levels. As a result, the inflow of overstays has exceeded border crossers for nearly a decade. These developments highlight the importance of accurate and timely estimates of overstays.

In 2017, the US Department of Homeland Security (DHS) released a report, *Fiscal Year 2016 Entry/Exit Overstay Report*, showing estimates of overstays, by country, for the 50.4 million nonimmigrants admitted in fiscal year 2016 (DHS 2017). At the end of the fiscal year, DHS had not verified the departure of 628,799 nonimmigrants.[1]

The Center for Migration Studies (CMS) compared the DHS overstay estimates to CMS's estimates of the number of undocumented residents that arrived in the past few years. Data were available to make the comparisons for 133 countries; these countries account for 99 percent of all overstays. The major findings include the following:

- For 90 of the 133 countries, the DHS and CMS estimates differ by less than 2,000, and the correlation between the estimates for those 90 countries is .97, which indicates a very close mutual relationship.

- The DHS estimates of overstays for Canada are far too high.

- The DHS estimates greatly exceed the CMS estimates for about 30 countries, half of them participants in the US Visa Waiver Program (VWP).[2]

---

1 The 628,799 figure refers to nonimmigrants that arrived in 2016 and whose departure had not been verified by the end of 2016. Thus, as demonstrated in this paper, it includes nonimmigrant admissions whose departure was not verified *and* actual overstays.
2 The US Visa Waiver Program (VWP) is described at https://www.dhs.gov/visa-waiver-program, as follows: "The VWP, which is administered by the Department of Homeland Security (DHS) in consultation with the State Department, permits citizens of 38 countries to travel to the United States for business or tourism for stays of up to 90 days without a visa. In return, those 38 countries must permit US citizens and nationals to travel to their countries for a similar length of time without a visa for business or tourism purposes."

*© 2017 by the Center for Migration Studies of New York. All rights reserved.*

GC CAR000614

- Slightly more than *half* of the 628,799 reported to be overstays by DHS actually left the country but their departures were not recorded.

- After adjusting the DHS estimates to take account of unrecorded departures, as well as departures in 2016 of overstays that lived here in 2015, overstay population growth was near zero in 2016.

- Thus, while overstays account for a large percentage of the newly undocumented, they represent less than half (44 percent) of the overall undocumented population, and they are less likely than illegal border crossers to be long-term residents.

- The country-specific figures shown here should help DHS focus its efforts on improving the verification of departures of temporary visitors.

- Finally, these comparisons indicate that the DHS estimates do not provide a sound basis for making decisions about admission to, or continuation in, the VWP.

## Introduction

Since 2008, the primary mode of entering the undocumented population in the United States has been to arrive legally (after screening) on nonimmigrant (temporary) visas, and then overstay the period of admission or otherwise violate the terms of the visas (Warren and Kerwin 2017). Before 2008, far more arrived illegally across the southern border (entry without inspection, EWI) than overstayed. The reversal in these two modes of entry did not occur because overstays increased but because the annual number of EWIs dropped sharply from 2000 to 2015, reaching historically low levels in the past few years (Warren 2017).

The issue of overstays has become increasingly important in discussions of immigration policy in the past two years. A recent Center for Migration Studies (CMS) report noted: "The striking change in the mode of arrival after 2005 raises important policy questions not just about the need for a 2,000-mile wall, but about the allocation of immigration enforcement resources and funding levels for border enforcement compared to other strategies that might reduce new arrivals into the undocumented population and strategies to reduce the overall size of this population" (Warren and Kerwin 2017).

Despite the increasing recognition of the importance of overstays, official statistics on this phenomenon have not been available until recently. The newest US Department of Homeland Security (DHS) estimates of overstays, released in 2017, are in the *Fiscal Year 2016 Entry/Exit Overstay Report*.[3] The report "provides data on departures and overstays, by country, for foreign visitors to the United States who entered as nonimmigrant visitors through an air or sea Port of Entry (POE) and who were expected to depart in FY 2016 (October 1, 2015 - September 30, 2016)" (DHS 2017). The DHS procedures used to

3  US Department of Homeland Security (DHS) reporting requirements for overstays are set forth in Section 2(a) of the Immigration and Naturalization Service Data Management Improvement Act of 2000 (Pub. L. No. 106-215, 114 Stat. 337 [2000]), House Report 114-668, and Senate Report 114-264.

GC CAR000615

estimate overstays are described in detail in the report. The DHS statistics evaluated here are the sum of the figures shown in the "Suspected In-Country Overstays" column in tables B through F.

This report assesses the credibility of the 2016 DHS estimates for 133 countries by comparing them to estimates for comparable countries derived by CMS. The CMS estimates are based on statistics on the foreign-born population collected in the Census Bureau's American Community Survey (ACS), as described in detail in Warren (2014). A summary of the estimation procedure is presented in the Appendix. Essentially, the CMS estimates for the 133 countries are the number of undocumented residents that arrived in approximately 2013[4] and were counted in 2014 and 2015.

Strictly speaking, neither the DHS nor CMS estimates actually are estimates of overstays. The DHS figures represent actual overstays plus arrivals whose departure could not be verified. That is, they include both actual overstays and unrecorded departures. The CMS estimates are for *net* arrivals in recent years. They include overstays *minus* those who overstayed and then left[5] the overstay population. In addition, the CMS estimates are subject to sampling variability and other possible errors. Despite these differences, the information shown in the three tables below make it apparent that, even with these potential differences, useful information can be derived by comparing the two sets of data.

## Comparison of DHS and CMS Estimates

The similarity of the estimates for many countries as well as the correlation of .97 between the two sets of estimates in Table 1 show that, even with the caveats above, the DHS and CMS estimates measure approximately the same population. The "2,000 difference" standard used to distinguish the nations in the three tables is arbitrary; however, given the fundamental differences in the underlying data, it is remarkable that the results are within plus or minus 2,000 for 90 of the 133 countries evaluated in this report. In fact, the reasonably close correspondence between the two sets of estimates in Table 1 greatly increases confidence in the significant findings in Table 2.

4 The gap of roughly one year or so between arrival (approximately 2013) and being counted (average of the 2014 and 2015 estimates) means that some overstays would have left the population. On the other hand, it is likely that some overstays would have been added to the population (for example, if they were in status for a year or more and then overstayed). The similarity of the DHS and Center for Migration Studies (CMS) estimates for the 92 countries in Table 1 suggests that the departures and additions tended to cancel each other. 5 Overstays can leave the population in four ways: emigrate voluntarily, adjust to lawful status, be removed by DHS, or (a relatively small number) die. Also, nonimmigrants can enter the overstay population after being in the United States for more than a year, for example by working without authorization or remaining in the United States after attending college.

GC CAR000616

## Table 1. Countries with Less Than 2,000 Difference between CMS and DHS Estimates of Nonimmigrant Overstays

*Correlation, these 90 countries = .97*

| Country | CMS | DHS | Country | CMS | DHS |
|---|---|---|---|---|---|
| **These 90 countries** | **86,500** | **109,900** | | | |
| Afghanistan | 1,400 | 500 | Honduras | 4,800 | 5,600 |
| Albania | 1,000 | 500 | Hungary** | 300 | 1,900 |
| Algeria | 400 | 400 | Iceland** | z | 200 |
| Antigua-Barbuda | 100 | 200 | Indonesia | 600 | 1,700 |
| Armenia | 400 | 300 | Iran | 1,600 | 900 |
| Azerbaijan | 100 | 300 | Iraq | z | 1,200 |
| Barbados | 100 | 1,600 | Kazakhstan | 500 | 800 |
| Belarus | 500 | 700 | Kenya | 2,500 | 1,100 |
| Belgium** | 100 | 1,400 | Kuwait | 200 | 1,000 |
| Belize | 300 | 600 | Laos | 500 | 300 |
| Bhutan | 1,200 | 100 | Latvia** | z | 300 |
| Bolivia | 200 | 1,200 | Lebanon | 700 | 1,000 |
| Bosnia | 300 | 300 | Liberia | 800 | 800 |
| Bulgaria | 300 | 800 | Libya | 300 | 400 |
| Cambodia | 600 | 200 | Lithuania** | 200 | 500 |
| Cameroon | 1,100 | 1,200 | Macedonia | 700 | 400 |
| Cape Verde | 600 | 900 | Malaysia | 800 | 1,600 |
| China | 24,300 | 25,500 | Micronesia | 400 | z |
| Congo | 1,100 | 800 | Moldavia | 400 | 1,000 |
| Costa Rica | 1,000 | 2,700 | Montenegro | 100 | 300 |
| Croatia | 100 | 300 | Morocco | 500 | 800 |
| Cyprus | z | 100 | New Zealand** | z | 1,600 |
| Czech Republic** | 100 | 1,000 | Nicaragua | 1,400 | 1,400 |
| Denmark** | z | 1,600 | Norway** | 100 | 1,100 |
| Dominica | 400 | 300 | Pakistan | 4,500 | 3,000 |
| Egypt | 3,000 | 2,100 | Panama | 200 | 900 |
| Eritrea | 800 | 600 | Paraguay | 100 | 400 |
| Fiji | 300 | 300 | Romania | 700 | 1,500 |
| Finland** | z | 700 | Saint Lucia | 200 | 400 |
| Gambia | 100 | 200 | Saint Vincent | z | 400 |
| Georgia | 200 | 1,100 | Senegal | 400 | 400 |
| Ghana | 3,100 | 1,200 | Serbia | 500 | 1,200 |
| Greece** | 400 | 1,300 | Sierra Leone | 1,200 | 200 |
| Grenada | 100 | 300 | Singapore** | 100 | 600 |
| Guatemala | 5,800 | 6,600 | Slovakia** | 400 | 800 |
| Guinea | 100 | 300 | Somalia | z | z |
| Guyana | 1,700 | 1,900 | South Africa | 600 | 1,200 |

** denotes Visa Waiver country.     z indicates zero or rounds to zero.

GC CAR000617

## Table 1. Countries with Less Than 2,000 Difference between CMS and DHS Estimates of Nonimmigrant Overstays – *continued*

*Correlation, these 90 countries = .97*

| Country | CMS | DHS | Country | CMS | DHS |
|---------|-----|-----|---------|-----|-----|
| Sri Lanka | 200 | 500 | Trinidad and Tobago | 600 | 1,000 |
| Sudan | 800 | 400 | Uganda | 300 | 500 |
| Syria | 1,100 | 900 | United Arab Emirates | 100 | 500 |
| Taiwan** | 900 | 2,000 | Uruguay | 100 | 1,400 |
| Tanzania | 100 | 300 | Uzbekistan | 1,000 | 900 |
| Thailand | 3,000 | 3,200 | Yemen | 300 | 300 |
| Togo | 200 | 300 | Zambia | 100 | 200 |
| Tonga | 100 | 300 | Zimbabwe | z | 200 |

** denotes Visa Waiver country.          z indicates zero or rounds to zero.

*Source*: CMS estimates of undocumented residents in 2014 and 2015 by year of arrival; DHS estimates (sum of all categories) shown in DHS (2017).

Table 2 shows comparisons for the 36 countries in which the DHS estimates exceeded the CMS estimates by 2,000 or more. For the non-Visa Waiver Program (VWP) countries in the left panel of Table 2, the country that stands out the most is Canada: 119,400 DHS overstays compared to only 900 new arrivals in the undocumented population. Other notable differences in the left panel are Brazil (39,100 vs. 4,900), Colombia (19,600 vs. 6,000), Nigeria (13,800 vs. 4,000), and Venezuela (23,900 vs. 5,300).

Even though they differ by more than 2,000, the DHS and CMS estimates for four relatively large sending countries in Table 2 are fairly close: Mexico (46,700 vs. 42,100);[6] India (24,400 vs. 18,800); Dominican Republic (10,400 vs. 7,500); and Korea (7,000 vs. 4,400).

The largest differences in Table 2, and possibly the most significant from a policy perspective, are for the VWP countries in the right panel. With the exception of Korea, as noted, all of the DHS estimates for VWP countries shown in Table 2 greatly exaggerate the number of overstays. In fact, excluding Korea, total DHS overstays in the right panel of Table 2 outnumber the CMS estimates by 115,800 to 4,200. For nine VWP countries — Australia, Austria, France, Germany, Italy, Netherlands, Sweden, Switzerland, and the United Kingdom — the DHS estimates of overstays in just one year, 2016, are higher than the CMS estimates of the *total* undocumented population from each of those countries in 2015.

---

6  The CMS estimate of overstays in 2016 is based partly on DHS estimates of overstays from Mexico in 2015. Thus, it is not surprising that the CMS and DHS estimates for Mexico are reasonably close in 2016.

GC CAR000618

## Table 2. Countries in Which the DHS Estimate Exceeds the CMS Estimate of Nonimmigrant Overstays by 2,000 or More

| Country | CMS | DHS | Country | CMS | DHS |
|---|---|---|---|---|---|
| **All 36 countries** | **120,700** | **484,900** | | | |
| Non-VWP | 112,100 | 362,100 | VWP countries | 8,600 | 122,800 |
| Argentina | 900 | 7,000 | Australia** | 100 | 7,000 |
| Bahamas | 400 | 4,000 | Austria** | z | 2,900 |
| Brazil | 4,900 | 39,100 | Chile** | 600 | 5,600 |
| Canada | 900 | 119,400 | France** | 200 | 11,000 |
| Colombia | 6,000 | 19,600 | Germany** | 500 | 19,500 |
| Dom. Rep. | 7,500 | 10,400 | Ireland** | 100 | 2,400 |
| Ecuador | 4,500 | 7,600 | Italy** | 500 | 15,300 |
| El Salvador | 2,900 | 5,100 | Japan** | 400 | 5,400 |
| India | 18,800 | 24,400 | Korea** | 4,400 | 7,000 |
| Israel | 100 | 3,900 | Netherlands** | z | 4,300 |
| Jamaica | 5,300 | 10,800 | Portugal** | 400 | 3,500 |
| Jordan | 100 | 2,600 | Spain** | 800 | 12,100 |
| Mexico | 42,100 | 46,700 | Sweden** | 100 | 2,800 |
| Nigeria | 4,000 | 13,800 | Switzerland** | z | 2,300 |
| Peru | 3,900 | 6,000 | UK** | 500 | 21,700 |
| Poland | 1,000 | 3,000 | | | |
| Russia | 1,600 | 4,200 | | | |
| Saudi Arabia | 400 | 3,100 | | | |
| Turkey | 200 | 3,300 | | | |
| Ukraine | 1,300 | 4,200 | | | |
| Venezuela | 5,300 | 23,900 | | | |

** denotes Visa Waiver country          z indicates zero or rounds to zero.

*Source*: CMS estimates of undocumented residents in 2014 and 2015 by year of arrival; DHS estimates (sum of all categories) shown in DHS (2017).

The CMS estimate exceeds the DHS estimate of overstays by 2,000 or more in only seven countries (Table 3). In general, we would expect the DHS estimates to be higher because they include unverified departures as well as actual overstays. Some of the differences — especially those for Bangladesh, Burma, Ethiopia, Haiti, and Nepal — might be explained by sampling variability or other errors in the CMS data. However, the CMS estimates for the Philippines and Vietnam appear to be too high. The data and assumptions that CMS used to derive estimates for those two countries should be reexamined. The outcome of that review will not affect the findings presented here because the overall assessment of the DHS estimates is based on the figures shown in Tables 1 and 2.

GC CAR000619

## Table 3. Countries in Which the CMS Estimate Exceeds the DHS Estimate of Nonimmigrant Overstays by 2,000 or More

| Country | CMS | DHS | Country | CMS | DHS |
|---|---|---|---|---|---|
| All 7 countries | **52,000** | **25,500** | Haiti | 8,100 | 5,700 |
| Bangladesh | 3,600 | 1,500 | Nepal | 4,900 | 1,500 |
| Burma | 2,600 | 300 | Philippines | 17,200 | 10,800 |
| Ethiopia | 4,100 | 1,000 | Vietnam | 11,500 | 4,700 |

*Source*: CMS estimates of undocumented residents in 2014 and 2015 by year of arrival; DHS estimates (sum of all categories) shown in DHS (2017).

## Discussion

The CMS estimates shown here are the only data that are sufficiently detailed and precise to evaluate the country-by-country overstay numbers reported by DHS. Even with the differences in the two data sets, the comparability of the estimates for 90 countries shown in Table 1 indicate that the two sets of estimates measure approximately the same population.

The figures presented above show that overstays are significantly overestimated for more than 30 countries in the 2016 DHS report, and half of those are VWP countries. In addition to assessing the DHS estimates for individual countries, the estimates in Tables 1 and 2 provide a basis for assessing the accuracy of DHS's *total* of 628,799 overstays reported for 2016. In Table 1, total DHS overstays are higher than the CMS estimates by about 23,000. In Table 2, the DHS total for the 36 countries is 485,000; the CMS total is 121,000. Increasing the CMS estimate by 50 percent (an extreme assumption) would raise the CMS total to 181,000. Thus, the DHS estimates shown in Table 2 are likely to be overstated by at least 300,000 (485,000 minus 181,000). Subtracting the total DHS overestimates in both tables would reduce the DHS total of 628,799 by 323,000. In other words, about 323,000, or slightly more than half, of the 628,799 reported to be overstays by DHS actually left the country but their departures were not recorded. The result is a revised total of about 306,000 estimated overstays in 2016.

It is important to keep the estimated 306,000 overstays in demographic perspective. Arrivals of overstays during the year do not represent undocumented population growth any more than births during the year represent total population growth. To estimate population change, those who were here at the beginning of the year, and left during the year, must be taken into account. Statistics reported by CMS[7] indicate that about 5.7 percent left the overstay population annually from 2008 to 2015. At that rate, about 275,000 of the 4,830,000 overstays that resided here at the end of 2015 would have left during 2016. The net growth of about 31,000 (306,000 minus 275,000) in 2016 indicated by these estimates is subject to a considerable amount of error. However, the estimate is not far from the average net growth of 20,000 from 2008 to 2015 shown in Table 5 in the Appendix. In summary, the

7 The "statistics reported by CMS" in this paragraph primarily refer to the estimates in Table 5 of Warren (2017). For reference, Table 5 from that report is replicated at the end of the Appendix.

774

DHS estimate of overstays in 2016, reduced to account for unrecorded departures of those who arrived in 2016, as well as departures during 2016 of overstays that lived here in 2015, indicates that overstay population growth was near zero in 2016.

## Conclusion

It is clear that the DHS estimates of overstays from Canada and from VWP countries that have very small undocumented populations, as well as the *total* number, erroneously include very large numbers of nonimmigrants that departed but their departure could not be verified. The country-specific figures shown in Table 2 should help DHS focus its efforts on improving the verification of departures of temporary visitors.

The findings reported here are important for at least two other reasons. First, the remarkably high, and erroneous, number of overstays reported by DHS for many VWP countries could lead to mistaken efforts to remove specific countries or to eliminate the program entirely. Second, the unsubstantiated report that more than 600,000 nonimmigrants overstayed in 2016 could revive fears that undocumented population growth has resumed or could lead to enforcement tactics or funding levels unjustified by the size of the overstay challenge. The best information available indicates that overstays from VWP countries remain at extremely low levels and that the total overstay population is growing very slowly.

The findings also add to a growing body of literature that argues for broad immigration reform. Since 2013, the Center for Migration Studies has released a dozen reports on the US undocumented population that demonstrate that:

- illegal entries to the United States fell dramatically between 2000 and 2015 (Warren 2017);

- given diminished illegal entries, the majority of new entries into the US undocumented population in recent years has come from nonimmigrants who overstayed or otherwise violated the terms of their temporary visas (Warren and Kerwin 2017); and

- most US undocumented residents have lived in the United States for long periods, have built strong equitable ties, and have contributed substantially to the country (Warren and Kerwin 2015, 98-100).

- Based on these trends, CMS has argued against the necessity of building a 2,000 mile border wall (Warren and Kerwin 2017).  It has also presented several options for legalizing different groups of undocumented residents, and has argued that these options, combined with reform of the legal immigration system and immigration enforcement, would lead to a substantial, permanent reduction in the US undocumented population (Kerwin and Warren 2017, 320-23).

This paper finds that DHS has greatly overstated the number of noncitizens from roughly 30 counties who have overstayed their nonimmigrant (temporary) visas. In particular, the DHS estimates for 2016 include significant numbers of nonimmigrants that left the undocumented population, but whose departure could not be verified. Thus, the actual number of overstays in 2016 was about half of the number estimated by DHS. Accurately

GC CAR000621

recording the arrival and departure of more than 50 million temporary admissions each year is a monumental task. DHS deserves substantial praise for accounting for well over 99 percent of all departures.

These findings provide further evidence that the conditions for broad immigration reform — a robust immigration enforcement system, a legal immigration system that has not been overhauled in 52 years, and a large, long-term undocumented population — are firmly in place.

## Appendix

### A. Derivation of the CMS Estimates in This Report

Steps 1 to 5 below summarize the CMS methodology for deriving annual estimates of the undocumented population. Steps 6 and 7 describe how those estimates were used to compile the CMS estimates shown in Tables 1 to 3 above.

CMS used the procedures below (Steps 1 to 5) to derive estimates of the undocumented resident population in 2010. The same steps[8] were followed to derive annual estimates for 2011 to 2015. The classification of noncitizens as undocumented residents was done at the microdata level. The CMS estimates shown here were compiled by country of origin and single year of entry from those data sets. Warren (2014) provides a detailed description of the methodology and compares the CMS estimates based on this methodology to estimates derived using the residual method.

**Step 1.** The first step in the estimation procedure was to compile data from the 2010 ACS for all noncitizens who entered the United States from 1982 to 2010. It was assumed that nearly all undocumented residents are in the category "noncitizens who entered the US after 1981." Very few who entered before 1982 would still be residing here as undocumented residents in 2010.[9]

**Step 2.** A series of edits, referred to as "logical edits," [10] were used to identify and remove as many legal residents as possible based on responses in the survey.

**Step 3.** Separate population controls were estimated for 145 countries or areas for undocumented residents counted in the 2010 ACS. For each country or area, the ratio of the population control to the logically edited population (from Step 2) was computed.

---

8  The country-by-country selection ratios for 2010, computed in Step 3, were used in Step 4 for every year. Independent population controls were computed *only* for 2010.

9  A large percentage of those who entered before 1982 obtained legal status under the Immigration Reform and Control Act of 1986 (IRCA) and those who did not apply for legalization have had more than 25 years in which to leave the undocumented resident population — that is, to adjust to legal status, be removed, leave voluntarily, or die.

10  The term logical edit refers to the process of determining probable legal status by examining survey data; for example, respondents were assigned to the legal category if they worked in occupations that generally require legal status, had the characteristics of legal temporary migrants, were immediate relatives of US citizens, received public benefits restricted to legal residents, were from countries where most arrivals would be refugees, or were age 60 or older at entry.

GC CAR000622

**Step 4**. The country-by-country ratios derived in Step 3 were used to make final selections of individual respondents in the ACS to be classified as undocumented residents.

**Step 5.** The estimates of those counted in the ACS (from Step 4) were adjusted for undercount.

**Step 6.** The CMS estimates from Step 5 were first compiled by single year of entry. Then, for each of the 133 countries listed in Tables 1, 2, and 3, the average of the following five recent entry cohorts was computed: three entry cohorts (2012, 2013, and 2014) from the 2015 estimates, and two entry cohorts (2012 and 2013) from the 2014 estimates.

**Step 7.** Step 6 yields estimates of *total* undocumented arrivals; however, estimates of *overstay* arrivals were needed for the CMS data shown in Tables 1, 2, and 3. Total arrivals were converted to overstay arrivals using the percentages and procedures shown in Table A-1. That is, 34.7 percent of the total undocumented arrivals from Mexico (computed in Step 6) were estimated to be overstays.

## Table A-1. Percent of Total Arrivals Estimated to be Overstays

| Country | Percent |
|---|---|
| Mexico | 34.7% |
| El Salvador | 11.0% |
| Guatemala | 24.9% |
| Honduras | 20.4% |
| Nicaragua | 56.3% |
| Dominican Republic | 54.4% |
| All other countries | See below |

Note: These percentages, along with the method of estimation, are shown in Warren and Kerwin (2017). See Table A-1 in that report.

Estimating overstays for each of the 127 countries not listed in Table A-1. The method of estimating illegal border crossers (EWIs) and overstays for each of the 127 countries that are not shown in Table A-1 has been updated and improved for these estimates. The first step was to estimate EWIs from each of these 127 countries. EWIs were estimated to be the *least* of (a) 5 percent of CMS's estimate of total arrivals from each of these countries, or (b) 25 percent of aliens apprehended by DHS for each of these countries in 2015.[11] The second step was to subtract EWIs from CMS's estimates of total entries for each country. Unrounded estimates were used to derive all of the figures shown in this report, and then the estimates for each country were rounded to hundreds.

The largest estimates of EWIs for the countries *not* listed in Table A-1 were: India (700), China (500), Brazil, Haiti, Jamaica, and Colombia (300 each), Ecuador and Peru (200 each), and 100 for 10 other countries. The estimates of EWIs for all other countries were less than 50.

---

11  See Table 34 of the 2015 DHS Yearbook of Immigration Statistics.

GC CAR000623

B. Table Replicated from Warren (2017)

## Table 5. Change in the Undocumented Population, 2008 to 2015, by Mode of Entry

*Numbers in thousands, rounded independently.*

| Mode of entry | 2008 to 2015 period | | | | Percent that | Average |
| --- | --- | --- | --- | --- | --- | --- |
| | Undoc. pop. in 2008 | Net arrivals | Left the undoc. pop.* | Undoc. pop. in 2015 | left the pop. from 2008 to 2015 | annual change |
| | *(1)* | *(2)* | *(3)* | *(4)* | *(5)=(3)/(1)* | *(6)=(2)-(3)/7* |
| **Total** | **11,460** | **3,095** | **3,510** | **11,045** | **31%** | **-60** |
| EWIs | 6,775 | 1,080 | 1,640 | 6,215 | 24% | -80 |
| Overstays | 4,690 | 2,015 | 1,870 | 4,830 | 40% | 20 |
| Percent overstays | 41% | 65% | 53% | 44% | - | - |

*Source*: Center for Migration Studies. Columns 1 and 4, estimates derived by CMS. Column 3 = [population in 2008] - [population in 2015 that *arrived before 2008*]. Col. 2 = Col. 4 – Col. 1 + Col. 3.

\* Undocumented residents can leave the population in four ways: emigrate voluntarily, adjust to lawful status, be removed by DHS, or (a relatively small number) die.

## REFERENCES

DHS (US Department of Homeland Security). 2017. *Fiscal Year 2016 Entry/Exit Overstay Report*. Washington, DC: DHS.

Kerwin, Donald. 2010. "More Than IRCA: US Legalization Programs and the Current Policy Debate." Washington, DC: Migration Policy Institute. https://www.migrationpolicy.org/research/us-legalization-programs-by-the-numbers.

Kerwin, Donald, and Robert Warren. 2017. "National Interests and Common Ground in the US Immigration Debate: How to Legalize the US Immigration System and Permanently Reduce Its Undocumented Population." *Journal on Migration and Human Security* 5(2): 297-330. https://doi.org/10.14240/jmhs.v5i2.86.

Warren, Robert. 2014. "Democratizing Data about Unauthorized Residents in the United States: Estimates and Public-Use Data, 2010 to 2013." *Journal on Migration and Human Security* 2(4). 305-28. http://dx.doi.org/10.14240/jmhs.v2i4.38.

———. 2017. "Zero Undocumented Population Growth is Here to Stay and Immigration Reform Would Preserve and Extend These Gains." *Journal on Migration and Human Security* 5(2): 491-508. https://doi.org/10.14240/jmhs.v5i2.95.

Warren, Robert, and Donald Kerwin. 2015. "Beyond DAPA and DACA: Revisiting Legislative Reform in Light of Long-Term Trends in Unauthorized Immigration to the United States." *Journal on Migration and Human Security* 3(1): 80-108. https://doi.org/10.14240/jmhs.v3i1.45.

GC CAR000624

Case 1:18-cv-00891-LCB-JEP   Document 57-2   Filed 07/03/19   Page 68 of 203

———. 2017. "The 2,000 Mile Wall in Search of a Purpose: Since 2007 Visa Overstays have Outnumbered Undocumented Border Crossers by a Half Million." *Journal on Migration and Human Securit*y 5(1): 124-36. https://doi.org/10.14240/jmhs.v%25vi%25i.77.

GC CAR000625

Case 1:18-cv-00891-LCB-JEP   Document 57-2   Filed 07/03/19   Page 69 of 203



# THE NATIONAL FOUNDATION
# FOR AMERICAN POLICY

June 10, 2018

Mr. L. Francis Cissna
Director
U. S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, DC 20529

Dear Director Cissna:

To help you in formulating the best policy for the country, I have enclosed materials that respond to the May 10, 2018 U.S. Citizenship and Immigration Services (USCIS) policy memorandum on "Accrual of Unlawful Presence and F, J, and M Nonimmigrants."

The materials include two articles published on Forbes.com that discuss the policy. One contains an interview with Paul Virtue, who drafted the policy on unlawful presence when at INS that the new memorandum will overturn. Mr. Virtue makes several important points you should consider. The other article focuses on an analysis by noted demographer Robert Warren that questions the conclusions of the DHS "overstay" report that USCIS cites as a key justification for the new unlawful presence memo. I have also attached a copy of Mr. Warren's report.

Thank you.

Sincerely,

Stuart Anderson
Executive Director

GC CAR 000626
Case 1:18-cv-00891-LCB-JEP   Document 57-2   Filed 07/03/19   Page 70 of 203

# Forbes

June 1, 2018

# USCIS Policy Change Could Bar Many International Students

By STUART ANDERSON

A new U.S. Citizenship and Immigration Services (USCIS) memo, described as "an abrupt, radical departure from more than 20 years of policy guidance" by one education group, may result in many international students who unknowingly violate their immigration status from being barred from the United States for 10 years.

"There has always been a strict distinction between violating status and being unlawfully present in the United States," notes immigration attorney Cyrus Mehta. "One can be in violation of status without being unlawfully present. Even if an F, J and M student dropped out of school or engaged in unauthorized work, he or she would be considered to have been in violation of status but not accruing unlawful presence. This is because an F, M and J nonimmigrant is usually admitted for a Duration of Status (D/S) rather than up to a certain date."

International educators are concerned the new USCIS policy on "Accrual of Unlawful Presence" will harm students. "The proposed change is operationally complex and may lead to wrongly identifying a large number of foreign students and exchange visitors as failing to maintain lawful status, thus unfairly subjecting them to the 3-year, 10-year, or permanent bars to re-entry to the United States," wrote NAFSA: Association of International Educators in comments to USCIS on the new policy. "Like American students, international students should be allowed to complete their studies at their chosen institution, without the stress or fear of being deported based on an oversight of which they may not be aware."

To better understand the policy change and its implications I interviewed Paul Virtue, a partner at Mayer Brown. He wrote what is known as the "Virtue memo," in 1997, which established guidance for the Immigration and Naturalization Service on "unlawful presence." That guidance has remained in force, but will be overturned, at least in part, on August 9, 2018, once the new USCIS policy memo goes into effect.

**Stuart Anderson:** What is "unlawful presence" and why does it matter?

GC CAR 000627

**Paul Virtue:** In the 1996 Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Congress created a new ground of inadmissibility for foreign nationals who had been unlawfully present in the United States for more than 180 days, but less than one year, and who had departed the country prior to the commencement of removal proceedings. Such an individual was deemed inadmissible to the United States for a period of three years. In addition, a foreign national who had been unlawfully present in the United States for one year or more and is again seeking admission is inadmissible for 10 years.

Under the statute, an alien is deemed to be unlawfully present in the United States if he or she remains after the expiration of his or her authorized period of stay or is present in the United States without having been admitted or paroled. The new ground of inadmissibility based on unlawful presence became known as the "3- and 10-year bars." The new law became effective on April 1, 1997.

The new law took on added significance when a provision that had allowed people who were unlawfully present (but eligible for an immigrant visa) to adjust their status in the United States upon payment of a $1,000 penalty lapsed on April 30, 2001. The repeal of section 245(i) of the Immigration and Nationality Act (INA) thus created a "Catch-22" situation for people who were otherwise eligible for permanent residence, but who could no longer adjust status in the United States and yet would trigger the 3- or 10-year bar by leaving and applying for an immigrant visa at a U.S. consulate outside the United States. The consequences are especially harsh for the beneficiaries of employment sponsorship who don't have a US citizen or permanent resident spouse or parent to qualify for the "extreme hardship" waiver.

**Anderson:** What was the background that resulted in you drafting what is known as the "Virtue memo" back in 1997?

**Virtue:** In early 1997, I was appointed acting Executive Associate Commissioner for Programs of the Immigration and Naturalization Service (INS), with responsibility for implementing the new law. In a memorandum to INS adjudicators published on September 19, 1997, we set out our position on the interpretation of the term, "unlawfully present," as that term related to nonimmigrants who had overstayed their authorized period of stay. (A *nonimmigrant* has permission to stay temporarily in the U.S.)

In the September 1997 memorandum we took the position that the expiration date of the nonimmigrant's Arrival/Departure Record (Form I-94) represented the end of the authorized period of stay. Thus, a nonimmigrant was deemed to have commenced a period of unlawful presence on the earlier of the day following the expiration of the Form I-94 or the date of an official determination that the nonimmigrant had otherwise violated his or her status. Students (F-1 and M-1) and exchange visitors (J-1), however, were admitted not to a date certain but rather for the duration of their authorized academic, vocational or exchange program, respectively. Upon arrival, the student/exchange visitor was admitted for "duration of status" and their Forms I-94 were annotated "D/S."

We considered changing the practice of admitting students and exchange visitors until a date certain, but the Inspections program (now U.S. Customs and Border Protection – CBP) balked at

GC CAR 000628

that approach. Accordingly, for reasons of practicality and fundamental fairness, we took the position that a student or exchange visitor began to accrue unlawful presence only after an official determination had been made by INS or an immigration judge that the nonimmigrant has violated his or her status. The 1997 guidance as well as many other legacy INS policies were consolidated in the USCIS Adjudicators Field Manual (AFM) in May 2009.

**Anderson:** Can you explain the significance of the new USCIS memo on "Accrual of Unlawful Presence and F, J and M Nonimmigrants"?

**Virtue:** By memorandum dated May 10, 2018, U.S. Citizenship and Immigration Services announced a change, effective August 9, 2018, in the way it will calculate periods of unlawful presence in the United States for students and exchange visitors who remain beyond completion of their academic/training program.

Citing technological developments since 1997, that now allow for more precise tracking of compliance with academic and training programs, USCIS will rely on the information entered by the school/training sponsor in the Student and Exchange Visitor Information System (SEVIS) administered by Immigration and Customs Enforcement (ICE). The revisions will be reflected in Chapter 40 of the Adjudicators Field Manual. The agency has invited public comment for a 30-day period on this change.

We can expect to see substantial commentary from the academic community, which is largely responsible for the accuracy of the data contained in SEVIS. Concerns will likely include whether this new approach will provide the student/exchange visitor with definitive notice of a violation – and that he or she is accruing unlawful presence as a result of that violation. The new policy will take effect on August 9, 2018, which means that students and exchange visitors who for one reason or another have failed to maintain their status will begin to accrue unlawful presence, in some cases unbeknownst to them, on that date.

**Anderson:** What are the key differences between the memo you wrote in 1997 and the new USCIS memo?

**Virtue:** The key difference between the new policy and that established in September 1997 is that under the new policy the date on which a person begins to accrue unlawful presence is not tied to an official determination. Therefore, an individual may learn only *after the fact* that he or she has already accrued months of unlawful presence and is left with no recourse for avoiding the 3- and 10-year bars to admission. Moreover, under the new policy, the failure of the student or exchange visitor to maintain status results in a finding of unlawful presence for dependent family members over the age of 18 years. Therefore, the dependent family member can suffer significant consequences through no fault of his or her own.

**Anderson:** The recent DHS *Fiscal Year 2016 Entry/Exit Overstay Report* seems to conclude that anyone DHS cannot verify as having departed should be viewed as an "overstay," at least for the purposes of the DHS report. Can you list some of the reasons why DHS might not be able to verify someone's departure but the person may not have overstayed their time allowed in the U.S.?

GC CAR 000629

**Virtue:** The DHS report on overstays is dependent on the accuracy of information in SEVIS and the agency's ability to match entry and exit information, especially for students who, for example, may have departed through a land port of entry or have had a change of status that was not updated in SEVIS. The system for matching data on change of status from the CLAIMS system administered by USCIS is not foolproof. Indeed, a biometric entry/exit system aims to improve the ability of DHS to identify overstays. While CBP's effort in this regard holds promise, it is not a finished product and there is still too much guesswork built into the DHS assumptions concerning the number of overstays among the student and exchange visitor populations.

**Anderson:** What do you think will be some of the potentially harmful consequences of the new USCIS memo on unlawful presence?

**Virtue:** My concern with the new approach is that it strays from the bright line we created in 1997. Under the new policy an adjudicating officer could make a determination that a prior minor infraction could have resulted in months or even years of unlawful presence having already been accrued, leaving the student or exchange visitor with no opportunity to cure the defect. It raises a question of fundamental fairness. The new policy recognizes that reinstatement in F-1 student status is fairly common. Accordingly, the policy provides that an F-1 student whose application for reinstatement is approved will not be considered to have accrued unlawful presence during the period the student was out of status.

**Anderson:** What do you believe is the right policy?

**Virtue:** The earlier policy put the foreign national on notice by virtue of an official determination that he or she had begun to accrue unlawful presence on a specific date. In my view fundamental fairness dictates such clear notice. For that reason, I believe the approach we took over 20 years ago was the right one.

**Anderson:** What advice would you give for individuals, universities and employers who could be affected by the new policy?

**Virtue:** We are advising our clients in student or exchange visitor status to pay careful attention to the information contained in their SEVIS records and to bring any discrepancies to the attention of their school/employer right away. We are advising universities and employers that their failure to maintain timely and accurate information in SEVIS will have significantly greater consequences after August 9, 2018.

GC CAR 000630

# Forbes

June 6, 2018

# USCIS Uses Questionable 'Overstay' Report to Justify Policies

By STUART ANDERSON

On May 10, 2018, U.S. Citizenship and Immigration Services (USCIS) cited a Department of Homeland Security (DHS) report on "overstays" to justify a new, highly restrictive policy that may result in international students who unknowingly violate their immigration status being barred from the United States for 10 years. However, a noted demographer has examined the DHS report and found it so flawed that he concluded it should not be the basis for making immigration policy.

All sides of the immigration debate respect Robert Warren as a demographer. He authored the first government reports to determine the number of unauthorized immigrants in the United States and has continued to produce such estimates up to the present day. I met Robert Warren when we both worked at the Immigration and Naturalization Service (INS). He worked for many years at the U.S. Census Bureau and became the director of the INS's Statistics Division.

In January 2018, Warren published a study for the Center for Migration Studies, where he is a senior visiting fellow, that evaluated the *Fiscal Year 2016 Entry/Exit Overstay Report* released by the Department of Homeland Security (on May 22, 2017). Now that USCIS is using the DHS overstay report to justify a questionable policy, Warren's analysis deserves greater attention.

The heart of the matter is that the Department of Homeland Security's report includes as "overstays" people who did not necessarily overstay their visa, but individuals who DHS simply was unable to confirm had departed the United States. "The DHS figures represent actual overstays *plus arrivals whose departure could not be verified*," writes Warren. "That is, they include both actual overstays *and unrecorded departures*." (Emphasis added.)

There are a number of reasons why the Department of Homeland Security might be unable to verify a foreign national's departure in its system. "The DHS report on overstays is dependent on the accuracy of information in SEVIS (Student and Exchange Visitor Information System) and the agency's ability to match entry and exit information, especially for students who, for example, may have departed through a land port of entry or have had a change of status that was not updated in SEVIS," attorney Paul Virtue, a former top official at the Immigration and Naturalization Service, told me in an interview.

GC CAR 000631

"The system for matching data on change of status from the CLAIMS system administered by USCIS is not foolproof," explains Virtue. "While CBP's [Customs and Border Protection] effort in this regard holds promise, it is not a finished product and there is still too much guesswork built into the DHS assumptions concerning the number of overstays among the student and exchange visitor populations."

Demographer Robert Warren found a number of the estimates in the Department of Homeland Security's overstay report to be implausible. "It is clear that the DHS estimates of overstays from Canada and from VWP [Visa Waiver Program] countries that have very small undocumented populations, as well as the *total* number, erroneously include very large numbers of nonimmigrants [individuals with temporary status] that departed but their departure could not be verified," he writes. "Slightly more than *half* of the 628,799 reported to be overstays by DHS actually left the country but their departures were not recorded. After adjusting the DHS estimates to take account of unrecorded departures, as well as departures in 2016 of overstays that lived here in 2015, overstay population growth was near zero in 2016."

Note this point: "Overstay population growth *was near zero in 2016*," according to Warren. That is not the impression anyone would receive from reading the DHS report.

In sum, Warren notes, "This paper finds that DHS has greatly overstated the number of noncitizens from roughly 30 countries who have overstayed their nonimmigrant (temporary) visas. In particular, the DHS estimates for 2016 include significant numbers of nonimmigrants that left the undocumented population, but whose departure could not be verified. Thus, the actual number of overstays in 2016 was about half of the number estimated by DHS."

The Center for Migration Studies report produced by Robert Warren reached two important conclusions: "First, the remarkably high, and erroneous, number of overstays reported by DHS for many Visa Waiver Program countries could lead to mistaken efforts to remove specific countries or to eliminate the program entirely. Second, the unsubstantiated report that more than 600,000 nonimmigrants overstayed in 2016 could revive fears that undocumented population growth has resumed or could lead to enforcement tactics or funding levels unjustified by the size of the overstay challenge."

Given Robert Warren's conclusion, it is remarkable USCIS cites the DHS overstay report to justify its new restrictive policy on unlawful presence. As noted, Warren's analysis of the report concludes, "DHS has greatly overstated the number of noncitizens from roughly 30 countries who have overstayed their nonimmigrant (temporary) visas" and included "a remarkably high, and erroneous, number of overstays."

The May 10, 2018 USCIS memorandum imposing controversial new rules on international students and exchange visitors states that it aims "to reduce the number of overstays" and offers proof of the need for the new policy by citing the DHS report's finding that "the total overstay rate was 6.19 percent for F nonimmigrants."

Here is the crux of the problem: There is an enormous amount of false precision contained in the DHS overstay report. More than half of the 6.19% "total overstay rate" for F-1 students in the

GC CAR 000632

DHS report comes from "Suspected In-Country" overstays, which DHS itself defines as "possible overstays" that have "no records of a departure or change in status." Even for those listed as "Out-of-Country" overstays, DHS can only offer "there is evidence indicating they are no longer physically present in the United States."

In sum, we simply do not know to what extent the numbers in the DHS report represent shortcomings in data collection and government systems, rather than identifiable individuals who have overstayed their allowed time in the U.S. And DHS and USCIS do not know either. Moreover, the report does not differentiate between a possible short-term or inadvertent lapse in status vs. an individual who spends years in the U.S. out of legal status.

In its new memo, which takes affect August 9, 2018, USCIS seeks to punish any lapse of status – and to potentially bar international students from the country for a decade for such lapses. Under a 1996 law, if an individual is "unlawfully present" in the United States for one year, he or she can be inadmissible to the U.S. (i.e., not allowed back in) for 10 years. Attorney Cyrus Mehta notes that prior to this new policy F, J or M students would not accrue unlawful presence if they were not in their academic program, etc., since such students would be admitted for a Duration of Status (i.e., not for a fixed period of time).

Paul Virtue, who helped formulate the policy on unlawful presence in 1997, when he worked at INS, believes the new USCIS policy may be unfair to students. "Under the new policy an adjudicating officer could make a determination that a prior minor infraction could have resulted in months or even years of unlawful presence having already been accrued, leaving the student or exchange visitor with no opportunity to cure the defect. It raises a question of fundamental fairness."

He thinks the balancing act achieved in the old policy is lost in the new USCIS memo. "The key difference between the new policy and that established in September 1997 is that under the new policy the date on which a person begins to accrue unlawful presence is not tied to an official determination," explains Virtue. "Therefore, an individual may learn only *after the fact* that he or she has already accrued months of unlawful presence and is left with no recourse for avoiding the 3- and 10-year bars to admission."

That the new policy is unfair seems clear and, given other recent USCIS policies, some may suspect its purpose is to discourage international students from coming to the United States. That the new policy relies on a report on overstays whose conclusions, upon review, are questionable, may provide additional reason for suspicion.

GC CAR 000633





SEATTLE, WA



DIANE M. BUTLER

@

June 10, 2018

Mr. L. Francis Cissna
Director
U.S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, DC 20529

Submitted via email: publicengagementfeedback@uscis.dhs.gov

**Re:     Comment on USCIS Policy Memorandum: Accrual of Unlawful Presence and
          F, J, and M Nonimmigrants**

Dear Director Cissna:

I am writing to comment in objection to the U.S. Citizenship and Immigration Services (USCIS) policy memorandum of May 10, 2018, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants."

The memo is an abrupt departure from statutory provisions and over 20 years of policy guidance. In 1996, Congress passed IIRIRA which included unlawful presence provisions.[1] Congress did not intend to expand the definition of unlawful presence to include all violations of status.[2] USCIS crafted guidance on this complex area of law in the USCIS Memorandum, "Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009). No regulations ever have been promulgated to interpret the meaning of unlawful presence.

Please withdraw the memo and do not incorporate the proposed sections into the Adjudicator's Field Manual. Implementing the changes, planned on August 9, 2018, could result in F, J, and M nonimmigrants being unfairly excluded from the United States through visa application, admissions, and change of status procedures, and it would hinder efforts to attract bright, innovative minds to our country from around the world.

---

[1] Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub.L. 104–208, 110 Stat. 3009-546, enacted September 30, 1996 (sometimes abbreviated as "IIRAIRA" or "IIRIRA").

[2] Compare INA §212(a)(9)(B)(ii) defining unlawful presence as the period "after the expiration of the period of stay authorized by the Attorney General, and IIRIRA §632 and INA §222(g), applying unlawful presence only to aliens who "remained in the United States beyond the period of stay authorized," that is, beyond a specific date.

GC CAR 000634

**Basis for Providing Comment**

I have been practicing immigration law since 1996 and have represented thousands of clients filing a wide range of petitions and applications with USCIS. Working in proximity to the Canadian border, I have dealt extensively with Customs and Border Protection (CBP) and with consular offices on nonimmigrant visa (NIV) issues. I also serve as an advisor to the Trade Development Alliance of Greater Seattle's EDU Roundtable, promoting higher education as an element of trade expansion. This comment focuses on the part of the memorandum that concerns status violation rather than overstay issues, and in particular focuses on what might be construed as unauthorized employment, and the resulting actions by CBP and consular officers.

**Summary Examples of Harsh Consequences of Proposed Changes**

The policy would have extremely harsh consequences for F-1, J-1, and M-1 nonimmigrants ("NIV students") who engage in activities deemed to constitute even minor, inadvertent, or unwitting, status violations. For example, in the context of work, there may be a range of actions that could be construed to constitute status violations:

- Having an EAD and working for pay for a day as a barrista;

- Weekend babysitting for a host family and receiving Amazon gift cards;

- Working throughout a semester for pay in a job not authorized under Curricular Practical Training or Optional Practical Training;

- Working under OPT in a job that later is determined not to be closely enough related to the degree;

- Working under CPT for two hours more than the 20 hours per week authorized;

- Volunteering to do research for a professor;

- Volunteering in a homeless shelter;

- Investing in and starting a business and working to build it without receiving any pay; or

- Investing in an EB-5 enterprise.

Some examples would appear to constitute technical status violations, but a number are subject to interpretation.

These types of deemed violations due to work might not come to the NIV student's attention until they are outside the United States applying for a visa or applying for entry with CBP. A consular officer or CBP officer may google the student, and see a Facebook post of the student behind a barrista counter or see a LinkedIn reference to the student volunteering in a

professor's lab. The student may have had every intent to comply with all immigration provisions, and may have thought the experience was permitted. Under the proposed policy, the officer would be obliged to find that the unlawful presence clock started ticking on the first day of the volunteer activities.

The problem with the unlawful presence clock under the policy is that it does not turn off. This creates a "gotcha" for the NIV student that could sneak up on him or her or family members for years to come. The policy effectively would impose a guilt-until-proven-innocent standard that is counter to our system of justice.

**Due Process Concerns with the Inequity of Lack of Ability to Contest Unlawful Presence**

In the context of visa applications and seeking entry to the United States, the NIV student's ability to challenge a decision is curtailed. With the doctrine of consular nonreviewability, once a consular officer issues certain decision such as a 214b immigrant intent denial, the student has no chance to dispute the denial. There is no appeal and no waiver application. Similarly, when a CBP officer at a Port of Entry decides not to let an NIV student enter because the CBP officer decided some activity constituted a status violation, the student has no right to appeal.

Under the existing policy, the ability to contest a status violation decision already is somewhat limited. But the unlawful presence clock does not start and continue to tick. Under the proposed change, NIV students might accrue 180 days or 365 days of unlawful presence without even knowing it – retroactively – and then be barred from the United States for three years or 10 years. This may occur on the brink of the student completing a college degree, as they return from summer break to complete a last semester.

**Far-Reaching Ripple Effects**

The wide scale on which the policy change would apply could have far-reaching ripple effects. If the NIV student with the deemed violation were a Teaching Assistant, the school relying on having the TA would be left to scramble to fill the need. The schools with these barred NIV students would forego the tuition. The communities where these students resided would be deprived of the diverse exchange of ideas and economic benefits of the students and their families. Moreover, if the NIV student violates status, then the derivative spouse and 18-and-over children also would start accruing unlawful presence from the date of the student's violation, with no way of disputing the allegations.

As a matter of statutory construction, and as a matter of policy, the term "unlawful presence" has been defined as meaning presence in the United States beyond a specified period of time and should not be defined as including a violation of terms of nonimmigrant status where

GC CAR 000636

the period of authorized nonimmigrant status has not expired. Unlawful presence should only trigger when there is clear notice of remaining beyond an expiration date of authorized stay in the United States and not when there is a contestable allegation of violation of status.

NIV students with status violations described herein generally do not present a significant threat to national security and public safety. The proposed policy is so unforgiving that it create chaotic conditions with high levels of unpredictability.

Please reconsider, and do not implement this policy change.

Very truly yours,

Davis Wright Tremaine LLP

Diane M. Butler

June 11, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

**Re:    USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

GC CAR000638

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

Other examples include:

- A student is in the final Spring semester of a Masters program, and is enrolled in his last required course on his degree plan (which is a 3-credit course). The student plans to continue on with his Ph.D. in the Fall semester with a full-time course load. However, the student inadvertently misses the deadline for filing his May graduation paperwork. Therefore, his Masters degree will not be officially awarded until December (the end of the Fall semester). In such a case, it will appear that the student was under-enrolled in the Spring semester, which is a violation of status. In reality, he correctly followed the regulations regarding enrollment, but missed a paperwork deadline.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,


Julia Siu, M.A.
International Student Counselor
International Student and Scholar Services
Office of International Affairs

GC CAR000639

Texas Tech University

GC CAR000640

June 11, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

>    **Re:    USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M**
>    **Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

GC CAR000641

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

Other examples include:

- Student was told by previous institution of deadline to transfer SEVIS record out to new institution. However, the deadline provided was incorrect and the student went out of status through no fault of their own. As such, the student was required to file for reinstatement that is still pending after almost 10 months. Should this new policy go into effect, the student would have been out of status and unlawfully present for 14 months at the time of writing. The new policy would ban the student from returning to the U.S. for 3 or 10 years. In this particular case, the student did nothing wrong but was advised incorrectly by his previous institution, yet he would pay the long-term consequences.
- Student fell out of status due to previous institution not following SEVP policies and procedures. As such the student was required to apply for reinstatement but due to the lengthy application process, had to cancel his reinstatement application so he could transfer to a new institution to begin his college career (if he had not transferred, he would not have been able to enroll full-time as required by regulation). He resubmitted his reinstatement application for a second time and at this point has been out of status for approximately 18 months. Given the lengthy reinstatement application approval timeline, it will be almost 24 months before he is approved for full-status. Implementation of this policy would irrevocably harm the student who became out of status through the previous institution's lack of adherence to SEVP policy. In this case, the student did nothing wrong and has been adhering to all regulations; adopting the new guidance would irrevocably harm this student as he would likely be under the 10 year ban though he faithfully followed all requirements.
- Student fell out of status while waiting for required admissions paperwork to transfer to new institution. Student has been approved for reinstatement but had this policy taken effect, would have been barred from returning for 3 to 10 years due to a paperwork error.

GC CAR000642

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,

Katie Ahlman

GC CAR000643



# INDIANA UNIVERSITY

**OFFICE OF THE VICE PRESIDENT
FOR INTERNATIONAL AFFAIRS**

June 11, 2018

To:     publicengagementfeedback@uscis.dhs.gov
Re:     Accrual of Unlawful Presence and F, J, and M Nonimmigrants

To Whom It May Concern:

I write on behalf of Indiana University in response to the Policy Memorandum on Accrual of
Unlawful Presence and F, J, and M Nonimmigrants.

Indiana University enrolls more than 114,000 students on its eight campuses: the flagship
campus in Bloomington, which is a residential campus; an urban campus in Indianapolis,
which also includes the IU Medical Center; and six regional campuses in the Indiana cities of
Gary, South Bend, Fort Wayne, Kokomo, Richmond, and New Albany. The University offers
1,124 degree programs, has more than 250 research centers and institutes, and employs
more than 20,000 faculty, professional, and support staff.

Internationally known for the quality of its academic programs and strong international
student and scholar support services, Indiana University enrolls more than 8,500
international students and also processes immigrant and non-immigrant work petitions for
international faculty, researchers, physicians, and support staff.

Nationwide, per figures obtained from NAFSA: Association of International Educators,
international students and scholars contributed $36.9 billion to the U.S. economy last year
and supported 450,331 jobs. Incidentally, that is 400,000 more than all of the coal miners in
the United States.

This policy memorandum on unlawful presence is just the latest example of an overly harsh
measure taken by the administration to further discourage the world's top international
students and scholars from attending our nation's leading colleges and universities—which
are global in reach and scope.

## Authority

USCIS seems to be overstepping their jurisdiction by drafting a Policy Memorandum in this
area. It does not seem to be within USCIS's scope to interpret the start date for a period of
overstay. This seems to be better interpreted by the courts or Immigration and Customs
Enforcement. Further, moving the penalty for a minor status violation (for example, an I-20
extension or taking one too many on-line classes in pursuit of full-time enrollment) that has
heretofore had a simple remedy to the level of unlawful presence is not reasonable nor will
it be appreciated by the courts, which will undoubtedly be overwhelmed with challenges.

This Policy Memorandum effectively undermines the SEVIS system, which was to require
sponsoring institutions to take actions and verify information within the system knowing

Bloomington, IN ████     fax ████

GC CAR 000644

DHS and DOS were recipients of that information. International students and scholars remain the most regulated and monitored group of non-immigrants within U.S. borders. As Designated School Officials and Responsible Officers, international educators serve a vital role in maintaining the integrity/information reporting of their portion of the non-immigrant population, removing a burden that ICE could not possibly carry, while allowing students and scholars to accomplish their goals. Applying a standard of unlawful presence to minor, correctable infractions undermines the ability of the United States to successfully attract and enroll international students and scholars.

**Need Analysis**

The data analysis provided to justify the need for this policy change is weak. The report only uses one year of data for all of the F, M, and J overstays. The previous two years only measured tourist visa entry/exit data. One set of data points makes it impossible to interpret the data correctly. There is no ability to determine if this is an increasing, decreasing, or maintained trend. To then make assumptions based on a small portion of data is not advisable.

DHS notes the following: "The United States did not build its border, aviation, and immigration infrastructure with exit processing in mind.  Consequently, airports in the United States do not have areas designated   exclusively for travelers leaving the United States.  Instead, traveler departures are recorded  biographically using outbound passenger manifests provided by commercial carriers. Under the  Advance Passenger Information System legislation, carriers are required to validate the manifest against the travel document presented by the traveler before he or she is permitted to board the aircraft or sea vessel.

DHS classifies individuals as overstays by using the ADIS system to match departure and status change records to arrival records collected during the admission process. DHS identifies individuals as having overstayed if their departure record shows they departed the United States after their lawful admission period expired (i.e., Out-of-Country Overstays). While these individuals are considered overstays, there is evidence indicating they are no longer physically present in the United States. DHS also identifies individuals as possible overstays if there are no records of a departure or change in status prior to the end of their authorized admission period.

Even with the holes in this system, the F, M, and J Suspected In-Country Overstay rate is 2.81 percent of the total number of students and exchange visitors who were expected to change status or depart the United States.

There is no information on length of overstay. One does not trigger the three-year bar until one has accrued more than 180 days, but less than one year, of unlawful presence. Those who accrue one year or more of unlawful presence are barred for ten years. The data do not speak to this information either.

The Overstay Report on which this policy relies also states that DHS is also implementing a biometric-based departure program to complement the biographic data collection that already exists. Perhaps DHS should wait until their data are complete before implementing such unreasonably harsh and unnecessary enforcement measures.

**Adjudication Delays**

A student who commits a minor technical immigration infraction, such as failing to report an information update, has the option of applying to be reinstated to lawful status. Such

applications are currently taking DHS in excess of 11 months nationwide to adjudicate. According to the new policy memo, if a student's reinstatement application is denied, he or she must immediately depart the country, and the period of time from the date of the original status violation to the date when the reinstatement is denied counts toward the unlawful presence calculation. In other words, that student would then be barred for returning to the United States, potentially for up to 10 years, but most likely for at least three years, depending on the time it takes DHS to adjudicate the application. At a minimum, given current processing times, all students who have reinstatement applications denied will face a three-year bar. We want policies that encourage students to take responsibility for their mistakes in this regard. This new policy will have the opposite effect. This is highly disruptive to the student/scholar experience when there have not necessarily been any unlawful actions taken and they are requesting a legitimate benefit related to their lawful status.

Any reasonable person would ask why USCIS would take so long to adjudicate an application for reinstatement, given their stated purpose of securing our borders and enhancing security.

**Impact on Future Applications**

It is not clear how this memorandum will impact the processes of the other government agencies (SEVIS records, CBP admission processes and I-94s, DOS and visa issuance). It is not completely clear how a violation may affect future applications (H1-B, LPR), but the potential for a "surprise" finding of a previous violation seems to be a real possibility. These sorts of surprises impact much more than the international applicant, ranging from an American citizen expecting the admission of a fiancé, to institutions anticipating a new professor or researcher, to businesses counting on a new hire.

**Dependents**

The consequences for dependents is another area of concern. A dependent may have his or her own status violation or be subject to a violation of the F-1 as a dependent. Because dependents may apply for change of status to F-1, J-1, and other statuses, how might USCIS change the review process for determining eligibility for the new status based on the memorandum? This clearly creates the possibility of more RFEs and even longer adjudication processing timelines.

Is this memo attempting to override the current statutory exception to Unlawful Presence applied to minors under the age of 18? How is an F-2, M-2, or J-2 dependent's "conduct or circumstances" evaluated in terms of determining whether a period of authorized stay would end? Why should an individual other than the one who committed the violation be denied benefits?

**Questions**

Clarification is needed on page 4: An F, J, or M nonimmigrant begins accruing unlawful presence, due to a failure to maintain his or her status on or after August 9, 2018, on the earliest day of any of the following:
- "The day after the Form I-94 expires, if the F, J, or M nonimmigrant was admitted for a date certain"

This bullet point raised some concern for students who have entered the United States with an I-515A. Previously, as long their documentation had been received for adjudication before the end date on the I-94, they were allowed to stay inside the United States even after that date until their request had been approved or denied. Will they now begin accruing days of unlawful presence after the end date on their I-94 documents? What if the request is approved? How will that be annotated so that unlawful presence is not triggered, if that is the end result?

Footnote 17 on page 7 of this memo indicates that an alien who violates status is subject to removal proceedings and rendered deportable. With this remedy already in place, what are the merits of this change in guidance?

On page 10 the fourth bullet point in the section under "Foreign students (F nonimmigrant) . . ." speaks of cap gap. Perhaps USCIS could also provide guidance on cap gap grace periods for when the H-1B petition is denied or withdrawn, as that continues to be an unclear point within DHS and thus within the community of stakeholders.

Regarding footnote 29 on page 10: "If the reinstatement application is approved, however, no unlawful presence generally will have accrued during the time period in which the student was out of status," we ask that USCIS clarify what "generally" means in the context of this sentence.

We are fortunate to have proactive systems in place to prevent these inadvertent status violations at Indiana University, but our systems do not have the ability to change the administration's propensity to do harm to those who come to the United States to make a better life for themselves and their families.  What the administration fails to understand is that in the end, it is the United States that will suffer as the world's leading students, researchers, and scientists go elsewhere to make contributions toward solving the world's greatest challenges, to be leaders in the arts, education, and industry—and to create jobs.

Thank you for taking the above recommendations under consideration prior to revising this Policy Memorandum.

Sincerely,

David Zaret
Vice President


cc:     Christopher Viers, Associate Vice President for International Services
        Doug Wasitis, Assistant Vice President for Government Relations

GC CAR 000647



STUDENT LIFE
## INTERNATIONAL CENTER
UNIVERSITY OF MICHIGAN

June 11, 2018

Mr. L. Francis Cissna
Director
U. S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, DC 20529

Via email: publicengagementfeedback@uscis.dhs.gov

Dear Director Cissna:

The University of Michigan – Ann Arbor is submitting these comments in response to the U.S. Citizenship and Immigration Services (USCIS) policy memorandum of May 10, 2018, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants."

The University of Michigan – Ann Arbor is a large public university with more than 8,000 F-1 and J-1 international students, including students pursuing post-completion Optional Practical Training (OPT) or Academic Training, and approximately 1,000 international scholars (J-1 Exchange Visitors), who could be affected by the changes proposed in this policy memorandum.

The change proposed in this policy memorandum is a drastic one as it reverses a policy which has been in effect for over 20 years. Under the current policy, an F-1 student or J-1 Exchange visitor whose I-94 record indicates permission to stay through duration of status (D/S), will not begin to accrue unlawful presence without a formal finding of a status violation made in the course of a DHS benefits determination or by an immigration judge. The current policy thus provides clear notice to the F-1 or J-1 student or J-1 scholar that they must prepare to depart the United States immediately or take action to address the status violation if that is a possibility. The new proposed policy lacks the clarity of the effective date, which is a particular problem since the implications of accruing unlawful presence are so significant; potentially resulting in three-year, ten-year or permanent bars to entrance into the United States.

The University of Michigan is also concerned that this proposed policy change may lead to our international students and scholars being wrongly identified as failing to maintain lawful status, or may lead to our international students and scholars becoming subject to these severe penalties due to minor or technical status violations, or due to the length of time required to adjudicate applications for reinstatement to student status.

Although we agree that the Department of Homeland Security has implemented new tracking mechanisms in the last 20 years, there are still instances in which data in immigration documents and in

Page <strong>1</strong> of 3



electronic records such as SEVIS (the Student and Exchange Visitor Information System) could be inconsistent or inaccurate, leading to an erroneous determination that the student or exchange visitor has not maintained lawful status. Also, new initiatives by the Student and Exchange Visitor Program (SEVP) offer the opportunity for students engaged in OPT to update certain personal and employment information through a portal, but due to technical issues and some confusion among students about when and how to enter information, the data entered through this portal is not always accurate. This OPT portal example represents an instance in which a student could be judged to have violated lawful immigration status and would be subject to the severe consequences of accrual of unlawful presence.

Students who apply for reinstatement to F-1 status to address a status violation will not know for many months whether or not their reinstatement application has been approved. The status violation could be relatively minor, such as the failure to maintain full-time enrollment due to dropping one class without obtaining appropriate advance permission. Under current policy, if USCIS ultimately denies the reinstatement request, the student would not start accruing unlawful presence until the date of the denial, which gives sufficient time to either make arrangements to leave the country, or possibly to ask USCIS to reconsider its decision. In the proposed policy, virtually all students whose reinstatement applications are denied would find themselves subject to at least the 3-year bar, merely because USCIS takes so long to adjudicate applications for reinstatement.

Similarly, if students and scholars were under the impression that they were maintaining status but were later determined not to be doing so, they could be subject to the various bars. They would not be able to take action to avoid penalties resulting from unlawful presence since the alleged status violation would be in the past and unlawful presence would have already accrued. This gap presents a significant notice and due process concern for international students and scholars.

Finally, as an institution that values the contributions of our international community, including our F-1 students and our J-1 Exchange Visitors, we are concerned that imposing these significant sanctions for technical or inadvertent errors may discourage international students and scholars planning study or research at the University of Michigan. Our highly skilled international students and scholars may perceive this change as a message that the United States is not welcoming to them, and may choose to pursue studies or research in other countries. Instead, we would hope that USCIS would support policies that do not damage the United States' position as a leader in global education.

Our recommendation is to leave the current policy in place. Of course, we appreciate the need to reduce potential overstays, but, for the reasons explained in this comment letter, we question whether directly equating a violation of nonimmigrant status under INA 214, with the start of counting days of unlawful presence under INA 212(a)(9)(B) is the appropriate way to accomplish that goal. Instead, it is more likely to result in situations in which compliant international students and exchange visitors are found to have accrued unlawful presence due to misunderstandings or inadvertent errors. Like American students, international students should be allowed to complete their studies at their chosen institution, without the stress or fear of being subject to severe penalties based on an oversight of which they may not be aware.

Although this comment letter specifically addresses the proposed policy memo's impact on the University of Michigan, the University also supports and concurs with the comments and recommendations regarding this proposed policy change made by NAFSA: Association of International Educators.

GC CAR 000649

The University of Michigan thanks USCIS for the opportunity to comment on this proposed policy change.

Sincerely,

*Judith Pennywell*

Judith Pennywell, Ed.D.
Director, International Center
University of Michigan

*Louise M. Baldwin*

Louise M. Baldwin
Senior Associate Director
International Center, University of Michigan

GC CAR 000650

# Robyn K. Brown

████████████ ██ ██ ██ · ████ · ████████ @█████

June 10, 2018

Mr. L. Francis Cissna
Director, U. S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Avenue NW
Washington, DC 20529

Submitted via email: publicengagementfeedback@uscis.dhs.gov

**Re: PM-602-1060: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Director Cissna:

As a member of both NAFSA: Association of International Educators and the American Immigration
Lawyers Association, I am writing to express my concern regarding the May 10, 2018, USCIS policy
memorandum entitled "Accrual of Unlawful Presence and F, J, and M Nonimmigrants" (PM-602-
1060).

I have seen up close the harsh effects resulting from unintentional and harmless violations of F and J
nonimmigrant status. Not only for individual students and visiting scholars, but for the future of the
prosperity of the U.S. higher education system, our nation's economy, and diplomatic relationships
around the world, I urge you to reconsider the new policy.

As a Designated School Official (DSO), I have terminated records in the Student & Exchange Visitor
Information System (SEVIS) for status violations and informed students that they must leave the
U.S. weeks after earning their degree simply because they worked a few weeks after graduation
without authorization in an effort to help their professors. *See* 8 C.F.R. 214.3(g)(2) (listing the
reporting obligations of schools certified by the Student & Exchange Visitor Program). I have
observed firsthand how stressful the F-1 reinstatement process can be due to its unpredictable
timelines and requests for evidence. In none of the circumstances I have encountered has the student
willfully ignored the regulations pertaining to their status or maliciously sought to harm the people of
the United States.

In my direct experience working with hundreds of international students, nearly all students that
come to the United States endeavor to follow the regulations. They have often invested their family's
savings on an opportunity to achieve a U.S. degree, and they fully intend to make the most of the
chance they have been given. However, they do not always completely understand the
responsibilities of their nonimmigrant status. The requirements of their nonimmigrant status can be
complicated even for practitioners that deal with the regulations on a daily basis. Sometimes the
students also do not comprehend that what seems to them a minor violation—such as dropping a
class because they are experiencing financial hardship—can actually derail the entire trajectory of
their academic and career plans.

1

The USCIS should also take into consideration that international students and scholars are not licensed to practice law and are typically outside their own country's legal systems for the first time in their lives. Further, most staff members at universities that provide international students and scholars with guidance and report mandated information to the SEVIS database are not licensed attorneys. *See* 8 C.F.R. 214.3(l) (listing the qualifications for DSOs). It would be impractical to require these school officials to be lawyers, as the student services field simply cannot attract enough qualified individuals for the salaries offered by higher education institutions.

Despite these challenges, schools strive to communicate the regulations accurately to their international students and scholars, and they work diligently toward increasing compliance with reporting deadlines. However, no matter how well-trained and knowledgeable the staff is, and no matter how well-thought-out the processes are for gathering and reporting the required data, individuals do make mistakes from time to time. Under the new policy, such a mistake could have drastic results in the life of a student or scholar that is not aware of the mistake until they have already accrued more than 180 days of unlawful presence. Accordingly, when they depart the U.S., they will be unable to return for at least 3 years. *See* section 212(a)(9)(B) of the Immigration & Nationality Act.

For a variety of innocuous reasons, a student or scholar may not realize for months that he or she is "out of status." For example, after the SEVIS registration period that occurs at the beginning of each semester, *see* 8 C.F.R. 214.3(g)(2)(iii), a university with a busy international student office that serves a large number of international students may not notice if a student withdraws from one class mid-semester because he is afraid of failing the course. Only the next semester, when the student requests a travel signature on his Form I-20 (Certificate of Eligibility) and the university re-verifies enrollment, might the DSO recognize and report the student's violation. By that time, several months would have passed by.

Under the current policy, these students can apply for reinstatement, stay in the United States, and continue their studies without fear that they may accrue unlawful presence while they are awaiting adjudication of their applications. *See, e.g.*, section 40.9.2(b)(1)(E)(ii) of the USCIS Adjudicator's Field Manual (emphasizing that for nonimmigrants admitted for duration of status, the accrual of unlawful presence does not begin on the date a status violation occurs); 8 CFR 214.2(f)(16) (discussing reinstatement to F-1 status).

Under the new policy that becomes effective in August, the same student who applies as soon as he realizes he is out of status could accrue more than 180 days of unlawful presence simply while compiling his reinstatement application and awaiting its adjudication, if his application is ultimately denied. The lengthy USCIS adjudication timelines make such an occurrence not merely a risk but nearly a certainty. The most recent data available on the USCIS website indicates the national average processing time for Form I-539 (used for reinstatement applications) was 4.4 months, as of January 2018.

The new policy will have draconian effects on well-intentioned students who pose no threat to the United States but merely committed a violation of their nonimmigrant status that most Americans likely find forgivable, such working off-campus when a sponsoring relative has experienced a tragedy and can no longer afford to pay the student's tuition. Moreover, the USCIS's unexpected shift from decades of policy guidance on the accrual of unlawful presence for F, J, and M

GC CAR 000652

nonimmigrants will intensify the inhospitable environment that already urges many students to choose enrollment at universities in other countries. As word of this new policy and its implications spread, prospective international students will increasingly seek to pursue their higher education goals in countries that are more welcoming. By continuing to announce and implement policies that communicates they are unwelcome in the United States, the United States will forfeit their talents, skills, and innovative ideas. Further, their economic contributions—such as tuition dollars, funds spent at U.S. stores and rental properties, and the creation of future businesses that provide U.S. citizens with jobs—will be lost to other countries.

The current policy regarding the accrual of unlawful presence makes sense because it encourages students to admit their mistakes and seek to resolve them, and it allows them to resume full-time enrollment and continue contributing to their schools and communities. The new policy will encourage students who have forgotten to extend their I-20, have dropped below full-time enrollment, or have otherwise fallen out of status to remain in the shadows. They will have no incentive to identify themselves and seek a remedy to their status violation by filing for reinstatement, because doing so will likely result in their removal from the United States. The new policy will thus make it harder, not easier, to track international students and their activities.

In addition, as deftly explained in NAFSA's comment dated May 24, 2018, there does not appear to be interagency coordination of the implementation of this new policy. Namely, the U.S. Department of State administers the Exchange Visitor Program and issues visas to students and scholars, and within the U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) have vital operations that will be significantly affected by the new policy. Until the DOS, ICE, and CBP have had a chance to discuss and plan for what this means for enforcement, adjudication, and investigation, the new policy should not be finalized and implemented.

For the aforementioned reasons, I agree with NAFSA's comment letter that the current policy should remain in place until the new policy can be more fully considered through a transparent process. If the USCIS's policy is implemented, I urge that the extension of stay/change of status tolling rules be expanded to apply to reinstatement applications. *See* AFM 40.9.2(b)(2)(G). Further, if the policy is put into effect, I urge the USCIS to expand the sections of the AFM describing situations in which unlawful presence does not accrue. *See* revisions to AFM 40.9.2(b)(1)(E)(iii) as described in PM-602-1060.

Thank you for your consideration of these comments.

Best regards,

*Robyn Brown*

Robyn Brown
Member, NAFSA: Association of International Educators
Member, American Immigration Lawyers Association

3

GC CAR 000653

June 11, 2018

Mr. L. Francis Cissna
Director
U.S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, D.C. 20529

Dear Director Cissna:

As leaders of associations representing two and four year, public and nonprofit, institutions of higher education, we write to express serious concern with the U.S. Citizenship and Immigration Services (USCIS) policy memorandum dated May 10, 2018 concerning the "Accrual of Unlawful Presence for F, J, and M Nonimmigrants." As written, the memo obscures and conflates the important distinction between "unlawful presence" – illegal presence in the United States – and "maintenance of status" – as defined under the Immigration and Nationality Act (INA). This proposed action would cause significant disruption and harm to educational and research programs at American colleges and universities. We want to work with USCIS to address any security concerns related to visa overstays and to ensure that visa policies and systems are efficient and effective so that our nation can continue to benefit from the presence of talented international students, scholars, and researchers.

As you are aware, there are very serious consequences if an individual is found unlawfully present in the United States – including a bar to reenter the country for a period of three or 10 years. Under the proposed policy, USCIS would rely on the information entered into the Student and Exchange Visitor Information System (SEVIS) to determine if an F, M, or J visa holder violated their immigration status, rather than on an official determination by an immigration judge or the Department of Homeland Security. By equating "unlawful presence" with "failure to maintain status," this new policy may pose very serious consequences for foreign students, the U.S. universities where they pursue higher education, and contribute to a highly problematic trend of sending the wrong messages about the U.S. as a welcoming country for international students.

Unlike all other visa holders, F, M and J nonimmigrants (foreign students and exchange visitors) are allowed to enter the United States for the duration of status– known as "Duration of Status" or "(D/S)" – rather than for a "date certain." Under current agency policy promulgated by the 1997 "Virtue memo,"[1] a student or exchange visitor only begins to accrue "unlawful presence" after a USCIS adjudicator or immigration judge makes a formal finding that the individual violated their status. If implemented, the May 10, 2018 USCIS policy memorandum would fundamentally change the way the federal government calculates periods of unlawful presence for students beyond their Duration of Status.

There are many benign reasons why a student or exchange visitor might inadvertently fail to maintain status, including a change in practical training or employment status, medical leave, or a reduction in credit-bearing coursework. The SEVIS system attempts to capture information confirming compliance with some but not all situations that might be useful in identifying a failure to maintain status, including unintentional failures. Additionally, SEVIS is not a flawless system. It has been subject to automated and clerical errors including human error on the part of government agencies. These are not infrequent occurrences. The compliance and enforcement implications of USCIS' new proposed policy are incredibly nuanced and complex, with very serious consequences for a violation. As a matter of good faith, fairness, and practicality, unlawful presence should only trigger if and when the student has been clearly notified of a potential violation. Moreover, unlawful presence policy, because of the severe

---

[1] 1997 Virtue Memo: https://www.nafsa.org/uploadedFiles/virtue_memo_on_interpreting.pdf?n=234

GC CAR000654

consequences, should not by definition regularly capture unknowing violations. International students should not be expected to have deep expertise in immigration law to be able to interpret a potential violation without clear notification from the U.S. government.

We are very concerned that under the proposed policy, "unlawful presence" could be erroneously triggered by technical, unintentional or unknown violations in an individual's SEVIS records. We are also concerned that the proposed policy can be applied retroactively, and that an ambiguous or inconsistent regulatory interpretation may bar a student from the U.S. for up to 10 years without the ability to cure the mistake or challenge the finding. This would have very far-reaching impacts on the higher education community as well as the United States' ability to attract students, scholars, scientists and researchers to our campuses.

As a legal matter, this new interpretation of "unlawful presence" suggested by the agency is directly inconsistent with statutory language. The Immigration and Nationality Act (INA) contains no language suggesting that "failure to maintain status," a term used frequently throughout the statute, is equivalent to "unlawful presence," a term used in the Act only for the purpose of creating bars to inadmissibility. Congress has been very clear that "maintenance of status" relates to F, M, and J visas while "unlawful presence" is a wholly distinct concept inapplicable to these visa categories. In enacting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Congress overhauled the enforcement provisions of the INA while retaining or adding references to "maintenance of status." In doing so, Congress clearly chose *not* to use the phrase "unlawful presence" relative to F, M, and J visas rather retaining the use of "maintenance of status" with the intent of keeping distinct definitions that the policy memorandum would eliminate.

In IIRIRA, Congress left the harshest statutory penalties for unlawful presence – three year and ten year bars for admission to the United States.  There is no mechanism for exceptions or waivers once an individual is subject to one of these bars.  Elsewhere, Congress established other penalties, including removal from the United Sates or ineligibility for lawful permanent resident status, for failure to maintain status - but allowed some exceptions and waivers in those situations, although extremely limited.  The statutory scheme quite simply does not permit a reasonable reading that conflates unlawful presence and maintenance of status.

Moreover, we are deeply troubled with the manner in which USCIS announced this proposed change, without an official regulatory notice in the Federal Register for public comment. The U.S. higher education and research communities have long enjoyed constructive partnerships with the State Department and Department of Homeland Security in support of national security. We urge DHS to engage the higher education community and other stakeholders through the standard rulemaking process as required under the Administrative Procedures Act before implementing such a drastic shift in policy.

We are eager to work with USCIS and other federal agencies to address any concerns regarding student visa overstays to ensure the protection of our national security while upholding our nation's values and interests. Please do not hesitate to reach out to Hanan Saab at hsaab@aplu.org if we can be helpful as you consider our concerns.

Sincerely,

Peter McPherson
President
Association of Public and Land-grant
Universities

Mary Sue Coleman
President
Association of American Universities

GC CAR000655

Walter G. Bumphus
President
American Association of Community Colleges

Mildred García
President
American Association of State Colleges and
Universities

Ted Mitchell
President
American Council on Education

Michael J. Sheeran
President
Association of Jesuit Colleges and Universities

David L. Warren
President
National Association of Independent Colleges and Universities

GC CAR000656

GC CAR000657



# MIAMI UNIVERSITY
OXFORD, OH · EST. 1809

GLOBAL INITIATIVES
*International Student and Scholar Services*



Oxford, OH

office
fax

MiamiOH.edu/global

June 10, 2018

To Whom It May Concern,

We are writing on behalf of Miami University's International Students and Scholar Services office, in response to the USCIS policy memo issued May 10, 2018, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants." We are deeply concerned that this policy change will have a negative impact on our students. Accrual of unlawful presence beginning the day after an F, J, or M nonimmigrant fails to maintain status, presumes that individuals are able to regain status immediately. Depending on the particular point in the semester, Miami students who fall below full-time enrollment may not have the opportunity to regain status immediately due to closure of course registration. This policy change also appears to contradict other policies like 8 CFR 214.2(f)(16)(A) which indicates that applying for reinstatement within five months is allowable and considered taking action in a timely manner. We also believe the policy change will negatively impact our students who have already lost status and are currently waiting for the adjudication of reinstatement applications. Processing times for reinstatement may extend beyond 180 days depending on the service center as is the case for centers in California (approximately five months) and Vermont (approximately one year). The proposed change does not consider how application processing times will affect accrual of unlawful presence for students who lose status and seek to take appropriate action.

We are also concerned that the new policy may increase the liability of Designated School Officials and their institutions in assisting students with maintenance of status. The amount of time allowed for implementation of this policy change is very short and insufficient for our institution to update policies, educate students, and send notifications to those who may be immediately affected. Our university currently lacks the technology necessary to monitor student enrollment closely enough to take early action to prevent loss of status. In addition, DSOs will be expected to advise students on matters beyond their purview. This policy update is complex and has far-reaching implications that we are also struggling to fully grasp. However, students will expect us to outline the implications of this policy and how they should proceed if they find that they are accruing days of unlawful presence. Due to the limitations of our perspective and our desire to avoid unauthorized practice of law by giving legal advice, we will need to refer our students to attorneys. Our students' access to immigration attorneys is limited because, our university is located in a small, rural town with few legal resources and no immigration attorneys. Our office's priority is to serve our students by providing resources and sound





GLOBAL INITIATIVES
*International Student and Scholar Services*

Oxford, OH
office
fax

MiamiOH.edu/global

guidance related immigration matters. The extent to which we may need to do so in response to the proposed policy change could open the university to increased legal risk.

In addition to the impact of this change in policy on students and DSOs, there are several concerns regarding the clarity and timing of the update. Implementation time for school officials would be minimal. University staff will need time to update informational material such as webpages, handouts, and emails. Because the change will happen over the summer and many international students and scholars may be in their home country for the break period, the information sent by school officials at this time would likely be ineffective in reaching the intended audience. Many school officials have follow up questions to clarify the change in policy and it would be best if the implementation time could be pushed back in order to allow time to clarify any "gray areas." Lastly, if this change in policy takes effect, it does somewhat contradict other policies. For example, the general standard for taking action in a timely manner for a loss of legal status is to file for to regain legal status within five months. The contradiction in policies should be clarified before implementation.

We appreciate your consideration and thought in how this change in policy needs time to be clarified and how concerned we are, as school officials, that this could have severe repercussions on international students and scholars.

Best,

International Student and Scholar Services
Miami University
Oxford, Ohio 45056



L. Francis Cissna, Director
U. S. Citizenship & Immigration Services
20 Massachusetts Avenue, NW
Washington, DC 20529

June 11, 2018

**Re:    Comments on Proposed Policy Memorandum entitled "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," PM-602-1060**

Dear Director Cissna,

On behalf of Compete America, we submit this letter in response to the May 11th publication by USCIS of a proposed Policy Memorandum suggesting a new agency approach concerning the "Accrual of Unlawful Presence and F, J, and M Nonimmigrants." The agency proposes abandoning the prior policy that, in most situations, required an official government determination and notice, or the expiration of a date-certain period of stay, before unlawful presence could accrue.

The Compete America coalition is the leading advocate for reform of U.S. immigration policy for highly educated foreign professionals. Our coalition members include higher education associations, industry associations, and employers. Coalition members collaborate to reflect where possible the common interests of universities and colleges, research institutions, and corporations, and administrators and lawyers that represent these organizations, with regard to high-skilled employment-based immigration. For more than 20 years, Compete America has worked with successive administrations and Congress on issues critical to immigration compliance in the employment-based immigration system, as well as the global mobility of talent. The Coalition is committed to continuing its efforts to ensure that the United States has the capacity to educate, obtain, and retain the talent necessary for continued innovation and job creation in the United States.

## INCORPORATING STATEMENTS BY OTHERS

As an initial matter, we want to state that the Compete America coalition supports the comments filed by the members of our coalition from the higher education community. Specifically, Compete America would like to incorporate by reference the detailed comment filed by NAFSA, the Association of International Educators, as well as the comment filed by AAU and APLU, respectively the American Association of Universities and the Association of Public and Land-grant Universities. The joint letter from AAU and APLU was also co-signed by the American Council on Education, the American Association of Community Colleges, the American Association of State Colleges and Universities, the National Association of Independent Colleges, and Universities, and the Association of Jesuit Colleges and Universities, thus representing almost all post-secondary institutions in the United States.

Compete America also incorporates by reference the statements of legacy INS Executive Associate Commissioner Paul Virtue, who was recently interviewed by *Forbes* magazine about the origins of the current agency policy governing Accrual of Unlawful Presence and F, J, and M Nonimmigrants. We include in the Compete America comment the entirety of the *Forbes* article on unlawful presence policy, so that is considered by the agency in your assessment of public comments on the current proposal. The article highlights that:

GC CAR000660

The USCIS proposed new policy "strays from the bright line created in 1997."

"The earlier policy put the foreign national on notice by virtue of an official determination that he or she had begun to accrue unlawful presence on a specific date. … [F]undamental fairness dictates such clear notice."

We believe that Mr. Virtue's statements, coming from one of the chief architects of the current policy, lay out two critical defects with the agency's proposed new policy, one legal and one practical. We believe that each of these defects, standing alone, warrants USCIS dropping the proposed policy change until further analysis can be completed by the agency.

As a matter of law, we do not believe that federal agencies are free to adopt policies that do not comply with Fundamental Fairness. As explained by the NAFSA comment as well as the AAU and APLU comment, the new suggested policy will *inevitably* lead to individuals finding out after the fact that they have already accrued months of unlawful presence, thus subjecting themselves to the three- and ten-year bars to admission. For example, it appears that USCIS consistently takes in excess of six months to adjudicate requests for reinstatement which means that any student that seeks to correct even a minor violation will automatically be left with at least a three-year bar should that request be rejected for any reason. Furthermore, under the new policy the spouses of impacted students and exchange visitors, as well as children over age 18, will face three- and ten-year bars through no fault of their own and without knowledge of when the principal F-1, M-1or J-1 visa holder may have inadvertently violated a term or condition of student or exchange visitor status. These severe and unforgiving results seem unfair, especially in the vast and dispersed enterprise that is the activities of foreign-born students and exchange visitors in the United States, primarily conducted on the campuses of U.S. universities and colleges.

As a matter of policy, operationalizing the approach reflected in the new proposal leaves the unlawful presence determination *without* a bright line, which is impractical for the agency. This is fraught with an expectation of inconsistencies and uncertainty. While the current policy was initially adopted 20 years ago to be implemented primarily by one agency – INS, as part of the Department of Justice, there are three separate component agencies of the Department of Homeland Security that now have significant and active responsibilities related to this policy – USCIS as well as its sister agencies Immigration and Customs Enforcement and Customs and Border Protection. The draft policy memorandum does not reflect whether ICE's Student and Exchange Visitor Program was properly consulted, if other alternatives might solve the problem USCIS is trying to address, or if ICE and CBP stand ready to implement the new suggested approach. Under both the old and new proposal, the Bureau of Consular Affairs at the Department of State plays a role as well. It would seem there are, or should be, operational concerns about this new approach including but not limited to significant interagency work that must be completed before announcing the implementation of a new policy.

LEGAL ISSUES

In the short time period provided for public review and comment, shortened in effect, in part, because the agency's policy concerns regarding unlawful presence were not otherwise publicly known in advance of the May 11th publication of the draft policy memorandum, our coalition has not been able to fully flesh out nor agree on how to address the complex legal issues presented by USCIS's new suggested approach. Nevertheless, we want to flag two primary legal issues for consideration. We hope the comments of other stakeholders will delve into more substantive analysis of these same points, as well as other legal concerns, but we want to at least identify what we see as two principal legal concerns.

We believe the following two legal issues are considerable and complicated, and merit USCIS stepping back from its proposal:

GC CAR000661

1. **Failure to Comply with Requirements for an Agency Change in Interpretation**

We are surprised the agency is moving forward with such a dramatic departure from the policy that has been in place since September 1997 without either satisfying the controlling "good guidance" requirements, providing a sufficiently robust rationale for its new approach, or complying with the Administrative Procedure Act (APA).

The Office of Management and Budget, Executive Office of the President, laid out requirements for agencies that seek to put forward new policies without engaging in notice and comment rulemaking, found in the Final Bulletin for Agency Good Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). The Bulletin establishes requirements for significant guidance documents, including publication in the Federal Register and an agency obligation to provide a comment and response document. Under the Bulletin, a ''significant guidance document'' means a guidance document disseminated to regulated entities or the general public that may reasonably be anticipated to, among other things, either materially alter the rights and obligations of the regulated community or raise novel legal or policy issues. (See p. 3439 of the Jan. 25, 2007 Federal Register notice.) It seems clear that the proposed policy memorandum announcing a new interpretation of unlawful presence under the Immigration and Nationality Act is a significant guidance document.

At a minimum, even where an agency is merely engaging in an effort to change its interpretation of a controlling statute, the Supreme Court has made clear the agency has an obligation to identify a rationale for its changed position that is not arbitrary. (See Encino Motorcars v. Navarro, 138 S.Ct. 1134 (2018).) It does not seem USCIS has satisfied that requirement given that it is unclear from the proposed policy memorandum either what the precise problem is that the agency is trying to solve or its reasoning for the proposed change. For example, part of the rationale provided seems to be based on a DHS Overstay Report that identifies an approximate overstay rate of 6% for F-1 students, but the report's methodology leaves it murky at best what this overstay calculation is based in. It is not evident that F-1 overstay representations in the report account for individuals who remain *lawfully* in the United States after the date identified on their SEVIS I-20, including individuals who change nonimmigrant status or adjust status to permanent resident after marrying an American. It also is not clear whether the F-1 overstay rates include or exclude students on STEM OPT extensions. Moreover, another part of the rationale USCIS provided is grounded in an unfounded reliance on what USCIS apparently believes is the uncontroverted precision and completeness in the Student and Exchange Visitor Information System (SEVIS). The agency's suggested reliance on SEVIS as a panacea to accurately identify failures to maintain status is misplaced, especially because SEVIS does not necessarily provide notice to the impacted individuals. The claimed basis for this policy shift must be cogent and may not be capricious in order to pass muster in the first instance, a standard it is difficult to see that the agency has satisfied. Perhaps most vitally, the agency has not described the problem it is attempting to resolve with the new interpretation. The Immigration and Nationality Act provides full authority, in clear and unequivocal terms, to initiate removal proceedings concerning any alien that it can show has violated the terms and conditions of her nonimmigrant status. Why this authority needs to be supplemented by a broad expansion of the definition of unlawful presence is never explained.

In addition, it may be that the suggested policy is in fact a substantive rule and not an interpretive one, necessitating APA compliance. We are aware that in recent years the Supreme Court has acted to largely remove the obligation of federal agencies to undergo public notice and comment rulemaking to revise a "mere" interpretation. (See Perez v Mortgage Bankers Association, 135 S. Ct. 1190 (2015).) However, the suggested policy shift on unlawful presence may require public notice and comment rulemaking nevertheless. It seems that where a statute has not changed but an agency's abrupt change of course will create *binding* new and wholly unexpected changes to the rights and obligations of the regulated community, public notice and comment rulemaking is indeed required – because the new interpretation is in effect a substantive rule. Especially when, as here, the agency's new interpretation will itself *create* severe and unforgiving results (bars to admission for which there are largely no waivers or exceptions), it may the interpretation is best considered a substantive rule, where the public is entitled to the protections afforded by the APA.

GC CAR000662

## 2. As a Matter of Statutory Interpretation, Unlawful Presence Should Not Be Interpreted as Equivalent to a Failure to Maintain Status

The new, suggested interpretation seems to ignore fundamental principles of statutory construction by equating "unlawful presence" and "failure to maintain status" under the Immigration and Nationality Act (hereafter INA).

In enacting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Division C of Pub.L. 104–208, enacted September 30, 1996) (hereafter referred to as IIRIRA), Congress overhauled the enforcement provisions of the INA. Among other things, Congress reworded and revised the grounds of inadmissibility generally, removed the previous distinction between exclusion and deportation, removed discretion that had long been left to Immigration Judges, and in general took many steps to provide a stricter system concerning immigration enforcement.

In IIRIRA, Congress established three-year and ten-year bars to inadmissibility under section 212(a)(9)(B) of the INA for aliens who are "unlawfully present" in the United States for a period of 180 days or one year, respectively. Congress defined "unlawful presence" as being "present in the United States after the expiration of the period of stay by the Attorney General." Similarly, for purposes of nonimmigrant visa validity IIIRIRA established at section 222(g)(1) of the INA that for aliens admitted to the country on nonimmigrant visas who "remained in the United States beyond the period of stay authorized by the Attorney General" such visas were deemed voided "beginning after the conclusion of such period of stay." Section 222(g) has been consistently interpreted by the Departments of Justice, Homeland Security, and State as applying only to aliens who remain beyond a specific date on their I-94 Record of Admission or any extension or change of status, and consistently interpreted as not including aliens who violated the terms of their nonimmigrant status. Indeed, the plain meaning of "the expiration of the period of stay authorized" is remaining beyond a specified date – not violating the terms of status. And, the meaning of this phrase in both 222(g) and 212(a)(9) *must* be the same. It is the most basic tenet of statutory construction that Congress could not have intended two different meanings when it used the exact same language in two different sections.

Moreover, equating unlawful presence with a failure to maintain status, as proposed in USCIS's draft policy memorandum, fails to account for the numerous places in IIIRIRA where Congress retained or added references to "maintenance of status" while Congress chose *not* to use that phrase in *defining* unlawful presence. In the context of IIRIRA's enactment, it is particularly significant that Congress *retained* and expanded the use of the maintenance of status concept while *also* creating a new concept of unlawful presence that was *not* defined in the INA in terms of maintenance of status.

To expand the definition of unlawful presence to include all violations of status cannot be reconciled with other language utilized by Congress in IIRIRA and in the INA. When defining unlawful presence, Congress did not make specific reference to violation of the terms of status or unauthorized employment or a failure to maintain status. Rather, Congress made specific reference to presence in the United States after the expiration of a specified period of time.

Indeed, when Congress intended to punish any failure to maintain nonimmigrant status or failure to comply with the conditions of such status, Congress stated such intention in plain language. For example, the following sections of the INA establish penalties tied to maintenance of status:

- Section 241(a)(1)(C) renders an alien removable if she has "failed to maintain nonimmigrant status … or to comply with the conditions of any such status."
- Section 245(c)(2) renders an alien ineligible for adjustment of status to permanent resident if the alien engages in unauthorized employment or "is in unlawful immigration status" or "has failed to maintain continuously a lawful status."
- Section 245(c)(7), added by section 375 of IIRIRA, creates a bar to adjustment of status to permanent resident for an alien who "is not in a lawful nonimmigrant status."
- Section 245(c)(8), added by section 375 of IIRIRA, renders an alien ineligible for adjustment of status to permanent resident status if the alien "has otherwise violated the terms of a nonimmigrant status."

4

GC CAR000663

In other words, the INA language shows that failure to maintain status and unlawful presence are not the same. Congress established exceedingly harsh penalties for unlawful presence – three year and ten year bars for admission to the United States in any status for any purpose – that in most cases are not subject to exceptions or waivers. It established other penalties, including removal or ineligibility for lawful permanent resident status described above, for failure to maintain status, for which waivers may be available and for which there are exceptions for a technical violation. The two – unlawful presence and failure to maintain status – cannot be conflated under the statutory scheme.

## CONCLUSION

The Compete America coalition is concerned about USCIS's proposal. In short, the draft policy memorandum suggests revising a bright-line rule that has been in place for the last 20 years that has been both fair and practical. The negative impact to the higher education community and foreign-born students and exchange visitors is clear and direct. In addition, the new approach will ultimately have a negative impact in the employer community. It will create the dynamic of employers engaged in on-campus recruitment finding out years after an inadvertent violation or innocuous, technical violation that a foreign-born employee earning her undergraduate or graduate degree in the United States was unlawfully present, and inadmissible for a new status. Moreover, conflating unlawful presence and maintenance of status does not as a matter of logic only apply to students and exchange visitors admitted for a "D/S" period (duration of status) or Canadian visitors who are treated as duration of status nonimmigrants. Thus, adopting the proposed new approach seems to necessarily portend a future – although as of yet unannounced – where *all* nonimmigrants are presumed by USCIS to accrue unlawful presence without notice if later determined to have violated a term or condition status, to include employer-sponsored nonimmigrant classifications such as the H-1B and L-1 categories. This overbreadth would inject significant uncertainty into the legal immigration system.

Compete America urges USCIS to abandon implementation of a new policy interpreting Accrual Unlawful Presence for F, J, and M visa holders until the agency has had more time to carefully consider the legal implications of and legal requirements for a new approach while also allowing time to complete what should be necessary interagency work as well as work with stakeholders to address some of the unnecessary and negative implications of a change in policy.

Compete America always welcomes the opportunity to work with the agency to improve the nation's immigration system. We would be willing to sit with policymakers to discuss this issue, should that be helpful. We thank you in advance for any consideration you can give to the concerns we have raised.

Respectfully,

Scott Corley
Executive Director, Compete America



June 11, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

**Re: USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition to the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

**This new policy could negatively impact the many Disciples seminarians who would serve as our ministers and apply their theological education to build up the Christian Church (Disciples of Christ) in the U.S. and Canada.**

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled."

For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals who may find themselves subject to the three- and ten-year bars to admissibility. This change raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as she maintains her nonimmigrant status. What the new memorandum fails to recognize is that the question as to whether an individual has violated her nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

For example:

- An F-1 seminary student is permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his student status.
- A Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate her status.
- A seminarian may be approved for Curricular Practical Training (CPT) in a field education position not sufficiently related to the course of study or a clinical pastoral education (CPE) program that does not meet the requirements, thereby leading the student to unknowingly and unintentionally violate her status.
- A seminarian may volunteer in an unpaid church or ministry position that, under technical employment laws, classifies him as an "employee," thereby leading the student to unknowingly and unintentionally violate his status.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish students with severe three and ten year bars while depriving us of their gifts and graces. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,

Tana Liu-Beers, Esq.
Immigration Legal Counsel
Disciples Home Missions

GC CAR 000666

 **The Seltzer Firm**
PRACTICE LIMITED TO IMMIGRATION AND NATIONALITY LAW


New York, NY
Tel:
Fax:

June 7, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

**Re:    USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M**
**Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.



GC CAR 000667

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

Other examples include:

- Technical issues with SEVIS
  - Most recently, data exchange problems between SEVIS and SEVP portal where SEVIS did not properly save employer data that students entered in the portal;
  - More frequently, erroneous terminations in SEVIS due to pending applications;
- Working on OPT in a field that is later determined not to be the "major area of study;"
- J-1 remaining beyond the 30 day grace period because J-1 waiver pending but later denied;
- Beginning a degree program while still on OPT;
- J-1 mistakenly letting insurance lapse, but immediately correcting it;

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,

Suzanne B. Seltzer

GC CAR 000668



University of California
San Francisco

Brian K. Groves
Director
International Students & Scholars Office
Student Academic Affairs
University of California, San Francisco



William J. Rutter Center

San Francisco, CA

June 11, 2018

Mr. L. Francis Cissna
Director
U. S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Avenue,
NW Washington, DC 20529

Dear Director Cissna:

I'm writing in response to the U.S. Citizenship and Immigration Services (USCIS) policy memorandum of May 10, 2018, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants" on behalf of the University of California. As one of the largest public university systems in the United States, the University of California hosts tens of thousands of international students and researchers across its ten campuses. As written, application of this new policy has the potential create significant harm to students and exchange visitors for circumstances that may be beyond their control. The bright line in determining unlawful presence under the current policy becomes unnecessarily complex and arbitrary as outlined in the new policy. We believe the existing policy to be fair, reasonable and in the best interest of the United States.

Of greatest concern is the possibility of the new policy to inadvertently subject student and exchange visitors to the bars on re-entry. As part of its justification for the new policy, the USCIS cites the agency's reliance on new technologies and systems, specifically mentioning the SEVIS system. While the USCIS may be confident of the data integrity of the SEVIS system, it's important to note that SEVIS is managed by a different agency, Immigration and Customs Enforcement, and draws data from several other agency systems including Customs and Border Protection and the Department of State. The complexity of interagency data collection frequently leads to inaccuracies in a student or exchange visitor's record. Overreliance on interagency systems should not replace a legal examination based on the totality of evidence, taking in account all applicable law and policy.

A common scenario in conflict with the new policy would be when an F-1 student returns to the US after a brief visit home but is incorrectly admitted by CBP as an F-2 dependent. When the student checks his admission record in the CBP I-94 database, he finds the record of his



University of California
San Francisco

latest entry is missing but his previous entry is still recorded as F-1 D/S. Based on this record he resumes study and his on-campus employment. Six months later the student applies for Optional Practical Training but is denied because of the incorrect entry status and subsequently becomes subject to the three-year bar. In this scenario, the student may have been at fault for not questioning CBP about his latest entry record, however the actual problem was precipitated by the incorrect port-of-entry record.

Such status issues are compounded by lengthy USCIS adjudication times for many benefits, students may only learn of any violation of status and accrual of unlawful presence long after they have the ability to correct the violation or leave in a timely manner.

Because the INA 212(a)(9)(B) penalties are so severe, we believe the current policy is inherently fair. The University of California also concurs with NAFSA's recommendations in lieu of implementing the new rule. These are:

- Leave in place the current policy, which has served for over 20 years. Neither DHS nor legacy INS ever published regulations to implement this important area of law. If the agency wishes to implement such a drastic change to longstanding common interpretation of the law, it must be done through the notice and comment process.
- Do not implement any policy change until implementation has been fully coordinated with the Department of State and other DHS units such as CBP and SEVP
- Exclude from the unlawful presence count any status violations that occurred under color of law.
- Apply the change of status/extension of stay tolling rules to reinstatement applications.
- Expand the sections describing examples where F, M, and J nonimmigrants "do not accrue unlawful presence in certain situations."

Thank you for your opportunity to comment.

Brian Groves
Director, International Students and Scholars Office

June 11, 2018
U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

Re:    **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

GC CAR000671

"D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,

Pilar Ellis
PDSO, Fullerton College

GC CAR000672



**Dartmouth College · Office of Visa and Immigration Services**
63 South Main Street · Suite 303 · Hanover · New Hampshire · 03755
Telephone: (603) 646.3474 · Fax: (603) 646.1616 ·
Email: Visa.and.Immigration.Services@Dartmouth.edu · Web: http://www.dartmouth.edu/~ovis

June 11, 2018

Lee Francis Cissna, Director
U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

> Re: USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J and M Nonimmigrants

Dear Director Cissna,

Dartmouth College submits these comments regarding the recently issued USCIS policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants" (PM-602-1060) posted by USCIS on May 11, 2018.

Founded in 1769, Dartmouth is a member of the Ivy League. Dartmouth is committed to providing the best undergraduate liberal arts experience, and outstanding graduate programs in the Geisel School of Medicine, the Thayer School of Engineering, the Tuck School of Business, and the Guarini School of Graduate and Advanced Studies. Dartmouth sponsors international F-1 students as well as non-degree students, research scholars, visiting faculty and other visitors on our J-1 Exchange Visitor Program.

As both an F and J program sponsor, Dartmouth is deeply concerned by the agency's abrupt and significant departure from current policy guidance on unlawful presence and how it is determined for F and J nonimmigrants. Under the proposed changes, F and J nonimmigrants can be charged with unlawful presence for years without any notice or due process based on an unknowing or inadvertent violation of immigration status. This puts F and J nonimmigrants at risk of being unfairly subjected to the 3-year, 10-year and permanent bars to reentry that come with accrual of unlawful presence, which under current and longstanding policy is triggered when there is a formal determination by an immigration judge or DHS official, and clear notice provided to the nonimmigrant. The current policy provides a procedural framework and certainty in calculating when unlawful presence accrues. The proposed policy does not. It eliminates due process, and creates uncertainty and unpredictability.

The rules governing maintenance of status for F and J nonimmigrants are myriad and complex. Designated School Officers (DSOs) and Responsible/Alternative Responsible Officers

GC CAR000673

(ROs/AROs) place the utmost importance on compliance with these rules, and we work closely with international students and exchange visitors to ensure they maintain their nonimmigrant status and fulfill their government reporting obligations. Under the proposed policy, unlawful presence would begin to accrue without notice, and possibly without the individual's or the sponsoring institution's knowledge, if students or exchange visitors inadvertently, unintentionally, or unknowingly do something that could be interpreted as a violation of status. If the unlawful presence clock started at some point in the past, any window for departing the country before triggering the 3 or 10-year bar will have passed without the individual's knowledge.

We have strong concerns that this proposed policy will discourage international students, researchers and faculty from coming to the U.S. because of the risk that a minor infraction or technical violation could put them at risk of being barred to reentry for years.

In light of the foregoing, Dartmouth respectfully asks the agency to withdraw this memorandum.

Thank you for the opportunity to comment.

Sincerely,

Susan C. Ellison
Director, PDSO, RO
Office of Visa and Immigration Services
Dartmouth College

GC CAR000674



# Iandoli Desai & Cronin P.C.

████████ ████ Boston, MA
P████ F████
www.iandoli.com

Richard L. Iandoli
Prasant D. Desai
Madeline Choi Cronin*
Donal Eoin Reilly
Mary E. Walsh
Jennifer A. McGill
*Admitted in California

June 11, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

Re: **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

The new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

GC CAR 000675

critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,

Mary Walsh

Mary E. Walsh, Esq.
Iandoli Desai & Cronin P.C.

Boston, MA




The State University
of New York

June 11, 2018

Mr. L. Francis Cissna
Director
U. S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, DC 20529

Dear Director Cissna:

On behalf of The State University of New York (SUNY), I write to you today to express
my deep concern regarding the U.S. Citizenship and Immigration Services (USCIS)
policy memorandum of May 10, 2018 on the "Accrual of Unlawful Presence and F, J,
and M Nonimmigrants" ("May 10 Memorandum"). The May 10 Memorandum equates
"unlawful presence" with "maintenance of status" which is contrary to the statutory
framework under the Immigration and Nationality Act ("INA") and represents a
significant departure from policy guidance that has been in effect for more than 20 years.
Such departure may negatively impact not only our international student population but
also our economy and rich academic programs that thrive on the contributions of our
international community members.

At SUNY alone, there were 22,216 international students on the F and J visas in the Fall
of 2016, and 21,976 in the Fall 2017. In terms of the economy, international students
contribute $36.9 billion to the U.S. economy, and create or support 450,331 jobs. In New
York State, international students and exchange visitors contribute $4.6 billion and
support 55,851 jobs. In coordination with other higher education institutions and
organizations, we believe we can work with USCIS and the Department of Homeland
Security ("DHS") on resolving national security concerns without jeopardizing the
substantial benefits international students bring to our country, the State of New York,
and SUNY.

The May 10 Memorandum sets forth an operationally complex structure, which may
mistakenly identify a large number of foreign students and exchange visitors as failing to
maintain lawful status and unfairly subjecting them to the 3-year, 10-year, or permanent
bars to re-entry to the

GC CAR 000677

United States. International students, like their domestic counterparts, should be allowed to complete their studies at their chosen institution, without the stress or fear of being deported based on an oversight of which they may not be aware.

Further, USCIS may achieve the goal of reducing the number of non-immigrants who violate their status or stay beyond the legally allowable period through the implementation of various policies within the sub-agencies of DHS and in collaboration with other federal agencies. These policy changes should be explored and implemented before announcing a policy change that will apply a disproportionate punishment of the 3-year, 10-year, and permanent bars of admissibility to international students and exchange visitors and their spouses and children.

## Background

The current policy has held up for more than 20 years because it provides bright-line dates established in government systems, which give adequate notice of unlawful presence to students and exchange visitors and their schools and exchange programs. Under current policy, non-immigrants begin to accrue unlawful presence the day after DHS denied their request for an immigration benefit, if DHS made a formal finding that they violated their non-immigrant status while adjudicating a request for another immigration benefit; the day after their Form I-94 (travel document) expired or the day after an immigration judge or in certain cases, the Board of Immigration Appeals (BIA), ordered them excluded, deported, or removed (whether or not the decision is appealed). The bright lines of the expiration date on a Form I-94 or the date an immigration judge ordered the non-immigrant deported are easy to see. Failure to maintain status under the F, M, and J visa programs do not present such a bright line, however, particularly because there is overlap between different types of "status." For example,

• Visa status (the validity period of the nonimmigrant visa in one's passport)
• SEVIS status (the draft, initial, active, completed, deactivated, or terminated status of a nonimmigrant's electronic record in the Student and Exchange Visitor Information System database)
• Non-immigrant status (abiding by the duration and other conditions of the nonimmigrant category in which an alien is admitted to the United States by DHS)

It is not easy for a non-immigrant to discern when a violation of status has occurred. There may be inconsistency among immigration documents, electronic records, and actions that lead to a determination in violation of status. There could also be situations where documents and actions are not being interpreted correctly by various stakeholders involved with the non-immigrant's duration of stay. Plainly stated, immigration law is complicated, and both compliance and enforcement is a very technical matter that requires training and expertise. Because of this complexity, an alien might not even know he is "out of status" until informed by the government.

GC CAR 000678

There are some violations of status that can easily be fixed with proper advisement or correction of documents while findings of unlawful presence are far more detrimental to the non-immigrant and not easily cured. DHS is now proposing to directly equate a failure to maintain non-immigrant status accorded under INA §214 (setting forth conditions of admission and duration of stay in the U.S in a non-immigrant status), with the start of counting days of unlawful presence under INA 212(a)(9)(B) (explicitly considering an alien to be unlawfully present in the United States if present in the United States *after the expiration of the period of stay* authorized by the Attorney General). Since a failure to maintain status has the potential of being fixed, there should be no expiration of the period of stay until there is a finding that the failure to maintain status cannot be fixed, which finding is clearly communicated to the non-immigrant. Thus, the policy in place for the last 20 years that distinguishes between status violations and unlawful presence makes sense for purposes of applying INA 212(a)(9)(B), from both legal and public policy viewpoints. A clear government determination, whether it is the expiration date on a non-immigrant's Form I-94 or a formal finding by an immigration judge, serves as a fair and clear warning to an alien that the clock is ticking, and she must take action to leave the United States or otherwise cure the deficiency, if possible. An alien who persists after such fair notice, must face the possibility of not being able to return to the United States for either 3 or 10 years.

Finally, there is nothing in the statutory framework to support the equation of the two concepts of failure to maintain non-immigrant status with unlawful presence. Indeed, when Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") and overhauled INA enforcement provisions, it chose not to use the phrase "unlawful" presence relative to F, M, and J visas, leaving in references to "maintenance of status" to those categories. It was clearly the intent of Congress to leave the two concepts separate.

**Fairness**

Because the INA 212(a)(9)(B) penalties are so severe, we must also weigh the fairness of the policies enforcing that law. Long USCIS adjudication times, for example, may lead to someone becoming subject to the unlawful presence penalties in any case that is ultimately denied. For example, consider a student who registers for fewer classes than she should have one semester, which leads her school to terminate her SEVIS record. In good faith, the student registers for a full course of study the next semester, and applies in good faith to USCIS to reinstate her student status. It is not uncommon for a USCIS Service Center to take six months or longer to adjudicate an application for reinstatement to student status.

Under current USCIS policy, if USCIS ultimately denies the student's reinstatement, she would start counting unlawful presence as of the date of the denial, which gives sufficient time to either make arrangements to leave the country, or possibly to ask USCIS to

GC CAR 000679

reconsider its decision. In the proposed policy, virtually all students whose reinstatement applications are denied would find themselves subject to at least the 3-year bar, merely because USCIS took so long to adjudicate applications for reinstatement.

In addition, a student or exchange visitor might not even know that he was in violation of status until DHS makes a formal determination of that. If the unlawful presence "clock" is seen to start at some distant time in the past in such cases, any window for departing the country will have passed.

**Recommendation**

In lieu of implementing the policy described in the memo, SUNY respectfully requests that the current policy, which has served us well for over 20 years, remain in place. Neither DHS nor legacy INS ever published regulations to implement this important area of law. If the agency wishes to implement such a drastic change to longstanding common interpretation of the law, it is best done through the formal rulemaking under the Administrative Procedures Act. This will allow for a thoughtful notice and comment period. As I stated at the outset, the higher education community is able to provide thoughtful commentary that will inform you and the other sub-regulatory agencies of DHS in order to protect national security and promote a robust economy and rich academic programs that are supported by international students and exchange visitors.


Thank you for the opportunity to comment.

Sincerely yours,

Kristina M. Johnson, PhD
Chancellor

GC CAR 000680

# **Carnegie Mellon University**
## Office of International Education

Pittsburgh, PA ███

Phone: ███ • Email: ███ • Web: ███

June 10, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

Re:     USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants

Dear Madam/Sir:

I am writing to express my opposition to and concerns about the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018. This new memorandum will reverse more than 20 years of US government practice regarding the accrual of "unlawful presence" and represents a shift in policy guidance of deeply impactful and potential negative consequences. I respectfully encourage the Service to reconsider and withdraw this memo.

The main concerns I have are the fairness of the policy, the ability of nonimmigrants in F, M and J statuses to understand it, the ability of various agencies who already struggle with inter-agency coordination to implement it and the potential negative impacts upon our economy and national security.

<u>Unlawful Presence defined for F, J and M categories</u>. The legal term of "unlawful presence," is defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) as an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For 20+ years, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions with respect to nonimmigrant students and exchange visitors in the F, J, and M categories to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

Fluidity and complexity of non-immigrant status, even with legal presence. Nonimmigrant status is a legal condition, not a physical thing. It is dynamic, not static, which means that a person's nonimmigrant status must be acquired and maintained, and can be changed, or lost, and in some circumstances, reinstated. Especially with respect to F, M and J statuses, these actions, events, and data are often recorded and presented in relation to one another in the form of physical and electronic documents and records. Documents and electronic records only point to immigration status, though; they do not stand in the place of it. If all documents and electronic records are consistent, their reliability as indicators of immigration status is high. However, these documents and records reflect only a snapshot in time, they reflect only some, not all, actions, events, and data, and they are subject to both machine and human error.

Inherent, systemic complexities. A failure to account for inconsistency among immigration documents, electronic records, and actions and events in the real world could lead to an adverse determination on status or benefit eligibility. Whether the data in documents and electronic records is being interpreted correctly, taking into account all applicable law and policy, is also a primary concern.

Recommendation to uphold the current practice and policy. The current policy has held up for more than twenty years because it provides bright-line dates established in government systems, which give adequate notice to students and exchange visitors and their schools and exchange programs. The expiration date on a date-certain Form I-94 is one such clearly established date. If an individual stays beyond that date, he or she begins to accumulate days of unlawful presence. Students and scholars with the Duration of Status (D/S) notation, do not have that bright-line date. Further, many status violations do not present such a bright line, either, particularly because there is overlap between different types of "status." For example, there are three different types of "statuses" which apply to F, M and J persons, which may confuse the point at which "unlawful presence" may begin accruing:

- Visa status (the validity period of the nonimmigrant visa in your passport)
- SEVIS status (the draft, initial, active, completed, deactivated, or terminated status of a nonimmigrant's electronic record in the Student and Exchange Visitor Information System database)
- Nonimmigrant status (abiding by the duration and other conditions of the nonimmigrant category in which an alien is admitted to the United States by DHS)

Proposal results in the unnecessary application of the 3- and 10-year bars. The proposal to directly equate a violation of nonimmigrant status accorded under INA 214, with the start of counting days of unlawful presence under INA 212(a)(9)(B), as of the day after the date that a status violation occurs, removes the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

Current regulations support mutual goals. We agree that students and exchange visitors need to follow the regulations governing their status however, regulations/policies governing maintenance of F, M and J status have grown increasingly complex and there are occasions when student inadvertently or unknowingly violate a provision of the rules governing their status. This proposed change makes things exponentially more complex. Like American students, foreign students should be allowed to complete

their studies at their chosen institution, without the stress or fear of being deported based on an oversight of which they may not be aware.

Examples of situations which may cause "unlawful presence" to begin accruing, or confusion about accrual, under new memorandum include:

- A student submitting an address update to one institutional email account, not realize it is not the correct institutional process for submitting address updates that will be forwarded to SEVIS, thus technically not submitting their address update within 10 days.
- A student who has been focused on his/her studies and realizes at the last minute that their I-20 will expire, submits an extension request at 5:00 pm on the day it expires. While technically requested "in time", the DSO cannot process the extension that day. The SEVIS system will allow for the extension beyond that date if submitted by the PDSO. Does unlawful presence accrue?
- A STEM OPT 6 month report is submitted but cannot be submitted to SEVIS because of SEVIS system error. Again, does unlawful presence accrue?
- A student who is having difficulty in a course is advised by their academic advisor to drop the course in order to avoid failing grade. The student doesn't realize they must also obtain reduced course load approval from their DSO, if applicable. The student applies for reinstatement, which typically take 6+ months to be adjudicated. Under this memorandum, it appears that the student may be accruing days of unlawful presence and thus be subject to the bar even if the reinstatement is grated because of the Service's slow processing times.
- CLAIMS data does not properly update in SEVIS thus causing a student to not receive an email with Student Portal log in information and causing problems with the ability to properly update SEVIS. Reporting dates may be missed and the student may not be aware of the issue.

Current status violation safeguards protect mutual goals. While an alien who violates his or her nonimmigrant status is certainly removable, the policy in place for the last 20 years that distinguishes between status violations and unlawful presence makes sense for purposes of applying INA 212(a)(9)(B), from both legal and public policy viewpoints. A clear government determination, whether it is the expiration date on a nonimmigrant's Form I-94, or a formal finding of a status violation made in the course of a DHS benefits determination or by an immigration judge, serves as a fair and clear warning to an alien that the clock is ticking, and he or she must take action to leave the United States or otherwise cure the status deficiency. An alien who persists after such fair notice, must face the possibility of not being able to return to the United States for either 3 or 10 years.

Immigration policy is incredibly complex with dire consequences for violation. The concept of "unlawful presence" with various "clocks," "tolling" provisions, and "bars" has to this point been the purview of immigration law specialists and law school classes. Foreign students, scholars, and exchange visitors are not immigration attorneys or policy professionals and it is unfair to treat them as such. Unlawful presence should only trigger when there is clear notice of remaining beyond an expiration date of authorized stay in the United States and not when there is a contestable allegation of violation of status.

Economic benefits of education and research in the US support US security also. Homeland Security's Secure Borders and Open Doors Advisory Committee noted in 2008 that it is the mission of the Departments of Homeland Security and State "to protect not only America's security but also our

economic livelihood, ideals, image, and strategic relationships with the world." Hosting foreign students, researchers, faculty and international visitors are critical components of this effort and, yet, data shows that foreign student interest in studying in the US is flattening, if not outright declining. This proposal is yet another policy which makes the United States less attractive to talented foreign students, scholars, and exchange visitors and undoubtedly will encourage them to look elsewhere to do their groundbreaking research and build diplomatic ties. Foreign students, scholars, and exchange visitors are here to learn, and they make America safer by becoming the nation's best ambassadors and allies. By treating them all as criminals for minor or technical violations, we will be making America less safe and a less desirable place to study. This is contrary to our nation's values as a welcoming nation of immigrants. Moreover, it is also short-sighted from a national security perspective as the strength of our system of higher education in the US, which is a critical component of our national security efforts, depends in part on the continued flow of foreign students and scholars to our institutions of higher learning.

Proposed regulations does more harm than good.   USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy.

Recommendation: keep the current, successful policy in place.   I urge USCIS to leave in place the current policy, which has served for over 20 years and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Thank you for the opportunity to comment and your consideration of these important issues.

Sincerely,

Linda Gentile
Director, Office of International Education
PDSO/RO

Office of International Programs





Orono, Maine
Tel:
Fax:
Email:                    @
umaine.edu/international

June 11, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

**Re:  USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

GC CAR 000685

fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

Additional complications are:

It is unclear from the memo whether the trigger for the accrual of unlawful status is the date of the violation or the date that the violation is reported in SEVIS. DSOs are required to report status violations in SEVIS within 21 days of the violation. Without clarification this clarification it seems it will be impossible for a student or exchange visitor to accurately calculate the exact number of days.

The memo appears to state that a student will not accrue time in unlawful presence during the time that an application for reinstatement is pending provided that the application is ultimately approved. Currently these applications are taking over a year to adjudicate. It is unclear whether the student whose application is denied would find him or herself with over a year of accrued unlawful presence. If this is the case then it seems unfair to the student who is told that he/she may legally stay in the US while the application is pending a decision. Under such circumstances it seems that USCIS should fast track I-539 applications for requests for reinstatement of student status so that students are not unduly punished. As mentioned previously, a student may fall out of status for a relatively minor violation or through DSO error. This consequence that will ensue under this proposed change in policy do not seem to fit the circumstances of the average international student seeking a degree at a US institution.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode

foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,

Sarah Joughin
Associate Director
PDSO





8 June 2018

Re: Policy Memo – PM-602-1060 : Accrual of Unlawful Presence and F, J, and M Nonimmigrants

Dear USCIS Chief Officer:

We are a team of Designated School Officials (DSOs) and Alternate Responsible Officers (AROs) who wish to express our concern regarding the recent change of policy guidance (PM-602-1060) announced on May 10, 2018 regarding redefinition of unlawful presence by non-immigrants admitted into the U.S. for Durations of Status (D/S) to take effect on August 9, 2018 and seek your reconsideration of this implementation.

Under this new guidance, an F or J nonimmigrant admitted for duration of status begins to accrue unlawful presence the day after the nonimmigrant no longer pursues the course of study or authorized activity, or the day after he or she engages in an unauthorized activity. Yet by this definition, an F or J nonimmigrant may innocently fail to pursue study or engage in an unauthorized activity without knowledge due to circumstances beyond their control and be unable to complete their actual authorized academic program or course of study due to the extreme 3 year and 10 year bars for such a mistake and incomplete guidance for all relative actors involved in reporting the nonimmigrant's maintenance of status.

For example, an F-1 international student may fail to enroll in or attend classes to meet a full-time course of study as required by 8.CFR.214.2(f) due to outstanding medical reasons; and in such a case neither the student, the school, nor the DSO is able to take proper action to report such an option whereby the student may act or have acted to maintain status, such as in the form of a Medical Reduced Course Load or Leave of Absence permitted by 8.CFR.214.2 (f). In such case that automatic action is taken by SEVIS on the student's record, what guidance is there to prevent incorrect accrual of unlawful presence for the student due to administrative or system error regarding the student's status? Without policy guidance for DSOs and SEVIS, the PM-602-1060 seems to imply that adjudication of a student's unlawful presence is explicitly subject to the reporting of a DSO or action of the SEVIS database even though neither a DSO nor SEVIS have the legal authority to adjudicate unlawful presence in the U.S. Even according to PM-6012-1060 annotation 27, an F, J, or M nonimmigrant begins accruing unlawful presence, due to a failure to maintain his or her status as "may be determined by a DHS officer." The practical application of the new definition for determining unlawful presence does not appear to meet the legal requirements for adjudication of a non-immigrant's status and therefore does not seem acceptable for determining accrual of unlawful presence.

The new guidance in PM-602-1060 also states that unlawful presence is no longer counted from the time a petition of status is denied by a USCIS Officer but rather from the date of failure to pursue course of study or engagement in unauthorized activity. This policy change has stipulated that if an F-1 student,

who due to medical circumstances beyond their control, applies for re-instatement of status as afforded by 8.CFR.214.2(f) and is denied has now been accruing unlawful presence for the duration of the pending Re-instatement application. Currently, processing times by USCIS for these petitions are taking several months to a year or longer in order to be adjudicated. Therefore, what guidance is provided to a student who takes action to maintain status according to 8.CFR.214.2(f) but accrues extended unlawful presence due to processing negligence by USCIS itself? In this situation, the policy guidance of PM-602-1060 appears to negate the viability of Re-instatement as afforded by the code of federal regulations, and it is questioned whether USCIS policy has this legal precedence. In addition, for an F-1 international student petitioning Re-instatement, who for all definitions of intent as a bona fide student is pursuing the necessary actions to maintain that intent for his or her lawful presence in the U.S., this policy guidance seems to provide excessive hardship and unnecessary discrimination against the F-1's bona fide student intent due to circumstances beyond the F-1's control.

The above points have been exemplified by a situation of medical circumstances for an F-1 student but can be further exemplified for F-1 or J-1 non-immigrants and their dependents in countless other situations including but not limited to: employment activities, transfers between academic institutions, change of status petitions, employment petitions, change of academic program objectives, and engaging in modern forms of academic activities not well-defined in the code of federal regulations such as online or study away educational activities.

F-1 and J-1 nonimmigrants provide unparalleled value to the U.S. economy, U.S. government activities and relations, and the American education system in infinite positive ways. We strongly urge you to consider the impact of the change of policy guidance in PM-602-1060 that it will have not just on international students and exchange visitors or their families and home countries, but on the average American who benefits from F and J nonimmigrant tax dollars, education service careers and jobs, cultural enlightenment and heritage, in addition to social engagement afforded through the international exchange environment.

It is understood that the 3 and 10-year bars imposed by length of unlawful presence were designed to prevent status overstays and thereby reduce undocumented individuals in the U.S. However, because of the desire and need for many international students and exchange visitors to complete their academic objectives in the U.S. when they are here, we are strongly concerned that the new policy guidance will provide undue hardship on these nonimmigrants and possibly compel more, not less, of them to remain in the U.S. past their status in order to complete the academic objectives before becoming subject to the bars. This runs the risk of only more undocumented individuals in the U.S., negatively affecting not only the international student or exchange visitor who chooses to become undocumented but also school officials and academic institutions, the U.S. economy, U.S. government activities and relations, and the American education system in infinite negative ways. The according detrimental loss that will occur to the average American due the disadvantage of undocumented nonimmigrants can also not be overstated.

The prior policy guidance to unlawful presence provided on May 6, 2009 in Chapter 40.9 Section 212(a)(9) of the Act - Aliens Unlawfully Present after Previous Immigration Violations, which has been seen as successful policy guidance for nearly the past decade, did not have the incongruence of the new policy outlined in PM-602-160. In respect of the old adage, *if ain't broke, don't fix it*, and in due concern as detailed in this letter, we sincerely seek your reconsideration of implementation of the new policy guidance and recommend continued use of the prior guidance provided on May 6, 2009.

Respectfully,

Gale Lynch, Senior Director

Alexandra Chow, Associate Director

Heather Hena, Applications Manager

Crystal Tapia, Systems Manager

Bengisu Peker, Senior International Student
and Scholar Advisor

Lindsay Wersebe, Senior International Student
and Scholar Advisor

Joselyn Duran, Assistant Applications Manager

Rachel Young, International Student Advisor

Kristen Gartside, International Student Advisor

Andrew Amadei, International Student Advisor

Stacey DiMarino, Front Desk Advisor

GC CAR 000690

June 8, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

> **Re:** **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Director Cissna:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

As a professional in the field of international education, I work with thousands of international students who come to the U.S. to pursue higher education. Along with a staff team of dedicated professionals, we assist students in navigating the complex U.S. immigration system and in maintaining status in order to focus on their primary goal – obtaining an excellent education and furthering their personal and career objectives.

The new USCIS practice memo causes many concerns. On a large scale, this is another policy that will make the United States less attractive to talented international students and scholars. Briefly stated, it will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are

initiated." This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

International students already study in the U.S. under a regulatory framework that makes their experience quite different from that of domestic students. Employment limitations, difficult visa application procedures, and other constraints are accepted by students as a price to accessing incredible educations opportunities in the U.S. However, creating a situation in which individuals must worry that even unintentional errors that impact one's status can have devastating effects on their educational progress seems to be inappropriate and unfair. In our role as Designated School Officials (DSOs), my staff help students who have fallen out of status with reinstatement applications. While most are eventually approved, there have been instances where an individual received a denial of their reinstatement request. Under current policy and practice, these individuals are then able to take appropriate actions, including potentially leaving the U.S., in order to comply with DHS/USCIS decisions on their case. In many cases the appropriate actions taken by the individual help to preserve future opportunities to pursue education and/or employment in the U.S. The new policy will, in many cases, make it impossible for an impacted person to take appropriate actions in a timely manner. This situation is damaging to not only the individual's personal situation, but also U.S. higher education more broadly, as we seek to attract and retain the most talented students from around the world.

Thank you for the opportunity to comment.

Sincerely,

Tony Tambascia
Executive Director, Office of International Services
University of Southern California



June 11, 2018

Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

**Submitted via email**: publicengagementfeedback@uscis.dhs.gov

> **Re:** **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

The American Immigration Lawyers Association (AILA) and the American Immigration Council (Immigration Council) respectfully submit the following comments in response to the USCIS Memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted on the USCIS website on May 11, 2017.[1]

Established in 1946, AILA is a voluntary bar association of more than 15,000 attorneys and law professors practicing, researching and teaching in the field of immigration and nationality law. Our mission includes the advancement of the law pertaining to immigration and nationality and the facilitation of justice in the field. AILA members regularly advise and represent businesses, U.S. citizens, U.S. lawful permanent residents, and foreign nationals regarding the application and interpretation of U.S. immigration laws.

The American Immigration Council is a non-profit organization established to increase public understanding of immigration law and policy, advocate for the fair and just administration of our immigration laws, protect the legal rights of noncitizens, and educate the public about the enduring contributions of America's immigrants. In addition, through its work on the economic benefits of immigration reform, the Immigration Council has helped to establish baseline standards for understanding the important role immigration plays in shaping and driving a twenty-first century American economy.

## A. Background and Overview of Historical Interpretation of Unlawful Presence

"Unlawful presence" is a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA). The term refers to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." Under INA §212(a)(9)(B), a person who has been unlawfully

---

[1] PM 602-1060, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," (May 10, 2018) *available at* https://www.uscis.gov/sites/default/files/USCIS/Outreach/Draft%20Memorandum%20for%20Comment/AccrualofUnlawfulPresenceFJMNonimmigrantsMEMO_v2.pdf

1

GC CAR000693

present for more than 180 days but less than one year and who departs the United States is barred from returning for three years. A person who departs after having been unlawfully present for more than one year is barred for ten years. Created by Congress with the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), the unlawful presence provisions took effect on April 1, 1997.[2]

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for "duration of status," or "D/S," which means the student or exchange visitor can remain in the United States as long as he or she maintains nonimmigrant status. This generally means the individual must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension.

Because international students are not admitted until a date-certain, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice of a status violation to individuals admitted for "D/S" before the unlawful presence clock will start. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. Beginning in 1997, this interpretation was commemorated in a series of USCIS guidance documents and was most recently reiterated in the May 6, 2009 "Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act."[3] The 2009 guidance emphasizes that "the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[4] Further, Chapter 40.9.2(a)(2) of the Adjudicator's Field Manual (AFM) makes it clear that "to understand the operation of sections 212(a)(9)(B) and 212(a)(9)(C)(i)(l) of the Act, it is important to comprehend the difference between being in an unlawful immigration status and the accrual of unlawful presence…. Although these concepts are related … they are not the same."

## B. Summary of USCIS's New Interpretation of Unlawful Presence

As described in the May 11, 2018 memorandum (hereinafter "2018 memorandum" or "memo"), USCIS will now deem unlawful presence to have started accruing for F, M, and J nonimmigrants as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. For status violations found to have occurred on or before August 9, 2018, the effective date of the memo, unlawful presence will be calculated beginning August 10, 2018, if not accrued earlier.

When assessing whether a status violation has occurred, the memo states that adjudicators are to consider: (1) information contained in systems available to USCIS; (2) information contained in the individual's "A file;" and (3) information obtained through a Request for Evidence (RFE) or Notice of Intent to Deny (NOID). Moreover, the memo states that while the status of the spouse and children of an F, J, or M nonimmigrant is contingent on the status of the principal nonimmigrant, the period of stay authorized for a dependent spouse or child may also end due to their own conduct or circumstances.

---

[2] Div. C of Pub. Law No. 104-208 (Sept. 30, 1996).
[3] *See* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.
[4] *Id*. at 25.

GC CAR000694

After more than 20 years of consistent interpretation that recognizes the principle of fundamental fairness and provides certainty in determining when unlawful presence begins to accrue, USCIS is abruptly changing course and conflating the two distinct legal concepts of "status violation" and "unlawful presence." There is no doubt that this new approach to interpreting unlawful presence will have a significant negative impact on the student, vocational, and exchange visitor communities, and will further erode foreign student enrollments in U.S. colleges and universities. Moreover, for the reasons described below, we submit that the 2018 memorandum is an unlawful interpretation of the statutory unlawful presence provisions and cannot stand.

## C. The 2018 Memorandum Conflicts with the Unlawful Presence Statute, which is Clear on its Face

The 2018 memorandum conflicts with the unambiguous language of the INA. In 1996, Congress created the new concept of unlawful presence, clearly stating that a person is "unlawfully present" if he or she "is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled."[5] Thus, equating unlawful presence with a status violation is contrary to Congress' clearly expressed intent. Moreover, principles of statutory construction confirm that Congress never intended such an interpretation, as the new unlawful presence provisions were incorporated into the INA without any modification to the numerous provisions that penalize a person for a "status violation" or "failure to maintain status." For example:

- **INA §212(a)(6)(G)**: Renders a noncitizen who "violates a term or condition" of an F-1 student visa inadmissible until the noncitizen has been outside of the United States for a continuous period of five years after the violation.

- **INA §237(a)(1)(C)(i)**: Renders a noncitizen deportable if he or she has "failed to maintain the nonimmigrant status in which [he or she] was admitted ... or to comply with the conditions of any such status."

- **INA §245(c)(2)**: Renders a noncitizen ineligible for §245 adjustment of status if the noncitizen engages in unauthorized employment, "is in unlawful immigration status," or "has failed ... to maintain continuously a lawful status since entry into the United States."

- **INA §245(c)(7)**: Renders a noncitizen ineligible for §203(b) adjustment of status who is "not in a lawful nonimmigrant status."

- **INA §245(c)(8)**: Renders a noncitizen ineligible for §245 adjustment of status who "has otherwise violated the terms of a nonimmigrant visa."

- **INA §245(k)**: Includes, as part of its eligibility requirements, that an individual not "fail[] to maintain, continuously, a lawful status."

Other statutory provisions confirm that Congress intended the two concepts to remain distinct. For example, adjustment of status under INA §245A(a)(2) requires: (1) entry before January 1, 1982; (2) continuous residence in unlawful status since such date; and (3) that the period of authorized stay expired before January 1, 1982, or that the government knew of the unlawful status. The third prong makes it clear that expiration of a period of authorized stay and "unlawful status" of which the

---

[5] INA §212(a)(9)(B)(ii).

3

GC CAR000695

government is aware are different concepts. Otherwise, adopting an interpretation in line with the 2018 memorandum, individuals who violated the terms of their status would automatically be deemed outside the "period of authorized stay" and the purposeful distinction noted in prong (3) would be irrelevant.[6]

In addition, the unlawful presence statute itself distinguishes between "unlawful presence" and "status" in INA §212(a)(9)(B)(iv)(II). That section states that the accrual of unlawful presence is tolled for an individual who "has filed a nonfrivolous application for a change or extension of *status* before the date of expiration of the period of stay authorized by the Attorney General …." (Emphasis added). By using the terms "status" and "unlawful presence" in this way, Congress evinced that these are separate legal concepts with distinct legal consequences.

As explained by the Supreme Court, "it is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning."[7] "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."[8] Any interpretation of "unlawful presence" or "expiration of the period of authorized stay" that is conflated with a "status violation" or "failure to maintain status" would render sections of the INA superfluous.

When it intends to penalize a failure to maintain status or status violation, Congress has made that intention clear by the plain language of the statute. Section 212(a)(9)(B) of the INA makes no reference to these terms or concepts. Where "one interpretation of a statute or regulation obviously could have been conveyed more clearly with different phrasing, the fact that the authors eschewed that phrasing suggests ... that they in fact intended a different interpretation."[9] Therefore, the 2018 memorandum, which folds the concept of a status violation into the definition of unlawful presence, is contrary to the plain language of the statute and the unambiguous intention of Congress in its adoption of INA §212(a)(9)(B).

## D. Assuming without Conceding that the Statute is Ambiguous, the Memorandum Is Not Entitled to Deference

Because there is no ambiguity in the statute, the law is applied as written and the 2018 memorandum receives no deference under *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*[10] Assuming only for argument's sake that an ambiguity exists, the guidance – which was not issued through the formal rulemaking process – would at most be afforded deference under *Skidmore v. Swift & Co*. but here too, that fails.[11] Deference under *Skidmore* depends on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."[12] Based on flawed and inconsistent reasoning, the 2018 memorandum reverses the agency's long-standing interpretation of unlawful presence without adequate justification, is not designed to achieve its stated goals, and cannot stand.

---

[6] *See also* 8 USC §1365(b)(2), which similarly distinguishes between the expiration of a period of authorized stay and unlawful status known to the government.

[7] *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 571 (2012) (internal citations omitted).

[8] *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal citations omitted).

[9] *Gerbier v. Holmes*, 280 F.3d 297, 309 (3d Cir. 2002) (quoting *United States v. Ibarra-Galindo*, 206 F.3d 1337, 1339 (9th Cir. 2000) (overruled on other grounds)).

[10] 467 U.S. 837, 842-43 (1984).

[11] 323 U.S. 134, 140 (1944).

[12] *Id* at 140.

GC CAR000696

*Skidmore* instructs us to consider the agency's "consistency with earlier and later pronouncements." As noted above, the 2018 memorandum represents a significant departure from more than 20 years of a single, unified approach to unlawful presence for F, J, and M nonimmigrants. In evaluating "the thoroughness evident in [the agency's] consideration [and] the validity of its reasoning," we address each of the points USCIS makes to justify the change in unlawful presence interpretation.

First, USCIS states that "the former INS policy, as consolidated in the AFM, went into effect in 1997, prior to the creation of some of the technologies and systems currently used by DHS to monitor nonimmigrants … in F, J, or M status."[13]  More specifically, it notes that "since the creation of the policy, the Student and Exchange Visitor Information System (SEVIS) … has provided USCIS officers additional information on an alien's immigration history."[14] However, SEVIS went into effect in 2003. Although this was six years after INA §212(a)(9)(B) took effect in 1997, it was also six years *before* the 2009 consolidated guidance reaffirmed USCIS's long-standing interpretation of unlawful presence. Moreover, as acknowledged by SEVIS itself, the accuracy and integrity of SEVIS data is flawed,[15] and "[i[Inaccurate data can affect the status of the student's SEVIS record and put the student's eligibility for benefits at risk."[16]

Second, USCIS claims that the purpose of the new policy is to "reduce the number of overstays."[17] However, this is not borne out by the policy itself, which provides no instructions or guidance on preventing overstays, such as notifying students and exchange visitors in advance of the end of their program. Instead, the memorandum introduces a "gotcha" approach, instructing adjudicators to search records for perceived status violations and retroactively calculate periods of unlawful presence without notice. Far from reducing the number of overstays, the memorandum expands the very definition of what constitutes an overstay – something the agency has no legal authority to do. The approach to unlawful presence described in the memo does nothing to advance this stated purpose.

In support of this stated goal, USCIS cites the DHS Fiscal Year 2016 Entry/Exit Overstay Report,[18] which notes that for FY 2016, "the estimated overstay rate was 6.19 percent for F nonimmigrants, 3.80 percent for J nonimmigrants, and 11.60 percent for M nonimmigrants."[19] However, the figures cited by USCIS include "out-of-country" overstays, or individuals whose departure was recorded after their lawful period of admission expired. This could easily encompass individuals who stayed just a few days longer than the conclusion of their program to tie up their personal affairs and is not a true representation of the "overstay" population with which the administration is concerned. The "suspected in-country" overstay rate (individuals for whom no departure has been recorded) is in fact much lower than the figures cited by USCIS: 2.99 percent for F nonimmigrants, 2.94 percent for M nonimmigrants, and 2.42 percent for J nonimmigrants. In addition, as noted in the Executive Summary, determining lawful status is not a straightforward analysis:

---

[13] PM-602-1060 at 2.
[14] *Id.*
[15] *See* https://www.ice.gov/sevis/data-integrity.
[16] https://studyinthestates.dhs.gov/2016/06/maintaining-accurate-sevis-records-when-to-request-a-correction-or-data-fix
[17] PM-602-1060 at 2.
[18] *See* https://www.dhs.gov/sites/default/files/publications/Entry%20and%20Exit%20Overstay%20Report%2C%20Fiscal%20Year%202016.pdf
[19] PM-602-1060 at 2.

5

GC CAR000697

… [D]etermining lawful status is more complicated than solely matching entry and exit data. For example, a person may receive from CBP a six-month admission upon entry, and then he or she may subsequently receive from U.S. Citizenship and Immigration Services (USCIS) a six-month extension. **Identifying extensions, changes, or adjustments of status is necessary to determine whether a person is truly an overstay**.

In addition:

> Valid periods of admission to the United States vary; therefore**, it was necessary to establish "cutoff dates" for the purposes of a written report**. Unless otherwise noted, the tables accompanying this report refer to departures that were expected to occur between October 1, 2015 and September 30, 2016….[20]

In other words, due to limitations associated with producing a written report, DHS acknowledges that the "overstay" data in the report includes some individuals who were later granted permission to remain beyond their initial period of authorized stay. The fact that this data was inflated is confirmed by the fact that four months after the "cutoff dates," the number of overstays substantially decreased:

> Due to continuing departures and adjustments in status by individuals in this population, by January 10, 2017, the number of Suspected In-Country Overstays for FY 2016 decreased to 544,676, rendering the Suspected In-Country Overstay rate as 1.07 percent. **In other words, as of January 10, 2017, DHS has been able to confirm the departures or adjustment in status of more than 98.90 percent of nonimmigrant visitors scheduled to depart in FY 2016 via air and sea POEs, and that number continues to grow.**[21]

The report also concedes to other factors limiting its accuracy, such as its reliance on information from the Arrival and Departure Information System (ADIS). ADIS has limited capacity to record exits and entries made via land and makes no distinction of those who overstay one day versus one year or longer.[22] Yet this is a significant difference, as a one-day overstay may be the result of a person missing their flight or sustaining an injury that renders them unable to travel.

Lastly, USCIS states that the new memo will "improve" how USCIS implements the unlawful presence ground of inadmissibility but fails to offer any reason or explanation as to how the new memo will accomplish that. In sum, USCIS has clearly failed to thoroughly consider the implications of its new unlawful presence interpretation, failed to adequately justify a need for the change, and has cited no concrete authorities to support its stated goals. The memorandum cannot stand under *Skidmore* deference.

### E. The Memorandum Is a Legislative Rule that Requires Notice and Comment Rulemaking under the Administrative Procedure Act (APA)

The Administrative Procedure Act (APA) recognizes two types of administrative rules: legislative rules issued through formal notice and comment rulemaking, which are given the full force and effect of law, and interpretive rules designed to advise the public of agency interpretation of a legal rule. Interpretive rules do not require notice and comment and lack the force of law.[23]  While the 2018

---

[20] *Id*. (emphasis added).
[21] *Id*. (emphasis added).
[22] *Id*.
[23] *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1200-01 (2015).

GC CAR000698

memorandum purports to merely advise the public of how the term "unlawful presence" is to be interpreted, that conclusion is neither factually correct nor legally supported.

As noted above, over the course of two decades, USCIS has stood by its 1997 interpretation of unlawful presence, reiterating it most recently in 2009 when it undertook a comprehensive review of its various memoranda and case law on unlawful presence and issued consolidated guidance that ultimately became chapter 40.9.2 of the AFM. While we maintain that the 2018 memorandum, which erases the distinction between the concepts of "unlawful presence" and "violation of status" is unlawful, the APA requires USCIS to give the public advance notice and an opportunity to comment through formal rulemaking before attempting to impose what constitutes a change in how the law will be applied in the future.

While the courts have not developed a unified approach to evaluating whether a rule is legislative or interpretive, the reasoning of various decisions is instructive. Employing textual analysis, the Ninth Circuit has held that legislative rules "are those which effect a change in existing law or policy."[24] Another critical characteristic of legislative rules is that they have general application.[25] Conversely, "interpretive rules are those which merely clarify or explain existing law or regulations."[26] While a legislative rule is a broad wholesale change in interpretation and application of law, interpretive rules are used more for "discretionary fine-tuning than for general law-making."[27] For example, in *Jean v. Nelson,* the Eleventh  Circuit considered whether a blanket change in how INS treated arriving aliens [detention (new) vs. parole (old)] was a legislative or interpretive rule.[28] The court found that even though parole was still a discretionary option, the rule was legislative because it had general applicability, and did more than just clarify or explain an existing rule.[29] Because the rule created an entirely new procedure for all cases, notice and comment rulemaking was required.[30] Similar analytical approaches are found in *N.H. Hosp. Ass'n v. Azar,*[31] and *Dia Navigation Corp. Ltd. v. Pomeroy.*[32]

Applying this analysis, the 2018 memorandum is a legislative rule because it changes the manner in which unlawful presence is determined for all F, J, and M nonimmigrants who have been admitted "D/S" and is therefore of general applicability. It will result in future enforcement actions against persons under facts and circumstances that did not previously result in enforcement actions, thus doing far more than merely "explaining" an existing policy. Finally, it is a 180-degree change in the manner in which USCIS treats persons admitted for the duration of their status by conflating the fact (or even potential fact) of a status violation with the beginning of a period of unlawful presence.

## F.  USCIS Has Failed to Articulate a Satisfactory Explanation for its New Approach to Unlawful Presence as Required by *Encino Motorcars*

In *Encino Motorcars, LLC v. Navarro,* the U.S. Supreme Court reaffirmed several longstanding rules of administrative rulemaking, including the basic procedural tenet that agencies must give adequate

---

[24] *Alcaraz v. Block,* 746 F.2d 593, 613 (9th Cir. 1984).
[25] *Flagstaff Med. Ctr. v. Sullivan,* 962 F.2d 879, 886 (9th Cir. 1992).
[26] *Alcaraz,* 746 F.3d at 613; *Hoctor v. USDA,* 82 F.3d 165, 170-71 (7th Cir. 1996).
[27] *Alcaraz,* Id. at 613.
[28] 711 F.2d 1455 (11th Cir. 1983), *vacated in part as moot,* 727 F.2d 957 (11th Cir. 1984) (new regulations issued).
[29] 711 F.2d at 1476, 1478.
[30] *Id.* at 1478.
[31]  887 F.3d 62, 72-73 (1st Cir. 2018).
[32] 34 F.3d 1255 (3d Cir. 1994).

GC CAR000699

reasons for their decisions.[33] Citing *Motor Vehicle Mfrs. Assn. of United States v. State Farm Mut. Automobile Ins. Co.* (*MVMA*), the Court stated that an agency "must examine the relevant data and articulate a satisfactory explanation for its actions including a rational connection between the facts found and the choice made."[34] That requirement is satisfied when the agency's explanation is clear enough that its "path may reasonably be discerned."[35] In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.[36] When an agency fails to provide even that level of minimal analysis, its actions are arbitrary and capricious and cannot carry the force of law.[37]

As described in Part D, *supra*, and Part G, *infra*, the change in unlawful presence interpretation articulated in the 2018 memorandum is not supported by a reasoned explanation, eliminates a critical notice element, and fails to take into consideration fundamental fairness and due process requirements, as well as the reliance interests of the regulated public that have built up over the past two decades. For all of these reasons, the 2018 memorandum is an arbitrary and capricious change in interpretation that cannot stand.

## G. The 2018 Memorandum Raises Significant Due Process and Fundamental Fairness Concerns and is Constitutionally Suspect

Unlike foreign nationals who are admitted until a "date certain," and will trigger unlawful presence if they remain in the U.S. beyond the date recorded on Form I-94 (or recorded in CBP electronic systems), plus any extension thereafter granted, students and exchange visitors that are admitted for "D/S" lack the benefit of such a bright-line test. As a result, legacy INS and USCIS created a different bright-line standard, one that incorporates the principle of fundamental fairness: formal notification by USCIS or an immigration judge that a status violation occurred before the unlawful presence clock can start. The exceedingly harsh penalties associated with unlawful presence, and the clear distinctions Congress created between the concepts of unlawful presence and status violation, have informed more than 20 years of policy, which ascribes caution to calculating unlawful presence.

The new memorandum throws caution to the wind. The government's new interpretation of unlawful presence raises serious due process concerns and is unfair and unworkable in its application. Since 1997, the Service has interpreted INA §212(a)(9)(B) as requiring some form of notice to individuals for unlawful presence to accrue. Under the 2018 memorandum, while the government's finding that an F, M, or J nonimmigrant has violated status would still typically occur in the course of a USCIS benefits adjudication, the date on which unlawful presence will accrue is imposed retroactively. The 2018 memorandum instructs adjudicators to consider information in the systems available to USCIS, in the alien's record, and alien's admissions regarding his or her immigration history or other information discovered during the adjudication," but provides no limitation as to how far back adjudicators may reach, such that a student or exchange visitor may abruptly learn that he or she has been unlawfully present for several years.[38] Moreover, the memo states that "an F-2, J-2, or M-2 nonimmigrant's period of stay authorized ends when the F-1, J-1, or M-1 nonimmigrant's period of stay authorized ends." This means that a spouse may find out only many years after the fact that they too accrued unlawful presence.[39]

---

[33] 136 S. Ct. 2117, 2125 (2016).
[34] 463 U.S. 29, 43 (1983).
[35] *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974).
[36] *Encino Motorcars*, 136 S. Ct. at 2126; *Perez*, 135 S. Ct. at 1209.
[37] *See* 5 U.S.C. § 706(2)(A); *MVMA*, 463 U.S. at 42-43.
[38] PM-602-1060 at 4 n.12.
[39] *Id.* at 5.

8

GC CAR000700

The regulation at 8 CFR §214.2(f)(5)-(6) articulates the circumstances in which an F-1 student is deemed to be "out of status." F-1 students who work without authorization, who are deemed to not be pursuing a full course of study, who transfer to another school without permission, and who fail to complete a full course of study are deemed to be "out of status." However, F-1 students are subject to additional reporting requirements that may constitute a status violation if not completed timely. These reporting requirements include: reporting biographical information to a Designated School Official (DSO) every six months during a STEM OPT extension;[40] and completing an annual self-evaluation report that is signed by the employer and submitted to the DSO within 1 year and 10 days of the validity period on the Employment Authorization Document, as well as a final evaluation within 10 days of the conclusion of the 24-month period of STEM OPT.[41] Additionally, employers of STEM OPT students are required to report absences to the DSO; and any material change in a STEM OPT training plan must be reported to the DSO by the student after having the employer sign a new training plan.[42] USCIS has not articulated whether the failure to undertake any of these actions would trigger the accrual of unlawful presence. The 2018 memorandum makes no distinction between minor technical violations (e.g. reporting a change in employment a few days late) versus a major violation (dropping all classes without authorization).

In practice, this policy will create a large class of inadmissible aliens who have received no notice of their unlawful presence because in many cases, F, M, and J nonimmigrants have no knowledge that a status violation has even occurred. In addition, a significant number of individuals will only become aware of a status violation when it is too late to correct course and they find themselves subject to a three- or ten-year bar to admissibility. Under the new memo, accidental and inadvertent status violations will subject unsuspecting individuals who have not acted in bad faith to extreme penalties. Examples of situations where students or exchange visitors may be found to have inadvertently violated their status include:

1. **Inadvertently Engaging in Unauthorized Employment**. While 8 CFR §214.2(f)(9) clearly states that a student may work on campus for up to 20 hours per week and requires authorization in the form of curricular or optional practical training to work off-campus in certain circumstances, there is no clear guidance on what constitutes "employment." A student may believe that off-campus volunteer work is not unauthorized "employment" even though it is possible that the Service could view it as such, particularly if it involves activities that normally would be compensated. Other activities that are not clearly defined include working for and being paid by an overseas entity while physically present in the U.S.; selling something on eBay; selling personally created art work or photography; getting paid for publication of one's dissertation; getting paid to host a seminar or speak at an academic conference or event; getting paid a royalty for activities associated with research, etc.

2. **Practical Training Issues**. Issues may also arise when a student on OPT drops below 20 hours of work one week, starts a degree program while on OPT, or works just a few days or one week beyond CPT.

3. **Inadvertently Violating Status by Following the Advice of a School or Designated School Official (DSO)**. A school may err in advising a student, leading to an accidental status violation through no fault of the student. For example, a school may incorrectly advise a student as to the number of hours that he or she may work on campus, or incorrectly advise

---

[40] 8 CFR §214.2(f)(12).
[41] 8 CFR §214.2(f)(10)(ii)(C)(9)(i).
[42] 8 CFR §214.2(f)(10)(ii)(C)(6); and 8 CFR §214.2(f)(10)(ii)(C)(9)(ii).

GC CAR000701

a student to drop a class that causes the student to fall below a full course of study. A DSO may grant a reduced course load authorization in good faith, but SEVP or USCIS may later determine this authorization should not have been granted. Further, a program administrator may send a J-1 student physician to a training location that has not been approved or may improperly advise a student physician that he or she may moonlight doing non-GME work within the same training hospital.

4. **Extraordinary Circumstances Beyond One's Control**. Extraordinary circumstances can also cause a student or exchange visitor to unintentionally violate status. For example, in May 2018, an F-1 student on OPT was walking down the sidewalk in Denver when a car hit him and pinned him to a tree. His leg had to be amputated.[43] Under 8 CFR §214.2(f)(10)(ii)(E), he will be out of status as soon as he is unemployed for 90 days. If he is hospitalized for more than 180 days after the effective date of the new policy and after he falls out of status through no fault of his own, he will be subject to the three-year bar when he departs. Additionally, USCIS has never issued clear guidelines on maintaining status when on maternity leave.

5. **Dependents May Be Unlawfully Present Without Knowing It**. Since the status of dependents of F-1, J-1 and M-1 nonimmigrants depends upon the principal nonimmigrant maintaining his or her status, those family members (with the exception of children under the age of 18, who are statutorily exempt from accruing unlawful presence) would be out of status and unlawfully present upon a violation of the principal's status. Thus, a spouse who is unaware of a principal's status violation would become subject to serious immigration penalties without even knowing it. This could occur, for example, when the principal tries to hide his or her failure at school from an unknowing spouse or in an abusive situation.

By collapsing the distinction between "unlawful presence" and "status violation" and deeming unlawful presence to accrue retroactively, the 2018 memorandum removes the important procedural safeguard of notice to individuals that they may be deprived of a liberty interest. This lack of notice raises due process concerns. The Fifth Amendment's due process clause is a core concept in the Bill of Rights and requires all levels of American government to operate within the law, using procedures that are fundamentally fair. The core elements of due process are notice and a hearing before an impartial tribunal, which "minimize substantively unfair or mistaken deprivations" by providing individuals an opportunity to contest the basis on which the government seeks to deprive them of protected interests.[44] "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[45]

The three- and ten-year bars to admissibility represent a deprivation of liberty, as subject individuals are barred from returning to the United States for a lengthy period of time. In *Kent v. Dulles*, the Supreme Court held that the right to travel is a "liberty" interest protected by the Fifth Amendment and that where governmental restrictions on travel are involved, the Court will construe narrowly all delegated powers that curtail or dilute them.[46] Moreover, the constitutional guarantee of due process is not limited to U.S. citizens but applies equally to all "persons" present in the United States, regardless of alienage or immigration status.[47]

---

[43] http://kdvr.com/2018/05/03/25-year-old-man-sedated-and-on-ventilator-following-crash-in-lone-tree/
[44] *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).
[45] *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).
[46] 357 U.S. 116 (1958).
[47] *Plyler v. Doe*, 457 U.S. 202 (1982).

GC CAR000702

The Supreme Court has held that in applying the Fifth Amendment's due process guarantee, one must balance the private interests of affected individuals with the government's interest. In *Mathews v. Eldridge*, the Court indicated that the identification of the specific dictates of due process generally requires consideration of three distinct factors:

> [F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[48]

Applying the *Eldridge* test to the aforementioned examples of cases where students may inadvertently violate their status illustrates the problems inherent in the new interpretation of unlawful presence. Take, for example, a student who inadvertently violates F-1 status by engaging in activities later deemed to have constituted unauthorized "employment." First, the student has a private interest that will be affected by the application of the new policy to his case, given that he will likely have accrued sufficient unlawful presence at the time the determination is made to trigger a three- or ten-year bar upon departure from the United States. Second, the lack of legal guidance on what constitutes "employment" creates a significant likelihood of an erroneous deprivation, and the additional procedural safeguards, which previously existed in the form of notice before deeming the accrual of unlawful presence to have commenced, no longer exist. Third, although the government may have a compelling interest in enforcing the immigration laws and in implementing policies to minimize overstays, the policy at issue in this case does nothing to further that interest. As outlined above, the 2018 memorandum will severely penalize individuals for status violations that were unintentional and of which they were likely unaware until it is too late. It is precisely this risk of the erroneous deprivation of a liberty interest that is at stake in application of the 2018 memorandum. This new approach to unlawful presence is devoid of fundamental fairness and is constitutionally suspect.

## H.  Conclusion

For these reasons, we urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades. It is critical that USCIS ensure that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,


THE AMERICAN IMMIGRATION LAWYERS ASSOCIATION
THE AMERICAN IMMIGRATION COUNCIL

---

[48] 424 U.S. 319, 335 (1976).

GC CAR000703



Penn Global
International Student and Scholar Services

June 11, 2018

To:     publicengagementfeedback@uscis.dhs.gov
Re:     "Accrual of Unlawful Presence and F, J, and M Nonimmigrants"
        PM-602-1060
        May 10, 2018

To Whom It May Concern:

The University of Pennsylvania International Students and Scholars Services office appreciates the chance to comment on the policy memo of May 10, 2018, entitled "Accrual of Unlawful Presence and F, J, and M Nonimmigrants".

As a point of departure, we are troubled by the dramatic and abrupt change proposed by this memo. It takes a clear line – that a student begins accruing unlawful presence when a status violation has been formally found by a government official – and replaces it with a scheme that is unnecessarily confusing and all but does away with the longstanding concept of "D/S".

At its heart, our primary concern is our students may face consequences that are quite severe as a result of otherwise minor status violations without having received adequate, or in some cases *any*, notice that such a violation has occurred. The result of these changes will result in an unprecedented number of students who may begin to accrue unlawful status before they even know it. The following examples are just a few of any number of benign scenarios that could result in a student accruing unlawful presence without even knowing that a status violation has occurred:

- A student engages in a volunteer activity that is deemed to have been employment, only years later when applying for an H-1B;
- A student is unknowingly dropped from full-time enrollment because of a financial issue, and then corrects the issue with a later payment and completes the semester;
- A student's timely filed H-1B petition is rejected by USCIS and his or her attorney does not subsequently inform the student in time.

It is unclear from the memo how a student's lapse of status would be affected by a reinstatement request, but such a request comes with the added complication that such a request could easily pend for longer than the 6-month period required to trigger a 3-year bar.

We also feel compelled to point out that many of the situations in which a student might find him or herself fall into gray areas and may be contestable. What becomes, for example, of the student who graduates with a degree in communications and accepts a marketing position that is determined by the DSO to be sufficiently related to that student's degree, but is later determined by USCIS to not be so related? If a student is put on notice by a decision from USCIS, then he or she may leave the US in a timely manner. However, a student who is determined retroactively to have violated status, that student may not have the same opportunity.



GC CAR000704



Penn Global
International Student and Scholar Services

Nonimmigrant status is a legal condition, not a physical thing. It is also dynamic, not static. We find the guidance purported by this memo to be misguided, as it confounds the separate concepts of "Unlawful Presence" and "Maintaining Status". Students who come to the US in F, J, or M status are admitted for Duration of Status (D/S) and are not regularly given a date certain admission. That is, the student is admitted for as long as they continue to maintain their status. Whether or not a student has fallen out of status is a question without an obvious answer, and requires a sophisticated individual to make a determination. That determination is a necessary component for the equitable application of Unlawful Presence. The necessary predicate is that one can be in violation of status without being unlawfully present. Currently, even a student who drops out of school completely is not accruing unlawful presence until told so, if that student has clearly otherwise violated his or her status. This memo will remove that notice. As a matter of policy, we suggest that unlawful presence should only occur when one goes beyond a fixed expiration date and not when there is a contestable violation of status.

We note that there are no published regulations that apply specifically to this particular area of immigration law. Given the wide ranging impact and the drastic departure from long-standing practice, we suggest that the subject matter warrants more due process than that provided by a mere memo. We urge USCIS and DHS to engage in an official notice and comment process before enacting relevant regulations. Any implementation should be postponed until such time.

We thank you for your consideration and we appreciate the opportunity to voice our comments.

Sincerely,

Frank Calabrese, Esq.
Associate Director, ISSS
University of Pennsylvania

GC CAR000705



June 11, 2018

Mr. L. Francis Cissna
Director
U.S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Ave, NW
Washington, DC 20529

Submitted via email: publicengagementfeedback@uscis.dhs.gov

Dear Director Cissna:

North Carolina State University (NC State) is a research-extensive land-grant university dedicated to excellent teaching, the creation and application of knowledge, and engagement with public and private partners. By uniting our strength in science and technology with a commitment to excellence in a comprehensive range of disciplines, NC State promotes an integrated approach to problem solving that transforms lives and provides leadership for social, economic, and technological development across North Carolina and around the world. With just over 34,000 students, NC State is the largest university in the state of North Carolina, with students from all 50 states, two U.S. territories, and over 117 foreign countries.

NC State has a vibrant international student community, with 6184 active and initial F-1 records and 573 active and initial J-1 records in the Student and Exchange Visitor Information System. NC State has the largest number of F-1 students of any institution in North Carolina, public or private, as well as a vibrant J-1 scholar program, and for this reason, NC State is well situated to comment on the impact of the U.S. Citizenship and Immigration Services (USCIS) policy memorandum of May 10, 2018 " Accrual of Unlawful Presence and F, J, and M Nonimmigrants."

NC State is concerned about this abrupt departure from policy guidance that has been in place for more than twenty years. Not only is this proposed change operationally complex, which could lead to wrongly identifying a large number of foreign students and exchange visitors as failing to maintain lawful status, it thrusts institutions and F and J program administrators into significant institutional liability and risk. We have broken down our comment into two parts-our legal concerns with this departure in longstanding policy, and the implications of increased institutional liability for our institution and our F and J visa administrators on campus.

Congress established Unlawful Presence as a new ground of exclusion in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRAIRA). Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

These legal concerns have real impact for University F and J program sponsors, who are charged by SEVP as compliance administrator and adviser to these nonimmigrants. The following substantive institutional potential liability and risk management concerns flow from the legal ramifications of the proposed policy change:

1. **Absent an unlawful presence finding by DHS or an Immigration Judge that the F or J individual has violated status, Universities who sponsor F and J nonimmigrants will - *de facto* - become charged with this legal responsibility**.

This creates immense risk and liability to institutions of higher education as fact finder and arbitrator of how a potential violation of status may turn duration of status (D/S) into unlawful presence with a bar to re-entry. The University's Primary Designated Student Official (PDSO) and designated Responsible Officer (RO) and staff are not qualified to make such critical, legal determinations; this has always been the purview of the Department of Homeland Security or Department of Justice. F and J program sponsors have received no guidance or training from DOS or DHS (USCIS, SEVP, etc.) on how to make these complex legal findings. Even with training and guidance, University program sponsors do not, and will not, have access to the F and J nonimmigrant's complete immigration history, which is essential to a legal determination of unlawful presence. SEVIS access to historical data in F and J status is limited to the sponsoring institution, meaning a school has no access to SEVIS data transferred from another school. The simple fact is that University F and J program sponsors are not the personal immigration attorney of the nonimmigrant; rather their compliance obligation is to SEVP. There is an inherent conflict of interest in placing F and J program sponsors in the position to be collector of facts and arbitrator of a finding of unlawful presence to the F or J beneficiary. This is a complex legal analysis that could bring irreparable harm and long term consequence to the F and J nonimmigrant. Without a clear ruling by DHS officials or an Immigration Judge, F and J nonimmigrants will rely on the University to provide legal analysis on this matter by individuals who are primarily non-attorneys, thereby opening the University to potential legal exposure.

2. **Absent a dated notice issued by DHS or an Immigration Judge specifying when the unlawful presence clock is triggered, F and J program sponsors will – *de facto* – become charged with this legal task.**

Under the current practice, the nonimmigrant receives a dated notice of the violation of status in writing and the clock is triggered on the day after the date of the notice. The current practice provides certainty and clarity around the important determination of accrued unlawful presence time and whether a 3 or 10 year bar will attach, or because of the retroactive nature of the proposed policy, has already attached. The proposed policy places numerous liabilities on F and J program sponsors in "helping" the nonimmigrant make these determinations in order to take corrective action or otherwise cure the status deficiency. As with #1 above, PSDOs, ROs and their respective DSO and AROs are not qualified to execute this legal function and any errors in judgment, process, or communication will place the University at risk of failure

GC CAR 000708

to properly administer the program, e.g. withdrawal of F-1 program certification or J-1 program designation, as well as potential claims by the nonimmigrant against the University.

### 3. The retroactive nature of the proposed policy creates institutional liability that can occur at any time and continue without end.

Absent a finding of unlawful presence by DHS or an Immigration Judge legally creating a "date certain" for triggering unlawful presence, any F and J nonimmigrant may enroll at the University in initial status or as a transfer and, wittingly or unwittingly, bring with them possible unlawful presence. Further, any action by the nonimmigrant that may, wittingly or unwittingly, have caused them to temporarily fall out of status during their time at the University will forever bind that institution with the unlawful presence finding, whether at the time known to the University or not. The combination of uncertainty in whether unlawful presence has attached, lack of clarity around when the clock starts, and retroactive nature of this proposed policy will mean that the University will be subject to potential liability and risk. Any attempt to "help" the nonimmigrant identify an unlawful presence event and count accrued time could make the University liable. In the alternative, if the University does not weigh in on these legal matters, it could also be potentially held liable for failure to properly advise the nonimmigrant and adequately comply with SEVP program requirements.

### 4. The proposed unlawful presence policy will fundamentally change the nature of higher education compliance as SEVP program sponsors and advising to F and J nonimmigrants.

The dedicated (P)DSOs and (A)ROs at NC State take immigration compliance and their related advising duties seriously. Their inherent relationship with SEVP Field Representatives (which at the moment is an open and vacant position for our region) and with F International Students and J Exchange Visitors must operate within an environment of candor and trust. The proposed unlawful presence policy erodes such trust and creates the setting that all F and J nonimmigrants could be potential liabilities to the University if previous status violations, for whatever reason, were not disclosed or even known. Basic advisory functions around maintenance of status, international travel and reinstatement will become mired in institutional risk and liability if 3 and 10 year bars to re-entry under unlawful presence become part of (P)DSOs and (A)ROs advising responsibility. Such complex and dire consequences will likely impact the University's ability to administer the program within current SEVP regulatory and compliance requirements.

In light of these significant concerns, the University supports the recommendations submitted by NAFSA: Association of International Educators on May 24, 2018. Namely that in lieu of implementing the policy described in the memo, the following happen:

- Leave in place the current policy, which has benefited the United States for over 20 years. Neither DHS nor legacy INS ever published regulations to implement this important area of law. If the agency wishes to implement such drastic changes to longstanding common interpretation of the law, it must be done according to the Administrative Procedures Act (APA) and through notice and comment.

GC CAR 000709

- Implementation of any unlawful presence policy change must be fully coordinated with relevant government stakeholders, such as the Department of State, including the Visa Office and the Bureau of Education and Cultural Affairs' Exchange Visitor Program, and other divisions of DHS, including Immigration and Customs Enforcement (ICE) and the Student and Exchange Visitors Program (SEVP), and Customs and Border Protection (CBP).

- Exclude from unlawful presence count any status violations that occurred under color of law, where the student or exchange visitor reasonably relied on authorizations granted. For example, curricular or optional practical training authorized by SEVIS, or admission by CBP, or any number of agency actions that DHS later determines may have been improperly given should not start the unlawful presence clock until DHS or an Immigration Judge makes a formal status determination.

- Apply the change of status/extension of stay "tolling rule" to reinstatement applications.

- Expand the sections describing where F, J, and M nonimmigrants "do not accrue unlawful presence in certain situations." [draft Adjudicator's Field Manual 40.9.2(b)(1)(E)(iii)].

As you review the comments submitted, I implore you to incorporate stakeholder concerns into consideration to ensure that American universities are not negatively impacted by the proposed draft policy memorandum.

Thank you for your attention and consideration to these issues.

Sincerely,

Elizabeth A. James, PDSO
Director

GC CAR 000710

June 11, 2018


Mr. L. Francis Cissna
Director
U.S Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, D.C 20529


Dear Director Cissna,

In regards to the May 10 Memorandum "Accrual of Unlawful Presence of F, J and M Nonimmigrants" I believe there are two areas that need to be considered in this policy change.

**Terminations at the F, J and M level are largely done by PDSO/DSO and A/RO's –**

Interpretations of what constitutes a violation of status that should result in termination are made by PDSO/DSO and A/RO's and they range widely depending on the individual DSO's regulatory interpretation style, institutional policy, etc. This leads to vast inconsistencies in what is considered a "violation" of F, J and M status. An example is cases where CPT authorization is determined differently based on institution or what is considered "full-time" for PhD students, also varies by institutional policy.

These and other interpretations/policies vary so much by institution and individual office/advisor, even though there are INA 214 regulations and SEVP policy guidance, the fact remains that a DSO's decision to terminate status should always remain up to interpretation/final ruling.

DSOs are not trained immigration lawyers or judges. Most of us are student affairs administrators, student advocates and support services primarily, DSOs secondarily. To be blunt, we don't get paid by DHS, we don't really work for DHS. We work for our schools and for our students. This is a very important dynamic and distinction. Changing the significance of the "termination date" as the moment a student begins accruing unlawful presence will shift the dynamic between college personnel and students, a change with the ability to significantly impact the level of trust students' will place in their International advising staff and offices.

This contributes to the second point I wish to make, which is –

**USCIS Processing times –**

Currently, estimated processing time of a reinstatement of status is listed as 10.5-13.5 months on the USCIS Case Status https://egov.uscis.gov/processing-times/ This is well beyond the 180 days wherein, if a student is ultimately denied, they are immediately subject to a 3 year or even 10 year bar of admission. This is unacceptable.

Life happens for these students. It occasionally means that a student finds themselves unwittingly out of legal F1 status. There are (presumably) hundreds of reinstatement cases approved each year. So, in essence, USCIS recognizes that there are cases where a student falling out of status was through unforeseen and completely acceptable circumstances, and they are in fact, entitled to be reinstated.

GC CAR000711

If this memorandum goes through as is, it will be completely unwise for any student to apply for reinstatement as it will be assuming a very expensive, very big risk. In the past, I have always advised students that there is, of course, inherent risk that they will not be granted reinstatement, but the risk is mitigated by the fact that the reward outweighs the cost of the application, the only major risk under the old policy. Now, since unlawful presence will have already begun to accrue while USCIS takes an enormous amount of time making a decision, that risk is too great.

I fear we will lose hundreds of students who otherwise may have been able to continue their studies without any issue. Now, they will simply choose not to try and instead return home, taking all of their talent and potential with them.

This memorandum reads as a clear goal to simply reduce the number of foreign students and scholars in the U.S. This hurts stakeholders from both the private and public sector, all of whom should have the opportunity to be consulted on such a significant change in policy.

**Proposal of changes** –

In conclusion, I would like to echo the following recommendations from NAFSA's official comment letter, dated May 24, 2018 –

- Leave in place the current policy, which has served for over 20 years. Neither DHS nor legacy INS ever published regulations to implement this important are of law. If the agency wishes to implement such a drastic change to longstanding common interpretation of law, it must be done through the notice and comment process.
- Exclude from the unlawful presence count any status violations that occurred under color of law, to avoid "gotcha" scenarios, where the student reasonably relied on the authorizations granted. For example, curricular practical training authorized in SEVIS that DHS later determines may have been improperly give, should not start the unlawful presence "clock" until DHS or an immigration judge makes a formal status determination.
- Apply the change of status/extension of stay tolling rules to reinstatement applications.
- Expand the sections describing examples where F, M and J nonimmigrants "do not accrue unlawful presence in certain situations"

Thank you for the opportunity to comment,


Kara Kauffman

GC CAR000712

June 11, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

    **Re:**    **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants (PM-602-1060)**

Dear Sir or Madam:

I am writing in regards to the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants (PM-602-1060)," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

Founded in 1898, Northeastern University is a global, experiential research university. Our tradition of partnership and engagement creates a distinctive approach to education and research built on the values of experiential learning, innovation, and entrepreneurship. Northeastern University is the recognized leader in experiential learning, powered by the world's most innovative cooperative-education program. We offer students opportunities for professional work, research, service, and global learning in 131 countries on seven continents. The same spirit of engagement guides a use-inspired research enterprise that is strategically aligned with three global imperatives: health, security, and sustainability. Northeastern University offers a comprehensive range of undergraduate and graduate programs leading to degrees through the doctorate in nine colleges and schools, and select advanced degrees at graduate campuses in Silicon Valley, Charlotte, Seattle and Toronto. The geographically and ethnically diverse student body is made up of more than 37,000 students, with over 18,000 undergraduate students and 14,500 graduate students. In addition, Northeastern University has over 2,800 faculty members and 2,900 staff, which together total over 5,700. Finally, Northeastern University hosts over 13,000 international undergraduate and graduate students and postdoctoral scholars from 147 different nations across the world supported by the university's Office of Global Services. Our staff's commitment ensures that our community maintains compliance through their immigration, academic, and employment experiences.

Following the release of this new policy memorandum, there have been significant discussions amongst Designated School Officials (DSOs) and Alternate Responsible Officers (AROs) both at Northeastern University and at higher education institutions across the U.S. International student and scholar advisors spend a significant amount of time advising and supporting international students and scholars on maintaining their immigration status in the U.S. This is something that the vast majority of international students and scholars deeply and sincerely want to do, and this means they need to remain aware of all immigration regulations while also balancing the

GC CAR 000713

demands all students and scholars experience along with their institution's requirements. It is for this reason that while changes in regulations can be expected, these proposed changes are especially problematic and heavily burdensome to administer by higher education institutions, including Northeastern University.

The new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not. The new policy will cause a great deal of uncertainty for international students and scholars holding F and J immigration status in the U.S.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three year, ten year or permanent bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student and exchange visitor communities.

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. for a finite period. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student, thereby leading the student to unknowingly and unintentionally violate their

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

GC CAR 000714

status.  This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, we believe this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, potentially lead to decreasing foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy.

Northeastern University respectfully urges USCIS to maintain the current unlawful presence guidance that has been in place for over 20 years and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,


Timothy E. Leshan
Vice President for Government Relations
Northeastern University


June 11, 2018

Mr. L. Francis Cissna, Director
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, DC 20529

> Re: Murthy Law Firm Comments on the USCIS Policy Change Regarding
> Unlawful Presence for F, J, and M Nonimmigrants

Dear Director Cissna:

The Murthy Law Firm writes in response to the U.S. Citizenship and Immigr ation
Service (USCIS) policy memorandum "Accrual of Unlawful Presence and F, J, and M
Nonimmigrants", dated May 10, 2018 ("the Memo"). The Memo is a troublesome, unjust,
and impractical shift in policy with unintended consequences that will negatively impact
students, their families, the U.S. educational system, and the economy. As such, it will
have far-reaching harmful effects on our country.

This Memo appears to be part of a larger shift in the atmosphere of our country. To
many Americans, it feels as if our legal and judicial systems are under assault by the
current Administration, which has directly resulted in the loss of credibility of our
government and institutions. Such a change is harmful for our country in the long term
and threatens the democracy of the greatest nation on earth – a nation, it should be
noted, which was largely built by immigrants and their descendants.

For the reasons outlined below, the Murthy Law Firm respectfully requests that the
USCIS withdraw the Memo:

### Overview of the Impact of the Memo

The proposed policy in the Memo upends more than two decades of guidance, which
made a clear distinction between the concepts of status and unlawful presence. The
current policy provides some semblance of protection to international students by
providing clear lines as to when she or he will begin to accrue unlawful presence: either
after the date of the expiration of the I-94 or upon an adverse finding by the USCIS or a
judge. Under the current policy, international students are provided with clear notice of
when they will begin to accrue unlawful presence, allowing them and their families time
to comply with the law and depart the United States in a timely manner or to pursue
other means of legal recourse. This Memo erases this protection and replaces it with an
unclear and confusing standard of determining unlawful presence.

Case 1:18-cv-00091-LCB-JEP   Document 57-2   Filed 07/03/19   Page 160 of 203

**Stated Purpose of the Memo Contradicts its Practical Application**

The Memo states one of its purposes is to "improve how USCIS implements the unlawful presence ground of inadmissibility under INA 212(a)(9)(B) and INA 212(a)(9)(C)(i)(I)." It is unclear, however, how altering the current unambiguous policy could aid in the implementation of the bars to admission. Rather, the change in policy proposed in the Memo appears likely to cause great confusion to foreign nationals, Designated School Officials ("DSO"), and U.S. Customs and Border Protection ("CBP") Inspectors at ports of entry. In fact, pursuant to the Memo, the CBP Inspectors may incorrectly refuse admission for a larger number of international students and exchange visitors and their families. The Memo is written in such a way that it creates the potential for international students to be subject to harsh penalties through simple mistakes that go unnoticed, both by DSOs and the students, and not due to their conscious action. It seeks to blur a once bright line rule and aims to do so for only a targeted class of nonimmigrants, namely international students, who provide billions of dollars in revenue to the U.S. educational system and help our economy with their investment in our fine universities.

**Lack of Clarity of Violation of Status**

More specifically, this policy would create a separate class of foreign nationals, namely those in F, J, M status and their dependents, who would begin to accrue unlawful presence immediately upon any violation of status, no matter how minor the infraction. Such a departure from previous policy is particularly concerning during such a turbulent time in immigration law, especially for student visa holders who appear to be subject to much of the government's increased scrutiny. International students are expected to keep up with complicated and nuanced legal concepts, some of which even experienced attorneys struggle to grasp. This is compounded by the fact USCIS has abruptly changed its policy with little to no notice, by, for example, making unannounced website updates and enforcing them as law, such as the 2018 change in STEM OPT extensions being retroactively applied against international students working with consulting companies.

**Unintentional Oversight Could Result in 3 or 10 Year Bars**

It appears USCIS has failed to consider just how this policy will function within the already established law. For example, INA §222(g) automatically voids a nonimmigrant's visa when he or she "remained in the United States beyond the period of stay authorized by the Attorney General." F, M, and J nonimmigrants are admitted to the United States for Duration of Status ("D/S") and therefore do not have an end date on their I-94s. The language of the statute clearly applies in the instance of traditional visa admittance, and can be unambiguously applied under the currently policy. The language of the statute, however, does not account for those admitted for D/S. It is unclear, then, how this provision of the Act will now apply, if at all, to F, M, and J nonimmigrants who begin to accrue unlawful presence. Furthermore, it is unclear whether the U.S. Department of State ("DOS") and CBP could find that the foreign national violated his or her status during the previous stay and therefore decide to enforce this provision.

Perhaps most troubling, this Memo throws all concept of fairness and equity out the window and fails to consider the harsh impact this policy shift would cause. The Memo gives foreign nationals no notice of their unlawful presence. A student could, for example, violate his or her status and continue to study for months without knowledge of

the misunderstanding or mistake. That mistake may not be discovered until USCIS makes a finding during the adjudication of a separate application or petition, potentially years later. At that time, if the foreign national's status violation was six months prior, she has unknowingly subjected herself to a 3-year or 10-year bar to admission to the United States.

## USCIS's Own Adjudication Delays Compound Harmful Consequences

The negative impact on students is further exacerbated by the government's own significant processing times. Students, for example, who apply for reinstatement of their F-1 status, often have to wait in excess of 6 months for a decision. Under the new policy, if the reinstatement is ultimately denied, the student will have accrued unlawful presence for the entirety of the pendency of the application, and will therefore be subject to the 3-year or 10-year bar to admission. Students will be faced with the impossible decision of abandoning their educational aspirations and the loss of tens of thousands of dollars and time already invested in the university or risk subjecting themselves to harsh penalties, should their cases be denied.

## Students Rely on DSOs for Proper Advice and Action

The Memo and updated AFM sections do not account for international students' wholehearted reliance on school and government officials. Students often rely heavily on the advice and guidance of DSOs at universities (who are deputed by ICE to understand and advise students). The students understandably believe that the DSO has correctly granted F-1 benefits, such as Curricular Practical Training ("CPT") authorization and Optional Practical Training ("OPT") recommendation. Under the Memo, nonimmigrants who reasonably rely upon the guidance of a DSO who improperly or incorrectly grants any such benefits will immediately, and without notice, be subject to the harsh consequences of unlawful presence, which may not be brought to their attention until months or even years later.

## Harsh Impact on Innocent Family Members

The Memo will also lead to harsh effects for dependents in F-2, M-2, and J-2 status. Under the proposed policy, dependents begin to accrue unlawful presence as soon as the principal nonimmigrant violates their status. As a result, dependents would begin to accrue unlawful presence without any notice and through absolutely no action (or inaction) on their part, which violates the principles of fundamental due process provided under the U.S. Constitution and our system of fairness and justice.

## Devastating Impact of the Loss of International Students

This Memo is likely to directly lead many potential international students to study in other countries that are more welcoming of their financial investment and talent. These other countries' gain will certainly be the United States' loss. These international students contribute not only economically but also invest their intellectual capital to enrich the country where they have chosen to study. For example, in 2016 "all 6 American winners of the Nobel Prize in economics and scientific fields were immigrants to the United

States."[1] A study of the number of immigrants awarded the Nobel Prize between 1901 and 2017 found that immigrants had won 33 out of 85 of the Nobel Prizes won by Americans in the Medicine, Physics, and Chemistry.[2]

Similarly, many international students who study in the United States and return home become leaders in their respective countries. Their appreciation and understanding of the United States' way of life, culture, and values permeates their institutions. This in turn creates global goodwill, the importance of which cannot be understated. Simply put, we cannot afford to create a demoralizing climate for international students.

## Summary Recommendations Proposed by the Murthy Law Firm

Due to the myriad concerns outlined above, the Murthy Law Firm recommends the following with regards to the proposed Memo:

1. USCIS should withdraw the Memo in its entirety and reassess how it can better accomplish its stated goals of reducing the number of visa overstays and implement the unlawful presence ground of inadmissibility.

2. Alternatively, could consider eliminating D/S for F, J, or M students and replace it with a date certain on their I-94s so as to simplify and track expiration dates.

3. USCIS should implement exceptions to the policy in instances where an international student reasonably relied on the actions and decisions of trusted officials authorized to represent the government and ICE, such as DSOs.

4. USCIS should update the policy to allow for tolling of unlawful presence when an international student has a pending reinstatement, change of status, or other application or petition.

We thank you for the opportunity to provide our input and trust and expect that you will consider the far-reaching impact of the Memo and take the necessary action to mitigate the harsh consequences of such a complete shift in policy.

Respectfully submitted,

Sheela Murthy
President & CEO

Allison A. Terry
Attorney

---

[1] https://www.forbes.com/sites/stuartanderson/2017/10/08/immigrants-keep-winning-nobel-prizes/#7e46e7dc117b.
[2] National Foundation for American Policy, *Immigrants and Nobel Prizes: 1901- 2017* at 1, *available at* http://nfap.com/wp-content/uploads/2017/10/Immigrants-and-Nobel-Prizes-1901-to-2017.NFAP-Policy-Brief.October-20171.pdf

GC CAR 000719



June 11, 2018

Mr. L. Francis Cissna
Director
U.S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, D.C. 20529

Dear Director Cissna,

FWD.us is writing in response to the May 11th publication by U.S. Citizenship and Immigration Services (USCIS) entitled "Accrual of Unlawful Presence and F, J, and M Nonimmigrants."

FWD.us is a bipartisan organization started by key leaders in the tech and business community to promote policies to keep the United States competitive in a global economy, starting with commonsense immigration reform and criminal justice reform.

We would like to begin by referencing and expressing our support of the joint comment filed by a host of higher education associations including the Association of Public and Land-grant Universities, the American Council on Education, and the American Association of Universities. We would also like to acknowledge our support of comments filed by NAFSA: Association of International Educators, and the Presidents' Alliance on Higher Education and Immigration. FWD.us urges USCIS to seriously consider the concerns of the higher education community before adopting this new policy.

It is critical to note that because USCIS only provided one month for public review and comment of its sudden change of its long standing interpretation of the accrual of unlawful presence for F, J, and M visa holders, our organization has not been able to fully assess its impact. In this comment however, we put forward our strong concerns about the adverse impact this policy will have on employers, negative long-term ramifications to innovation and business in the United States, and about the unlikelihood that this proposed policy would meaningfully increase compliance with immigration law.

By changing the way in which unlawful presence is counted for F, J, and M nonimmigrants, USCIS is running the risk that years after an F, J, or M nonimmigrant student graduates from a U.S. college or university and becomes employed at an American company under a different visa category, they could be cited as having violated their terms of status back when they were a student, leading them to be prosecuted and removed from the country. When this occurs, it is sure to create uncertainty amongst American businesses seeking to hire the most qualified

GC CAR000720

candidates--who may happen to be international students--and could lead to a rapid decline in the employment of F, J, and M students at American companies, likely also resulting in a reduction of international students attempting to enroll at U.S. colleges and universities. Fewer international students coming through our higher education system would hurt our universities and longer term economic growth. Consequently, in the wake of such a decline in international student post-graduate employment, we would be sending U.S. college and university-educated F, J, and M students back abroad to compete against employers based in the United States. A scenario in which companies in the United States backed away from hiring the best and brightest international students, would quickly reduce one of our most robust talent pipelines and stifle economic growth in our country.

International students currently make up 41 percent of masters and 45 percent of PhDs at U.S. universities, and studies have shown that every foreign-born student who graduates from a U.S. university with an advanced degree and stays to work in STEM creates 2.62 jobs for American workers.

Aside from the fact that this new policy would be administratively challenging to enforce, it would fail to provide necessary notice to F, J, M nonimmigrants and their prospective employers and create unimaginable confusion for all. For decades, USCIS and its predecessor, legacy Immigration and Naturalization Services, have not considered unlawful presence to begin accruing until after notice is provided to an individual in violation of immigration status by way of USCIS adjudicating a filing for an immigration benefit or an immigration judge finding such a violation. F, J, and M nonimmigrants have been given notice that they would be accruing unlawful presence, and thus could be barred from re-entering the U.S. or adjusting their status if they remained in the United States for 180 or more days. If they discovered their violation, they could try to remedy it before it was too late. Under USCIS' proposed new policy outlined in its May 11, 2018 memo however, F, J, and M nonimmigrants would instead begin to accrue unlawful presence the moment their violation occurs, regardless of their knowledge of such violation, thus stripping away certainty in determining when unlawful presence begins to accrue. Similarly, prospective employers seeking to employ F-1 students have less certainty of whether, after paying the required fees to file a petition sponsoring a temporary worker and undergoing the lengthy process, they will ultimately be able to onboard the employee.

High skilled immigrants, like those who arrive to the United States on F, J, or M visas, grow our economy, create American jobs, and boost wages for native-born workers. In particular, they help to fill a critical skills gap in the current U.S. workforce. The shortage of talented science, technology, engineering and mathematics (STEM) workers presents a serious challenge to companies looking to grow and fill jobs and to continue driving America's global leadership in innovation. International students have filled many of those roles. Without STEM-educated and skilled immigrant workers participating in the United States job market, it's liable to harm  our economic growth and reduce  our gross domestic product. Rather than making it even more difficult for F, J, and M visa-holding students to comply with an already overwhelmingly byzantine set of immigration laws, we should be reforming the system to make it easier for

GC CAR000721

students we have invested in through our higher education system to stay here, pay taxes, create jobs, and grow our economy.

In addition to the extreme likelihood that this proposed policy would handicap U.S. innovation, it is also dubious that it would do much to actually increase compliance with immigration laws. At best, this policy would be duplicative of penalties already codified into law through the Immigration and Nationality Act and the Illegal Immigration Reform and Immigrant Responsibility Act to hold individuals accountable who are in the country unlawfully or fail to maintain their status. These violations already can result in three and ten year bars for admission to the United States or loss of eligibility for lawful permanent resident status. At worst, this policy would result in punishing F, J, and M visa holders who unwittingly violated their status because of poor counseling by their institutions or through attempting to navigate our overly complicated immigration system. By excessively limiting the opportunities for nonimmigrant students to comply with the spirit of the law and remain lawfully in status, the United States will eliminate the ability of qualified individuals to contribute to our country and grow our economy.

FWD.us remains concerned about the implementation of this policy that would change the way unlawful presence is counted for F, J, and M nonimmigrants. It is evident that this policy would adversely impact our tech and business sectors and stymie economic growth. In addition, there is little evidence that it would improve compliance with our immigration laws. USCIS' proposed policy change reflects a growing attack on legal immigration that undermines the U.S.' global standing, threatens our economic leadership, and fundamentally contradicts our nation's heritage as a country that welcomes immigrants from every corner of the globe. We join our colleagues in asking that USCIS refrain from implementing this proposed policy on August 9 before the economic and legal implications can be more carefully considered.

Sincerely,

Todd Schulte
President, FWD.us

GC CAR000722

6/12/2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

    **Re:**    **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

I am writing to express my opposition and concerns regarding the new policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted by U.S. Citizenship and Immigration Services (USCIS) on May 11, 2018.

Briefly stated, the new memorandum will reverse more than 20 years of USCIS practice regarding the accrual of "unlawful presence," a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA) by reference to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. The USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] This longstanding policy provides certainty in determining when unlawful presence begins to accrue, which the new policy does not.

As described in the May 11, 2018 memorandum, USCIS will now deem unlawful presence to have started accruing as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities.

---

[1] **See** USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), **available at** http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension. What the new memorandum fails to recognize is that the question as to whether an individual has violated their nonimmigrant status is complex and nuanced. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

USCIS states that the purpose of the new guidance is to "reduce the number of overstays" and "to improve how USCIS implements the unlawful presence ground of inadmissibility." Unfortunately, this approach accomplishes neither of these goals and will instead unfairly punish a potentially significant portion of the student and exchange visitor population, further erode foreign student enrollments at U.S. colleges and universities, and unnecessarily damage the U.S. economy. I urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades and ensures that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

My biggest concern is the retrospective effect of this new interpretation. Based upon the historic interpretation, many aliens have been planning immigration strategies for years at considerable expense to legitimize their unlawful status in reliance on the historic interpretation. If this interpretation is to be implemented, it should only apply to F-1 students and other D/S people who are in breach of their status after this policy change. It should not apply to people who have placed reliance on the long-standing interpretation, and to rely on the old interpretation to consular process and avoid incurring the three and ten-year bars. In other words, there should be no retrospective enforcement of this new interpretation.

Sincerely,

PAUL SHANE



NEWTON MA

# world relief®

## BALTIMORE

STAND/FOR THE VULNERABLE™
Baltimore Immigration Legal Clinic

███████████
T ██████████ | F ██████████
worldrelief.net/BaltimoreClinic

June 10, 2018

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

Dear Director Cissna:

World Relief Immigration Programs would like to comment on the U.S. Citizenship and Immigration Services (USCIS) policy memorandum posted on May 11, 2018, entitled "Accrual of Unlawful Presence and F, J, and M Nonimmigrants."

Our objection to this memorandum is two-fold: first, the new policy is fundamentally unfair to international students and exchange visitors already in the United States and second, it would **not** "reduce the number of overstays" or "improve the implementation of the 'unlawful presence' grounds" as it purports to do. Thus, our organization requests either that the memo be withdrawn or its implementation be delayed for twelve months, such that: (i) the implementation of the new policy may be coordinated with the Department of State and other DHS sub-units such as CBP and SEVP and (ii) those members of the international student education field and the visa holders themselves may have sufficient time to inform themselves about this complicated area of immigration law.

The new memorandum is a sudden change to the immigration policy establishing that F, J and M status holders admitted for duration of status begin accruing 'unlawful presence'[1] only if a formal finding is made that they have violated their immigration status. This long held interpretation ensured that visa holders were aware that they were accruing unlawful presence and could take action to prevent the devastating consequences for departure after unlawful presence[2]. The proposed policy states that 'unlawful presence' begins to accrue on the date a visa violation occurs, thereby eliminating an important procedural protection which provides notice to the visa holder that he or she may suffer INA 212(a)(9)(B) penalties after departing the country.

Implementation of this memo will levy disproportionate punishment against the F, J and M visa holders and their dependents already in the country who have relied on the current 'unlawful presence' policy. It

---

[1] INA § 212(a)(9)(B)(ii) defines 'unlawful presence' as those individuals "present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled."

[2] INA § 212(a)(9)(B)(i) establishes a three and ten year bar to reentry for a departure from the United States after more than 180 and 365 days of unlawful presence, respectively

will lead to unjust outcomes immediately and in the future. After August 9, 2018, innocent mistakes that have already been made by such visa holders or administrative errors committed by University personnel could trigger accrual of unlawful presence and thus result in disastrous consequences for the visa holder and their families. Below are several examples of unreasonable consequences of this potential policy:

- An F-1 student who was involved in creating a dorm room business startup with her roommates, without authorization from her Designated School Official (DSO), could be considered as having violated her status. Under the new policy, that innovative student may have unwittingly foreclosed the opportunity of returning to the U.S. by obtaining an H-1B visa abroad after graduating.

- An academic exchange visitor who registered for less than the 12 required credits, due to a serious illness or an accident, would have a status violation because of circumstances outside of his control, through no fault of the visa holder.

- Also, a J-1 student who was erroneously advised by the DSO that she could take an additional course outside of the curriculum of her approved exchange program would have a visa violation because of the mistake of the DSO, not the visa holder.

- Additionally, the student who submits a reinstatement application, to cure a violation of status due to enrollment in insufficient credits in the prior semester, will not have a decision on the reinstatement application for at least six months, and if denied, will already be subject to the unlawful presence bars after any subsequent departure.

These situations of unintentional violation of status could have disastrous consequences without having provided adequate notice in advance about the proposed change in policy and its resulting consequences.

Furthermore, the proposed policy changes are not rationally related to the objectives laid out in the memorandum. First, the changes will **not** reduce the number of visa overstays. This was one of the motivations behind the passage of IIRIRA in 1996, wherein the unlawful presence bars became effective on April 1, 1997. However, the creation of these bars had the opposite effect, in that it encouraged those without valid status to stay in the U.S. rather than returning to their home countries in order to avoid triggering the unlawful presence bars. Similarly, the visa holders and their families who have been in the U.S. lawfully for years, but who inadvertently violate their status after the August 9 effective date, will most likely choose to stay in the U.S. rather than trigger the unlawful presence bars by a departure, unless they qualify for an inadmissibility waiver. Lastly, the memo specifically subjects F, J and M visa holders to the unlawful presence grounds, but other visa classes that are also admitted for duration of status such as Investor (I) and Diplomatic (A1-2 or G1-4) visas are unaffected by the policy change. There is no discernible explanation in the memorandum as to why investors and diplomatic visitors will not also be subject to the unlawful presence grounds of inadmissibility upon violation of their status.

The policy change will **not** "improve the implementation of the unlawful presence grounds of INA 212(a)(9)(B) & (C)," and indeed, that does not appear to be the intent of the policy drafters. The memorandum's reference to President Trump's Executive Order 13768 solidifies the notion that the intent of this policy is to simply increase the inadmissibility grounds to which F, J and M status holders are subject and thus punitively prevent more of them from being able to obtain status in the future. They are simply changing established policies in order to facilitate the removal of more F, J and M visa holders and discourage potential international students, scholars and researchers from applying for these kinds of visas.

GC CAR 000726

The unlawful presence bars are some of the most draconian provisions of the U.S. immigration system and it is clear in the statutory language that the authors of those provisions intended for the bars to apply to only those individuals who have **notice** that they are in the United States in violation of the law, i.e. those who enter the country illegally, those whose I-94s have expired or those who've been officially notified of a violation by USCIS or an Immigration Judge.

Therefore, this policy change should either be withdrawn from consideration or the implementation should be delayed for one year. This should be the case because it will take at least that amount of time for the international student community, and the institutional personnel who advise them, to fully digest and understand the convoluted and nuanced subject of unlawful presence. This academic community must know the subject thoroughly, not only to prevent the nightmare scenario in which incorrect advice leads to an unintentional status violation, but also to inform potential F, J and M students wanting to study here in the future. Knowledge of this subject must be deep and widespread in order for the policy change to actually deter visa overstays as the policy drafters intended. In addition, this delay would allow the aforementioned State Department and DHS sub-agencies to formulate their own implementation policies and/or make improvements to their information systems that align with the present memorandum. Allowing these other agencies to coordinate with USCIS in implementing the memo, as well as fix errors in their information systems would prevent some of the most glaring mistakes where the unlawful presence bars are unfairly applied to innocent visa holders whose present (and future) status is jeopardized solely due to irregularities in their student records, or other administrative mistakes outside of their control.

Thank you for the opportunity to comment.


Sincerely,


Courtney Tudi, Esq.
Director of National Immigration Programs
720-549-4844
█████ @ █████



# AFL-CIO

### AMERICA'S UNIONS

**American Federation
of Labor and
Congress of Industrial
Organizations**

aflcio.org

**EXECUTIVE COUNCIL**

**RICHARD L. TRUMKA**
PRESIDENT

**ELIZABETH H. SHULER**
SECRETARY-TREASURER

**TEFERE A. GEBRE**
EXECUTIVE VICE PRESIDENT

Michael Sacco
Robert A. Scardelletti
Harold Schaitberger
Clyde Rivers
Cecil Roberts
Leo W. Gerard
Gregory J. Junemann
Fred Redmond
Matthew Loeb
Randi Weingarten
Fredric V. Rolando
Newton B. Jones
D. Michael Langford
Baldemar Velasquez
James Boland
Bruce R. Smith
Lee A. Saunders
Terry O'Sullivan
Lawrence J. Hanley
Lorretta Johnson
James Callahan
DeMaurice Smith
Sean McGarvey
J. David Cox Sr.
David Durkee
D. Taylor
Kenneth Rigmaiden
Stuart Appelbaum
Harold Daggett
Bhairavi Desai
Paul Rinaldi
Mark Dimondstein
Dennis D. Williams
Cindy Estrada
Capt. Timothy Canoll
Sara Nelson
Lori Pelletier
Marc Perrone
Jorge Ramirez
Eric Dean
Joseph Sellers Jr.
Christopher Shelton
Lonnie R. Stephenson
Richard Lanigan
Robert Martinez
Gabrielle Carteris
Mark McManus
Elissa McBride
John Samuelsen
George E. McCubbin III
Vonda McDaniel
Gwen Mills
Charles Wowkanech
Bonnie Castillo

June 11, 2018

Mr. L. Francis Cissna
Director
U. S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, DC 20529

RE: U.S. Citizenship and Immigration Services policy memorandum of May 10, 2018, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants."

Dear Director Cissna:

As unions, workers' organizations and advocates representing millions of working men and women of all immigration status – including many who work in this country on J, F and other nonimmigrant visas – the AFL-CIO and the undersigned strive to ensure that all who labor in this country receive decent pay, good benefits, safe working conditions, and fair treatment.

We write to convey serious concerns about the proposed changes to the unlawful presence determination process. Although we recognize that nonimmigrants must be in compliance with the law and that visa overstays are a concern, we do not believe that the measures proposed in this memo will be a fair or effective means to address the problem.

The memo creates a subjective and retroactive process with dire potential consequences for international students, researchers, and working men and women in a wide range of industries. The proposed change is likely to lead to wrongful determinations that unfairly trigger bars to re-entry to the United States. The fear of being denied entry, losing eligibility for a visa and other benefits as a result of an unappealable status determination will also have a chilling effect on the ability of these individuals to exercise their civil and workplace rights. This in turn also affects the ability of U.S. citizen co-workers to exercise their own civil and workplace rights, making our workplaces less safe and our country a less desirable place to study and work.

We urge you not to implement this memo and instead to ensure that nonimmigrant students, exchange visitors and workers receive clear notice and full due process before any accrual of unlawful presence.

**The proposed revision erodes due process and places an undue burden on visa holders.**

To reduce the number of nonimmigrants who violate immigration status or stay beyond the legally allowable period, USCIS must articulate the appropriate role of the sub-agencies of the Department of Homeland Security (DHS) and other federal agencies in ensuring that visa holders have adequate information and notice. There is no indication that USCIS has coordinated implementation of this extreme policy shift with other government stakeholders, including the Department of State (including the Visa Office and the Bureau of Education and Cultural Affairs' Exchange Visitor Program), and other divisions of DHS, such as Immigration and Customs Enforcement (ICE), the Student and Exchange Visitor Program (SEVP), and Customs and Border Protection.

Visa holders who may not be aware of a violation of status will now be considered guilty not only of the original infraction, but also of overstaying their visa in the period since that infraction. While it is clearly the responsibility of nonimmigrant visa holders to remain in compliance with the law, it is crucial that they receive complete and detailed information concerning the rules that govern their stay in the United States and have the right to fair notice, a hearing and the right to appeal.

In the proposed policy, however, due process will be extremely limited. For example, virtually all students whose Student and Exchange Visitor Information System (SEVIS) reinstatement applications are denied would find themselves subject to at least the 3-year bar, merely because USCIS takes so long to adjudicate applications for reinstatement. In addition, a student or exchange visitor might not even know that he or she was in violation of status until DHS issues a formal determination. If the unlawful presence "clock" is seen to start at some distant time in the past in such cases, any window for departing the country will have passed.

**The proposed change threatens to chill the exercise of civil and workplace rights.**

It is well-documented that workers who are in the United States working pursuant to nonimmigrant work visas, including J-1 visa holders, are frequently exploited during the recruitment process and in their U.S. jobs. These abuses abound in part because the very structure of the program places workers at the mercy of a single employer for both their job and continued presence in the U.S. When a job is abusive, guest workers often cannot leave without facing severe immigration consequences, including loss of status and deportation. As a result, many visa holders choose to endure the abuse, creating a dynamic that lowers standards and working conditions for all workers. The proposed guidance significantly increases the severity of the immigration consequences that workers looking to escape an abusive employer will face. As a result, workers will be even less likely to escape abusive employers and those employers will be able to break the law with impunity.

GC CAR 000729

A number of prominent recent cases from around the country make clear that universities, like other employers, often threaten immigration enforcement consequences when workers engage in concerted activity protected under federal labor law. For example, at Washington University in St. Louis, the employer told graduate students attempting to exercise their federal labor rights that F-1 visa students would immediately lose their status in case of a lawful strike. *See The Washington University in St. Louis*, Case 14-CA-202172, National Labor Relations Board Office of the General Counsel Advice Memorandum, dated Oct. 31, 2017, available at https://apps.nlrb.gov/link/document.aspx/09031d45826e5ffd. Likewise, at Pennsylvania State University, graduate students alleged that the university had threatened that students on international visas could be affected in case of a strike. Juliana Feliciano Reyes, "Union organizers say Penn State is trying to scare foreign grad students with ICE - and it's working," Philadelphia Inquirer, April 13, 2018, available at http://www.philly.com/philly/education/penn-state-graduate-union-international-student-visa-ice-20180413.html?mobi=true.

Such threats by employers of nonimmigrant visa holders will be significantly more forceful should this memorandum be implemented because employers will be incentivized to hold out the possibility that employees who participate in strikes or other protected collective activity will risk not only a loss of status but also the accrual of unlawful presence and its attendant consequences. It will be very difficult for nonimmigrant visa holders to evaluate the accuracy of such threats.

If nonimmigrant visa holders have reasonable basis to fear that their status and ability to remain in and return to the country may be retroactively denied, this will cause a chilling effect on collective activity that undermines the rights of nonimmigrant visa holders and all workers, regardless of their immigration status. *See, e.g., Labriola Baking Co.*, 361 NLRB No. 41, at *2 (Sept. 8, 2014) (noting that "threats touching on employees' immigration status warrant careful scrutiny" because "they are among the most likely to instill fear among employees.").

As such, this proposal will allow employers to drive down standards and encourage retaliation against people who blow the whistle on workplace crimes, making our workplaces less safe and our country a less desirable place to study and work. It is yet another policy that will encourage international students, scholars, and workers to take their talents elsewhere.

**The proposed change will put well-intentioned students and workers at a risk of severe penalties for accidental or unwitting violations of status.**

The memo is an abrupt departure from more than 20 years of policy guidance. The current policy has held up for decades because it provides bright-line dates established in government systems, which give adequate notice to nonimmigrant students, exchange visitors and workers, as well as their schools and exchange programs.

For example, if an individual stays beyond the expiration date on a Form I-94, he or she begins to accumulate days of unlawful presence. However, many status violations, such as those related to SEVIS and nonimmigrant visa renewals, do not present such a bright line, which is why a clear government determination is needed. A formal finding of a status violation made in the course of a DHS benefits determination or by an immigration judge serves as a fair and clear warning to an individual that the clock is ticking, and he or she must take action to leave the United States or otherwise cure the status deficiency. Without definitive notice, the complexity of our system makes unwitting violations likely.

Various documents and the data contained in databases serve as indicators of nonimmigrant status. If all documents and electronic records are consistent, their reliability as indicators is high. However, these documents and records reflect only a snapshot in time and are subject to both machine and human error.

A failure to account for inconsistency among immigration documents, electronic records, and real world developments could easily lead to an adverse determination on status or benefit eligibility. Whether the data in documents and electronic records is being interpreted correctly, taking into account all applicable law and policy, is also a primary concern.

Immigration law is complicated, and both compliance and enforcement are technical matters that require training and expertise. Because of this complexity, an individual on an F, J, or M visa often does not even know he or she is "out of status" until informed by the government.

**We oppose the changes proposed in this guidance, and urge USCIS to maintain a fair process of notification and review before unlawful status can begin to accrue.**

Thank you for the opportunity to comment.

Sincerely,

AFL-CIO
American Association of University Professors
American Federation of Teachers
Centro de los derechos del Migrante, Inc.
Communication Workers of America
Freedom Network USA
National Education Association
Service Employees International
Southern Poverty Law Center
United Automobile, Aerospace and Agricultural Implement Workers
United Food and Commercial Workers
United Steelworkers

GC CAR 000731




June 11, 2018

Department of Homeland Security
U.S. Citizenship and Immigration Services
Office of the Director
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

**Submitted via email**: publicengagementfeedback@uscis.dhs.gov

> **Re:** **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Madam or Sir:

The American Immigration Lawyers Association (AILA) and the American Immigration Council (Immigration Council) respectfully submit the following comments in response to the USCIS Memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," posted on the USCIS website on May 11, 2017.[1]

Established in 1946, AILA is a voluntary bar association of more than 15,000 attorneys and law professors practicing, researching and teaching in the field of immigration and nationality law. Our mission includes the advancement of the law pertaining to immigration and nationality and the facilitation of justice in the field. AILA members regularly advise and represent businesses, U.S. citizens, U.S. lawful permanent residents, and foreign nationals regarding the application and interpretation of U.S. immigration laws.

The American Immigration Council is a non-profit organization established to increase public understanding of immigration law and policy, advocate for the fair and just administration of our immigration laws, protect the legal rights of noncitizens, and educate the public about the enduring contributions of America's immigrants. In addition, through its work on the economic benefits of immigration reform, the Immigration Council has helped to establish baseline standards for understanding the important role immigration plays in shaping and driving a twenty-first century American economy.

## A. Background and Overview of Historical Interpretation of Unlawful Presence

"Unlawful presence" is a legal term defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA). The term refers to an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." Under INA §212(a)(9)(B), a person who has been unlawfully

---

[1] PM 602-1060, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," (May 10, 2018) *available at* https://www.uscis.gov/sites/default/files/USCIS/Outreach/Draft%20Memorandum%20for%20Comment/AccrualofUnlawfulPresenceFJMNonimmigrantsMEMO_v2.pdf

1

GC CAR000732

present for more than 180 days but less than one year and who departs the United States is barred from returning for three years. A person who departs after having been unlawfully present for more than one year is barred for ten years. Created by Congress with the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), the unlawful presence provisions took effect on April 1, 1997.[2]

In recognition of the fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a date-certain. Instead, they are admitted for "duration of status," or "D/S," which means the student or exchange visitor can remain in the United States as long as he or she maintains nonimmigrant status. This generally means the individual must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension.

Because international students are not admitted until a date-certain, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice of a status violation to individuals admitted for "D/S" before the unlawful presence clock will start. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge. Beginning in 1997, this interpretation was commemorated in a series of USCIS guidance documents and was most recently reiterated in the May 6, 2009 "Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act."[3] The 2009 guidance emphasizes that "the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[4] Further, Chapter 40.9.2(a)(2) of the Adjudicator's Field Manual (AFM) makes it clear that "to understand the operation of sections 212(a)(9)(B) and 212(a)(9)(C)(i)(l) of the Act, it is important to comprehend the difference between being in an unlawful immigration status and the accrual of unlawful presence…. Although these concepts are related … they are not the same."

**B. Summary of USCIS's New Interpretation of Unlawful Presence**

As described in the May 11, 2018 memorandum (hereinafter "2018 memorandum" or "memo"), USCIS will now deem unlawful presence to have started accruing for F, M, and J nonimmigrants as of the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. For status violations found to have occurred on or before August 9, 2018, the effective date of the memo, unlawful presence will be calculated beginning August 10, 2018, if not accrued earlier.

When assessing whether a status violation has occurred, the memo states that adjudicators are to consider: (1) information contained in systems available to USCIS; (2) information contained in the individual's "A file;" and (3) information obtained through a Request for Evidence (RFE) or Notice of Intent to Deny (NOID). Moreover, the memo states that while the status of the spouse and children of an F, J, or M nonimmigrant is contingent on the status of the principal nonimmigrant, the period of stay authorized for a dependent spouse or child may also end due to their own conduct or circumstances.

---

[2] Div. C of Pub. Law No. 104-208 (Sept. 30, 1996).
[3] *See* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.
[4] *Id*. at 25.

2

GC CAR000733

After more than 20 years of consistent interpretation that recognizes the principle of fundamental fairness and provides certainty in determining when unlawful presence begins to accrue, USCIS is abruptly changing course and conflating the two distinct legal concepts of "status violation" and "unlawful presence." There is no doubt that this new approach to interpreting unlawful presence will have a significant negative impact on the student, vocational, and exchange visitor communities, and will further erode foreign student enrollments in U.S. colleges and universities. Moreover, for the reasons described below, we submit that the 2018 memorandum is an unlawful interpretation of the statutory unlawful presence provisions and cannot stand.

## C.   The 2018 Memorandum Conflicts with the Unlawful Presence Statute, which is Clear on its Face

The 2018 memorandum conflicts with the unambiguous language of the INA. In 1996, Congress created the new concept of unlawful presence, clearly stating that a person is "unlawfully present" if he or she "is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled."[5] Thus, equating unlawful presence with a status violation is contrary to Congress' clearly expressed intent. Moreover, principles of statutory construction confirm that Congress never intended such an interpretation, as the new unlawful presence provisions were incorporated into the INA without any modification to the numerous provisions that penalize a person for a "status violation" or "failure to maintain status." For example:

- **INA §212(a)(6)(G)**: Renders a noncitizen who "violates a term or condition" of an F-1 student visa inadmissible until the noncitizen has been outside of the United States for a continuous period of five years after the violation.

- **INA §237(a)(1)(C)(i)**: Renders a noncitizen deportable if he or she has "failed to maintain the nonimmigrant status in which [he or she] was admitted ... or to comply with the conditions of any such status."

- **INA §245(c)(2)**: Renders a noncitizen ineligible for §245 adjustment of status if the noncitizen engages in unauthorized employment, "is in unlawful immigration status," or "has failed ... to maintain continuously a lawful status since entry into the United States."

- **INA §245(c)(7)**: Renders a noncitizen ineligible for §203(b) adjustment of status who is "not in a lawful nonimmigrant status."

- **INA §245(c)(8)**: Renders a noncitizen ineligible for §245 adjustment of status who "has otherwise violated the terms of a nonimmigrant visa."

- **INA §245(k)**: Includes, as part of its eligibility requirements, that an individual not "fail[] to maintain, continuously, a lawful status."

Other statutory provisions confirm that Congress intended the two concepts to remain distinct. For example, adjustment of status under INA §245A(a)(2) requires: (1) entry before January 1, 1982; (2) continuous residence in unlawful status since such date; and (3) that the period of authorized stay expired before January 1, 1982, or that the government knew of the unlawful status. The third prong makes it clear that expiration of a period of authorized stay and "unlawful status" of which the

---

[5] INA §212(a)(9)(B)(ii).

**AILA Doc. No. 18061135. (Posted 6/11/18)**    GC CAR000734

government is aware are different concepts. Otherwise, adopting an interpretation in line with the 2018 memorandum, individuals who violated the terms of their status would automatically be deemed outside the "period of authorized stay" and the purposeful distinction noted in prong (3) would be irrelevant.[6]

In addition, the unlawful presence statute itself distinguishes between "unlawful presence" and "status" in INA §212(a)(9)(B)(iv)(II). That section states that the accrual of unlawful presence is tolled for an individual who "has filed a nonfrivolous application for a change or extension of *status* before the date of expiration of the period of stay authorized by the Attorney General …." (Emphasis added). By using the terms "status" and "unlawful presence" in this way, Congress evinced that these are separate legal concepts with distinct legal consequences.

As explained by the Supreme Court, "it is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning."[7] "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."[8] Any interpretation of "unlawful presence" or "expiration of the period of authorized stay" that is conflated with a "status violation" or "failure to maintain status" would render sections of the INA superfluous.

When it intends to penalize a failure to maintain status or status violation, Congress has made that intention clear by the plain language of the statute. Section 212(a)(9)(B) of the INA makes no reference to these terms or concepts. Where "one interpretation of a statute or regulation obviously could have been conveyed more clearly with different phrasing, the fact that the authors eschewed that phrasing suggests ... that they in fact intended a different interpretation."[9] Therefore, the 2018 memorandum, which folds the concept of a status violation into the definition of unlawful presence, is contrary to the plain language of the statute and the unambiguous intention of Congress in its adoption of INA §212(a)(9)(B).

### D. Assuming without Conceding that the Statute is Ambiguous, the Memorandum Is Not Entitled to Deference

Because there is no ambiguity in the statute, the law is applied as written and the 2018 memorandum receives no deference under *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*[10] Assuming only for argument's sake that an ambiguity exists, the guidance – which was not issued through the formal rulemaking process – would at most be afforded deference under *Skidmore v. Swift & Co*. but here too, that fails.[11] Deference under *Skidmore* depends on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."[12] Based on flawed and inconsistent reasoning, the 2018 memorandum reverses the agency's long-standing interpretation of unlawful presence without adequate justification, is not designed to achieve its stated goals, and cannot stand.

---

[6] *See also* 8 USC §1365(b)(2), which similarly distinguishes between the expiration of a period of authorized stay and unlawful status known to the government.
[7] *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 571 (2012) (internal citations omitted).
[8] *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal citations omitted).
[9] *Gerbier v. Holmes*, 280 F.3d 297, 309 (3d Cir. 2002) (quoting *United States v. Ibarra-Galindo*, 206 F.3d 1337, 1339 (9th Cir. 2000) (overruled on other grounds)).
[10] 467 U.S. 837, 842-43 (1984).
[11] 323 U.S. 134, 140 (1944).
[12] *Id* at 140.

4

GC CAR000735

*Skidmore* instructs us to consider the agency's "consistency with earlier and later pronouncements." As noted above, the 2018 memorandum represents a significant departure from more than 20 years of a single, unified approach to unlawful presence for F, J, and M nonimmigrants. In evaluating "the thoroughness evident in [the agency's] consideration [and] the validity of its reasoning," we address each of the points USCIS makes to justify the change in unlawful presence interpretation.

First, USCIS states that "the former INS policy, as consolidated in the AFM, went into effect in 1997, prior to the creation of some of the technologies and systems currently used by DHS to monitor nonimmigrants … in F, J, or M status."[13] More specifically, it notes that "since the creation of the policy, the Student and Exchange Visitor Information System (SEVIS) … has provided USCIS officers additional information on an alien's immigration history."[14] However, SEVIS went into effect in 2003. Although this was six years after INA §212(a)(9)(B) took effect in 1997, it was also six years *before* the 2009 consolidated guidance reaffirmed USCIS's long-standing interpretation of unlawful presence. Moreover, as acknowledged by SEVIS itself, the accuracy and integrity of SEVIS data is flawed,[15] and "[i[Inaccurate data can affect the status of the student's SEVIS record and put the student's eligibility for benefits at risk."[16]

Second, USCIS claims that the purpose of the new policy is to "reduce the number of overstays."[17] However, this is not borne out by the policy itself, which provides no instructions or guidance on preventing overstays, such as notifying students and exchange visitors in advance of the end of their program. Instead, the memorandum introduces a "gotcha" approach, instructing adjudicators to search records for perceived status violations and retroactively calculate periods of unlawful presence without notice. Far from reducing the number of overstays, the memorandum expands the very definition of what constitutes an overstay – something the agency has no legal authority to do. The approach to unlawful presence described in the memo does nothing to advance this stated purpose.

In support of this stated goal, USCIS cites the DHS Fiscal Year 2016 Entry/Exit Overstay Report,[18] which notes that for FY 2016, "the estimated overstay rate was 6.19 percent for F nonimmigrants, 3.80 percent for J nonimmigrants, and 11.60 percent for M nonimmigrants."[19] However, the figures cited by USCIS include "out-of-country" overstays, or individuals whose departure was recorded after their lawful period of admission expired. This could easily encompass individuals who stayed just a few days longer than the conclusion of their program to tie up their personal affairs and is not a true representation of the "overstay" population with which the administration is concerned. The "suspected in-country" overstay rate (individuals for whom no departure has been recorded) is in fact much lower than the figures cited by USCIS: 2.99 percent for F nonimmigrants, 2.94 percent for M nonimmigrants, and 2.42 percent for J nonimmigrants. In addition, as noted in the Executive Summary, determining lawful status is not a straightforward analysis:

---

[13] PM-602-1060 at 2.

[14] *Id.*

[15] *See* https://www.ice.gov/sevis/data-integrity.

[16] https://studyinthestates.dhs.gov/2016/06/maintaining-accurate-sevis-records-when-to-request-a-correction-or-data-fix

[17] PM-602-1060 at 2.

[18] *See* https://www.dhs.gov/sites/default/files/publications/Entry%20and%20Exit%20Overstay%20Report%2C%20Fiscal%20Year%202016.pdf

[19] PM-602-1060 at 2.

5

GC CAR000736

… [D]etermining lawful status is more complicated than solely matching entry and exit data. For example, a person may receive from CBP a six-month admission upon entry, and then he or she may subsequently receive from U.S. Citizenship and Immigration Services (USCIS) a six-month extension. **Identifying extensions, changes, or adjustments of status is necessary to determine whether a person is truly an overstay**.

In addition:

> Valid periods of admission to the United States vary; therefore**, it was necessary to establish "cutoff dates" for the purposes of a written report**. Unless otherwise noted, the tables accompanying this report refer to departures that were expected to occur between October 1, 2015 and September 30, 2016….[20]

In other words, due to limitations associated with producing a written report, DHS acknowledges that the "overstay" data in the report includes some individuals who were later granted permission to remain beyond their initial period of authorized stay. The fact that this data was inflated is confirmed by the fact that four months after the "cutoff dates," the number of overstays substantially decreased:

> Due to continuing departures and adjustments in status by individuals in this population, by January 10, 2017, the number of Suspected In-Country Overstays for FY 2016 decreased to 544,676, rendering the Suspected In-Country Overstay rate as 1.07 percent. **In other words, as of January 10, 2017, DHS has been able to confirm the departures or adjustment in status of more than 98.90 percent of nonimmigrant visitors scheduled to depart in FY 2016 via air and sea POEs, and that number continues to grow.**[21]

The report also concedes to other factors limiting its accuracy, such as its reliance on information from the Arrival and Departure Information System (ADIS). ADIS has limited capacity to record exits and entries made via land and makes no distinction of those who overstay one day versus one year or longer.[22] Yet this is a significant difference, as a one-day overstay may be the result of a person missing their flight or sustaining an injury that renders them unable to travel.

Lastly, USCIS states that the new memo will "improve" how USCIS implements the unlawful presence ground of inadmissibility but fails to offer any reason or explanation as to how the new memo will accomplish that. In sum, USCIS has clearly failed to thoroughly consider the implications of its new unlawful presence interpretation, failed to adequately justify a need for the change, and has cited no concrete authorities to support its stated goals. The memorandum cannot stand under *Skidmore* deference.

## E. The Memorandum Is a Legislative Rule that Requires Notice and Comment Rulemaking under the Administrative Procedure Act (APA)

The Administrative Procedure Act (APA) recognizes two types of administrative rules: legislative rules issued through formal notice and comment rulemaking, which are given the full force and effect of law, and interpretive rules designed to advise the public of agency interpretation of a legal rule. Interpretive rules do not require notice and comment and lack the force of law.[23]  While the 2018

---

[20] *Id*. (emphasis added).
[21] *Id*. (emphasis added).
[22] *Id*.
[23] *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1200-01 (2015).

**AILA Doc. No. 18061135. (Posted 6/11/18)**       GC CAR000737

memorandum purports to merely advise the public of how the term "unlawful presence" is to be interpreted, that conclusion is neither factually correct nor legally supported.

As noted above, over the course of two decades, USCIS has stood by its 1997 interpretation of unlawful presence, reiterating it most recently in 2009 when it undertook a comprehensive review of its various memoranda and case law on unlawful presence and issued consolidated guidance that ultimately became chapter 40.9.2 of the AFM. While we maintain that the 2018 memorandum, which erases the distinction between the concepts of "unlawful presence" and "violation of status" is unlawful, the APA requires USCIS to give the public advance notice and an opportunity to comment through formal rulemaking before attempting to impose what constitutes a change in how the law will be applied in the future.

While the courts have not developed a unified approach to evaluating whether a rule is legislative or interpretive, the reasoning of various decisions is instructive. Employing textual analysis, the Ninth Circuit has held that legislative rules "are those which effect a change in existing law or policy."[24] Another critical characteristic of legislative rules is that they have general application.[25] Conversely, "interpretive rules are those which merely clarify or explain existing law or regulations."[26] While a legislative rule is a broad wholesale change in interpretation and application of law, interpretive rules are used more for "discretionary fine-tuning than for general law-making."[27] For example, in *Jean v. Nelson,* the Eleventh Circuit considered whether a blanket change in how INS treated arriving aliens [detention (new) vs. parole (old)] was a legislative or interpretive rule.[28] The court found that even though parole was still a discretionary option, the rule was legislative because it had general applicability, and did more than just clarify or explain an existing rule.[29] Because the rule created an entirely new procedure for all cases, notice and comment rulemaking was required.[30] Similar analytical approaches are found in *N.H. Hosp. Ass'n v. Azar,*[31] and *Dia Navigation Corp. Ltd. v. Pomeroy.*[32]

Applying this analysis, the 2018 memorandum is a legislative rule because it changes the manner in which unlawful presence is determined for all F, J, and M nonimmigrants who have been admitted "D/S" and is therefore of general applicability. It will result in future enforcement actions against persons under facts and circumstances that did not previously result in enforcement actions, thus doing far more than merely "explaining" an existing policy. Finally, it is a 180-degree change in the manner in which USCIS treats persons admitted for the duration of their status by conflating the fact (or even potential fact) of a status violation with the beginning of a period of unlawful presence.

## F.  USCIS Has Failed to Articulate a Satisfactory Explanation for its New Approach to Unlawful Presence as Required by *Encino Motorcars*

In *Encino Motorcars, LLC v. Navarro,* the U.S. Supreme Court reaffirmed several longstanding rules of administrative rulemaking, including the basic procedural tenet that agencies must give adequate

---

[24] *Alcaraz v. Block,* 746 F.2d 593, 613 (9th Cir. 1984).
[25] *Flagstaff Med. Ctr. v. Sullivan,* 962 F.2d 879, 886 (9th Cir. 1992).
[26] *Alcaraz,* 746 F.3d at 613; *Hoctor v. USDA,* 82 F.3d 165, 170-71 (7th Cir. 1996).
[27] *Alcaraz,* Id. at 613.
[28] 711 F.2d 1455 (11th Cir. 1983), *vacated in part as moot,* 727 F.2d 957 (11th Cir. 1984) (new regulations issued).
[29] 711 F.2d at 1476, 1478.
[30] *Id.* at 1478.
[31]  887 F.3d 62, 72-73 (1st Cir. 2018).
[32] 34 F.3d 1255 (3d Cir. 1994).

AILA Doc. No. 18061135. (Posted 6/11/18)

GC CAR000738

reasons for their decisions.[33] Citing *Motor Vehicle Mfrs. Assn. of United States v. State Farm Mut. Automobile Ins. Co.* (*MVMA*), the Court stated that an agency "must examine the relevant data and articulate a satisfactory explanation for its actions including a rational connection between the facts found and the choice made."[34] That requirement is satisfied when the agency's explanation is clear enough that its "path may reasonably be discerned."[35] In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.[36] When an agency fails to provide even that level of minimal analysis, its actions are arbitrary and capricious and cannot carry the force of law.[37]

As described in Part D, *supra*, and Part G, *infra*, the change in unlawful presence interpretation articulated in the 2018 memorandum is not supported by a reasoned explanation, eliminates a critical notice element, and fails to take into consideration fundamental fairness and due process requirements, as well as the reliance interests of the regulated public that have built up over the past two decades. For all of these reasons, the 2018 memorandum is an arbitrary and capricious change in interpretation that cannot stand.

### G. The 2018 Memorandum Raises Significant Due Process and Fundamental Fairness Concerns and is Constitutionally Suspect

Unlike foreign nationals who are admitted until a "date certain," and will trigger unlawful presence if they remain in the U.S. beyond the date recorded on Form I-94 (or recorded in CBP electronic systems), plus any extension thereafter granted, students and exchange visitors that are admitted for "D/S" lack the benefit of such a bright-line test. As a result, legacy INS and USCIS created a different bright-line standard, one that incorporates the principle of fundamental fairness: formal notification by USCIS or an immigration judge that a status violation occurred before the unlawful presence clock can start. The exceedingly harsh penalties associated with unlawful presence, and the clear distinctions Congress created between the concepts of unlawful presence and status violation, have informed more than 20 years of policy, which ascribes caution to calculating unlawful presence.

The new memorandum throws caution to the wind. The government's new interpretation of unlawful presence raises serious due process concerns and is unfair and unworkable in its application. Since 1997, the Service has interpreted INA §212(a)(9)(B) as requiring some form of notice to individuals for unlawful presence to accrue. Under the 2018 memorandum, while the government's finding that an F, M, or J nonimmigrant has violated status would still typically occur in the course of a USCIS benefits adjudication, the date on which unlawful presence will accrue is imposed retroactively. The 2018 memorandum instructs adjudicators to consider information in the systems available to USCIS, in the alien's record, and alien's admissions regarding his or her immigration history or other information discovered during the adjudication," but provides no limitation as to how far back adjudicators may reach, such that a student or exchange visitor may abruptly learn that he or she has been unlawfully present for several years.[38] Moreover, the memo states that "an F-2, J-2, or M-2 nonimmigrant's period of stay authorized ends when the F-1, J-1, or M-1 nonimmigrant's period of stay authorized ends." This means that a spouse may find out only many years after the fact that they too accrued unlawful presence.[39]

---

[33] 136 S. Ct. 2117, 2125 (2016).
[34] 463 U.S. 29, 43 (1983).
[35] *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974).
[36] *Encino Motorcars*, 136 S. Ct. at 2126; *Perez*, 135 S. Ct. at 1209.
[37] *See* 5 U.S.C. § 706(2)(A); *MVMA*, 463 U.S. at 42-43.
[38] PM-602-1060 at 4 n.12.
[39] *Id.* at 5.

AILA Doc. No. 18061135. (Posted 6/11/18)

GC CAR000739

The regulation at 8 CFR §214.2(f)(5)-(6) articulates the circumstances in which an F-1 student is deemed to be "out of status." F-1 students who work without authorization, who are deemed to not be pursuing a full course of study, who transfer to another school without permission, and who fail to complete a full course of study are deemed to be "out of status." However, F-1 students are subject to additional reporting requirements that may constitute a status violation if not completed timely. These reporting requirements include: reporting biographical information to a Designated School Official (DSO) every six months during a STEM OPT extension;[40] and completing an annual self-evaluation report that is signed by the employer and submitted to the DSO within 1 year and 10 days of the validity period on the Employment Authorization Document, as well as a final evaluation within 10 days of the conclusion of the 24-month period of STEM OPT.[41] Additionally, employers of STEM OPT students are required to report absences to the DSO; and any material change in a STEM OPT training plan must be reported to the DSO by the student after having the employer sign a new training plan.[42] USCIS has not articulated whether the failure to undertake any of these actions would trigger the accrual of unlawful presence. The 2018 memorandum makes no distinction between minor technical violations (e.g. reporting a change in employment a few days late) versus a major violation (dropping all classes without authorization).

In practice, this policy will create a large class of inadmissible aliens who have received no notice of their unlawful presence because in many cases, F, M, and J nonimmigrants have no knowledge that a status violation has even occurred. In addition, a significant number of individuals will only become aware of a status violation when it is too late to correct course and they find themselves subject to a three- or ten-year bar to admissibility. Under the new memo, accidental and inadvertent status violations will subject unsuspecting individuals who have not acted in bad faith to extreme penalties. Examples of situations where students or exchange visitors may be found to have inadvertently violated their status include:

1. **Inadvertently Engaging in Unauthorized Employment**. While 8 CFR §214.2(f)(9) clearly states that a student may work on campus for up to 20 hours per week and requires authorization in the form of curricular or optional practical training to work off-campus in certain circumstances, there is no clear guidance on what constitutes "employment." A student may believe that off-campus volunteer work is not unauthorized "employment" even though it is possible that the Service could view it as such, particularly if it involves activities that normally would be compensated. Other activities that are not clearly defined include working for and being paid by an overseas entity while physically present in the U.S.; selling something on eBay; selling personally created art work or photography; getting paid for publication of one's dissertation; getting paid to host a seminar or speak at an academic conference or event; getting paid a royalty for activities associated with research, etc.

2. **Practical Training Issues**. Issues may also arise when a student on OPT drops below 20 hours of work one week, starts a degree program while on OPT, or works just a few days or one week beyond CPT.

3. **Inadvertently Violating Status by Following the Advice of a School or Designated School Official (DSO)**. A school may err in advising a student, leading to an accidental status violation through no fault of the student. For example, a school may incorrectly advise a student as to the number of hours that he or she may work on campus, or incorrectly advise

---

[40] 8 CFR §214.2(f)(12).
[41] 8 CFR §214.2(f)(10)(ii)(C)(9)(i).
[42] 8 CFR §214.2(f)(10)(ii)(C)(6); and 8 CFR §214.2(f)(10)(ii)(C)(9)(ii).

9

GC CAR000740

a student to drop a class that causes the student to fall below a full course of study. A DSO may grant a reduced course load authorization in good faith, but SEVP or USCIS may later determine this authorization should not have been granted. Further, a program administrator may send a J-1 student physician to a training location that has not been approved or may improperly advise a student physician that he or she may moonlight doing non-GME work within the same training hospital.

4. **Extraordinary Circumstances Beyond One's Control**. Extraordinary circumstances can also cause a student or exchange visitor to unintentionally violate status. For example, in May 2018, an F-1 student on OPT was walking down the sidewalk in Denver when a car hit him and pinned him to a tree. His leg had to be amputated.[43] Under 8 CFR §214.2(f)(10)(ii)(E), he will be out of status as soon as he is unemployed for 90 days. If he is hospitalized for more than 180 days after the effective date of the new policy and after he falls out of status through no fault of his own, he will be subject to the three-year bar when he departs. Additionally, USCIS has never issued clear guidelines on maintaining status when on maternity leave.

5. **Dependents May Be Unlawfully Present Without Knowing It**. Since the status of dependents of F-1, J-1 and M-1 nonimmigrants depends upon the principal nonimmigrant maintaining his or her status, those family members (with the exception of children under the age of 18, who are statutorily exempt from accruing unlawful presence) would be out of status and unlawfully present upon a violation of the principal's status. Thus, a spouse who is unaware of a principal's status violation would become subject to serious immigration penalties without even knowing it. This could occur, for example, when the principal tries to hide his or her failure at school from an unknowing spouse or in an abusive situation.

By collapsing the distinction between "unlawful presence" and "status violation" and deeming unlawful presence to accrue retroactively, the 2018 memorandum removes the important procedural safeguard of notice to individuals that they may be deprived of a liberty interest. This lack of notice raises due process concerns. The Fifth Amendment's due process clause is a core concept in the Bill of Rights and requires all levels of American government to operate within the law, using procedures that are fundamentally fair. The core elements of due process are notice and a hearing before an impartial tribunal, which "minimize substantively unfair or mistaken deprivations" by providing individuals an opportunity to contest the basis on which the government seeks to deprive them of protected interests.[44] "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[45]

The three- and ten-year bars to admissibility represent a deprivation of liberty, as subject individuals are barred from returning to the United States for a lengthy period of time. In *Kent v. Dulles*, the Supreme Court held that the right to travel is a "liberty" interest protected by the Fifth Amendment and that where governmental restrictions on travel are involved, the Court will construe narrowly all delegated powers that curtail or dilute them.[46] Moreover, the constitutional guarantee of due process is not limited to U.S. citizens but applies equally to all "persons" present in the United States, regardless of alienage or immigration status.[47]

---

[43] http://kdvr.com/2018/05/03/25-year-old-man-sedated-and-on-ventilator-following-crash-in-lone-tree/
[44] *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).
[45] *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).
[46] 357 U.S. 116 (1958).
[47] *Plyler v. Doe*, 457 U.S. 202 (1982).

AILA Doc. No. 18061135. (Posted 6/11/18)

GC CAR000741

The Supreme Court has held that in applying the Fifth Amendment's due process guarantee, one must balance the private interests of affected individuals with the government's interest. In *Mathews v. Eldridge*, the Court indicated that the identification of the specific dictates of due process generally requires consideration of three distinct factors:

> [F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[48]

Applying the *Eldridge* test to the aforementioned examples of cases where students may inadvertently violate their status illustrates the problems inherent in the new interpretation of unlawful presence. Take, for example, a student who inadvertently violates F-1 status by engaging in activities later deemed to have constituted unauthorized "employment." First, the student has a private interest that will be affected by the application of the new policy in his case, given that he will likely have accrued sufficient unlawful presence at the time the determination is made to trigger a three- or ten-year bar upon departure from the United States. Second, the lack of legal guidance on what constitutes "employment" creates a significant likelihood of an erroneous deprivation, and the additional procedural safeguards, which previously existed in the form of notice before deeming the accrual of unlawful presence to have commenced, no longer exist. Third, although the government may have a compelling interest in enforcing the immigration laws and in implementing policies to minimize overstays, the policy at issue in this case does nothing to further that interest. As outlined above, the 2018 memorandum will severely penalize individuals for status violations that were unintentional and of which they were likely unaware until it is too late. It is precisely this risk of the erroneous deprivation of a liberty interest that is at stake in application of the 2018 memorandum. This new approach to unlawful presence is devoid of fundamental fairness and is constitutionally suspect.

## H. Conclusion

For these reasons, we urge USCIS to abandon this misguided directive and to maintain the unlawful presence guidance that has been in place for decades. It is critical that USCIS ensure that fundamental fairness is a critical component in interpreting and implementing the unlawful presence statute.

Sincerely,


THE AMERICAN IMMIGRATION LAWYERS ASSOCIATION
THE AMERICAN IMMIGRATION COUNCIL

---

[48] 424 U.S. 319, 335 (1976).

AILA Doc. No. 18061135. (Posted 6/11/18)

GC CAR000742



**Kathy M. Foley**
**Associate Dean/Director**
**International Student & Scholar Services**
█████████ @ █████████

Middlebury College

███████████████
███████████████

Middlebury, VT

June 11, 2018

Submitted via email to: publicengagementfeedback@uscis.dhs.gov
Re: **Accrual of Unlawful Presence and F, J, and M Nonimmigrants (PM-602-1060)**

Dear USCIS,

I am writing in regard to the recommendations made in **"Policy Memorandum: Accrual of Unlawful Presence and F, J, and M Nonimmigrants (PM-602-1060).**" These proposals represent a radical change in USCIS's interpretation and application of the regulations related to the accrual of unlawful presence by those in student (F nonimmigrant), exchange visitor (J nonimmigrant), or vocational student (M nonimmigrant) status and their dependents while in the United States.

I work for **Middlebury College** and its many academic programs, including our graduate school, the **Middlebury Institute for International Studies**. We have many international students from more than 75 nations and faculty and staff from across the globe. We have demonstrated a long-standing commitment to international education and engaging international students and scholars in our community. The international students, researchers, staff and faculty on our campuses bring unique experiences and perspectives to our classrooms, important ideas and diverse approaches to our research projects, and exciting and dynamic leadership and perspectives to our campus community.

As a PDSO (Principle Designated School Official) and RO (Responsible Officer), I was alarmed to read about the proposed changes with regard to "unlawful presence". Much of my daily work and that of the International Student & Scholar Services (ISSS) team consists of advising international students and scholars on how to maintain their visa status (and that of their dependents). This is something that the vast majority of international students deeply and sincerely want to do, and this means they need to remain aware of visa regulations while also balancing the demands all students and employees experience along with their institution's requirements.

There have been significant discussions amongst DSOs and Alternate Responsible Officers (AROs) since the release of this memorandum regarding how we will assist F/J/M visa holders in understanding these new policies without inadvertently engaging in the unauthorized practice of law. *(It is important for us to stay clear about our role.)* While changes in regulations are to be expected, these proposed changes to interpretation of the regulations are especially problematic. They are a departure from the long-standing, common-sense interpretation of visa regulations that has been in place for over 20 years. This new approach creates a system where F/J/M visa holders may be found to have violated their visa status years <u>after</u> the violation supposedly occurred. This is especially troubling since this memorandum attaches the possibility that this violation could result in individuals being barred from entering the U.S. for three years, ten years, or permanently.

Although the announcement regarding these changes comes with sufficient notice for individuals who are currently out of status to take steps to remedy their visa status before they begin accruing unlawful presence, this new interpretation will cause a great deal of uncertainty for F/J/M visa holders moving forward.

Here are some specific examples of some problems DSOs/AROs foresee with the implementation of the concepts outlined in the memorandum.

1. **Recent SEVP Portal Release:** SEVP recently implemented a Portal through which F-1 students on post-completion optional practical training (OPT) or STEM OPT are allowed to report changes to their personal and/or employment information, but there have been issues with the system. Students are required to report these changes within ten days, but periodic problems with SEVIS and the Portal have resulted in incomplete information being available to students and instances when students have not been able to access the Portal. Additionally, some students have been confused about what information to enter and how to correctly enter it. All of this has resulted in incomplete and inaccurate data being reported to SEVIS through the Portal despite the best efforts of F-1 visa holders to report their information. Therefore, if USCIS relies on information from SEVIS (something the Policy memo mentions as a likely source of information for making decisions about violations of status), it is likely that there will be students judged to have violated their status based on this bad data.

    While DSOs/AROs and others have, historically, been able to help students resolve these data issues, the new interpretation of the regulations could mean that these student could be judged to have violated their status and could be accruing unlawful presence without realizing it.

2. **Changes to Regulations Causing Previously Approved Actions to Become Violations:** The student and scholar visa system (SEVIS) is set up so that school officials bear a great deal of responsibility for assisting F/J visa holders to maintain their status. As DSOs/AROs, we do our best communicate with our students when there are changes to visa regulations and regulatory interpretations. This is not an easy task—especially when changes to regulations or regulatory interpretations require that we tell students something that is the reverse of what we previously correctly advised them.

    Recently USCIS announcement restricting 3rd party employment for students on STEM OPT. In situations like that, it is very possible that students will believe that they have done everything necessary to comply with the rules. Yet, when they apply to renew a visa or to change visa status in the future, they could be told that their actions (permissible when they started, but now not allowed due to changes in regulatory interpretations) were a violation of their status. They may then discover that they been determined to have since accrued unlawful presence, barring them from changing visa status or re-entering the U.S.

GC CAR 000744

These are only two recent examples of actions that could result in international students accruing unlawful presence despite their attempts to follow the rules. We foresee many additional problems and unintended consequences that will result from such a large and dramatic shift in regulatory interpretation.

**In conclusion**

The USCIS press release for this memorandum quotes USCIS Director L. Francis Cissna as saying, *"USCIS is dedicated to our mission of ensuring the integrity of the immigration system. F, J, and M nonimmigrants are admitted to the United States for a specific purpose, and when that purpose has ended, we expect them to depart, or to obtain another, lawful immigration status."* This change, however, will <u>not</u> contribute meaningfully to that objective. Instead, it will likely result in confusion that will mean that well-meaning international students and exchange visitors could be found to have accrued unlawful presence due to innocent mistakes or misunderstandings of changing regulations. **Due to the strict bars that will be applied to these individuals due to these changes, these misunderstandings could have severe consequences.**

We are at a point in time where our international students can choose to study anywhere in the world. Many international students who enroll at U.S. institutions are the best in their schools at home, and they receive offers to attend institutions around the world. They choose to come to the United States because they have determined an institution is the best option for them to pursue their chosen field of study. While here, they excel in their classes, and they provide new perspectives and experiences to their classmates and the broader higher education community.

If we want to ensure the students fulfill the "specific purpose" when they receive their visa (obtaining an education at a U.S. institution), we must ensure our laws and regulations are structured and implemented in a fair and transparent manner. We must work to limit uncertainty so that students can focus on learning instead of tracking constantly changing regulations. **This new policy has the opposite result.**

**Recommendations**

I urge you to take these concerns into consideration and rather than making the proposed changes, consider the following recommendations suggested by NAFSA (Association of International Educators).

*For additional contextual details, see the NAFSA Letter to Director Cissna at*
*http://www.nafsa.org/_/file/_/amresource/NAFSAulpcomment20180524.pdf .*

- **Leave in place the current policy, which has served for over 20 years.** Neither DHS nor legacy INS ever published regulations to implement this important area of law. If the agency wishes to implement such a drastic change to long-standing, common interpretation of the law, it should be done through the notice and comment process.

GC CAR 000745

I note a few related issues below:

- o Under current policy, which has been in place for 20 years, the unlawful presence count begins only after a <u>formal finding</u> of a status violation by a DHS officer in the course of a benefits application, or by an immigration judge in the course of removal proceedings.
- o Under the newly proposed policy, the unlawful presence count begins <u>the day after the status violation</u>, which could be discovered well after the passing of 6-months due to USCIS processing delays and other reasons.
- o Under both the current and proposed policies:
  - ▪ Remaining in the United States beyond the expiration of a date-specific Form I-94 also starts the unlawful presence clock; yet
  - ▪ there are a number of important exceptions (such as unlawful presence not being counted if USCIS approves a student's application for reinstatement).

- **Do not implement any policy change until implementation has been fully coordinated with the Department of State and other DHS units such as CBP and SEVP.** It is unclear how this new interpretation will affect enforcement actions, admission protocols, SEVP records, and visa eligibility. It is imperative that you address these concerns before implementation of this proposal (scheduled to take effect August 9, 2018).
- **Exclude from the unlawful presence count any status violations that occurred under color of law, to avoid "gotcha" scenarios, where the student reasonably relied on the authorizations granted.** For example, curricular practical training (CPT) authorized in SEVIS that DHS later determines may have been improperly given, should not start the unlawful presence "clock" until DHS or an immigration judge makes a formal status determination.
- **Apply the change of status/extension of stay tolling rules to reinstatement applications.** Currently, individuals may apply for reinstatement based on particular timeframes that may no longer be valid under the new interpretation.
- **Expand the sections describing examples where F, J, and M nonimmigrants "do not accrue unlawful presence in certain situations."** See (draft) Adjudicator's Field Manual 40.9.2(b)(1)(E)(iii). *(See https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-17138/0-0-0-18383.html)*

Thank you for providing us with the opportunity to comment.
Sincerely,

*Kathy Foley*

Kathy M. Foley
Associate Dean/Director of International Student & Scholar Services
SEVIS Principle Designated School Official (PDSO)/Responsible Officer (RO)
Middlebury College and Middlebury Institute of International Studies at Monterey

GC CAR 000746

GC CAR 000747



June 11, 2018

***Via Email***

Mr. L. Francis Cissna, Director
Department of Homeland Security
U.S. Citizenship & Immigration Services
20 Massachusetts Avenue, NW
Washington, DC 20529
*Sent to:* publicengagementfeedback@uscis.dhs.gov

**RE:** **USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J, and M nonimmigrants**

Dear Director Cissna:

Erickson Immigration Group ("EIG") writes in response to the U.S. Citizenship and Immigration Services (USCIS) policy memorandum dated May 10, 2018, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants."

The memo is an abrupt and radical departure from more than 20 years of policy guidance. EIG requests that USCIS withdraw the memo due to the negative impact to the foreign exchange program and detriment to the U.S. economy. Implementing the revised policy as planned on August 9, 2018, would hinder efforts to attract talented individuals from around the world and could create undue harm to students, their families, academic institution, state resources, and broader community interests.

The proposed change is logistically complex and may lead to inappropriately identifying a large number of foreign students and exchange visitors as failing to maintain lawful nonimmigrant status, thus unfairly subjecting them to the 3-year, 10-year, or even to permanent bars to re-entry to the United States, based on an oversight or unintended circumstance which they may not be aware.

EIG represents multi-national employers that have an interest in and benefit from foreign students, often F-1 students on CPT, OPT, or STEM-OPT work authorization or J-1 exchange visitors as interns or trainees. EIG also has an interest in preserving the policies and legal principles that promote certainty and fair adjudication of immigration benefits.

The new memorandum would reverse USCIS practice and interpretation of how one accrues "unlawful presence," as defined under section 212(a)(9)(B)(ii) of the Immigration and Nationality Act (INA), referencing an individual who "is present in the United States after expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." For nonimmigrant students and exchange visitors in the F, J, and M categories, legacy Immigration and Naturalization Service (INS) and USCIS have interpreted the statutory unlawful presence provisions to require notice to the individual of a status violation prior to the commencement of the unlawful presence clock. Such notice is provided in the context of the adjudication of a request for an immigration benefit by USCIS or a determination of a status violation by an immigration judge.

| VIRGINIA | ████████ | ████ | Arlington, VA | ███ | p ████████ | f ████████ |
| CALIFORNIA | ████████ | ████ | San Francisco, | ███ | p ████████ | f ████████ |

EIGLAW.COM

GC CAR 000748

Case 1:18-cv-00891-LCB-JEP   Document 57-2   Filed 07/03/19   Page 192 of 203


Current and historical USCIS guidance articulating this position states, "It must be emphasized that the accrual of unlawful presence neither begins on the date that a status violation occurs, nor on the day on which removal proceedings are initiated."[1] **This longstanding policy provides certainty in determining when unlawful presence begins to accrue, while the new policy eliminates this practice**.

The new policy set out in USCIS's May 11 2018 memo deems that unlawful presence starts accruing the day after the date that a status violation occurs, thus removing the critical procedural safeguard of providing notice to affected individuals that may find themselves subject to the three- and ten-year bars to admissibility. If this policy is implemented, those affected will have little to no opportunity to dispute or remedy the stated violation. This raises serious questions regarding fundamental fairness and due process and will have a significant negative impact on the student, vocational, and exchange visitor communities. Essentially, the new policy memo removes the longstanding and complex distinction between nonimmigrant "status violation" and when one accrues "unlawful presence."

In recognition of the complexity and fluidity of academic programs, F, M, and J nonimmigrants are not admitted to the U.S. until a certain or specific date. Instead, they are admitted for the "duration of their status," or "D/S," which means the student or exchange visitor can remain in the United States as long as they maintain their nonimmigrant status. This generally means the student must maintain a full course of study or remain in the exchange program, not engage in unauthorized employment or other unauthorized activities, and complete the academic or exchange program in a timely manner or obtain an extension.

The new memorandum fails to address the complex and nuanced issues that determine whether an individual violated their nonimmigrant status. Students and exchange visitors can accidentally and unknowingly violate their status by dropping slightly below a full course of study, or by engaging in innocent, but unauthorized activity, including volunteer activities. For example, F-1 students are permitted to engage in work at a "qualifying on-campus job" for up to 20 hours per week while school is in session. Therefore, an F-1 student who inadvertently exceeds the 20-hour limit by just a couple of hours has technically violated his or her student status. In addition, a Designated School Official may make a good faith error in advising a student by authorizing a reduced course load that should not have been approved, thereby leading the student to unknowingly and unintentionally violate their status. This unfairness is compounded when the status violation also serves as the "trigger" for the accrual of unlawful presence by dependents of students and exchange visitors.

Other scenarios where a student might unintentionally or unwittingly have a lapse of status include:

- A science student volunteers in a professor's lab

- A student is authorized on CPT or OPT and some government official later decides the work wasn't sufficiently related to the degree

- A student gets into car accident and withdraws from a course late or fails to register

- A pregnant female takes maternity leave on OPT

**This memo eliminates the long-held distinction between violating immigration status and being unlawfully present in the United States.** The concept of "unlawful presence" with various "clocks,"

---

[1] *See* USCIS Memorandum, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), *available at* http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence.



"tolling" provisions, and "bars" has to this point been the purview of immigration law specialists and law school classes. Immigration policy is incredibly complex, and already has dire consequences for violation. Foreign students, scholars, and exchange visitors are not immigration attorneys or policy professionals and it is unfair to treat them as such. Unlawful presence should only trigger when there is clear notice of remaining beyond an expiration date of authorized stay in the United States and not when there is a contestable allegation of violation of status.

Based on feedback from our clients, this proposal seems to make the United States less attractive to talented international students, scholars, and exchange visitors and undoubtedly will encourage them to look elsewhere to do their groundbreaking research and build diplomatic ties. Foreign students, scholars, and exchange visitors are here to learn, and they make America safer by becoming the nation's best ambassadors and allies. By treating them all as criminals for minor or technical violations, we will be making America less safe and a less desirable place to study. This is contrary to our nation's values as a welcoming nation of immigrants.

The current policy has held up for more than 20 years because it provides bright-line dates established in government systems, which give adequate notice to students and exchange visitors and their schools and exchange programs, and an opportunity to rectify inadvertent, innocent or misconstrued errors.

While an alien who violates his or her nonimmigrant status is certainly removable, the policy in place distinguishes between status violations and unlawful presence makes sense for purposes of applying INA 212(a)(9)(B), from both legal and public policy viewpoints. A clear government determination, whether it is the expiration date on a nonimmigrant's Form I-94, or a formal finding of a status violation made in the course of a DHS benefits determination or by an immigration judge, serves as a fair and clear warning to an alien that the clock is ticking, and he or she just take action to leave the United States or otherwise cure the status deficiency. An alien, who persists after such fair notice, must face the possibility of not being able to return to United States for either 3 or 10 years.

Nonimmigrant status is a legal condition, not a physical thing. It is also dynamic, not static, which means that a person's nonimmigrant status must be acquired and maintained, and can be changed, or lost, and in some circumstances, reinstated. In many respects, nonimmigrant status is a relationship with the U.S. immigration system, with actions, events, and data in the "real" world contributing to the acquisition and maintenance, change, loss, or restoration, of the nonimmigrant relationship. In addition, a student or exchange visitor might not even know about any violation of status until an immigration officer at a Port of Entry decides a violation occurred in the past and bars entry to begin or return their activities.

In lieu of implementing the policy described in the memo, EIG recommends that you leave in place the current policy, which has served for over 20 years. Neither DHS nor legacy INS ever published regulations to implement this important area of law.

We thank you for the opportunity to comment.

Sincerely,

**Erickson Immigration Group**
Jenny T. Dao
Attorney

VIRGINIA ▮▮▮▮▮ | ▮▮▮ | Arlington, VA ▮▮ | p▮▮▮▮▮ | f▮▮▮▮

CALIFORNIA▮▮▮ | ▮▮ | San Francisco, ▮▮ | p▮▮▮▮▮ | f▮▮▮▮


**Global Programs**
International Students & Scholars Office

██████████████████████

Boston, Massachusetts ████
████████████ F ████████

June 11, 2018

Mr. L. Francis Cissna, Director
U. S. Citizenship & Immigration Services
Department of Homeland Security
20 Massachusetts Avenue, NW
Washington, DC 20529

Submitted via email: publicengagementfeedback@uscis.dhs.gov

**RE:     PM-602-1060 - Policy Memo: Accrual of Unlawful Presence and F, J, and M Nonimmigrants**

Dear Director Cissna:

We are writing on behalf of Boston University (F-1 sponsor number: BOS 214F00056000) with respect to the U.S. Citizenship and Immigration Services (USCIS) policy memorandum of May 10, 2018: PM-602-1060 "Accrual of Unlawful Presence and F, J, and M Nonimmigrants."

Boston University is a large research university sponsoring over 9,700 international students, primarily in F-1 and J-1 status, as well as over 1,300 academic scholars and faculty in H-1B, J-1, and other statuses. We are a member of the Association of American Universities (AAU), a consortium of distinguished U.S. research universities promoting education and academic research, and was ranked 12th in the U.S. for institutions hosting the largest number of international students according to the *2017 Open Doors* Report by the Institute of International Education (IIE). Our international students and scholars contribute significantly to the intellectual vitality of the United States, and we take seriously our responsibility to guide our international community in abiding by all appropriate laws.

We also recognize the important role USCIS plays in ensuring that visitors to the United States are lawfully present. Your work benefits both visiting scholars and Americans alike. However, we are seriously concerned by the fundamental change in policy USCIS has proposed in which the immigration status of F, J, and M nonimmigrants would be calculated, creating a misplaced overreliance on information entered into the Student and Exchange Visitor Information System (SEVIS) to determine whether individuals are in violation of their immigration status and therefore unlawfully present in the United States without an official determination of such status by the Department of Homeland Security, an immigration judge, or Board of Immigration Appeals.

**Key Concerns of the Policy Change**

  1. **The new policy obscures and conflates the important distinction between "unlawful presence" – illegal presence in the United States – and "maintenance of status". Furthermore, it appears to rely on systems that serve only as status indicators.**

For many nonimmigrants, the date-certain I-94 or document expiration date, give a clear "bright line" indication at the time of U.S. admission regarding the length of permitted stay. Most F, J, and

Boston University comments to PM-602-1060 Page 1
GC CAR 000751
Case 1:18-cv-00891-LCB-JEP   Document 57-2   Filed 07/03/19   Page 195 of 203

M nonimmigrants are admitted for "D/S" ("duration of status") which denotes a careful balance of maintaining unexpired documents, keeping an active and valid immigration record, and following detailed guidelines related to academic activities, employment and reporting deadlines.

There are several documents and systems that serve as status indicators for F, J, and M nonimmigrants. These may include: (1) a Form I-20 or DS-2019, (2) an electronic immigration record in the Student and Exchange Visitor Information System (SEVIS), (3) a passport stamp showing entry to the U.S. for duration of status or until a date certain, and (4) an electronic I-94 record.

Given the complexity of system interfaces and inconsistency between documents that are used as immigration status indicators, it may not always be immediately clear to a nonimmigrant student or exchange visitor in F, J, or M status that their immigration status is in jeopardy at the time that a technical violation of status occurs. However, these "unlawful presence" situations can be triggered by technical, unknown, and unintentional oversights. For example, a student or exchange visitor may not be immediately aware:

- If their SEVIS record is terminated whether by batch reporting or manually by a school official, whether in accordance with regulations or in error.

- If their I-94 record is not extended to D/S following a timely response to an I-515A.

- If USCIS approves incorrect dates on an Employment Authorization Document for Optional Practical Training, requiring a lengthy correction process to the EAD and/or SEVIS record.

- If the USCIS-SEVIS CLAIMS interface inadvertently completes a SEVIS record early when an H-1B petition is approved for a future start date.

**2. Accrual "clock" would begin without a government finding:**

Apart from scenarios where a student may not be immediately aware of a status infraction, the new memo also does not account for situations where a government agency may, after review and evaluation, make a determination that a past action falls short of a regulatory requirement.

For instance, SEVP has struggled for years to develop systems to accurately capture dates and data on OPT employment. While the recently launched SEVP Portal now allows greater functionality and transparency in this area, there is still a high degree of subjective review that might occur when evaluating the appropriateness or major-relatedness of employment.

It is extremely worrisome that a student may now face the risk of retroactive bars if the employment to which they entered in good faith may later come under extreme or prejudicial review. For instance:

- If the student reports employment during Optional Practical Training job that is later determined not to be directly related to their major field of study.

- If a student continues to work in good faith on the basis of a timely-filed pending application for STEM OPT extension, but the application is later denied by USCIS on the basis of a change in interpretation related to employer-employee relationships.

- If a student participated in a curricular activity that is later determined after evaluation to require CPT authorization.

Because of this complexity of evaluating and determining lawful status in these and similar cases, a student or exchange visitor might not even know they are "out of status" until a formal evaluation is made or communicated to them by a government agency.

**3.  Retroactive penalty for students who seek reinstatement or status correction:**
Under the proposed new policy, students who choose to utilize the F-1 reinstatement process as an avenue for legal appeal risk a lengthy adjudication process, the current reality of extreme adjudications, and the significant penalty of a 3-year or 10-year bar if their case is denied. Given that applications for reinstatement are currently taking 10-13 months for adjudication, this avenue has become nearly obsolete. Out of more than 9,700 international students at Boston University, less than a handful have opted to apply for reinstatement in the last two years. Most of these students were students who were not able to travel abroad due to war, travel bans, or other extreme personal, health, or financial circumstances.

Under the new policy, virtually all students who apply for reinstatement would risk the possibility of a 3-year or 10-year bar from the U.S. A student who is denied reinstatement, and then is unable to rectify their legal status by travel, loses the ability to complete their U.S. degree. We believe this would render reinstatement essentially unusable as a legal avenue.

**SUMMARY RECOMMENDATION**
We join NAFSA and many other national organizations in strongly recommending that USCIS continue its current policy of not begin the unlawful presence "clock" until after a notice of finding is made by a government agency. Unlawful presence should only be triggered when there is clear notice of remaining beyond an expiration date of authorized stay in the United States and not when there is a contestable allegation of violation of status. By implementing the proposed policy, the United States risks making our country less attractive to talented students, researchers, and scholar who have for decades spurred impactful economic opportunities and meaningful innovations for our communities.  We urge USCIS to reconsider its plan for such an extreme policy change.

Thank you for the opportunity to submit comments on the PM-602-1060 - Policy Memo: Accrual of Unlawful Presence and F, J, and M Nonimmigrants.

Respectfully,

**Jeanne E. Kelley**
Managing Director
Boston University Global Programs
International Students and Scholars Office





SOCIETY FOR HUMAN
RESOURCE MANAGEMENT

June 11, 2018

Lee Francis Cissna, Director
Department of Homeland Security
U.S. Citizenship and Immigration Services
Washington, D.C.

Dear Director Cissna:

The Council for Global Immigration (CFGI) and the Society for Human Resource Management (SHRM) submit these comments regarding the recently issued USCIS policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants" (PM-602-1060). CFGI and SHRM respectfully request the agency to withdraw this memorandum and ensure that the agency's policy toward unlawful presence continues to align with our principles of fairness, innovation and competitiveness.

CFGI, founded in 1972 as the American Council on International Personnel, is a strategic affiliate of SHRM. It is a nonprofit trade association comprised of leading multinational corporations, universities, and research institutions committed to advancing the employment-based immigration of high-skilled professionals. CFGI bridges the public and private sectors to promote sensible, forward-thinking policies that foster innovation and global talent mobility.

SHRM is the world's largest HR membership organization devoted to human resource management. Representing more than 285,000 member employers in over 160 countries impacting 116 million employees, the Society is the leading provider of resources to serve the needs of HR professionals and advance the professional practice of human resource management. SHRM has more than 575 affiliated chapters within the United States and subsidiary offices in China, India and United Arab Emirates.

## I. Background and Impact

The new USCIS policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants," purportedly aims to get at the very real problem of visa overstays, a legitimate concern that needs to be addressed. However, in doing so, the agency conflates visa overstays with violation of status, a separate problem for which there are other means to correct that do not require the extremely harsh penalty of accrual of unlawful presence, which can result in 3- and 10- years bars to entry into the United States.

CFGI and SHRM do not minimize the problem of violation of status, but we also do believe that USCIS should provide notice to foreign nationals and their employers of such violations of status and allow any appeals and rebuttal processes to run their course before assigning unlawful presence to foreign nationals.

· Alexandria, VA ███ USA · ████ · ████ Fax · councilforglobalimmigration.org

## II.    The Public Should Have Adequate Opportunity to Comments Under the Administrative Procedure Act for any Change to Unlawful Presence Policy

While we appreciate the opportunity to comment on this policy in an informal way, we believe that any significant change to the policy on unlawful presence should undergo formal notice and comment rulemaking. We have heard Director Lee Francis Cissna, on numerous occasions, express a commitment to the Administrative Procedure Act (APA) for significant policy changes. We respectfully submit that a change such as this (a change to the Adjudicator's Field Manual intended to have the force of law) is exactly the type of change that should be subject to the APA. Among other requirements under the APA, USCIS should conduct a full cost-benefit analysis of the new policy with a chance for the public to comment[1] and fully engage with the Student and Exchange Visitor Program (SEVP), Departments of State (DOS), Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) and other interested agencies as the Office of Management and Budget (OMB) coordinates under the APA.

## III.    The Memorandum Abandons the Fundamental Fairness of the Prior Unlawful Presence Policy

Our principles call for an immigration system that is fair, innovative, and competitive. With regard to fairness, we recognize the need to adopt policies that protect and develop the U.S. workforce. However, the system must also be fundamentally fair, which includes official notice of any status violations and opportunities to rebut or appeal as appropriate.

The primary reason the agency should retain the current unlawful presence policy is that it targets those who truly have overstayed their status with no intent to maintain it and provides fair notice to another category of people – those for whom USCIS determines some sort of violation of status has occurred, intentionally or unintentionally. In developing the current policy, former INS Acting Executive Associate Commissioner Paul Virtue notes that the policy was developed for "reasons of practicality and fundamental fairness."[2]

Since the issuance of the new memorandum, various scenarios have been presented to us from our members that show how the new policy would violate the principles of fundamental fairness. Several categories of individuals could inadvertently accrue unlawful presence under the new memorandum, only to learn after the fact that they have done so, including:

- Curricular practical training - A medical student who is asked by a supervisor to work a couple extra hours one weekend, inadvertently exceeding the 20-hour a week limit for curricular practical training in a high-pressure situation, only to have that violation pointed out in a later H-1B filing;

---

[1] For instance, while we take the issue of visa overstays very seriously, we have heard some concerns from our members that information from the Student and Exchange Visitor Information System (SEVIS), UCSIS CLAIMS and other systems might not be entirely reliable when calculating the number of overstays. The public should be given a full opportunity to provide such feedback under the APA. Additionally, the DHS Office of the Inspector General has outlined its own concerns over the calculation of overstays in its May 1, 2017 report "DHS Tracking of Visa Overstays is Hindered by Insufficient Technology" available at
https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-56-May17_0.pdf.

[2] Forbes, "USCIS Policy Change Could Bar Many International Students," June 1, 2018, available at
https://www.forbes.com/sites/stuartanderson/2018/06/01/uscis-policy-change-could-bar-many-international-students

- F-1 students - A student on F-1 optional practical training (OPT) whom USCIS determines was in violation of status a later date (for instance, in an H-1B petition) due to a USCIS interpretation of OPT rules for which the employer and student were not aware. This example is particularly acute at the moment given new rules regarding OPT and third-party placement on the USCIS website;
- Exchange visitors - Minor deviations from the scope of exchange visitor activities that come up in a Department of State site visit that are subsequently remedied by the sponsor, host and participant; and
- F-2 and J-2 spouses and children – These dependents could accrue unlawful presence for violations of the F-1 and J-1 visa holders that they had no way of which to be aware.

There are other scenarios due to government error that could occur:

- OPT to H-1B - A student who graduates, applies for and is granted 12 months of OPT for whom an employer gets an approved H-1B for consular processing but is unable to travel to get the H-1B abroad for seven months and continues to work on OPT, which need not be terminated until the individual receives his H-1B. In the H-1B visa appointment overseas, the student is told that USCIS CLAIMS terminated the F-1 record erroneously as if the H-1B petition was a change of status. Therefore, the student has been working without authorization, and accrued unlawful presence status for 7 months, and could be barred from entering the US on any visa for three years.
- J-2 to H-4 - A J-2 dependent works on an EAD valid for 12 months. The husband applies for change of status to H-1B – and USCIS processing time says 9 months – so the J-2 continues to work on the EAD for only seven months just to be safe. When home on vacation two years later, the H-4 (former J-2) is told that her husband's H-1B application was approved much earlier – and the J-2 worked without authorization for several months because the SEVIS record was terminated with the Change of Status – even though she had a valid EAD. Her unlawful presence has been tolling for over a year, and she could be barred from entering the US for ten years.

It is also unclear how the memorandum will account for "data fixes" through the Student and Exchange Visitor Information System (SEVIS) Help Desk. Since the inception of SEVIS, Student and Exchange SEVP guidance has directed Designated School Officials (DSO) registered in SEVIS to correct minor infractions through an action called a data fix. These events are not uncommon. With most cases, the SEVIS Help Desk makes the students F-1 record active and valid nunc pro tunc in cases such as the following:

- Mistaken record completion - The DSO mistakenly completes a record, which means the student has remained in the United States beyond the end date of the program, and may have been working on campus without F status.
- Lack of extension - The DSO mistakenly forgets to extend a record, with the same consequences listed above.
- Premature transfer date - The DSO mistakenly enters an incorrect, premature F-1 school transfer release date during a period of OPT. The student is unaware that the OPT permission has been removed by this action, and works without authorization.

3

GC CAR 000756

Additionally, while we thank USCIS for accounting for and not penalizing F-1 students who are properly reinstated pursuant to 8 CFR 214.2(f)(16), the memo does not appear to account for J-1 reinstatements. DOS outlines procedures for a responsible officer or alternate responsible officer to correct minor or technical infractions, as well as a process for DOS to approve reinstatements for individuals who have substantive infractions as specified in 22 CFR Part 62.45. We recommend that USCIS also account for J-1 reinstatements and ensure that Exchange Visitors will not be negatively impacted if they are properly reinstated via the procedures established in 22 CFR Part 62.45.

## IV.     The New Unlawful Presence Policy Inhibits the Ability of U.S. Employers to Compete and Innovate

With regard to innovation and competitiveness, our principles call for an immigration system that provides solutions that increase system effectiveness and predictability while creating and boosting U.S. economic growth and innovation. The new policy fails on both accounts.

Rather than an innovative solution that increases effectiveness and predictability, the policy would decrease the practicality achieved in the original Paul Virtue memorandum and vastly reduce the predictability in the current system. When students and exchange visitors in all of the scenarios above can be charged with unlawful presence for years without any notice or due process, employers will lack the predictability they need to meet deadlines and complete projects in which students on OPT are participating, and organizations are at risk of being unable to, among other activities, host interns and trainees.

Furthermore, the policy makes U.S. employers less competitive on the world stage, as it could cause talented foreign students who have committed no major immigration violations to become inadmissible for a period of 3- or 10-years. Additionally, it could cause other talented foreign students to forgo an education in the United States in the first place, seeing the immigration system as unpredictable and riddled with unfair pitfalls.

CFGI and SHRM thank USCIS for continued opportunities to comment on issues of such critical importance to U.S. employers. We request this memorandum to be pulled for the reasons stated above. If this policy is pursued further, we respectfully request that it be done through APA notice and comment rulemaking. We look forward to working with you.

Sincerely,


Lynn Shotwell
Executive Director
Council for Global Immigration

Mike Aitken
Senior Vice President, Government Affairs
Society for Human Resource Management

4

GC CAR 000757


June 11, 2018

Lee Francis Cissna, Director
U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, NW
Washington, DC 20529-2140

Submitted via email: publicengagementfeedback@uscis.dhs.gov

> Re:   USCIS Policy Memorandum: Accrual of Unlawful Presence and F, J and M
>       Nonimmigrants

Dear Director Cissna,

Dartmouth College submits these comments regarding the recently issued USCIS policy memorandum, "Accrual of Unlawful Presence and F, J, and M Nonimmigrants" (PM-602-1060) posted by USCIS on May 11, 2018.

Founded in 1769, Dartmouth is a member of the Ivy League. Dartmouth is committed to providing the best undergraduate liberal arts experience, and outstanding graduate programs in the Geisel School of Medicine, the Thayer School of Engineering, the Tuck School of Business, and the Guarini School of Graduate and Advanced Studies. Dartmouth sponsors international F-1 students as well as non-degree students, research scholars, visiting faculty and other visitors on our J-1 Exchange Visitor Program.

As both an F and J program sponsor, Dartmouth is deeply concerned by the agency's abrupt and significant departure from current policy guidance on unlawful presence and how it is determined for F and J nonimmigrants. Under the proposed changes, F and J nonimmigrants can be charged with unlawful presence for years without any notice or due process based on an unknowing or inadvertent violation of immigration status. This puts F and J nonimmigrants at risk of being unfairly subjected to the 3-year, 10-year and permanent bars to reentry that come with accrual of unlawful presence, which under current and longstanding policy is triggered when there is a formal determination by an immigration judge or DHS official, and clear notice provided to the nonimmigrant. The current policy provides a procedural framework and certainty in calculating when unlawful presence accrues. The proposed policy does not. It eliminates due process, and creates uncertainty and unpredictability.

The rules governing maintenance of status for F and J nonimmigrants are myriad and complex. Designated School Officers (DSOs) and Responsible/Alternative Responsible Officers

(ROs/AROs) place the utmost importance on compliance with these rules, and we work closely with international students and exchange visitors to ensure they maintain their nonimmigrant status and fulfill their government reporting obligations. Under the proposed policy, unlawful presence would begin to accrue without notice, and possibly without the individual's or the sponsoring institution's knowledge, if students or exchange visitors inadvertently, unintentionally, or unknowingly do something that could be interpreted as a violation of status. If the unlawful presence clock started at some point in the past, any window for departing the country before triggering the 3 or 10-year bar will have passed without the individual's knowledge.

We have strong concerns that this proposed policy will discourage international students, researchers and faculty from coming to the U.S. because of the risk that a minor infraction or technical violation could put them at risk of being barred to reentry for years.

In light of the foregoing, Dartmouth respectfully asks the agency to withdraw this memorandum.

Thank you for the opportunity to comment.

Sincerely,

Susan C. Ellison
Director, PDSO, RO
Office of Visa and Immigration Services
Dartmouth College