IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GUILFORD COLLEGE, GUILFORD COLLEGE )
INTERNATIONAL CLUB, THE NEW SCHOOL, )
FOOTHILL-DE ANZA COMMUNITY COLLEGE )
DISTRICT, HAVERFORD COLLEGE,  THE )
AMERICAN FEDERATION OF TEACHERS, )
JIA YE, and SEN LI, )
          )
          Plaintiffs, )
          )
          v. )         1:18CV891
          )
CHAD WOLF,[1] U.S. DEPARTMENT OF )
HOMELAND SECURITY, KEN CUCCINELLI, )
and U.S. CITIZENSHIP AND IMMIGRATION )
SERVICES, )
          )
          Defendants. )

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

       Plaintiffs challenge the U.S. Citizenship and Immigration Services' ("USCIS") issuance

of an August 9, 2018 Policy Memorandum, PM-602-1060.1, titled "Accrual of Unlawful

Presence and F, J, and M Nonimmigrants" (the "August 2018 PM").  (ECF No. 14.)  On May

3, 2019, this Court preliminarily enjoined the August 2018 PM, having concluded that it was

likely promulgated in violation of the Administrative Procedure Act (the "APA"), 5 U.S.C. §§

551 *et seq.*  (ECF No. 45.)  The parties now cross-move for summary judgment.  (ECF Nos.

---

[1] Plaintiffs' complaint named Kirstjen Nielsen, former Secretary of Homeland Security, and Lee Cissna, former
Director of USCIS, as Defendants.  (ECF No. 14.)  Both resigned during the pendency of this action.  Chad
Wolf currently serves as Acting Secretary of Homeland Secretary, and Ken Cuccinelli now serves as Acting
Director of USCIS.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Secretary Wolf and
Acting Director Cuccinelli are hereby substituted as parties to this action.  *See* Fed R. Civ. P. 25(d).

60; 62.)   For the reasons that follow, the Court grants Plaintiffs' motion, denies the Government's motion, and permanently enjoins the August 2018 PM nationwide.

## I.   BACKGROUND

In 1996, Congress amended the Immigration and Nationality Act ("INA") to introduce a new concept called "unlawful presence."   *See* 8 U.S.C. § 1182(a)(9)(B).   A nonimmigrant[2] person is deemed to be "unlawfully present" if that person is "present in the United States after the expiration of the period of stay authorized by the Attorney General."   *Id.*   The accrual of unlawful presence time can result in a penalty: Individuals who leave the United States after having been "unlawfully present" for more than 180 days are barred from reentering the country for three years.   *Id.* § 1182(a)(9)(B)(i).   Those who accumulate more than 365 days of unlawful-presence time may not return for ten years.   *Id.*

For people admitted to the United States for a fixed period—for instance, a tourist whose visa has a firm expiration date—the determination of when "unlawful presence" time begins to accrue is straightforward.   However, some nonimmigrant visa holders are not given precise dates upon which their authorized "period[s] of stay" expire.   For example, an international student studying at an American university may be admitted for the "time during which [the] student is pursuing a full course of study at an [approved] educational institution . . . or engaging in authorized practical training following completion of studies."   *See* 8 C.F.R.

---

[2] The term 'nonimmigrant' is used herein to describe "an alien who is admitted to the United States for a specific temporary period of time" and "for a specific purpose."   *See Nonimmigrant*, USCIC Glossary, available at https://www.uscis.gov/tools/glossary?topic_id=n#alpha-listing.

§ 214.2(f)(5). Such visas, including F, M, and J visas,[3] are considered valid for "duration of status." *Id.*

Until recently, the unlawful-presence 'clock' would not begin to run against an F, M, or J visa holder until a government official—either an immigration judge or a USCIS adjudicator—formally identified an immigration status violation. (*See* ECF Nos. 57-1 at 66; 61-3 at 2–3.) However, in 2018, USCIS changed course. In a May 10, 2018 Policy Memorandum, the agency announced that, in order "[t]o reduce the number of [visa] overstays and to improve how USCIS implements the unlawful presence ground of inadmissibility under [the] INA," it would be "changing its policy on how to calculate unlawful presence." (ECF No. 57-1 at 30.) Under this new policy, which was memorialized in the August 2018 PM, unlawful presence starts to accrue not at the time an individual is formally found to be out of status, but from the time an adjudicator determines the status violation first occurred. (*See id.* at 19.)

According to Plaintiffs, this policy change could cause otherwise "unintentional errors" to result in "life-altering consequences." (ECF No. 61 at 8.) Because "unlawful presence" time begins to accrue under the August 2018 PM "[t]he day after [an F, J, or M visa holder] engages in an unauthorized activity," (ECF No. 57-1 at 19), minor violations—like failing to update an address, or working a single extra hour in a week—could result in a three- or ten-year reentry bar "with no opportunity to cure," (ECF No. 61 at 8–9).

---

[3] An F visa holder is a nonimmigrant student who enters the United States to pursue a course of educational study. *See* 8 U.S.C. § 1101(a)(15)(F)(i). An M visa holder is a nonimmigrant student who enters the United States to pursue "a full course of study at an established vocational [or technical] school." *See id.* § 1101(a)(15)(M). A J visa holder is an individual who enters the United States to participate in an "exchange visitor program" authorized by the U.S. Department of State. *See id.* § 1101(a)(15)(J); 22 C.F.R. § 41.62(a)(1).

Plaintiffs thus initiated this action on October 23, 2018 seeking to halt implementation of the August 2018 PM. (*See* ECF Nos. 1; 14.) Their complaint contains four related claims: (1) that in issuing the August 2018 PM, USCIS failed to observe rulemaking procedures required by the APA; (2) that the August 2018 PM is "substantively arbitrary and capricious"; (3) that the August 2018 PM conflicts with the statutory text of the INA; and (4) that the August 2018 PM violates the Due Process Clause of the Fifth Amendment. (*See* ECF No. 14 ¶¶ 185–221.) This Court issued a preliminary injunction on May 3, 2019; however, in the absence of a certified administrative record, which at that time had not yet been filed, it declined to rule on Plaintiffs' request for partial summary judgment. (*See* ECF No. 45 at 27–29.) That record has since been made available, (ECF Nos. 57-1; 57-2), and the Court now considers the parties' cross-motions for summary judgment.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "This rubric has a special twist in the administrative law context," *see Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997), where summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *See Air Transp. Ass'n of Am. v. U.S. Dep't of Agric.*, 303 F. Supp. 3d 28, 38 (D.D.C. 2018) (quotation omitted); *see also All. for Legal Action v. U.S. Army Corps of Eng'rs*, 314 F. Supp. 2d 534, 541 (M.D.N.C. 2004).

Under the APA, courts must "hold unlawful and set aside" those agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5

4

U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or undertaken "without observance of procedure required by law." *id.* § 706(2)(D). "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). Nevertheless, the standard is not meant to "reduce judicial review to a 'rubber-stamp' of agency action." *Id.* (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976)). Rather, the court must engage in a "searching and careful" inquiry of the record in order to understand "the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; [and] the choices open to the agency and those made." *Id.* at 192–93 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Ethyl Corp.*, 541 F.2d at 36).

## III.  JURISDICTION

Before addressing the merits, a brief discussion of jurisdiction is necessary. In its preliminary injunction Order, this Court ruled that Plaintiffs had standing to challenge the August 2018 PM and that this matter was ripe for judicial review. (*See* ECF No. 45 at 5–13.) The Government urges the Court to "reject that preliminary ruling," (ECF No. 63 at 10), despite the fact that Plaintiffs' burden to demonstrate jurisdiction is the same now as it was then, *see Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (explaining that the burdens to demonstrate standing at the preliminary injunction and summary judgment stages are normally equivalent). While federal courts are always under "an obligation to assure ourselves" of jurisdiction, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006), this Court, having already determined that it has jurisdiction, is hesitant to rehash its prior analysis. However,

given the attention devoted to standing and timeliness in the parties' briefing, the Court will reaffirm its conclusions here.[4]

While numerous Plaintiffs bring this suit, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quoting *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)). The two individual plaintiffs in this case, Jia Ye and Sen Li ("Individual Plaintiffs"), clearly have standing. (*See* ECF No. 45 at 6–8.) Both are foreign nationals who, after entering the United States on F-1 student visas, subsequently graduated or withdrew from school. (ECF Nos. 16-1 ¶¶ 2, 4, 10; 16-2 ¶¶ 2, 4, 10.) Both were then recruited by the U.S. Army via the Military Accessions Vital to National Interest ("MANVI") program, signed enlistment contracts, and were advised to remain in the country as they await orders to report to Basic Training. (ECF Nos. 16-1 ¶¶ 6–9; 16-2 ¶¶ 6–9.) However, under the August 2018 PM's unlawful-presence calculation methodology, Ye and Li also began accruing unlawful-presence time as soon as they concluded their studies and fell out of status. Thus, USCIS' policy puts the Individual Plaintiffs in an untenable position—if they stay to honor their enlistment contracts, they face a substantial likelihood of a reentry bar in the future; if they leave to avoid accruing more unlawful-presence time, they risk losing their chance to serve and earn U.S. citizenship. *See Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 13 (D.D.C. 2017) (recognizing that the "lost opportunity to obtain . . . status" qualifies as a "cognizable injury in the immigration context"). This injury in fact—the accrual of "unlawful presence"

---

[4] The Court incorporates by reference the jurisdictional analysis from its preliminary injunction Order as if fully set out here. (*See* ECF No. 45 at 5–13.)

time in the here and now—is traceable to the August 2018 PM and will likely be redressed by the relief Plaintiffs seek. (*See* ECF No. 45 at 8.) That, in short, is enough to establish standing.

In its summary judgment briefing, the Government reiterates two previously rejected timing arguments: first, that because Ye and Li's personalized "administrative processes" are "ongoing," this case remains unripe, (ECF No. 63 at 14–15); and second, that the August 2018 PM does not "constitute a discrete, final agency action" reviewable under the APA, (*id.* at 13). Neither is persuasive. Plaintiffs do not challenge any *individual* unlawful-presence determinations; rather, Plaintiffs challenge the "decision, embodied in the August 2018 memorandum, to establish new, binding, detrimental rules" for such determinations.[5] (ECF No. 64 at 12.) Nor is this a scenario, as the government contends, in which the rule of administrative exhaustion precludes review. (*See* ECF No. 63 at 14.) *Cf. Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 105–06 (D.C. Cir. 1986) (explaining that exhaustion of administrative remedies is futile when the agency "has evidenced a strong stand on the issue in question and an unwillingness to reconsider the issue"). Further, it is clear that the August 2018 PM—which "supersede[s]" all prior guidance on "unlawful presence," (ECF No. 57-1 at 16), and "mark[s] the 'consummation' of the agency's decisionmaking process" from which

---

[5] In *Lujan v. National Wildlife Federation*, the Supreme Court rejected a suit which sought "*wholesale* improvement" of a "land withdrawal review program." *See* 497 U.S. 871, 890–91, 894 (1990). There, the challenged "program" was considered too broad to qualify as a "final agency action" reviewable under the APA because it encompassed more than "a single [agency] order or regulation, or even . . . a completed universe of particular . . . orders and regulations." *See id.* ("Until confided to us . . . more sweeping actions are for the other branches."). The Government argues that Plaintiffs' challenge to the August 2018 PM constitutes a similarly impermissible "programmatic agency challenge." (*See* ECF No. 63 at 10–13.) However, Plaintiffs properly confine their challenge to a *specific* agency action: the issuance of the August 2018 PM. *See* 33 Charles Alan Wright et al., Federal Practice & Procedure § 8322 (2d ed. 2019) (citing *Lujan*, 497 U.S. at 891) ("The APA authorizes challenges to specific actions—such as a particular rule or order. It does not authorize plaintiffs to pile together a mish-mash of discrete actions into a 'program' and then sue an agency to force broad policy changes to this 'program.'").

"legal consequences will flow," *see Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)—is a final agency action subject to review under the APA.[6]  For these reasons, the Court again concludes that at least one plaintiff has standing to sue, that this matter is ripe for adjudication, and that the prerequisites for Article III jurisdiction are therefore satisfied.  (*See* ECF No. 45 at 13.)

## IV.  DISCUSSION

The Court now turns to the merits.  Plaintiffs seek summary judgment on just two of their four claims: that the August 2018 PM was improperly issued without notice and comment (first cause of action); and that the August 2018 PM conflicts with the language of the INA (third cause of action).  (ECF Nos. 14 ¶¶ 185–192, 202–211; 60 at 1.)  The Government, for its part, moves for summary judgment on all claims.[7]  (ECF No. 62 at 1.)  As detailed below, the Court agrees with Plaintiffs that the August 2018 PM is both procedurally and substantively defective and should be permanently enjoined.

### A.  Notice and Comment

As a general matter, "[t]he APA requires that all 'rules' be issued through a statutorily prescribed notice-and-comment process."  *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 619 (4th Cir. 2018) (citing 5 U.S.C. § 553(a)–(c)).  However, there are exceptions.

---

[6] As discussed further below, the August 2018 PM is best classified as a "legislative rule," which means that, by definition, it is a "final agency action."  *See Broadgate Inc. v. USCIS*, 730 F. Supp. 2d 240, 244 (D.D.C. 2010).

[7] The Court declines to address the Government's request for summary judgment as to Plaintiffs' second and fourth causes of action.  *See Ashwander v. TVA*, 297 U.S. 288, 347 (1936) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.");  *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 4–6, 8 (D.C. Cir. 1999) (addressing statutory claims but declining to reach arbitrary and capricious challenge).

Unless required by another statute, the APA's notice-and-comment regime "does not apply" to (1) "interpretative rules,"[8] (2) "general statements of policy," or (3) "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). Rules *not* falling into one of these three categories are commonly referred to as "legislative rules" because they typically have the "force and effect of law." *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979)).

Proper notice-and-comment rulemaking has three steps. *Id.* First, the agency must publish a "[g]eneral notice of proposed rule making" in the Federal Register.[9] 5 U.S.C. § 553(b). Second, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c), then "consider and respond to significant comments received," *Perez*, 575 U.S. at 96 (citing *Overton Park*, 401 U.S. at 416). Last, when the final version of the rule is promulgated, the agency must include along with it "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(c). "Failure to abide by these requirements renders a [legislative] rule procedurally invalid." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018); *see also Children's Hosp.*, 896 F.3d at 623. However, if the rule is not legislative, but, instead, fits into one of the categorical exceptions listed above, then the agency may forego notice and comment altogether. *See* 5 U.S.C. § 553(b)(A).

---

[8] Denoted as "interpretive rules" herein.

[9] The requirement to publish notice of a proposed rule in the Federal Register does not apply if "persons subject [to the rule making] are named and either personally served or otherwise have actual notice thereof in accordance with law." 5 U.S.C. § 553(b).

Plaintiffs point out—and the Government does not contest—that, in issuing the August 2018 PM, USCIS failed to adhere to the notice-and-comment process. (*See* ECF No. 61 at 9.) "It is undisputed," for example, "that neither the May 2018 preliminary memorandum nor the August 2018 final memorandum was published in the Federal Register." *Id.* However, the Government submits that notice-and-comment procedures are irrelevant here because, as "a reasonable *interpretive* rule," the August 2018 PM is "exempt from the APA's notice-and-comment requirement."[10] (ECF No. 63 at 7 (emphasis added).) The validity of the August 2018 PM, therefore, turns on whether the Government's characterization is correct: if it is a legislative rule, then it must be "set aside" for failure to follow procedure; but if it is an interpretive rule, then the notice-and-comment requirements "do[ ] not apply." *See* 5 U.S.C. §§ 553(b), 706(2).

It has been said that the distinction between legislative and interpretive rules is "enshrouded in considerable smog." *See Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984); *see also Perez*, 575 U.S. at 96 (declining to "wade into" the ongoing debate over what constitutes an "interpretative rule"). However, caselaw provides some helpful guideposts. According to the Supreme Court, the "critical feature of interpretive rules is that they are issued . . . to advise the public of the agency's construction of the statutes and the rules which it administers." *Perez*, 575 U.S. at 97 (internal quotations omitted). The D.C. Circuit has echoed that interpretive rules "describe[ ] the agency's view of the meaning of an existing statute or regulation," without going so far as to "effect[ ] a substantive regulatory

---

[10] At times, the Government prefers to label the August 2018 PM as a "general statement of policy" rather than an interpretive rule. (*See, e.g.*, ECF No. 65 at 13.) Regardless, the question is still whether the memorandum is legislative or non-legislative.

change." *See Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014). Likewise, the Fourth Circuit has recognized that, in general, interpretive rules "simply state what the administrative agency thinks the statute means." *Children's Hosp.*, 896 F.3d at 620 (citing *Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989)).

"Somewhere along a spectrum," however, "a rule transitions from being interpretive to being legislative." *N.H. Hosp. Ass'n*, 887 F.3d at 70; *see Children's Hosp.*, 896 F.3d at 620–21. A key indicator is whether a rule represents an agency's effort to "*implement* [a] statute," rather than merely opine on its meaning. *See Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1340 (4th Cir. 1995) (emphasis added). Put another way, rules that aim to do more than "simply clarify or explain a regulatory term" tend to be legislative. *See Mendoza*, 754 F.3d at 1021. Thus, in deciding whether a rule is interpretive or legislative, courts should consider the agency's "intent in authoring it, as ascertained by an examination of the provision's language, its context, and any available extrinsic evidence." *Jerri's Ceramic Arts*, 874 F.2d at 208 (quoting *Doe v. Hampton*, 566 F.2d 265, 281 (D.C. Cir. 1977)). The bottom line is that a rule is legislative, and not interpretive, "if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise *effects a substantive change in existing law or policy*." *Children's Hosp.*, 896 F.3d at 620 (quoting *Mendoza*, 754 F.3d at 1021) (emphasis added); *see also Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015) (explaining that a rule's "most important" distinguishing feature is its "actual legal effect (or lack thereof)").

Here, the express language of the August 2018 PM is instructive. The memorandum states that its purpose is to "*reduce the number of overstays* and improve how USCIS *implements* the unlawful presence ground of inadmissibility under [the] INA." (*See* ECF No. 57-1 at 18

11

(emphasis added).) The memo goes on to explain that, in pursuit of those goals, "USCIS is now *changing its policy* on how to calculate unlawful presence." (*Id.* (emphasis added).) This language, which evinces a desire to achieve a substantive policy outcome, strongly suggests "that more is involved than mere 'interpretation.'" *Jerri's Ceramic Arts*, 874 F.2d at 208. Simply put, the August 2018 PM "endeavor[s] to implement the [INA]," rather than merely interpret it, which is "the effect of a legislative rule." *Mendoza* 754 F.3d at 1023 (quoting *Chamber of Commerce v. OSHA*, 636 F.2d 464, 469 (D.C. Cir. 1980)).

By its own terms, the August 2018 PM purports to be "intended solely for the guidance of USCIS personnel" and cautions that it should "not be relied upon" as the source of any benefits or rights, whether substantive or procedural. (*See* ECF No 57-1 at 28.) However, when determining whether a rule is legislative or interpretive, "a disclaimer by an agency about what its statements do and do not constitute as a legal matter [is] not dispositive." *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 516 (9th Cir. 2018); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (rejecting a "boilerplate" statement similar to the agency's here). The Government also tries to minimize the August 2018 PM's substantive tenor by suggesting that it is the INA, rather than the memorandum, which "creates deterrence for accruing unlawful presence." (ECF No. 67 at 13.) However, as compared to the agency's former policy, the deterrent effect of unlawful-presence time is enhanced significantly by the August 2018 PM. Because unlawful presence accrues sooner and more frequently under the memorandum, we can expect it to coerce nonimmigrants to depart the country more readily in order to avoid a reentry bar. This is a significant change from past practice; one which, as evidenced by the plain language, USCIS clearly intends to

12

effectuate through the August 2018 PM. The Court thus takes the text of the memorandum itself as compelling evidence that the August 2018 PM is a legislative rule.

Equally telling is the memorandum's complete lack of interpretive effort. "Had [USCIS] merely been interpreting the governing statute and regulation," then we would at least "expect that the agency's justification for the rule would rely on an interpretive methodology." *See N.H. Hosp. Ass'n*, 887 F.3d at 71–72; *accord Gen. Motors*, 742 F.2d at 1565 ("[Agency's] entire justification for the rule [was] comprised of reasoned statutory interpretation, with reference to the language, purpose and legislative history."). However, the August 2018 PM never so much as quotes the language of the statute it supposedly deciphers. In contrast, the 1997 memorandum setting out the former policy on unlawful presence—which, as discussed below, may or may not have been an interpretive rule itself—at least *claimed* to have been "interpret[ing]" the statute. (*See* ECF No. 61-3 at 2); *see also Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 105–06 (4th Cir. 2011) (giving weight to an agency's characterization of an action as its "interpretation" of the governing statute). Absent any sign of interpretive methodology, the objectives stated in the August 2018 PM—changing the way "unlawful presence" is calculated so as to reduce the number of overstays—point even more clearly toward the legislative end of the "spectrum."

As further evidence of its legislative character, the August 2018 PM establishes a "binding norm" on agency adjudicators which curtails their ability to "exercise their discretion." *See Chen Zhou Chai*, 48 F.3d at 1341; *Ass'n of Flight Attendants*, 785 F.3d at 717 (explaining that agency action which "imposes new obligations on regulated parties or narrowly limits administrative discretion . . . constitutes a legislative rule"). Under the terms

13

of the memorandum, unlawful presence *must* be calculated from the date a status violation occurs. (*See* ECF No. 57-1 at 18 (stating unequivocally that "F, J, and M nonimmigrants . . . start accruing unlawful presence as outlined [herein]").) The Government contends that the August 2018 PM is merely "guidance" which "directs adjudicators to consider a number of flexible factors when determining whether or how much 'unlawful presence' a former F, J, or M nonimmigrant has accrued." (ECF No. 63 at 21.) However, it is difficult to read this "guidance" as anything other than a mandate. *See Ass'n of Flight Attendants*, 785 F.3d at 717 ("[A] document that reads like an edict is likely to be binding, while one riddled with caveats is not."). Moreover, USCIS has incorporated the August 2018 PM into its Adjudicator's Field Manual (the "AFM") as "policy material."[11] (*See* ECF No. 57-1 at 20 (revising Chapter 40.9.2 of the AFM).) Pursuant to the AFM, "policy material is *binding upon all employees* of USCIS . . . [with] no exceptions."[12] *See USCIS AFM* § 3.4(b) (emphasis added). Thus, contrary to the Government's assertions, the August 2018 PM "will be considered binding as a practical matter"—another indication that it is a legislative rule. *See Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382–83 (D.C. Cir. 2002).

As the final step in its legislative-versus-interpretive analysis, the Court considers the relationship between the August 2018 PM and USCIS' past actions on "unlawful presence."

---

[11] The August 2018 PM is identified by reference number PM-602-1060.1. (ECF No. 57-1 at 16.) According to the AFM, "[m]emoranda . . . specifically designated as policy (bearing the 'P' suffix in the reference file number)" are considered "policy materials." *See USCIS AFM* § 3.4(a).

[12] The AFM draws a distinction between "correspondence" and "policy" material. *See USCIS AFM* § 3.4(a). Whereas policy material "is binding on all USCIS officers and must be adhered to unless and until revised, rescinded or superseded by law," correspondence is "advisory in nature, intended only to convey the author's point of view." *Id.*

The Government argues that, in addition to the August 2018 PM itself being an interpretive rule, USCIS' longstanding prior policy was *also* issued in the form of an interpretive rule. (*See* ECF No. 63 at 17–18.) This matters, according to the Government, because agencies are free under the APA to reverse even well-established interpretations without going through the notice-and-comment process. (*See* ECF No. 65 at 12–13.) On this point, the Government displays a correct understanding of the Supreme Court's decision in *Perez*, which confirmed that "[b]ecause an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule." *See* 575 U.S. at 101. However, the holding in *Perez* becomes inapposite if either action—the prior policy or the August 2018 PM—is, in fact, legislative in nature.

Like the August 2018 PM, it appears that the sources of the agency's prior position—agency memoranda from 1997 and 2009—were not issued through the notice-and-comment process. (*See* ECF Nos. 63 at 19; 64 at 17 n.2.) The Government suggests that this consistent lack of adherence to notice-and-comment procedure demonstrates that the agency has *always* issued its unlawful-presence policy through interpretive rules.[13] However, here there is strong, independent evidence that the August 2018 PM *is* a legislative rule, regardless of whether

---

[13] The Government directs this Court's attention to *National Council for Adoption v. Jewell*, in which the Eastern District of Virginia found that an agency's choice not to undertake notice and comment suggested that it did not intend for certain guidance materials to have the force of law. *See* 156 F. Supp. 3d 727, 737 (E.D. Va. 2015). However, in that case, "less than one month after issuing the [guidance]," the agency *did* undertake notice and comment to "transform parts of the [guidance] into legislative rules, which would have been unnecessary if [the agency] intended the [guidance itself] to have binding or legislative effect." *Id.* That is simply not the situation here. Further, while it is true that "attempts . . . to comply with APA notice-and-comment procedures [can] suggest that the agency believed them to be applicable, and support the conclusion that those procedures were applicable," *see N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 765 (4th Cir. 2012) (internal quotation omitted), the Court does not so readily accept the inverse proposition that a failure to undergo notice and comment suggests that those procedures were *not* applicable, as doing so risks incentivizing agencies to skip this important phase in the rule-making process.

earlier memoranda should have been classified as such. Further, even if the prior policy should have been issued through the notice-and-comment process, the Court agrees with Plaintiffs that "[a]n agency's first mistake is not a basis for making a second." (*See* ECF No. 64 at 17 n.2.) In other words, the August 2018 PM is not immunized by virtue of the fact that the prior policy went unchallenged.

In sum, the Court concludes that the August 2018 PM is a legislative rule which could not have been properly issued without notice and comment. Because USCIS failed to abide by APA procedure, the Court must grant summary judgment for Plaintiffs, hold the August 2018 PM unlawful, and set it aside. *See* 5 U.S.C. § 706(2).

## B. Statutory Conflict

In their third cause of action, Plaintiffs further assert that the August 2018 PM is "unlawful" because it was issued "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." (*See* ECF No. 14 ¶ 203 (quoting 5 U.S.C. § 706(2).) The Fourth Circuit recently acknowledged that "there is no bright-line rule as to whether a court that has decided to vacate an agency action on procedural grounds should nonetheless address a substantive claim." *Children's Hosp.*, 896 F.3d at 624. Thus, it does not appear that courts are prohibited from addressing an alternative claim when doing so would foster judicial and administrative economy. *See, e.g.*, *Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 322 (D.C. Cir. 2011); *Ala. Power Co. v. FERC*, 160 F.3d 7, 11 (D.C. Cir. 1998). In this case, the Court runs the special risk of prolonging Plaintiffs' paralyzing uncertainty if it side-steps their statutory-conflict claim. As detailed below, the August 2018 PM's construction of "unlawful presence"

runs afoul of the INA's plain text, and it would be a disservice to all parties if the Court did not articulate why.

In reviewing whether an agency has acted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706, a court is confronted with two questions: "First, applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue.'" *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)). If the statute is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

Here, the Court need not guess as to what Congress meant when it employed the term "unlawful presence," as the concept is defined right in the text of the INA:

> **Construction of unlawful presence:**
> For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.

8 U.S.C. § 1182(a)(9)(B)(ii). The vital phrase in this definition is "after the *expiration* of the *period of stay authorized*." *Id.* (emphasis added). If a nonimmigrant is in the United States on a visa with a set end date, the "period of stay authorized" obviously "expires" on that date, for the ordinary meaning of "expire" is "to become null at a time fixed beforehand." *See Expire*, Black's Law Dictionary (11th ed. 2019). However, under F, M, and J visas, which are issued

17

for "duration of status," there *is no* express expiration date. Rather, "duration of status" roughly equals the timeframe during which a nonimmigrant is pursuing an authorized course of study, or practical training following its completion, in the United States. *See, e.g.* 8 C.F.R. 214.2(f)(5)(i) (defining "duration of status" for F-1 visa holders). For example, Plaintiff Ye entered the United States on an F-1 visa for "duration of status," obtained a master's degree, worked in a related practical training program, and then attended classes at a community college. (ECF No. 16-2 ¶¶ 4–5, 10.)

Under its prior policy, USCIS resolved the issue of when a duration-of-status visa "expired" by beginning the accrual of unlawful presence only *after* an adjudicator made a formal finding of a status violation. (*See* ECF No. 57-1 at 66.) This construction tracked the plain language of the INA: once an adjudicator had declared a nonimmigrant to be in violation of his status, it could no longer be said that his "period of stay" was "authorized by the Attorney General." This is not to say that the agency's prior policy was the only permissible option for the agency; rather, it was one such option. However, as explained below, the position taken by USCIS in the August 2018 PM stretches the statutory text beyond its limits.

When Congress drafted the unlawful-presence provision, it had at its disposal several similar concepts already included in the INA.[14] For example, under the INA, a non-U.S. person may not adjust his status to lawful permanent residency if he "is in *unlawful immigration status*" at the time of filing or "has failed . . . to maintain continuously a *lawful status*" since

---

[14] The Court also notes that Congress used the term "lawful immigration status" elsewhere in the Illegal Immigration Reform and Immigrant Responsibility Act (the "IIRIRA"), the very bill which amended the INA to incorporate the concept of "unlawful presence." *See* Pub. L. 104-208 § 330(a)(1), 110 Stat. 3009-631 (1996) ("any alien . . . not in lawful immigration status in the United States").

entering the country. *See* 8 U.S.C. § 1255(c) (emphasis added). As explained in USCIS' AFM, a nonimmigrant is in "unlawful status" if he "has violated any of the terms or conditions" of his visa, "such as by engaging in unauthorized employment . . . [or] failing to maintain a full course of study." (*See* ECF No. 61-8 at 6.) Rather than define "unlawful presence" in these terms, however, Congress gave the concept a definition entirely its own.

It is a bedrock principle of statutory interpretation that "differences in language . . . convey differences in meaning." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017). Even when terms are closely related, the Court "must assume that Congress made a deliberate choice to use" the words it did. *See Cunningham v. Scibana*, 259 F.3d 303, 308 (4th Cir. 2001). Thus, the choice to carve out a separate definition for "unlawful presence"—one which hinges on the "expiration of the period of stay authorized by the Attorney General" rather than a violation of "lawful status"—deserves respect.[15]

Ignoring that choice, USCIS casts the INA's particularized definition aside in favor of its preferred rule. Under the August 2018 PM, a nonimmigrant "start[s] accruing unlawful presence . . . the day after he or she *engages in an unauthorized activity*."[16] (*See* ECF No. 57-1 at 18–19 (emphasis added).) In this way, the memorandum improperly dissolves the distinction between the "expiration of the period of stay authorized" and the violation of lawful status.

---

[15] Indeed, the AFM recognizes that there is a difference between "lawful immigration status" and the "period of authorized stay," explaining that "[t]hose in a period of authorized stay may or may not be in a lawful immigration status." (*See* ECF No. 61-8 at 3.)

[16] The Government argues that the August 2018 PM "is in line with INS's *initial* guidance memorandum on the exact same issue." (*See* ECF No. 67 at 14–15 (emphasis added).) However, as Plaintiffs point out, that initial policy was "an *interim* implementation of the newly enacted IIRIRA" and was in force for less than six months before being replaced by the 1997 memorandum. (ECF Nos. 61-3 at 2; 64 at 21 n.5.) Regardless, the Court affords little weight to a distant and briefly held position which, like the August 2018 PM, appears to have been incompatible with the text of the INA.

Imagine, for example, a student studying at a four-year American university on an F-1 visa. A reasonable case could be made that his "period of stay authorized" should be considered "expired" when he graduates with his degree. However, if he "engages in an unauthorized activity"—for instance, by moving into a different dormitory without notifying the authorities of his new address, *see* 8 C.F.R. § 265.1—he automatically begins to accrue unlawful-presence time under the August 2018 PM, long before graduation day, (*see* ECF No. 57-1 at 18–19). Under this scenario, the student's lawful-status violation is treated as though it were completely synonymous with the "expiration" of his "period of stay authorized"—a conflation that runs counter to the choices made by Congress, as well as the ordinary meaning of the word "expiration." This Court does not sit to judge the policy merit of USCIS' position. However, "[w]here a statute's language carries a plain meaning," as it does here, "the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018). And under the APA, it is this Court's duty to hold unlawful final agency actions which openly conflict with statutory text.

The Government raises several arguments in support of its contention that the August 2018 PM is, in fact, consistent with the INA's text. None are persuasive. The first is a broad-brush assertion that Congress has, in other sections of the INA, "statutorily affirmed" a general intent "that the Executive branch must carefully scrutinize F, J, and M nonimmigrants." (*See* ECF No. 65 at 21.) "But the agency cannot rewrite a statute just to serve a perceived statutory 'spirit.'" *Landstar Express Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 500 (D.C. Cir. 2009). Likewise, recent technological improvements that enhance the agency's

ability to monitor nonimmigrants cannot, as the Government argues, justify the August 2018 PM's deviation from the text of the INA. (*See* ECF Nos. 57-1 at 17; 65 at 21–22.) USCIS has to abide by the statute, no matter how accurately they can "scrutinize" visa holders.

Finally, the Government insists that it "does not go against either the statutory language or purpose for an adjudicator to assess 'unlawful presence' by taking someone's unlawful status into account." (ECF No. 65 at 23.) However, there is an important difference—indeed, the difference at the heart of this case—between using a finding of "unlawful status" to *start* the unlawful-presence clock and using "unlawful status" to *backdate* accrual. The former method causes a duration-of-status visa holder's "period of stay authorized" to "expire"; the latter method does not.

For these reasons, the Court concludes that the August 2018 PM impermissibly conflicts with the text of the INA, pursuant to which a nonimmigrant is not "deemed to be unlawfully present" until "after the expiration of the period of stay authorized by the Attorney General." 8 U.S.C. § 1182(a)(9)(B)(ii). Accordingly, Plaintiffs are entitled to summary judgment on their claim that the August 2018 PM was issued "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

## V. RELIEF

Having concluded that USCIS violated the APA by promulgating the August 2018 PM, the Court must now determine the appropriate relief. Though "their powers are not boundless," it is well established that "district courts have broad discretion when fashioning injunctive relief." *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010). An injunction "should be carefully addressed to the circumstances of the case" and be "no more burdensome to the

defendant than necessary to provide complete relief to the plaintiffs." *See Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). However, "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano*, 442 U.S. at 702. Accordingly, "[c]ourts may issue nationwide injunctions consistent with these principles." *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017), *vacated on other grounds*, 138 S. Ct. 353 (2017).

Plaintiffs seek a remedy that applies not just *anywhere*, but to *anyone* who would otherwise be subject to the policy implemented by the August 2018 PM. (*See* ECF Nos. 14 ¶ 19; 66 at 13–15.) Rightly so. When a reviewing court determines that an agency action violates the APA, as here, "the ordinary result is that the rule[ ] [is] vacated—not that [its] application to the individual petitioners is proscribed."[17] *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.3d 484, 495 n.21 (D.C. Cir. 1989)); *see also Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) ("[D]eficient notice [and comment] is a 'fundamental flaw' that almost always requires vacatur."). Further, the APA itself instructs courts to "hold unlawful and set aside" agency actions found to be invalid. *See* 5 U.S.C. § 706(2); *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2007) ("The nationwide injunction . . . is compelled by the text of the [APA]."); *see also* Mila Sohoni, *The Lost History of the "Universal" Injunction,* 133 Harv. L. Rev. 920, 982, 991

---

[17] Dissenting in *Lujan v. National Wildlife Federation*, but apparently expressing a view shared by all nine Justices, Justice Blackmun observed that in some APA challenges "the 'agency action' will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual." 497 U.S. at 913. In this way, "a single plaintiff, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court." *Id.*

n.466 (2020) (explaining that "[t]he universal injunction against federal agency action" has a "long[ ] pedigree" which informs the APA's directive that court's "set aside" unlawful rules under 5 U.S.C. § 706(2)).

Nevertheless, the Government insists that the scope of any relief should be limited to the named Plaintiffs in this case, as a remedy affecting the rights of nonparties would be "grossly overbroad . . . and . . . interfere with other courts' ability to decide similar issues or cases." (ECF No. 65 at 27.) Jurists and scholars alike have cautioned that nationwide injunctions may impede the 'percolation' of legal issues through the court system, depriving higher courts of the benefit of additional voices and fact patterns. *See, e.g., Dep't of Homeland Sec. v. New York*, No. 19A785, 2020 WL 413786, at *2 (S. Ct. Jan. 27, 2020) (Gorsuch, J., concurring in grant of stay); *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 418, 461 (2017). However, that concern is less pressing here, as Plaintiffs' challenge "presents purely . . . narrow issue[s] of law" which are "not fact-dependent and will not vary from one locality to another." *See City of Chi. v. Sessions*, 888 F.3d 272, 290–91 (7th Cir. 2018) ("There are some legal issues which benefit from consideration in multiple courts . . . . But a determination as to the plain meaning of a sentence in a statute is not such an issue.").

Moreover, under the circumstances of this case, the only practicable method of providing Plaintiffs with the relief to which they are entitled is to vacate the August 2018 PM and permanently enjoin its application. *See North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017) (reminding us that, in fashioning injunctive relief, courts must balance "what is necessary, what is fair, and what is workable"). First, the various individual, institutional, and

associational Plaintiffs in this case are "dispersed throughout the United States." *Int'l Refugee Assistance Project*, 857 F.3d at 605; (*see* ECF Nos. 16-1 through 16-7 (demonstrating that Plaintiffs and, where applicable, their members, reside throughout the country)). A geographically piecemeal injunction would therefore be insufficient to remedy their injuries. Second, an injunction which does not extend beyond the named Plaintiffs to reach similarly situated individuals could result in the uneven application of immigration policy. As the Fourth Circuit has explained, "nationwide injunctions are especially appropriate in the immigration context, as Congress has made clear that 'the immigration laws of the United States should be enforced vigorously and *uniformly*.'" *Int'l Refugee Assistance Project*, 857 F.3d at 605 (quoting *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015)); *see also Regents of the Univ. of Cal.*, 908 F.3d at 511 (concluding that "[a]llowing uneven application of nationwide immigration policy flies in the face of" the "need for uniformity"). Finally, the Court cannot ignore the likelihood that the August 2018 PM, if left in effect, could alter the unlawful-presence clocks for thousands, if not millions of nonimmigrant visa holders who are incapable of quickly bringing their individual cases and avoiding reentry bars. *See generally* Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. Rev. 1065, 1095 (2018) (extolling the utility of nationwide injunctions when obtaining class certification is prohibitively difficult); (ECF No. 57-1 at 17 (identifying nearly 1.5 million F, J, and M nonimmigrant visa holders who were "either expected to change status or depart the United States" in 2016 alone).

In sum, because the August 2018 PM was promulgated in violation of the APA's notice-and-comment requirements, the Court will "hold it unlawful and set it aside"—not just for the named Plaintiffs, but for all those subject to its terms. Furthermore, because the

24

unlawful-presence policy embodied in the August 2018 PM conflicts with clear statutory text, no amount of adherence to procedure can rectify the memorandum's defects unless and until Congress amends the INA. Accordingly, the Court will vacate the August 2018 PM and permanently enjoin its application nationwide.

For the reasons stated herein, the Court enters the following:

**[Order to Follow]**

## ORDER

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Partial Summary Judgment, (ECF No. 60), is GRANTED. The United States Citizenship and Immigration Services' August 9, 2018 memorandum entitled "Accrual of Unlawful Presence and F, J, and M Nonimmigrants" (PM-602-1060.1), as well as the corresponding memorandum with the same title issued on May 10, 2018 (PM-602-1060), are hereby declared invalid, set aside, and enjoined nationwide in all applications.

IT IS FURTHER ORDERED that the Government's Motion for Summary Judgment, (ECF No. 62), is DENIED.

A Judgment terminating this case will be filed contemporaneously with this Memorandum and Order.

This, the 6th day of February 2020.

/s/Loretta C. Biggs
United States District Judge